UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, : | |
| Plaintiff, : | |
| vs. : | Civil No.  1:20-cv-01529 |
| CHRISTOPHER CLARK : | |
| and : | |
| WILLIAM WRIGHT, : | |
| Defendants. : | |

DEFENDANT CHRISTOPHER CLARK'S ANSWER
AND GROUNDS OF DEFENSE

COMES NOW, Christopher Clark ("Clark"), by counsel hereby submits his Answer and

Grounds of Defense to the Complaint (ECF No. 1) filed on December 11, 2020 by Plaintiff, the

United States Securities and Exchange Commission ("SEC").  Clark denies all allegations

contained in the Complaint unless specifically admitted herein.  Clark's Answer and Grounds of

Defense replicates the Complaint's headings, which require no response, and allegations.

SUMMARY

1.      This action involves insider trading by Defendant Christopher Clark in the
securities of CEB Inc. ("CEB") before CEB and Gartner, Inc. ("Gartner") announced on January
5, 2017 that Gartner would acquire CEB for $2.6 billion. Gartner approached CEB about a
merger in October 2016, and soon thereafter, Clark was tipped about the potential merger by his
brother-in-law, Defendant William Wright, who served as CEB's corporate controller at the
time.

1

**ANSWER:**   Clark admits that CEB, Inc. ("CEB") and Gartner, Inc. ("Gartner")

announced on January 5, 2017 that Gartner would acquire CEB for $2.6 billion.  Clark has no

direct information of when Gartner approached CEB about a merger in October 2016 and cannot

admit or deny said averment and demands strict proof thereof.  Clark denies receiving a "tip"

from co-defendant William Wright ("Wright") of any material, non-public information

("MNPI").

2.      Specifically, in November 2016, Wright learned material, nonpublic information
("MNPI") concerning Gartner's potential acquisition of CEB. As CEB's corporate controller,
Wright had a duty to CEB not to disclose that information to Clark, who Wright knew had
previously traded in CEB stock. CEB maintained insider trading policies that Wright reviewed
and confirmed compliance with annually.

**ANSWER:**   Clark has no knowledge of when Wright learned of the referenced merger

and/or whether Wright knew he had previously traded in CEB.   Clark denies receiving any

MNPI from Wright.

3.      Between early November 2016 and January 3, 2017, merger discussions between
Gartner and CEB continued to progress. During that time, Wright and Clark, whose homes were
less than two miles apart, communicated by phone, text, and in person, including while Clark
coached their daughters' basketball team and at family holiday events.

**ANSWER:**   Clark admits in part and denies in part.  Clark has no knowledge of merger

discussions referenced in Paragraph 3 between CEB and Gartner and, therefore, denies and

demands strict proof thereof.   Clark admits that he and Wright live less than two miles apart and

to exchanging phone calls and texts with Wright on occasion about Wright's daughter's

basketball activities and other matters of mutual family interest.  Clark further admits coaching

multiple basketball teams in 2016-2017, including the one referenced in Paragraph 3 on which

Wright's daughter participated.  While Clark admits seeing Wright at basketball events and other

events of mutual family interest, Paragraph 3 lacks sufficient specificity to allow Clark to admit

or deny specific communications with Wright at specific basketball or family events.

2

4.      In the first weeks of December 2016, merger discussions intensified, with Gartner making multiple offers, each increasing in value. Between December 2 and the morning of December 9, 2016, Wright and Clark communicated at least five times – twice at their daughters' basketball activities, twice by text, and once on a short call at 8:20 am on the morning of the 9th.

**ANSWER:**   Clark admits communicating with the Wrights about basketball activities.

Clark can neither admit nor deny the specific instances of these alleged communications and

therefore denies same and demands strict proof thereof.

5.      That same day, with CEB trading at $59.50, Clark purchased 60 CEB call options with a strike price of $65. Forty of the CEB call options were set to expire in January 2017. It was the first time in more than five years that Clark took a bullish position on CEB.

**ANSWER:**   Clark admits the trades referenced.  That said, CEB options are only

traded in $5.00 increments, consequently, $65.00 was a reasonable purchase.

6.      In 15 transactions between December 9, 2016 and January 3, 2017, Clark purchased 377 out-of-the-money, short-term CEB call options for a combined $33,050. Clark also directed his son to purchase similar options. On all but five occasions, Clark's purchases represented 100% of the option series volume for that day. On four of the five remaining occasions, the only other purchaser of those call options was Clark's son.

**ANSWER:**   While Clark admits the financial transactions referenced, he denies

"direct[ing] his son to purchase similar options."  As Clark has no information relating to the

averments made in the final two sentences of Paragraph 6, he cannot admit or deny and demands

strict proof thereof.

7.      Clark undertook extraordinary efforts to raise cash for these purchases. On December 9, 2016, Clark sold all 407 shares of a unit investment trust in his wife's IRA account – the only holding in that account. Three days later, he borrowed $6,000 from a line of credit at his family credit union, nearly maxing out the $20,000 credit limit. On December 27, 2016, Clark took out a loan on his car. He used virtually all of this money to purchase short-term, out-of-the-money call options on CEB.

**ANSWER:**   Clark admits in part and denies in part.  While Clark admits the financial

transactions referenced, he denies the characterization of the transactions as "extraordinary

efforts to raise cash…" and, therefore, denies and demands strict proof thereof.

8.     As Clark's trading progressed, he and Wright communicated frequently. These communications often immediately preceded Clark's trading. For example, the Clarks and Wrights spent Christmas Eve and Christmas together in 2016. On December 27, 2016, the first trading day thereafter, Clark took out the loan on his car and bought 30 CEB call options at a $70 strike price with an expiration date of February 2017, even though CEB's share price closed the trading day at just over $60.

**ANSWER:**     Clark admits in part and denies in part.  Clark admits refinancing his car

on December 27, 2016 and subsequently purchasing the referenced CEB call options but denies

knowledge of CEB's closing share price and, thus, demands strict proof thereof.  Clark further

admits celebrating Christmas with his immediate and extended families in 2016 as was their

custom.  SEC's allegations that Clark and Wright communicated "frequently" and that their

communications "often immediately preceded Clark's trading" are vague *characterizations*

unsupported by factual allegations, including by omitting relevant dates, to which no response is

required.  To the extent a response is required, Clark denies and demands strict proof thereof.

9.     Clark also told his son to purchase similar options. Communications between Clark and his son often preceded his son's trading in CEB options. For example, on December 13, 2016, Clark and his son spoke for 13 minutes at 9:03 am. His son purchased five out-of-the-money CEB call options at 11 am. At 2:22 pm, they spoke again. Eight minutes later, his son purchased more of the same type of option. Clark's son had never held a bullish position in CEB until that day.

**ANSWER:**     Clark admits in part and denies in part.  Clark admits having discussions

with his son about the possibility of purchasing options but denies doing so on the basis of

MNPI.  Clark denies knowledge or information to form a belief as to the accuracy of statements

in Paragraph 9 related to specific telephone conversations between Clark and his son or related to

his son's trading history and, therefore, demands strict proof thereof.

10.     Notably, as merger negotiations reached their final stage in late December 2016 and early January 2017, Clark and his son took increasingly short-term positions in out-of-the-money CEB call options, consistent with the expectation that CEB's stock price would increase significantly in the near future. Before late December, almost all of the call options that Clark and his son purchased expired in March. But by late December and early January, both Clark and his son began to purchase call options with February and even January expirations.

**ANSWER:**   Clark admits in part and denies in part.  Clark admits to taking short-term positions in out-of-the-money CEB call options but denies any inference these trades were based on MNPI.  No response to SEC's characterizations of Clark's trading history is required as the trades speak for themselves.  Furthermore, Clark denies knowledge or information to form a belief as to positions taken by his son and, therefore, can neither admit nor deny and demands strict proof thereof.

11.     Before the market opened on January 5, 2017, CEB and Gartner announced that they had entered into a definitive merger agreement in which Gartner would acquire CEB for $77.25 per share. That day, CEB's stock price closed at $74.85 a share, an increase of 21% from the previous day's close.

**ANSWER:**   Clark denies knowledge or information sufficient to form a belief as to the truth of the allegations and demands strict proof thereof.

12.     Clark sold his CEB call options on January 5, 6 and February 3, 2017, reaping illicit profits of $243,190. Clark's son sold all of his call options on January 5, 2017, for profits of $53,050.

**ANSWER:**   Clark admits in part and denies in part.  While Clark admits making the referenced trades, he denies "reaping illicit profits of $243,190."  Clark denies knowledge or information to admit or deny the accuracy of statements relating to his son's trading history and demands strict proof thereof.

13.     The Commission brings this action against Christopher Clark and William Wright pursuant to Section 21A of the Securities Exchange Act of 1934 [*15 U.S.C. § 78u-1*] ("Exchange Act") to enjoin the transactions, acts, practices, and courses of business alleged in this Complaint and to seek civil penalties, and such further relief that the Court may deem appropriate.

**ANSWER:**   Paragraph 13 requires no response as it simply recites the Commission's statutory authority.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa*].

**ANSWER:**   Clark admits jurisdiction referenced in Paragraph 14.

15.     Venue in this district is proper pursuant to Section 27(a) of the Exchange Act [*15 U.S.C. §§ 78aa(a)*]. Certain of the purchases and sales of securities and acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within the Eastern District of Virginia, and were effected, directly or indirectly, by making use of the means, instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of national securities exchanges. Specifically, many of the securities purchases and communications described in this complaint occurred in this District. In addition, Defendants' primary residences are in this District.

**ANSWER:**     Clark admits venue referenced in Paragraph 15.

## DEFENDANTS

16.     Defendant **Christopher Clark**, age 51, is a resident of Arlington, Virginia. He is a senior loan officer at a mortgage company. Clark's wife's younger sister is married to defendant William Wright. By trading on MNPI, Clark made $243,190 in illicit trading profits.

**ANSWER:**     Clark admits in part and denies in part.  Clark, age 52, admits he is a

resident of Arlington, Virginia and is a senior mortgage loan officer at a mortgage company and

admits his wife's younger sister is married to Wright.  Clark denies, however, "trading on

MNPI" and also denies "ma[king] $243,190 in illicit trading profits."

17.     **Defendant William Wright**, age 44, is a resident of Arlington, Virginia. From July 2015 to August 2017, he was CEB's corporate controller. Prior to that, he was CEB's Managing Director of accounting and reporting. Throughout his tenure at CEB, Wright was directly involved in the preparation and filing of CEB's periodic earnings statements and press releases. Wright, together with a team of accountants he managed, was responsible for gathering, updating, and consolidating all aspects of CEB's accounting for purposes of these quarterly and annual filings. This typically included reviewing final versions of financial statements and press releases days before they were publicly released.

**ANSWER:**     Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

## RELEVANT ENTITIES

18.     **CEB Inc.**, also known as Corporate Executive Board, was until April 2017 a Delaware corporation headquartered in Arlington, Virginia. CEB was a global best practice insights and technology company providing products and services to businesses in various industries, including information technology, finance, human resources and marketing, among others. CEB's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NYSE under ticker symbol "CEB." CEB filed periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange 8 Act and related rules

thereunder until April 2017, when it voluntarily delisted from NYSE and terminated its reporting obligations with the Commission in connection with its acquisition by Gartner.

     **ANSWER:**    Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

     19.    **Gartner, Inc.** is a Delaware corporation headquartered in Stamford, Connecticut. Gartner provides information technology research and advisory services. Gartner's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on NYSE under the ticker "IT." Gartner files periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder.

     **ANSWER:**    Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

## FACTS

### Wright Had Access to Material, Nonpublic Information About CEB and Knew He Had A Duty To Keep It Confidential

     20.    Beginning in June 2015, Wright was the Corporate Controller at CEB, where he oversaw all aspects of the company's accounting and reported directly to CEB's Chief Accounting Officer. From the start of his employment at CEB in 2004, when he was hired as the company's Director of Financial Reporting, Wright knew he could not use MNPI about CEB he obtained in the course of his employment to trade in CEB securities. He also knew that he could not disclose such information to others, including "family members," so that they could trade.

     **ANSWER:**    Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

     21.    CEB maintained policies and procedures concerning confidential information and insider trading. Wright was required to, and did, confirm compliance with these policies on an annual basis.

     **ANSWER:**    Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

     22.    CEB's Chief Accounting Officer ("CAO") learned of the potential Gartner acquisition no later than November 1, 2016. Wright and the CAO – who was a groomsman in Wright's wedding – had been close friends for 20 years and had offices next to each other at work. They spoke frequently about personal and business matters and owned a vacation property together.

**ANSWER:**   Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

23.   News of the potential merger worried the CAO, who feared that he and Wright could
lose their jobs as a result. He was also concerned that the merger could cause their CEB stock to lose
value. Unsurprisingly, the night he learned of the merger, the CAO spoke with Wright on the phone
for an hour, after exchanging text messages between 6pm and 10pm. Between that date and the
merger, the frequency of their texts and calls increased dramatically.

**ANSWER:**   Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

24.   On November 3, 2016, following an internal CEB meeting that Wright and the CAO
both attended, they had an email exchange discussing how their CEB stock awards might not vest
upon a "change in control" of CEB.

**ANSWER:**   Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

25.   During these communications in early November 2016, the CAO told his close friend
Wright about the potential merger, a topic they continued to discuss thereafter.

**ANSWER:**   Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

26.   These communications between the CAO and Wright concerning the potential merger
were consistent with their disregard for the confidentiality of corporate information – a pattern that
continued after they were terminated by Gartner in August 2017. For example, on multiple occasions,
the CAO and Wright shared confidential corporate documents and data with one another via email,
including emails in July 2017, February 2018, and November 2018, in some cases using their
personal email accounts.

**ANSWER:**   Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

### Wright and Clark Were Brothers-in-law Who Communicated Frequently

27.   Wright and Clark were married to sisters and lived in the same town less than two
miles from each other. In the winter of 2016-2017, their daughters played on the same basketball
team, which Clark coached. Wright and Clark interacted in multiple contexts, including at family
gatherings, at their daughters' basketball practices and games, through calls and texts, and when
Clark, a mortgage broker, helped Wright locate and finance investment properties.

**ANSWER:**     Clark admits in part and denies in part.  Clark admits the first two

sentences.  As to the third sentence, while Clark admits exchanging phone calls and text

messages and attending family gatherings with Wright in the winter of 2016-2017, SEC's

allegations lack requisite specificity to allow Clark to admit or deny specific interactions with

Wright and, thus, Clark denies and demands strict proof thereof.  Furthermore, Clark admits

assisting Wright with mortgage financing for property, but denies SEC's characterization that he

"helped Wright locate and finance investment properties" and, therefore, denies and demands

strict proof thereof.

### Wright Gave Clark MNPI About the Potential Gartner Merger, and Clark, Knowing That It Was Provided in Violation of Wright's Duty to CEB, Traded on It

28.     In early December 2016, negotiations between CEB and Gartner progressed
significantly. Over the course of five days – December 2nd to the 7th – Gartner increased its offer
three times. At a meeting between Gartner and CEB executives on December 7th, CEB's CEO
indicated that he would recommend that CEB's board accept Gartner's most recent offer. That same
day, after CEB received a letter formally conveying Gartner's revised offer of $77 per share, counsel
for CEB communicated with counsel for Gartner concerning "the overall timing and process of
negotiations with respect to a merger agreement."

**ANSWER:**     Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

29.     That same week, between December 2 and the morning of December 9, 2016, Wright
and Clark communicated at least five times – twice at their daughters' basketball activities, twice by
text and once on a short call at 8:20 am on the morning of the 9th.

**ANSWER:**     Clark admits in part and denies in part.  While Clark admits to

communicating with Wright between December 2 and December 9, he denies knowledge or

information to admit or deny the specific number of or the methods by which these

communications occurred, therefore demands strict proof thereof.  While Clark admits to

attending "basketball activities" during the 2016-2017 at which Wright may have also been

present, Clark denies knowledge of any specific "basketball activities" he may have attended

with Wright.  Clark further denies receiving any MNPI from Wright during these or any other

communications and demands strict proof thereof.

30.     At 10:15 am on the morning of December 9th, Clark called his brokerage firm and
advised that he had been authorized by his wife to make trades in her IRA. He then instructed his
brokerage firm to sell all of the holdings in his wife's IRA, which consisted solely of shares of a unit
investment trust Clark's wife had held for almost two years. Liquidating the account generated
proceeds of $4,463.72.

**ANSWER:**     Clark admits in part.  While Clark admits instructing his broker to sell

holdings in his wife's IRA on or around the date and time referenced, he does not possess or

have access to phone records or brokerage account records to either admit or deny the specifics

of the transaction and, thus, demands strict proof thereof.

31.     That afternoon, while waiting for the trades placed in his wife's account to clear,
Clark bought 40 out-of-the-money CEB call options with a strike price of $65 and an expiration of
January 2017, and 20 out-of-the-money CEB call options with a $65 strike price and an expiration of
March 2017. These purchases represented the first time in over five years that Clark was bullish on
CEB, and represented 100% of the total trading in those particular option series that day, across all
exchanges. Clark's position at the end of the day represented 100% of the open interest in CEB
March $65 call options and 53% of the open interest in CEB January $65 call options. The open
interest in an option series is the number of options contracts currently issued and outstanding in the
market.

**ANSWER:**     Clark admits in part and denies in part.  While Clark admits making

referenced trades, he denies knowledge or information to either admit or deny the statistical

analysis of his held positions and, therefore, denies and demands strict proof thereof.  Further,

Clark denies any implication that his held positions were in anyway unusual or improper.

32.     CEB's share price closed that day at $59.50.

**ANSWER:**     Clark admits on information and belief.

33.     Merger negotiations involving the respective boards of Gartner and CEB, as well as
top executives and outside counsel, continued to progress throughout December. Each side
performed due diligence and sought to finalize the terms of the merger agreement.

**ANSWER:**     Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

34.     On Sunday, December 11, 2016, Clark and Wright were both at a practice for their daughters' basketball team.

**ANSWER:**     Clark lacks knowledge to either admit or deny whether he or Wright were

both present at a December 11, 2016 basketball practice and, therefore, denies and demands

strict proof thereof.

35.     The next trading day, December 12, 2016, Clark borrowed $6,000 from a line of credit, nearly maxing out his family's $20,000 borrowing limit. He then transferred that money, along with an additional $5,000, to the Clarks' joint IRA trading account. With that money, he proceeded to purchase more CEB options.

**ANSWER:**     Clark admits in part and denies in part.  Clark admits the referenced

financial transactions but denies transferring money to a "joint IRA trading account."

36.     Specifically, on December 12, Clark bought 10 out-of-the-money CEB call options with a strike price of $65 and an expiration of March 2017. He also communicated with his son, who bought 20 out-of-the-money March call options, with 10 each at strike prices of $65 and $70. These purchases represented 100% of the total trading in those particular option series that day, across all exchanges. Clark and his son's positions at the end of trading that day represented 100% of all the open interest in CEB call options with strike prices of $65 and $70 and expirations of March 2017.

**ANSWER:**     Clark admits in part.  While Clark admits purchasing the referenced

options, he denies knowledge or information to either admit or deny statements related to his

son's trades or any statistical assessment of his or his son's held positions and, therefore,

demands strict proof thereof.

37.     The next day, December 13, Clark and his son had a 13-minute call at 9:03 am. Clark's son then bought five out-of-the-money CEB call options at a $70 strike price and an expiration of March 2017, while Clark bought 20 of the same options. They spoke again at 2:22 pm for more than three minutes. Clark's son then bought five more of the same options, while Clark himself bought 20 more out-of-the-money CEB call options with a strike price of $65 and an expiration in March 2017. These purchases represented 100% of the total trading in those particular option series that day, across all exchanges.

**ANSWER:**     Clark admits in part.  While Clark admits his referenced trades, he denies

knowledge or information to admit or deny statements related to specific communications with

his son, his son's trading activities or any statistical analysis of his or his son's held positions

and, therefore, demands strict proof thereof.

38.     CEB's share price closed at $59.40 that day.

**ANSWER:**     Clark admits on information and belief.

39.     Clark and his son largely repeated their behavior the next day, December 14th. Following a five-minute call just before 9 am, Clark's son bought 15 out-of-the-money CEB call options with strike prices of $65 and $70 and expirations in March 2017, while Clark bought another 60 out-of-the-money CEB call options at a strike price of $65. These purchases represented 100% of the total trading in those particular option series that day, across all exchanges, and by the end of the trading day, Clark and his son again held 100% of the open interest in CEB March $65 call options.

**ANSWER:**     Clark admits in part.  While Clark admits his referenced trades, he denies

knowledge or information to admit or deny statements related to specific communications with

his son, his son's trading activities or any statistical analysis of his or his son's held positions

and, therefore, demands strict proof thereof.

40.     CEB's share price closed the trading day at $58.75.

**ANSWER:**     Clark admits on information and belief.

41.     During the days leading up to December 15, 2016, Wright was formally made part of the CEB team working on projects related to the potential merger with Gartner.

**ANSWER:**     Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

42.     On December 15, Clark purchased 25 additional out-of-the-money CEB call options at a strike price of $70 with a March expiration, which constituted 100% of the total trading in this particular option series that day, across all exchanges. On December 20, Clark purchased an additional 29 CEB call options at a strike price of $70 with a March 2017 expiration. The same day, his son purchased 10 out-of-the-money call options at a strike price of $70 with the same expiration. Those purchases on the 20th represented 100% of the total trading in that particular option series that day, across all exchanges.

**ANSWER:**     Clark admits in part.  While Clark admits his referenced trades, he denies

knowledge or information to admit or deny statements related to specific communications with

his son, his son's trading activities or any statistical analysis of his or his son's held positions

and, therefore, demands strict proof thereof.

### As Merger Negotiations Neared a Conclusion, Clark and His Son Traded Even More Aggressively

43.     At no point between December 9 and December 20, 2016 did CEB's stock trade above $61 per share.

**ANSWER:**     Clark admits on information and belief.

44.     As CEB and Gartner worked intensely to finalize the merger agreement in the last ten days of 2016 and the first few days of 2017, the topics they discussed included "the treatment in the merger of unvested employee equity incentive awards and certain employee compensation matters" – the precise issue about which Wright and the CAO communicated in early November.

**ANSWER:**     Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

45.     Wright continued to interact with Clark throughout this time, including by phone, at their daughters' basketball events, and at multiple family gatherings over the Christmas holidays.

**ANSWER:**     Clark admits in part.  Clark admits having interactions with Wright in late

December 2016 and early January 2017 by phone and in-person at basketball events and other

family gatherings but denies any implication these interactions ever included discussions about

MNPI related to CEB and/or Gartner.

46.     Beginning on December 22, 2016, a few days after Clark and Wright were at the same basketball practice, Clark bought 36 out-of-the-money CEB call options with a strike price of $70 and a February 2017 expiration. His purchase constituted 100% of the total trading in this option series that day, across all exchanges. At that point, Clark held 100% of the open interest in February $70 CEB call options.

**ANSWER:**     Clark admits in part.  While Clark admits his referenced purchase, he

denies knowledge or information to admit or deny statements related to his attendance at a

specific basketball practice or any statistical analysis of his held position and, therefore, demands

strict proof thereof.

47.     CEB's share price closed the trading day at $59.95.

**ANSWER:**     Clark admits on information and belief.

48.     On December 23, 24, and 25, 2016, the Clarks and the Wrights attended dinners and holidays parties together at their respective houses.

**ANSWER:**     While Clark admits attending holiday events with his family, the Wrights

and other extended family in December 2016, he denies any implication he received MNPI from

Wright at these events or any other time.

49.     On Tuesday, December 27, the first trading day after Christmas, Clark bought 30 more CEB call options at a strike price of $70 with a February 2017 expiration, which constituted 100% of the total trading in this option series that day, across all exchanges. Clark continued to be the only investor in the entire market to purchase February 2017 $70 call options.

**ANSWER:**     Clark admits in part.  While Clark admits the referenced purchase, he

denies knowledge or information to admit or deny statements related to any statistical analysis of

his held position and, therefore, demands strict proof thereof.

50.     That same day, Clark also took out a $9,401 loan on his car and, the next day, wired $8,500 of that amount to one of his brokerage accounts. On December 29, he used those funds to purchase 30 CEB call options at a strike price of $65 again with a February 2017 expiration, representing 75% of the total trading in this option series that day, across all exchanges, and another 30 call options at a strike price of $70 with a February 2017 expiration, which represented 100% of the total trading in this option series that day.

**ANSWER:**     Clark admits in part.  While Clark admits refinancing his auto loan at

Arlington Community Federal Credit Union and subsequently purchasing the referenced

securities, he denies knowledge or information to admit or deny statements related to any

statistical analysis of his held position and, therefore, demands strict proof thereof.

51.     Clark and Wright exchanged short telephone calls on December 30, 2016. The next trading day, January 3, 2017, Clark used the last of the $8,500 from the car loan to purchase another 27 CEB call options at a strike price of $70 with a February 2017 expiration. That purchase represented 100% of the total trading in this option series that day, across all exchanges.

**ANSWER:**     Clark admits in part.  While Clark admits the first sentence of Paragraph

51 and purchasing the referenced options, he denies SEC's characterization he "used the last of

14

the $8,500 from the car loan" for the purchase and, thus, demands strict proof thereof.  Clark also

denies knowledge or information to admit or deny statements related to any statistical analysis of

his held positions and, therefore, demands strict proof thereof.  Further, Clark denies he received

MNPI from Wright at any time.

52.     On January 4, 2017, Clark and his son spoke for over five minutes at 1:27 pm.
Shortly thereafter, Clark attempted repeatedly to buy more short-term, out-of-the-money call options,
but could not get his orders filled. Around the same time, though, Clark's son was able to buy 30
CEB call options at a strike price of $70 with a January 2017 expiration, more than eight dollars
above the current share price. CEB's stock price would have had to increase by roughly 13% within
11 trading days to make his trade profitable. Not surprisingly, Clark's son was the only person to
purchase that option series that day or at any time prior to the merger announcement.

**ANSWER:**     Clark admits in part.  While Clark admits attempting to purchase out-of-

the-money call options on January 4, 2017, he denies knowledge or information to admit or deny

statements related to an alleged conversation with his son at 1:27 p.m., his son's trading activity

that day or any statistical analysis of his or his son's held position and, therefore, demands strict

proof thereof.  As to the hyperbole, no response is warranted.

53.     The Gartner/CEB merger was announced before the market opened on January 5,
2017. That day, the stock price closed at $74.85, a 21% increase over the previous day's close of
$61.90. Trading volume also increased by over 1,600% from the prior trading day with 4.4 million
CEB shares trading.

**ANSWER:**     Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

54.     Clark's son sold all his CEB positions on the day the merger was announced,
generating profits of $53,050.

**ANSWER:**     Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

55.     Clark sold his CEB options between January 5 and February 3, 2017, reaping illicit
profits of $243,190.

15

**ANSWER:**     Clark admits in part and denies in part.  Clark admits selling CEB options

between January 5 and February 3, 2017 but denies "reaping illicit profits of $243,190."

### FINRA Requests Information from CEB Regarding Employee Access to Information about the Merger

56.     On Thursday, January 12, 2017, the Financial Industry Regulatory Authority ("FINRA") sent CEB a letter requesting, among other information, a list of CEB employees who were involved with or privy to the Gartner acquisition.

**ANSWER:**     No response by Clark is warranted as he could not have access to this

information and strict proof is requested.

57.     That Sunday, January 15, Clark and Wright had a 47-minute call. They then spoke by phone at least five more times over the next five days.

**ANSWER:**     Clark does not have access to his 2017 telephone records, nor does he

have any independent recollection of the calls referenced and, therefore, denies knowledge or

information to admit or deny and demands strict proof thereof.

58.     On March 8, 2017, CEB received another inquiry from FINRA, this time requesting that any employee with advance knowledge of the merger review an enclosed list of individuals and identify any he or she knew. Clark's name, as well as his wife's and son's names, were on the list.

**ANSWER:**     Clark denies knowledge or information sufficient to form a belief as to

the truth of the allegations and demands strict proof thereof.

59.     In CEB's April 2017 response, Wright acknowledged that he saw Clark at holiday events but claimed that he only spoke with Clark every month or two and that during the period September 29, 2016 to January 4, 2017, he only talked to Clark "3-4 times about mortgage options." In fact, during that period, Wright and Clark communicated frequently by text, phone, and in person at family gatherings and basketball practices.

**ANSWER:**     Clark denies knowledge or information sufficient to form a belief as to

the truth of allegations in Paragraph 59.  With that said, Clark admits speaking with Wright, on

occasion, about mortgages but has no information or recollection as to the exact dates of these

conversations and/or communications and, therefore, demands strict proof thereof.

16

60.     Wright also acknowledged that he knew Clark had previously traded on CEB stock.

**ANSWER:**     Clark denies knowledge or information sufficient to form a belief as to

the truth of allegations in Paragraph 60.

61.     The CAO also identified Clark and Clark's wife as the brother-in-law and sister-in-law of Wright, respectively.

**ANSWER:**     Clark denies knowledge or information sufficient to form a belief as to

the truth of allegations in Paragraph 61.

### Clark's Previous Trading in CEB

62.     Between 2008 and 2016, Clark traded in front of 18 CEB quarterly earnings announcements. In some instances, as with the announcement of the CEB Gartner merger, his son also traded in front of these announcements. In nearly every case, Clark purchased short-term put options in the couple of days before (or on the very day of) CEB's quarterly earnings releases, which were publicly scheduled in advance. The puts always expired the following month.

**ANSWER:**     Clark admits in part.  While Clark admits to trading ahead of CEB

quarterly earnings announcements, he denies knowledge or information to admit or deny the total

number of instances this trading behavior occurred.  Clark also admits purchasing CEB short-

term put options in advance of publicly scheduled quarterly earnings announcements.  Clark

denies knowledge or information to admit or deny statements related to specific expiration dates

of the options he purchased or about his son's trading activities and, therefore, demands strict

proof thereof.

63.     Clark bet correctly in 15 of 18 cases that CEB's stock would decline, although in a number of cases it did not decline enough to make his trade profitable based on the specific strike price of the option series he purchased.

**ANSWER:**     Clark admits in part and denies in part.  Clark admits purchasing CEB put

options but denies SEC's characterization that he "bet correctly" and demands strict proof

thereof.  Clark also admits that he did not always profit when trading CEB options.  Clark denies

any implication these trades or any others were made on the basis of MNPI.

64.     Throughout his tenure at CEB, Wright was directly involved in the preparation and filing of CEB's quarterly reports and press releases. Wright, together with a team of accountants he managed, was responsible for gathering, updating, and consolidating all aspects of CEB's accounting for purposes of these quarterly filings. This typically included reviewing final versions of financial statements and press releases days before they were publicly released.

**ANSWER:**     Clark denies knowledge or information sufficient to form a belief as to

the truth of allegations in Paragraph 64.

65.     For example, on Saturday, July 25, 2015, at 2:02 pm, Wright was copied on an email to CEB's Chief Financial Officer enclosing the "final reporting pack" for the second quarter 2015 that "should tie to the current press release." The email contained CEB's finalized quarterly financials.

**ANSWER:**     Clark denies knowledge or information sufficient to form a belief as to

the truth of allegations in Paragraph 65.

66.     At 2:52 pm that same day, Wright called Clark and they spoke for 12 minutes.

**ANSWER:**     Clark lacks sufficient evidence to admit or deny the allegations and,

therefore, demands strict proof thereof.

67.     On the morning of the next trading day, July 27, 2015, Clark sold a long position in another security. He then used the proceeds of that sale to purchase 40 CEB out-of-the-money put options, 20 of them at a strike price of $80, and 20 at $85 with August 2015 expirations. The stock closed over $86.

**ANSWER:**     Clark admits upon information and belief.

68.     The next morning, July 28, Clark and Wright spoke briefly at 8 am. Roughly two hours later, Clark and his son had two short calls. Over the course of that day, Clark purchased 82 more August 2015 put options on CEB at a strike price of $85, while Clark's son purchased 3 August 2015 put options at a strike price of $80.

**ANSWER:**     Clark admits in part.  While Clark admits to his trades, he denies

knowledge or information or an independent recollection of an alleged July 28 phone call he may

have had with Wright or subsequent alleged phone calls he may have had with his son, or related

to his son's trading activities and, therefore, demands strict proof thereof.

69.     CEB closed the trading day at $86.70.

**ANSWER:**   Clark admits on information and belief.

70.    After the market closed on July 28, CEB reported its second quarter 2015 earnings. The following day, CEB's stock closed at $76.98, an 11% decrease. By investing in out-of-the-money, short-term puts, Clark and his son earned profits of $82,880 and $961, respectively.

**ANSWER:**   Clark admits to his profits but does not have knowledge of his son's

profits and demands strict proof thereof.

## FIRST CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

71.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 70, inclusive, as if fully set forth herein.

**ANSWER:**   Clark incorporates by reference his responses to Paragraphs 1 through 70.

72.    At all relevant times, CEB's policies required that company insiders maintain the confidentiality of the company's MNPI and prohibited them from using such information to trade for their own accounts or disclosing this information to others. Wright annually certified his knowledge and understanding of these restrictions.

**ANSWER:**   No response by Clark is warranted as CEB's corporate polices or

Wright's purported annual certifications.

73.    Wright, CEB's corporate controller, tipped his brother-in-law Clark with MNPI about Gartner's potential acquisition of CEB in violation of CEB's policies and in breach of the fiduciary duty he owed to the company and its shareholders. Wright knew or recklessly disregarded that he had breached his duty by disclosing inside information to Clark.

**ANSWER:**   Clark denies Paragraph 73.

74.    Wright received a personal benefit from his tip of MNPI to his brother-in-law Clark, including the benefit of providing a gift of information to a close relative or friend. Clark had also assisted Wright in procuring mortgages for properties Wright owned. Wright also knew or recklessly disregarded that Clark would trade on his tips.

**ANSWER:**   The allegations of the first sentence of Paragraph 74 constitute a legal

conclusion to which no response is required.  To the extent a response is required, Clark denies

those allegations and specifically denies ever receiving MNPI from Wright.  Clark admits to

assisting Wright with mortgage financing on property.  Clark denies the allegation in the third

sentence of Paragraph 74.

75.     Clark purchased CEB call options based on MNPI he received from Wright. Clark
knew, or was reckless in not knowing, should have known, or consciously avoided knowing that the
tips he received from Wright were conveyed in breach of a fiduciary duty or similar obligation
arising from a relationship of trust and confidence, and in exchange for a benefit.

**ANSWER:**     Clark denies Paragraph 75.

76.     Defendants, with scienter, by use of the means or instrumentalities of interstate
commerce or of the mails, in connection with the purchase or sale of securities, directly or indirectly:

a) employed devices, schemes, or artifices to defraud;

b) made untrue statements of material fact or omitted to state material facts necessary in order to
   make the statements made, in light of the circumstances under which they were made, not
   misleading; and/or

c) engaged in acts, practices, or courses of business which operated or would operate as a fraud
   or deceit upon any person.

**ANSWER:**     The allegations in Paragraph 76 are legal conclusions to which no

response is required.  To the extent a response is required, Clark denies the allegations.

77.     By reason of the actions alleged herein, Defendants violated Section 10(b) of the
Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R.§ 240.10b-5*] and unless
restrained and enjoined will continue to do so.

**ANSWER:**     The allegations in Paragraph 77 are legal conclusions to which no

response is required.  To the extent a response is required, Clark denies the allegations.

## PRAYER FOR RELIEF

With respect to SEC's "Prayer for Relief," including each subpart thereto, Clark denies

SEC is entitled to any relief whatsoever and avers judgement should be entered in Clark's favor.

## AFFIRMATIVE AND OTHER DEFENSES

Clark states the following affirmative and/or other defenses. Nothing stated herein is

intended, or shall be construed, as an acknowledgment that any particular issue or subject matter is

relevant to the SEC's allegations. To the extent that a defense asserted herein as an "Affirmative Defense" is an ordinary defense, Clark does not intend to, and does not, assume any burden of proof, production, or persuasion that would not apply if such defense were not asserted herein.

### FIRST AFFIRMATIVE DEFENSE

Pursuant to Fed. R. Civ. P. 12(b)(6), Clark moves for dismissal of the Commission's Complaint since they have failed to state a cause of action on which relief can be granted and objects to the imposition of any relief referenced in the Prayer for Relief.

### SECOND AFFIRMATIVE DEFENSE

The SEC's claim for relief is barred, in part, by the applicable statute of limitations.

### THIRD AFFIRMATIVE DEFENSE

The SEC's claim for relief is barred, in whole or in part, because the Complaint fails to plead fraud with the particularity required by Federal Rule of Civil Procedure 9(b).

### FOURTH AFFIRMATIVE DEFENSE

Clark asserts the affirmative defense of laches based on SEC's unreasonable delay and/or lapse in asserting a claim, without excuse and with knowledge of the alleged claims, thereby resulting in prejudice to Clark.

### FIFTH AFFIRMATIVE DEFENSE

SEC's claim for relief is barred because Clark, at all times, acted in good faith.

### SIXTH AFFIRMATIVE DEFENSE

SEC's claim for relief is barred because the relief sought by SEC, in whole or in part, exceeds its lawful authority.  To the extent SEC seeks disgorgement, that claim is barred because Clark never received illicit or ill-gotten profits as a result of any action alleged in the Complaint.

## ADDITIONAL DEFENSES

Clark's investigation of the allegations asserted in the Complaint is ongoing, and he reserves the right to raise additional defenses, counter-claims, and/or third-party claims of which he may become aware through discovery or other investigation.

## DEMAND FOR JURY TRIAL

Clark hereby demands a jury trial.

WHEREFORE, after considering this Answer, Clark respectfully requests that this Court:

1.   Enter judgment dismissing the Complaint against Clark with prejudice;

2.   Order the SEC to pay Clark's attorneys' fees and costs related to this litigation; and

3.   Grant Clark such other relief as the Court shall deem just and proper.

Dated: February 8, 2021

Respectfully submitted,

Christopher Clark,

By Counsel,

Mark Cummings, VSB No. 18271
David E. Sher, VSB No. 12444
Sher Cummings & Ellis
3800 Fairfax Drive Suite 7
Arlington, VA 22203
Phone: (703) 525-1200
Fax: (703) 525-0067
Email: mcummings@sherandcummings.com
*Counsel for Defendant Christopher Clark*

## CERTIFICATE OF SERVICE

I CERTIFY that on February 9, 2021, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which will send a notification of such filing to the following

counsel of record:

Timothy K. Holloran
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(T): 202-551-4414
hallorant@sec.gov
*Counsel for Plaintiff U.S. S.E.C.*

Respectfully submitted,

Christopher Clark,

By Counsel,

Mark Cummings, VSB No. 18271
David E. Sher, VSB No. 12444
Sher Cummings & Ellis
3800 Fairfax Drive Suite 7
Arlington, VA 22203
Phone: (703) 525-1200
Fax: (703) 525-0067
Email: mcummings@sherandcummings.com
*Counsel for Defendant Christopher Clark*