**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** ) ) ) | |
| **Plaintiff,** ) ) | **Civil No. 1:20-cv-01529** |
| **vs.** ) ) | |
| **CHRISTOPHER CLARK** ) ) | |
| **and** ) ) | |
| **WILLIAM WRIGHT,** ) ) | |
| **Defendants.** ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT CHRISTOPHER CLARK'S**
**MOTION FOR SUMMARY JUDGMENT**

<u>INTRODUCTION</u>

Discovery in this matter is closed, and the undisputed material facts before the Court demonstrate that the Plaintiff cannot establish Christopher Clark participated in the illegal activities alleged in the Complaint. The SEC's case from the beginning was based on circumstantial evidence it believed existed. While Clark was already aware that this evidence did not actually exist, it became evident to all parties when discovery closed that the SEC did not find what it was ardently looking for. Instead of voluntarily dismissing this suit, it has pressed on unnecessarily. Defendant Christopher Clark seeks summary judgment because there are no material disputes of fact and he should prevail as a matter of law.

MOTION STANDARD

Summary judgment should be granted when there is no genuine dispute as to any material fact and when, based on the facts not in dispute, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If the record shows that there is no genuine issue as to any material fact, summary judgment is required.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (*quoting Anderson*, 477 U.S. at 247-48).

A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, although courts must view the evidence in the light most favorable to the nonmovant, the nonmoving party is prohibited from relying on mere allegations – it must set forth specific facts that go beyond the mere existence of a scintilla of evidence.  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curium); *Philpot v. Media Rsch. Ctr. Inc.*, 279 F. Supp. 3d 708, 712 (E. D. Va. 2018).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation omitted).  Here, the submitted pleadings, affidavits, and deposition testimony establish no genuine issue of material fact for trial and therefore, under the substantive law, summary judgment must be granted in favor of Christopher Clark.

<u>UNDISPUTED MATERIAL FACTS</u>

**Background Information:**

1. CEB Inc., also known as Corporate Executive Board, was until April 2017 a Delaware corporation headquartered in Arlington, Virginia. CEB was a global best practice insights and technology company providing products and services to businesses in various industries, including information technology, finance, human resources and marketing, among others. CEB's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NYSE under ticker symbol "CEB." CEB filed periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder until April 2017, when it voluntarily delisted from NYSE and terminated its reporting obligations with the Commission in connection with its acquisition by Gartner. Complaint ¶ 18.

2. From July 2015 to August 2017, William Wright was CEB's corporate controller. Complaint ¶ 17.

3. Christopher Clark is a resident of Arlington, Virginia and a senior loan officer at a mortgage company. Complaint ¶ 16.

4. The Securities and Exchanges Commission (SEC) brought this claim against Christopher Clark and William Wright[1] pursuant to Section 21A of the Securities Exchange Act of 1934 [*15 U.S.C. § 78u-l*] ("Exchange Act"). Complaint ¶ 13.

5. CEB maintained policies and procedures concerning confidential information and insider trading. Wright was required to, and did, confirm compliance with these policies on an annual basis. Complaint ¶ 21.

---

[1] The SEC and Defendant Wright entered a joint final judgment on October 21, 2021. (ECF 93).

6. In August 2016, Tom Monahan, CEB's CEO, announced he was retiring from the company and did not name a replacement. Wright Depo. Tr. 298:12-14.

7. Following Tom Monahan's retirement announcement in August 2016, the company prepared for questions about a potential sale of the company. Defense Depo. Ex. 175a.

8. On the 2016 3Q earnings call, Gary Bisbee, a local stock analyst, asked the following question: "[f]irst I guess I should say congratulations on the decision to move on to something else at some point. But in the process of discussing that with the board, has there been any discussion or thought about potentially considering a sale of the company?" SEC Trial Ex. 23; Lindahl Depo. Tr. 102:21-103:1; Cain Exp. Rep. at 19 n.39.

9. In November 2016, Donald J. Trump was elected as President of the United States after running on a platform for improving business conditions. Clark Depo. Tr. 272:3-273:8.

10. On the 2016 3Q earnings call, either Richard Lindahl or Tom Monahan responded to Gary Bisbee's questions by stating: "Gary, like any public Company I think our Boards open to any idea that unlocks a ton of value for our shareholders." SEC Trial Ex. 23.

11. Gartner, Inc. (Gartner) approached CEB, Inc. (CEB) about a merger in October 2016. Complaint ¶ 1.

12. Between early November 2016 and January 3, 2017, merger discussions between Gartner and CEB continued to progress. Complaint ¶ 3.

13. Before the market opened on January 5, 2017, CEB and Gartner announced that Gartner would acquire CEB for $2.6 billion, or $77.25 a share. Complaint ¶ 11.

14. On January 5, 2017, CEB's stock price closed at $74.85 a share. Complaint ¶ 11.

15. The SEC declined to bring an enforcement action against Andrew Nevins, Clark's son who also traded in CEB securities between December 2016 and January 2017. SEC Response

to Wright RFA ¶ 70 (admitted that it has not brought an enforcement action against Nevins); SEC Response to Wright RFA ¶ 71 (admitted that is has not asked Nevins to return the money made from these trades); SEC Response to Wright RFA ¶ 72 (admitted that it concluded the investigation of Nevins on December 29, 2020).

16. On June 19, 2020, the Department of Justice formally closed its investigation of Clark. Exh. 1 (DOJ Declination Letter).

**Clark and Wright Communications/Relationship:**

17. Clark and Wright are not blood relatives. Clark's wife is the sister of Wrights' wife. SEC admitted that Wright and Clark are not blood relatives. SEC Response to Wright RFA ¶ 56.

18. William Wright did not inform Christopher Clark when the CEB/Gartner acquisition would be publicly announced. SEC Response to Wright RFA ¶ 35 (SEC admitted it has no document showing Wright informed Clark); SEC Response to Wright RFA ¶ 36 (SEC admitted that it has no witness who will testify that Wright informed Clark).

19. Christopher Clark never received MNPI from Wright about the acquisition. SEC Response to Clark RFA ¶ 7 (SEC admitted it has no witness who will testify that Clark ever received MNPI from Wright about the acquisition); Wright Depo Transcript 311:6-15.

20. Throughout 2016, Wright was interviewing with BenefitFocus Group, a business operated in South Carolina. SEC Trial Ex. 74, 75.

21. In the winter of 2016-2017, Clark and Wright's daughters played on the same basketball team, which Clark coached. Complaint ¶ 27.

22. Throughout November 2016 and January 2017, Clark and Wright had few interactions. SEC Response to Wright RFA ¶ 20; SEC Response to Wright RFA ¶ 21; SEC Response to

Wright RFA ¶ 23; SEC Response to Wright RFA ¶ 42; SEC Response to Wright RFA ¶ 43; SEC Response to Clark RFA ¶ 1; SEC Response to Clark ¶ 2; SEC Response to Clark RFA ¶ 10.

23. In late November 2016, since Clark is a mortgage broker, Wright discussed a potential move to South Carolina with Clark to determine his realistic loan approval possibilities for purchasing a home. Wright Depo Transcript 40:9-41:15.

24. Despite how close the Wrights lived to the Clarks, they did not frequently go to one another's homes. Clark Depo Transcript 126:10-20.

25. Wright told Clark not to discuss his CEB trades with him. Wright Depo Transcript 140:17-141:11.

**Wright's Merger Involvement:**

26. William Wright and Barron Anschutz traveled to London on December 11, 2016 and returned from London on December 15, 2016. SEC Response to Wright RFA ¶ 24.

27. William Wright was informed by Barron Anschutz about the potential CEB/Gartner merger while on the December 2016 London trip. SEC Response to Wright RFA ¶ 26; SEC Response to Wright RFA ¶ 28; Anschutz Depo. Transcript at 54:16-55:3.

28. Prior to being informed of the CEB/Gartner merger, Wright did not have access to or possession of merger related MNPI. SEC Response to Wright RFA ¶ 29; SEC Response to Wright RFA ¶ 30.

**Clark's Trades:**

29. Between 2008 and 2016, Clark traded in front of 18 CEB quarterly earnings announcements. Complaint ¶ 62.

30. The SEC does not allege that Clark and Wright communicated ahead of 17 of the 18 trades alleged in ¶ 62 of the Complaint. SEC Response to Wright RFA ¶ 52.

31. Clark bet correctly in 15 of the 18 cases that CEB's stock would decline. Complaint ¶ 63; SEC Trial Ex. 19.

32. On December 9, 2016, Christopher Clark liquidated one of his wife's' IRA account's proceeds of $4,463.72 and purchased 60 CEB call options with a strike price of $65. Complaint ¶ 30; Complaint ¶ 31.

33. On December 12, 2016, Clark borrowed $6,000 from a line of credit and bought 10 out-of-the-money CEB call options with a strike price of $65. Complaint ¶ 35; Complaint ¶ 36.

34. On December 13, 2016, Clark purchased 20 out-of-the-money CEB call options at a $70 strike price and 20 out-of-the-money CEB call options at a $65 strike price. Complaint ¶ 38.

35. On December 14, 2016, Clark purchased 60 out-of-the-money CEB call options. Complaint ¶ 39.

36. On December 15, Clark purchased 25 additional out-of-the-money CEB call options at a strike price of $70. Complaint ¶ 42.

37. On December 20, Clark purchased an additional 29 CEB call options at a strike price of $70. Complaint ¶ 42.

38. On December 22, Clark purchased 36 out-of-the-money CEB call options at a strike price of $70. Complaint ¶ 46.

39. On December 27, 2016, Clark purchased 30 CEB call options at a $70 strike price with an expiration date of February 2017. Complaint ¶ 49.

40. On December 29, he purchased 30 CEB call options at a strike price of $65. Complaint ¶ 50.

41. On January 3, 2017, Clark purchased 27 CEB call options at a strike price of $70. Complaint ¶ 51.

42. On January 4, 2017, Clark attempted to purchase more CEB call options. Clark's attempts were unsuccessful because his purchase price was too low. Complaint ¶ 52.

43. In 15 transactions between December 9, 2016 and January 3, 2017, Clark purchased 377 out-of-the-money, short-term CEB call options for a cost of $33,050. Complaint ¶ 6.

44. Clark sold his CEB call options on January 5, 6, and February 3, 2017, earning profits of $243,190. Complaint ¶ 12.

**Clark's Finances:**

45. Throughout Fall 2016 to early 2017, Clark had five properties in Virginia, Georgia, and North Carolina. Clark Depo. Tr. 49:19-50:9.

46. Throughout 2016, Clark maintained a balance on his credit cards. Clark Depo Tr. 100:4-102:5.

47. Throughout 2016, Clark had multiple investment accounts: a 401(k) and E-trade account. Clark Depo Tr. 274:15-20.

48. Clark and his wife maintained sizeable 401(k) accounts that were their safe, conservative investment accounts while their E-Trade accounts were for riskier investments. Clark Depo. Tr. 274:15-20; SEC Depo Ex. 158.

49. Throughout 2016, Clark's four children attended private school, costing about $5,000 per month. Clark Depo Transcript 105:6-107:4.

50. Throughout 2016, Clark worked as a mortgage broker. Clark Depo Transcript 105:6-107:4.

51. As a mortgage broker, Clark's salary fluctuated throughout the year. On average, Clark's take home pay (after taxes and withholdings) was around $17,000 to $18,000 per month. Clark Depo Transcript 105:6-107:4. SEC Exhibit 149 (Clark's 2016 W-2).

52. Throughout 2016, Clark and his wife maxed out their 401K accounts. Clark Depo. Tr. 119:12-14.

<u>ARGUMENT</u>

There are three elements the SEC must prove by a preponderance of the evidence to prevail under Section 10(b) of the Exchange Act: (1) the use or possession of material, nonpublic information (MNPI) in connection with the purchase or sale of securities; (2) a personal benefit, for cases where corporate insiders pass material nonpublic information to outsiders who trade based on that information (as alleged here); and (3) a breach of a fiduciary duty or other relationship of trust and confidence.

I.      PREPONDERANCE OF THE EVIDENCE

The SEC must prove every element of its claim by a preponderance of the evidence. This burden requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before the trier may find in favor of the party who carrying the burden. *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 622 (1993). "In other words, the preponderance standard goes to how convincing the evidence in favor of a fact must be in comparison with the evidence against it." *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1953). To meet this burden, the burden-carrying party must show their evidence is more convincing that the evidence offered in opposition. *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 622 (1993). Even when the evidence is evenly balanced, the party with the burden must lose.

*Director, Officer of Workers' Compensation Programs v. Greenwich Collieries*, 512 U.S. 267, 281 (1994). There are no material facts in dispute that allow the SEC to meet this burden.

Further, with the drastic investigative technique advances since Section 10(b) of the Securities Act and Exchange Act was enacted, the SEC has far more resources at its disposal in investigating and prosecuting insider trader claims. For example, with the availability of "big data," the SEC can identify trading patterns and relationships that would've been undetectable in the past. Further, the use of electronic communications gives the SEC a greater ability to uncover details of the communications of traders. This can be seen here, with the SEC citing to phone records within the Complaint. The time of allowing the SEC to meet its burden through only circumstantial evidence has come and gone. Now, juries have come to expect, and sometimes require, the SEC to produce recorded conversations and multiple layers of corroborative evidence. This can be seen in *Salman v. United States*, where the tipper had testified that he disclosed MNPI to his brother and he even testified that he did it to benefit his brother. 137 S. Ct. 420 (2016). This standard is clearly not met here where there is no clear direct or circumstantial evidence showing that Wright provided information to Clark. Despite the boundless resources available to the SEC during its investigation, the SEC brought this claim without any proper evidence. Now that discovery has closed, it has become clear to all parties that the SEC cannot prevail here, and Clark should be allowed to resume his life and move past the turmoil this investigation and case has brought.

II.   NO MATERIAL DISPUTED FACTS PROVING BY PREPODERANCE OF THE
      EVIDENCE.

A.    THERE ARE NO DISPUTED FACTS SHOWING CHRISTOPHER CLARK USED OR
      POSSESSED MATERIAL, NONPUBLIC INFORMATION IN CONNECTION WITH
      THE PURCHASE OR SALE OF SECURITIES.

      Under Section 10(b) of the Securities Act, the SEC must prove by preponderance that Clark

used or possessed material, non-public information with the sale or purchase of securities. The

SEC cannot do so here because Clark was never given material, non-public information, and thus,

could not have used MNPI in connection with the sale or purchase of CEB securities.

      Clark does not dispute his successful trading of CEB securities in December 2016 to

February 2017. After trading in CEB since 2008, Clark's attention and efforts paid off. Undisputed

Material Facts ¶ 29. Despite his long history with CEB securities, the SEC seems to believe the

only possible way Clark could have been so successful was if he received insider information. This

belief is inaccurate because (1) Wright did not provide Clark insider information and (2) it ignores

the more likely possibility that Clark came to the decision on his own based on public information.

      i.    Wright did not provide Clark insider information.

      There is no dispute of material facts that would allow the SEC to prove that Wright provided

Clark with insider information by a preponderance on the evidence. It is undisputed that Wright

did not inform Clark when the CEB/Gartner acquisition would be publicly announced. Undisputed

Material Facts ¶ 18. It is further undisputed that Clark never received MNPI from Wright about

the acquisition. Undisputed Material Facts ¶ 19.

      When Clark began trading on CEB securities on December 9, 2016, Wright was not yet

aware of the acquisition. Wright was informed of the acquisition while on a work trip to London

with Barron Anschutz. Undisputed Material Facts ¶ 27. Wright and Anschutz travelled to London

on December 11, 2016, and returned on December 15, 2016. Undisputed Material Facts ¶ 26.

Before being informed of the acquisition, Wright did not have access or possession to merger related MNPI. Undisputed Material Facts ¶ 28. Wright could not provide Clark with information he did not have himself.

Further, Clark has traded in CEB securities since 2008. Undisputed Material Facts ¶ 29. Between 2008 and 2016, Clark traded in front of 18 CEB quarterly earnings announcements, just as he did here. Undisputed Material Facts ¶ 26. The SEC does not allege that Clark and Wright communicated ahead of 17 of these 18 earnings announcements. Undisputed Material Facts ¶ 30. In fact, Wright told Clark in the past not to discuss his CEB trades with him. Undisputed Material Facts ¶ 25. It is far too improbable that after all these years, Wright and Clark changed course. Further, it is clear that Clark could have come to the decisions he did solely on public information.

      ii.     It is more likely that Clark came to the decision on his own solely on public information.

There is no dispute of material facts that would allow the SEC to prove that the only way Clark correctly bet on CEB was through insider information by a preponderance on the evidence. Clark was not an unsophisticated trader. As mentioned above, Clark has been involved with CEB securities since 2008. Between 2008 and 2016, Clark traded in front of 18 CEB quarterly earnings announcements. Undisputed Material Facts ¶ 29. Of those 18 trades, Clark bet correctly in 15 of the cases that CEB's stock would decline. Undisputed Material Facts ¶ 31. Clark was particularly interested in local businesses and paid close attention to CEB.

As such, Clark is well aware of CEB's business. Specifically, that CEB was a global best practice insights and technology company providing products and services to businesses in various industries, including information technology, finance, human resources and marketing, among others. Undisputed Material Facts ¶ 1. Thus, when Donald Trump won the presidency in November 2016 on a business-friendly platform, Clark believed this would improve CEB's stock. Undisputed

Material Facts ¶ 9. In addition, when Tom Monahan announced his retirement as CEB's CEO without naming a successor, Clark was not the only person thinking this was an indicator that CEB was ripe for acquisition. CEB itself prepared for questions about a potential sale of the company. Undisputed Material Facts ¶ 7. In addition, on the 2016 3Q earnings call, Gary Bisbee, a local analyst, stated "[f]irst I guess I should say congratulations on the decision to move on to something else at some point. But in the process of discussing that with the board, has there been any discussion or thought about potentially considering a sale of the company?" Undisputed Material Facts ¶ 8.

Throughout the discovery phase of this litigation, the SEC spent significant time and energy on Clark's finances. Presumably this was done, in part, to show how unlikely it would be for Clark to spend $33,050 on CEB securities. Undisputed Material Facts ¶ 43. While Clark maintained debt throughout 2016, this was not unusual for Clark and, in fact, he viewed this debt not in a negative light, but that it allowed him to substantially grow his net worth. Throughout 2016, Clark maintained a positive net worth. Throughout Fall 2016 and early 2017, Clark had five properties in Virginia, Georgia, and North Carolina. Undisputed Material Facts ¶ 45. Throughout 2016, Clark's four children attended private school, which cost about $5,000 per month. Undisputed Material Facts ¶ 49. In 2016, Clark's net income alone was around $17,000 to $18,000 per month. Undisputed Material Facts ¶ 51. In addition, throughout 2016, Clark and his wife maxed out their 401K contributions. Undisputed Material Facts ¶ 52. This shows that Clark and his wife were not in financial strain. Clark and his wife were doing well financially which allowed Clark to participate in the marketplace as he did. In fact, Clark had far more resources at his disposal that he chose not to use in purchasing CEB securities. Clark should not be punished because of the SEC's lack of understanding of how private individuals operate their finances. The securities

statutes seek to maintain public confidence in the marketplace, not to punish someone for having a pastime the Commissioners do not understand. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

The SEC cannot prove by a preponderance of the evidence that Clark used or possessed material, non-public information in connection with any purchase or sale of securities because there is no dispute of material fact that Wright provided Clark insider information or that the only way Clark could have correctly bet on CEB securities was with insider information.  Because the SEC cannot meet its burden on this element, summary judgment should be granted.

B.    THERE ARE NO DISPUTED FACTS SHOWING WILLIAM WRIGHT RECEIVED A PERSONAL BENEFIT.

Even if the court determines at this stage of litigation that there is a dispute of material fact over the first issue, there is no dispute of material fact that the SEC cannot prove by a preponderance of the evidence that William Wright received a personal benefit. Here, Wright did not receive a personal benefit. The Supreme Court stated in *Dirks v. SEC* that a jury can infer a personal benefit when the tipper (1) receives something of value in exchange for the tip or (2) makes a gift to a trading relative or friend. 463 U.S. 646 (1983). The Court further clarified that the test:

> requires courts to focus on objective criteria, *i.e.*, whether the insider receives a direct or indirect personal benefit from disclosure, such as a pecuniary gain or a reputational benefit that will translate into future earnings. There are objective facts and circumstances that often justify such an inference. For example, there may be a relationship between the insider and the recipient that suggests a quid pro quo from the latter, or an intention to benefit the particular recipient. The elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend. The tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient.

*Id.* at 663-64. In the absence of evidence of direct financial gain, the Court explained in *Salman v. United States*, the extent to which an inference of personal benefit can be drawn from relationships to friends or relatives. 137 S. Ct. 420, 428. The tipper was the first tippee's brother. *Id.* at 424. The brothers were very close, testifying that the enjoyed a "very close relationship" and that the tipper "love[d] [his] brother very much." *Id.* "[The tipper] testified that he shared inside information with his brother to benefit him and with the expectation that his brother would trade on it." *Id.* This Court ultimately found the relationship sufficiently close to establish an inference of personal benefit.

Here, the SEC cannot prove by a preponderance of the evidence that Wright received a personal benefit through an exchange of something of value or through making a gift to a trading relative or friend. The only effort the SEC has made in proving a personal benefit was by obfuscating Clark's finances to portray him as financially strained. As discussed above, the SEC spent significant time and energy on Clark's finances. Presumably, as in part, to infer that Wright wished to help Clark's family. But, as detailed above, Clark was not financially strained. In fact, Clark was doing so well as to have the ability to spend $33,050 on CEB securities while having four children in private schools, maxing out 401K contributions, and maintained five properties. Undisputed Material Facts ¶ 49, 51, 32.

Further, it is undisputed that Clark and Wright are not blood relatives. Undisputed Material Facts ¶ 18. Clark's wife is the sister of Wright's wife. Undisputed Material Facts ¶ 17. Despite how close the Wrights lived to the Clarks, they did not frequently go to one another's homes. Undisputed Material Facts ¶ 24. And throughout November 2016 and January 2017, Clark and Wright had few interactions. Undisputed Material Facts ¶ 22. One of the only ties the SEC could show between the two was that in the winter of 2016, Clark coached a basketball team that their

daughters were both on. Undisputed Material Facts ¶ 21. In addition, Clark and Wright would occasionally discuss mortgage trends since Clark is a mortgage broker. For example, in November 2016, Wright talked to Clark about purchasing a home in South Carolina to understand his realistic options. Undisputed Material Facts ¶ 23.

The SEC cannot prove by a preponderance of the evidence that Wright received a personal benefit because there is no dispute of material fact that Wright received a personal benefit through an exchange of something of value or by providing information to a close friend or family member. Because the SEC cannot meet it burden on this element, summary judgment should be granted.

C.    THERE ARE NO DISPUTED FACTS SHOWING THAT THERE WAS A BREACH OF A FIDUCIARY DUTY.

Even if this court were to accept Clark and Wrights relationship as sufficiently close to infer a benefit, the SEC cannot show by a preponderance of the evidence that Clark breached a fiduciary duty. The SEC cannot do so because Wright did not provide Clark with any inside corporate information.

Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit undisclosed trading on inside corporate information by persons bound by a duty of trust and confidence not to exploit that information for their personal advantage. *Salman v. United States*, 137 S. Ct. 420, 421 (2016). In *Dirks v. SEC*, the Supreme Court explained that tippee liability hinges on whether the tipper's disclosure breaches a fiduciary duty, which occurs when the tipper discloses the information for a personal benefit. 463 U.S. at 646. As discussed in sections A and B above, Wright did not provide Clark any insider information. Without any such disclosure, the SEC cannot show that Wright breached a fiduciary duty. And further, because of the lack of benefit here, the SEC cannot establish any such duty would have extended to Clark.

16

The SEC cannot prove by a preponderance of the evidence that Clark breached a fiduciary duty because there is no dispute of material fact that Wright provided Clark with any insider information or that Wright received a personal benefit.  Because the SEC cannot meet it burden on this element, summary judgment should be granted.

<u>CONCLUSION</u>

Because the SEC cannot show that there is a genuine dispute of material fact on the essential elements of the allegations in the Complaint, Defendant Christopher Clark moves this Honorable Court to grant this motion.

Dated: October 22, 2021                              Respectfully submitted,

                                                     <u>/s/ Mark D. Cummings</u>
                                                     Mark D. Cummings. (VSB No. 18271)
                                                     Sher, Cummings and Ellis
                                                     3800 Fairfax Dr., Suite 7
                                                     Arlington, VA 22203
                                                     Phone: (703) 525-1200
                                                     Fax: (703) 525-0067

                                                     *Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 22, 2021, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send an electronic copy to all counsel of record in this matter.

By: /s/ Mark D. Cummings
Mark D. Cummings (VSB 18271)
Sher, Cummings and Ellis
3800 Fairfax Drive, Suite 7
Arlington, Virginia 22203
Tel: (703) 525-1200
Fax: (703) 525-0067

# Exhibit 1



**U.S. Department of Justice**

Criminal Division

*Fraud Section*

*Washington, D.C. 20530*

June 19, 2020

**Via E-Mail**
*mcummings@sherandcummings.com*
Mark D. Cummings, Esq.
Sher, Cummings & Ellis
3800 Fairfax Dr. Ste 7
Arlington, VA, 22203

       Re: Trading in the Securities of CEB

Dear Mr. Cummings,

      We write regarding the investigation by the U.S. Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") into your client, Christopher Clark, regarding possible violations of federal fraud laws in connection with trading in CEB securities by Mr. Clark and Andrew Nevins. Based upon the information known to the Fraud Section at this time, the Fraud Section has closed its inquiry into the above-listed matter. If the Fraud Section learns of additional information, the Fraud Section may reopen its inquiry.

                              Sincerely,

                              /s/ Brian Kidd
                              Brian Kidd
                              Chief
                              Market Integrity and Major Frauds Unit

cc:    Anna Kaminska, Assistant Chief
        Michael O'Neill, Assistant Chief
        Jason Covert, Trial Attorney