UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) ) | Civil No. 1:20-cv-01529 |
| vs. | ) ) ) | |
| CHRISTOPHER CLARK | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANT CLARK'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Defendant Christopher Clark (Clark) respectfully submits this Reply Memorandum of Law in further support of his Motion for Summary Judgment against Plaintiff, the United States Securities and Exchange Commission (SEC).

## INTRODUCTION

The material facts in this case are not subject to any genuine dispute. The SEC does not, and cannot, introduce any direct or circumstantial evidence to prove that Wright provided Clark with MNPI or that Clark traded on MNPI. Instead, the SEC attempts to raise "some metaphysical doubt" about uncontroversial and uncontroverted facts by mischaracterizing the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The SEC's stubborn refusal to acknowledge undisputed facts, many of which derive from evidence the SEC itself provided, does not create a genuine dispute for trial. Thus, Clark's motion for summary judgment should be granted.

1

## ARGUMENT

The SEC's opposition underscores the precise points Clark raised in his initial Memorandum in Support of his Summary Judgment Motion. The SEC's case has always been based on nonexistent circumstantial evidence. Now that discovery has closed, this fact is clear for all. While the SEC may choose to ignore this fact, its false beliefs cannot beat a properly submitted summary judgment motion. To defeat a summary judgment motion, the SEC "must do more than simply show that there is some metaphysical doubt as to the material facts." *FDIC v. Cashion*, 720 F.3d 169, 180-81 (4th Cir. 2013) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). It "must come forward with specific facts showing that there is a *genuine* issue for trial." *Id.* (emphasis added) (internal quotation marks omitted). However, the SEC is attempting to do precisely what the Supreme Court has disavowed – relying on mere allegations. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curium).

The SEC also confuses its own arguments. It propounds that insider trading can, and frequently must, be proven with circumstantial evidence. Opp'n Mem. at 1, 19. The SEC's premise is correct, but its application is wrong. As applied, rather than proving its own case, the SEC essentially attempted to shift the burden and require Clark to prove that his trading was innocent. It is upon the SEC, not Clark, to prove that each element of insider trading is met. *Dirks v. SEC*, 463 U.S. 646 (1983). The SEC's circumstantial evidence is simply insufficient to meet this burden. The SEC has resorted to pure speculation and unsupported theories in an attempt to convince this Court that there is a genuine issue of fact that Wright provided Clark with any material non-public information, or that Clark traded on any such information. In fact, the SEC did not dispute nearly all of the material facts initially submitted by Clark. Opp'n Mem. at ¶¶ 1-6, 8-17, 20-21, 23, 25-27, 29, 31-52. Instead, the SEC attempted to paint a new picture for the Court by adding new

information to the already undisputed facts. In doing so, the SEC frequently made logical leaps, asserting new "facts" the evidence in the record simply does not support. The SEC then used those "facts" to support its unfounded argument against Clark's summary judgment motion. While it is true that the court at this stage should view the facts in the light most favorable to the non-moving party, at no point in litigation must the court accept bare assertions at face value, especially those wholly untrue. *Aschcroft v. Iqbal*, 566 U.S. 662, 681 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). In addition, in further support of the SEC's opposition to Clark's properly submitted motion, the SEC gravely mischaracterizes the law.

**A.      The SEC's Mischaracterization and Misuse of Facts.**

Throughout the SEC's Responses to Clark's Statement of Material Facts, the SEC makes frequent mischaracterizations of the evidence in the record in an effort to fabricate a genuine dispute of material fact. If this Court considers only the *true* facts of this case, it shows that there is no genuine dispute. Thus, summary judgment should be granted.

First, the SEC stated that, "The SEC does not dispute that Wright, Clark's co-defendant, has stated that he told Clark not to discuss his CEB trades with him, but the SEC adds that Clark has *denied that Wright ever instructed Clark not to discuss his CEB trades with Wright.*" Opp'n Mem. at ¶ 25 (emphasis added). To support this "fact," the SEC cited to Clark's Deposition transcript, pages 219-220. *Id.* However, Clark repeatedly testified that he did not *recall* Wright ever telling him that. (Clark Dep. 219:20-220:23). At no point did Clark ever *deny* having this conversation. Rather, Clark simply stated that, nearly four years later, he could not *recall* Wright telling him that. *Id.* While the SEC may attempt to argue that this shows a dispute over facts, mischaracterizing clear evidence is not a dispute of fact.

3

Second, the SEC stated that, "Mr. Monahan's August 2016 resignation announcement was *not a factor* in Clark's decision to purchase CEB call options in December 2016." Opp'n Mem. at ¶ 7 (emphasis added). The SEC cites to Clark's deposition and SEC Trial Exhibit 277 to support this assertion. But again, this misrepresents what Clark actually said. Clark stated that his resignation was *not a major contributing factor* as to why he made these investments. (Clark Dep. 272:7-23, 281:5-282:6). At no point did Clark state that it was not a factor at all. Mischaracterizing clear evidence is not a dispute of fact.

Third, the SEC stated that, "*On multiple occasions*, Clark raised his investments in CEB with Wright, and in November 2016, over Thanksgiving weekend, Clark stopped by Wright's house *to talk to him about CEB's stock price*." Opp. Memo ¶ 17 (emphasis added). To support this assertion, the SEC cited to Wright's first interrogatory responses to the SEC. SEC Trial Exhibit 158. Yet again, the SEC misrepresents what Wright stated. Wright stated that he and Clark spoke about CEB stock *on only three occasions between 2008 and 2016* and on the final occasion, Thanksgiving weekend 2016, Wright stated that:

> *Chris came by our house to look at the Christmas light display in our front yard*, which many neighbors drop by to look at every year. While there, Chris said something to the effect of, "*The stock's really moving*." I told him I don't pay attention to the stock price, and changed the subject. Chris did not indicate whether he was trading in CEB stocks at the time.

SEC Trial Ex. 158, at 3-5 (emphasis added). At no point did Wright state that Clark stopped by to talk about the stock price. Mischaracterizing clear evidence is not a dispute of fact.

Fourth, the SEC stated that, "Clark has offered inconsistent explanations for his merger trades during the litigation." Opp. Memo ¶¶ 53-54. To support this assertion, the SEC detailed the multiple reasons Clark provided for why he made his trades. But this detail made clear that his reasons were consistent. Clark has been clear throughout the litigation that multiple factors (the

five the SEC details) influenced his decision. Opp. Memo ¶ 53. At no point has Clark stated that he trades based only on one factor, nor been inconsistent in the way described by the SEC. Mischaracterizing clear evidence is not a dispute of fact.

In addition, the SEC also made assertions without any supporting evidence. For instance, the SEC stated that "When [Anschutz] learned about the merger, Anschutz knew that the merger would have a significant impact on Wright professionally and personally and that Wright could lose his job as a result." Opp'n Mem. at ¶ 26. The SEC did not cite to anything in the record to support this assertion, nor can it because this evidence does not exist. Asserting a "fact" without any support from the record is not a dispute of fact.

Finally, the SEC also inconsistently used "facts" throughout its opposition. For example, the SEC, in support of the claim that Clark used "extraordinary means to finance his trades," stated that, "He maxed out his family's credit line." Opp'n Mem. at 21. But, in the Response of Facts, the SEC stated that, "as of December 2016, Clark and his wife also had… drawn over $19,000 (nearly the maximum) on a line of credit." Opp'n Mem. at ¶ 46. Not only are these statements inconsistent, the fact that by December 2016, Clark *and his wife* had drawn nearly the maximum on this line of credit does not suggest that Clark "maxed out his family's credit line" to finance his trades. Opp. Memo at 21.

While these alterations of fact may individually seem small, collectively they make a difference – especially in a case without any direct evidence. In addition, the SEC uses these additional "facts" to make additional logical leaps throughout its argument. Not only are these logical leaps unfounded, but the case law the SEC relies on does not support its position.

5

**B.      The SEC's Mischaracterizations of Law.**

The SEC asserts that it should prevail because "Courts uniformly hold that circumstantial evidence alone can support a verdict for the Government on insider trading claims." Opp'n Mem. at 19. But, relying on circumstantial evidence is not the same as the SEC relying on "facts" it came to through mischaracterizations of law and improper logical leaps.

Courts have consistently held that circumstantial evidence of "suspicious trades," "implausible reasons for such trades," "a dramatic departure from trading history," "inconsistent deposition testimony," and a failure to produce evidence do not create a reasonable inference of insider trading. *SEC v. Garcia*, 2011 U.S. Dist. LEXIS 148623 at *43 (N.D. Ill. Dec. 28, 2011) (holding that defendant's gain of 1,046% return on investment, marked departure from his trading history, "implausible reasons" for executing trades, and disposal and deletion of electronic records do not create a reasonable inference of insider trading); *SEC v. Horn*, 2010 U.S. Distr. LEXIS 135000 (N.D. Ill. Dec. 16, 2010) (holding that defendant's profit of $870,000 and inconsistent deposition testimony, coupled with his ability to access nonpublic information "is not enough [to]… ask a jury to infer that it was the product of insider trading"). Further, the cases relied on by the SEC do not support its position. The cases the SEC relies on involve either more direct connection between the tipper and tippee, drastically different trading patterns (such as making trades for the first time *ever*), or significantly higher investments. The mischaracterization of the case law can be clearly seen by the number of times the SEC says "in part" in a case parenthetical.

The SEC cites to *Waldman* to support the inference that Clark must have traded on MNPI because he "had not purchased calls in CEB since 2011, and almost never traded in options in other companies." Opp'n Mem. at 20. However, the facts in *Waldman* are not comparable here. One defendant in *Waldman* invested around $900,000 in two months, profiting around $7.1

6

million. *SEC v. Waldman*, 407 F. Supp. 3d. 299, 303 (S.D. N.Y. July 29, 2019). Another defendant withdrew 95% of his bank accounts to finance the trades of approximately $214,000, profiting more than $1.27 million. *Id*. at 303-04. There was also no dispute that the two talked about these investments and attempted to hide the trading activity from their financial advisor. *Id.* at 307-08.

  The SEC also cited to *Yang* to support the inference that Clark must have traded on MNPI as above. Opp. Memo at 21. However, the facts in *Yang* are even less analogous. The defendant formed an investment firm. *SEC v. Yang*, 999 F. Supp. 2d 1007, 1010 (N.D. Ill. 2013). The following month, he traveled to China and met with a company's executives and marketed his investment firm to potential investors. *Id.* The following month, the defendant opened a brokerage account for the firm and transferred in $29.7 million. *Id.* The defendant then used $28 million to purchase 3.2 million shares of the company whose executive's he met with. *Id.* The defendant also purchased 2,571 call options and 58,000 additional shares with a joint account. *Id.* The same month, the company announced that it would be going private and purchasing all of its stock at a 46% premium. *Id.* Even further, the defendant falsely filed documents in opening his accounts and violated his employer's policy barring trading on public companies. *Id.*

  The SEC claimed that Clark used "extraordinary means to finance the trades." According to the SEC, "Clark only took such risks because he knew what was going to happen." The SEC cited to *SEC v. Musella*, to support their position. However, in *Musella*, the defendant, the day before an acquisition was announced, cashed a $20,000 certificate of deposit, borrowed $48,000 from his 19-year-old, and made his first securities purchase of his life for $136,791.37. *SEC v. Musella*, 748 F. Supp. 1028, 1032 (S.D. N.Y. 1989). The SEC incorrectly attempts to equate these purchases to Clark's. It is undisputed that Clark had traded in securities for decades, Clark had in

the past drawn on an interest-bearing line of credit, Clark had multiple investment accounts, and he and his wife maxed out their 401K contributions, resulting in sizeable accounts.

The SEC claimed that "Courts have repeatedly ruled that evidence of suspicious trading that coincides with communications between the alleged tippee and tipper should go to the jury, often on facts much weaker than those here." Opp'n Mem. at 22. The SEC cited *SEC v. Alder* and *SEC v. Obus* in support of this assertion. *Id.* Neither lend support to the SEC. In *Alder*, the communications were far more suspect, with the defendant attending a board meeting where it was announced that there was potential fraud of $4 million in the company. *SEC v. Adler*, 137 F.3d 1325, 1329 (11th Cir. 1998). The following morning, the defendant called another individual who then called his wife two minutes later. *Id.* at 1330. Less than 10 minutes later, his wife sold 50,000 shares of the company's stock. *Id*. Later that same day, the tippee called another individual and within two hours that individual sold 5,000 shares. *Id.* In *Obus*, there was direct evidence that the defendant had been tipped and then purchased 330,000 shares and profited over $1 million in 8 days. *SEC v. Obus*, 693 F.3d 276, 281-82 (2d Cir. 2012). Even taking the facts as stated by the SEC as true, there is no evidence that Clark and Wright had communications and trades at all comparable to the communications in these cases.

In further support of the above assertion, the SEC incorrectly relied on *SEC v. All Know Holdings, Ltd.* 949 F. Supp. 2d 814 (N.D. Ill. 2013). But again, the facts here do not support the assertion by the SEC. For one, because the court granted all but one defendant's motion for summary judgment. *Id.* at 815. The defendant whose motion was denied was brother to the company's brother and his wife and worked with the company for three years. *Id.* at 816. The defendant purchased 7,900 shares the day before the announcement of an acquisition, his first ever purchase of this company's shares. *Id.* at 819. In doing so, this defendant spent three times his

8

annual salary in a single day. *Id.* at 818. In addition, the defendant made contradictory statements about his trades during his deposition. *Id.*

Possibly the most egregious mischaracterization is the SEC's reliance on *SEC v. Jacobs*. Opp'n Mem. at 22. The SEC stated that the court was "denying motion for post-verdict judgment… because of, in part, a "pattern of tight trades and tight communications." *Id*. The court actually stated that "*Plaintiff contends* that the record demonstrates a pattern of tight trades and tight communications and that this is enough to establish that [tipper] disclosed material nonpublic information to [tippee]. *SEC v. Jacobs*, 2014 WL 12597833, at 4 (N.D. Ohio March 18, 2014) (emphasis added).

These examples show just how pervasive the SEC's mischaracterizations of the law seeped into their opposition. In reality, the SEC has presented to the court no evidence comparable to those described above. Rather, the evidence provided aligns most with *Garcia* and *Horn*. *SEC v. Garcia*, 2011 WL 6812680 (N.D. Ill. 2011); *SEC v. Horn*, 2010 WL 5370988 (N.D. Ill. 2010). In *Garcia*, the court granted summary judgment even though the SEC asserted that the defendant made a gain of 1,046% return on investment, made a marked departure from his trading history, offered "implausible reasons" for executing trades, and disposed and deleted electronic records. *SEC v. Garcia*, 2011 WL 6812680 (N.D. Ill. 2011). And in *Horn*, the court granted summary judgment even though the SEC asserted that the defendant profited $870,000, had an inconsistent deposition transcription, and had the ability to access nonpublic information. *SEC v. Horn*, 2010 WL 5370988, at *7-8 (N.D. Ill. December 16, 2010).

Just as here, the SEC lacked direct evidence but contended that it could present enough circumstantial evidence to persuade a reasonable jury the defendant possessed nonpublic information. *Id.* at *4. But the court held that "it is not enough for the SEC simply to identify

9

suspicious trading and ask a jury to infer that it was the product of insider trading…. Furthermore, proof of access to nonpublic information is not proof of possession of that information." *Id.* at 5. Ultimately here, after four years of investigations, multiple FBI interviews, a review of thousands of pages of documents and financial records, and twelve depositions, the SEC has no more incriminating evidence than it did when it filed the complaint against Clark. Thus, just as the court in *Horn* held, this Court too should find that:

> To survive a motion for summary judgment, a party must "wheel out all its artillery to defeat it." After investigating Dr. Horn's trading activities for four years, deposing him (twice), deposing fourteen other individuals, and reviewing documents, the SEC has now been forced to show its hand; and it has failed to demonstrate any reason for this case to proceed to trial. The SEC's admitted lack of direct evidence is not fatal to its case, but the insufficiency of its purported circumstantial evidence is.

*SEC v. Horn*, at 8 (quoting *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (citations and internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, Clark respectfully requests that the Court grant his Motion for Summary Judgment.


Dated: November 11, 2021                                Respectfully submitted,

/s/ Mark D. Cummings
Mark D. Cummings (VSB 18271)
Sher, Cummings and Ellis
3800 Fairfax Drive, Suite 7
Arlington, VA 22203
Phone: (703) 525-1200
mcummings@sherandcummings.com

*Counsel for Defendant Christopher Clark*

## CERTIFICATE OF SERVICE

I hereby certify that on November 11, 2021, I filed the foregoing document via CM/ECF and thereby served all counsel of record in this matter.

By: /s/ Mark D. Cummings
Mark D. Cummings (VSB 18271)
Sher, Cummings and Ellis
3800 Fairfax Drive, Suite 7
Arlington, VA 22203
Phone: (703) 525-1200
mcummings@sherandcummings.com

*Counsel for Defendant Christopher Clark*
