```
                    UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA


   UNITED STATES SECURITIES AND      :
   EXCHANGE COMMISSION,              :
                                     :   Civil Action
                        Plaintiff,   :   No. 1:20-cv-01529-MSN-JFA
                                     :
        v.                           :
                                     :   December 8, 2021
   CHRISTOPHER CLARK,                :   10:00 a.m.
                                     :
                   et al.,           :
                                     :
                                     :
                   Defendants.       :
                                     :
   .............................  :


                   DAY 1 - MORNING SESSION
            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
          BEFORE THE HONORABLE CLAUDE M. HILTON,
            UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:          Olivia S. Choe, Trial Attorney
                            Securities and Exchange Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-5100
                            Email: Choeo@sec.gov

                            Daniel J. Maher, Trial Attorney
                            Securities and Exchange Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-5100
                            Email: Maherd@sec.gov

                            John Lucas, Trial Attorney
                            Securities and Exchange Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-5798
                            Email: Lucasj@sec.gov
```

APPEARANCES:   (Cont.)

For the Plaintiff:          **Sarah Marie Hall, Trial Attorney**
                            US Securities & Exchange Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-4784
                            Fax: 202-661-5849
                            Email: Halls@sec.gov


For the Defendants:         **Mark Davis Cummings, Esq.**
                            Sher, Cummings & Ellis
                            3800 N. Fairfax Drive
                            Suite 7
                            Arlington, VA 22203-1703
                            703-525-1200
                            Email:
                            Mcummings@sherandcummings.com

                            **David Edward Sher, Esq.**
                            Sher Cummings & Ellis
                            3800 N. Fairfax Drive
                            Suite 7
                            Arlington, VA 22203-1703
                            703-525-1200
                            Email: Sher@sherandcummings.com

                            **Adam Michael Collins, Esq.**
                            Sher, Cummings and Ellis
                            Virginia
                            3800 N. Fairfax Drive
                            Suite 7
                            Arlington, VA 22203
                            571-212-9192
                            Email: Acollins@sherandcummings.com

Court Reporter:             **Scott L. Wallace, RDR, RMR, CRR**
                            Official Court Reporter
                            United States District Court
                            401 Courthouse Square
                            Alexandria, VA  2231-5798
                            Office: 703.549.4626
                            Cell: 202.277.3739
                            Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                          **Page**

 OPENING STATEMENT ON BEHALF OF THE PLAINTIFF          18

 OPENING STATEMENT ON BEHALF OF THE DEFENDANT          31

 DIRECT EXAMINATION OF MATTHEW CAIN                    40
 BY MR. MAHER
 CROSS-EXAMINATION OF MATTHEW CAIN                     76
 BY MR. SCHER
 REDIRECT EXAMINATION OF MATTHEW CAIN                  103
 BY MR. MAHER

## EXHIBITS

**DESCRIPTION**                                                          **Page**

—

1          **<u>MORNING SESSION, DECEMBER 8, 2021</u>**

2  (10:01 a.m.)

3          THE COURTROOM CLERK:  Civil Action Number 20-1529,

4  *Securities and Exchange Commission versus Christopher Clark.*

5  This case comes on for trial by jury.

6          Will counsel please note your appearances for the record.

7          MS. CHOE:  Good morning, Your Honor.  Olivia Choe on

8  behalf of the Securities and Exchange Commission, and with me are

9  my colleagues, Daniel Maher, Sarah Hall, and John Lucas.

10          THE COURT:  All right.

11          MR. CUMMINGS:  Good morning, Your Honor.  My name is Mark

12  Cummings, the law firm of Scher, Cummings and Ellis, and with me

13  is David Scher, my law partner, my associate counsel, Adam

14  Collins, my litigation paralegal, Mr. Taylor Byrd.  And seated to

15  my left is our client, Mr. Christopher Clark.  Thank you.

16          THE COURTROOM CLERK:  Ladies and gentlemen of the jury, as

17  I call your name, please stand, answer present, and be seated as

18  the next name is called.  Juror Number 1, Lizbeth Alvarado Cruz.

19          A PROSPECTIVE JUROR:  Present.

20          THE COURTROOM CLERK:  Juror Number 2, Henry Bailey, V.

21          A PROSPECTIVE JUROR:  Present.

22          THE COURTROOM CLERK:  Juror Number 3, Linda Barrett.

23          A PROSPECTIVE JUROR:  Present.

24          THE COURTROOM CLERK:  Juror Number 4, Remi Bernard.

25          A PROSPECTIVE JUROR:  Present.

1          THE COURTROOM CLERK:  Juror Number 5, Jillian Bolls.

2          A PROSPECTIVE JUROR:  Present.

3          THE COURTROOM CLERK:  Juror Number 6, Chadha Puja.

4          A PROSPECTIVE JUROR:  Present.

5          THE COURTROOM CLERK:  Juror Number 7, Sophie Clarke.

6          A PROSPECTIVE JUROR:  Present.

7          THE COURTROOM CLERK:  Juror Number 8, Ronald Collins, Jr.

8          A PROSPECTIVE JUROR:  Present.

9          THE COURTROOM CLERK:  Juror Number 9, Geoffrey Dick.

10         A PROSPECTIVE JUROR:  Present.

11         THE COURTROOM CLERK:  Juror Number 10, Gavin Fugere.

12         A PROSPECTIVE JUROR:  Present.

13         THE COURTROOM CLERK:  Juror Number 11, Krishna Gadicherla.

14         A PROSPECTIVE JUROR:  Present.

15         THE COURTROOM CLERK:  Juror Number 12, Kevin Gilfedder.

16         A PROSPECTIVE JUROR:  Present.

17         THE COURTROOM CLERK:  Juror Number 13, Christopher

18  Gormsen.

19         A PROSPECTIVE JUROR:  Present.

20         THE COURTROOM CLERK:  Juror Number 14, William Heaney.

21         A PROSPECTIVE JUROR:  Present.

22         THE COURTROOM CLERK:  Juror Number 15, Helencia Hines.

23         A PROSPECTIVE JUROR:  Present.

24         THE COURTROOM CLERK:  Juror Number 16, James Hruska.

25         A PROSPECTIVE JUROR:  Present.

```
 1          THE COURTROOM CLERK:  Juror Number 17, Mark Jackson.

 2          A PROSPECTIVE JUROR:  Present.

 3          THE COURTROOM CLERK:  Juror Number 18, James Leyden.

 4          A PROSPECTIVE JUROR:  Present.

 5          THE COURTROOM CLERK:  Juror Number 19, Helia Maritato.

 6          A PROSPECTIVE JUROR:  Present.

 7          THE COURTROOM CLERK:  Juror Number 20, Paula Martori.

 8          A PROSPECTIVE JUROR:  Present.

 9          THE COURTROOM CLERK:  Juror Number 22, Jared McCain.

10          A PROSPECTIVE JUROR:  Present.

11          THE COURTROOM CLERK:  Juror Number 23, Sang Michale.

12          A PROSPECTIVE JUROR:  Present.

13          THE COURTROOM CLERK:  Juror Number 24, Daniel Plank.

14          A PROSPECTIVE JUROR:  Present.

15          THE COURTROOM CLERK:  Juror 25, William Ragland.

16          A PROSPECTIVE JUROR:  Present.

17          THE COURTROOM CLERK:  Juror 26, John Rickards, Jr.

18          A PROSPECTIVE JUROR:  Present.

19          THE COURTROOM CLERK:  Juror 27, Scilla Rinaldi.

20          A PROSPECTIVE JUROR:  Present.

21          THE COURTROOM CLERK:  Juror 28, Deepthi Rodrigues.

22          A PROSPECTIVE JUROR:  Present.

23          THE COURTROOM CLERK:  Juror 29, Loretta Santacroce.

24          A PROSPECTIVE JUROR:  Present.

25          THE COURTROOM CLERK:  Juror 30, Carl Schoepe.
```

```
 1          A PROSPECTIVE JUROR:  Present.

 2          THE COURTROOM CLERK:  Juror 31, Tristan Scoffield.

 3          A PROSPECTIVE JUROR:  Present.

 4          THE COURTROOM CLERK:  Juror 32, Sonali Shah.

 5          A PROSPECTIVE JUROR:  Present.

 6          THE COURTROOM CLERK:  Juror 33, Paul Shaw.

 7          A PROSPECTIVE JUROR:  Present.

 8          THE COURTROOM CLERK:  Juror 34, Nola Shere.

 9          A PROSPECTIVE JUROR:  Present.

10          THE COURTROOM CLERK:  Juror 35, Bindu Sood.

11          A PROSPECTIVE JUROR:  Present.

12          THE COURTROOM CLERK:  Juror 36, Christopher Spadoni.

13          A PROSPECTIVE JUROR:  Present.

14          THE COURTROOM CLERK:  Juror 37, Paciencia Sunga.

15          A PROSPECTIVE JUROR:  Present.

16          THE COURTROOM CLERK:  Juror 38, Randall Vanscoy.

17          A PROSPECTIVE JUROR:  Present.

18          THE COURTROOM CLERK:  Juror 39, Deserai Wood.

19          A PROSPECTIVE JUROR:  Present.

20          THE COURTROOM CLERK:  Juror 40, Matthew Worden.

21          A PROSPECTIVE JUROR:  Present.

22          THE COURTROOM CLERK:  Is there anyone's name who I have

23  not called?  Would you all please stand and raise your right

24  hand.

25          (Jury venire sworn.)
```

1       THE COURT:  Ladies and gentlemen, we have for trial today

2  a civil case wherein the Securities and Exchange Commission has

3  filed this lawsuit against Christopher Clark to recover some

4  monies and other -- perhaps other penalties alleging that he

5  engaged in insider trading on or about -- or, in and about

6  January the 5th of 2017.  They allege, among other things, that

7  he traded in the securities of CEB Incorporated before CEB and

8  Gartner, Inc. announced that they would -- that they would --

9  Gartner would acquire CEB.  And before that, he bought options

10  for the stock.

11       Now the Securities and Exchange Commission, being

12  represented by Sarah Hall, John Lucas, Olivia Cloe [sic] --

13       MR. CUMMINGS:  Judge, that's Choe.  Sorry.

14       THE COURT:  Pardon me?

15       MR. CUMMINGS:  Olivia Choe.

16       THE COURT:  Olivia Choe?

17       MR. CUMMINGS:  Did I pronounce that correctly?

18       MS. CHOE:  Yes, thank you.  Thank you.

19       THE COURT:  All right.  C-H-O-E is the way it's spelled,

20  it's Choe.  Sorry.  Those lawyers are seated to the table to my

21  left.  The defendant is being represented by Mr. Mark Cummings,

22  Mr. David Scher, and Mr. Alan Collins seated at the table to my

23  right.  Do any of you know anything about the facts and

24  circumstances of this case?  Yes, sir?

25       A PROSPECTIVE JUROR:  I did read the complaint on the

1    SEC's Website yesterday.

2        A PROSPECTIVE JUROR:  So did I.

3        THE COURT:  Yes, sir.

4        A PROSPECTIVE JUROR:  Oh, I said, "So did I."  I read a

5    little paragraph on the SEC Website yesterday.

6        THE COURT:  All right.  Are any of you either close

7    personal friends, relatives of, have any kind of business

8    relationship with the plaintiff, the defendant, or any of the

9    lawyers involved in this case?

10       A PROSPECTIVE JUROR:  Your Honor, I want to state I used

11   to work for CEB --

12       THE COURT SECURITY OFFICER:  Stand up.

13       A PROSPECTIVE JUROR:  Your Honor, I want to state I used

14   to work for CEB previously, but during the merge, I spun off to a

15   company called Challenger Inc., which is the sales methodology

16   company, so I previously worked for CEB at one point.

17       THE COURT:  All right.  What is your name, sir?

18       A PROSPECTIVE JUROR:  Matthew Worden.

19       THE COURT:  All right.  Thank you.

20       Have any of you ever been involved in a civil case before,

21   either as a plaintiff, a defendant, or a witness?  Yes, sir.

22   Would you stand and tell me your name and the circumstance.

23       A PROSPECTIVE JUROR:  Daniel Plank and it was a civil case

24   against a hospital.  My brother passed away.

25       THE COURT:  All right.  Thank you.  Yes, ma'am?

1          A PROSPECTIVE JUROR:  Freedom of Information Act case.  I

2     was a supervisor in the Department of Labor.

3          THE COURT:  All right.  What is your name, ma'am?

4          A PROSPECTIVE JUROR:  Loretta Santacroce.

5          THE COURT:  Thank you.  Anyone else been involved in a

6     civil case, plaintiff, defendant, as a witness?  Have any of you

7     ever been involved in any kind of matters with or before the

8     Securities and Exchange Commission?  Are any of you or any

9     members of your immediate family employed in the securities

10    industry or in accounting or any C.P.A. kind of work?

11         Yes, sir.  Would you stand and tell me your name and the

12    circumstances.

13         A PROSPECTIVE JUROR:  Yeah.  My name is Christopher

14    Gormsen.  I'm the chief accounting officer of a publicly-traded

15    hotel company.

16         THE COURT:  Thank you.  Yes, sir?

17         A PROSPECTIVE JUROR:  Hi.  My name is Gavin Fugere.  I

18    have a close family friend who is a CFO.

19         THE COURT:  Thank you.  Yes, ma'am?

20         A PROSPECTIVE JUROR:  Hi.  I was working on --

21         THE COURT:  Would you speak a little louder or you can

22    come forward and speak if you want.

23         A PROSPECTIVE JUROR:  I worked for the SEC in the IT

24    department for a few months, but I'm not working there anymore.

25         THE COURT:  I'm sorry.  I still didn't understand -- I

```
 1    didn't hear.

 2         A PROSPECTIVE JUROR:  I worked on the SEC project IT

 3    department for a few months but currently I'm not on it.

 4         THE COURT:  All right.  Thank you.  Anyone else?  Now I'm

 5    going to read a list of witnesses, and I don't believe all of

 6    these people are going to be called or need to be called, but

 7    they may -- I want to be sure that you all don't know them or

 8    have a problem with any of the witnesses.  And I'm going to read

 9    a lengthy list here, and when it's over, I'm going to ask you if

10    you are either close personal friends, relatives of, or have any

11    kind of business relationship with any of these people.

12         Barron Anschutz, Gary Bisbee, Matthew Cain, Christopher

13    Clark, Tisha Clark, Jeremy Desor, Gregory Fine, Andrea Fox,

14    Cameron Funkhouser, Vicky Husband, Melody Jones, Richard Lindahl,

15    Jesse Levin, Joyce Liu, I believe, L-I-U, Andrew Nevins, Robin

16    Pena, Michael Petron, Jean Truman, James Wells, Leslie Wright,

17    and William Wright?  Any of you either close personal friends,

18    relatives of, have any kind of business relationship with any of

19    those people?

20         All right.  Now, I don't know exactly how long this case

21    is going to take.  I can go today and tomorrow, but as long as

22    I'm taking evidence, I can't do that on Friday because I have a

23    motions docket.  So, it's possible this case could go over until

24    Monday.  Is there any of you that have any particular difficulty

25    or disability that would prevent you from sitting on this jury?
```

```
 1    Yes, sir?
 2         A PROSPECTIVE JUROR:  Yes.  I am the sole owner of --
 3         THE COURT:  I'm sorry?
 4         A PROSPECTIVE JUROR:  I'm the sole owner of my business.
 5    I have to -- it's my busiest time of year.
 6         THE COURT:  What particular problem do you have?  I assume
 7    everybody operates a business that has a business.  But do you
 8    have some particular difficulty that would --
 9         A PROSPECTIVE JUROR:  Well, it's -- I can't function my
10    business.  It's Christmas time and it's a busy time of year.
11         THE COURT:  Are you the only employee?
12         A PROSPECTIVE JUROR:  I'm the only one.
13         THE COURT:  What kind of a business is it?
14         A PROSPECTIVE JUROR:  Canning products.  It's a canning
15    business.  I'm a master canner.  I make pickles, yams, that type
16    of product.
17         THE COURT:  All right.  Well, I'll excuse you.  Just
18    remain here until all the other jurors are excused.
19         Anyone else?  All right.  Can all of you or can everyone
20    here on the panel speak and write and understand the English
21    language?  Speak, understand the English language?
22         All right.  Now, considering all the questions I've just
23    asked you, is there any reason why any one of you could not sit
24    on this jury, render a fair and impartial verdict based on the
25    evidence presented here in the courtroom, and the instructions
```

```
 1   that the Court will give you on the law?
 2        All right.  We're ready to pick the jury.  We're going
 3   over for a couple of nights, maybe a little longer.  We need to
 4   pick a jury of eight so we can ensure that we have enough people.
 5   Is that agreeable to counsel?
 6        MS. CHOE:  Yes, Your Honor.
 7        May I just ask for the name of the juror who was excused
 8   for cause?
 9        THE COURT:  Yes.  May I ask your name, sir?
10        A PROSPECTIVE JUROR:  Vanscoy, V as in victory.
11        MR. CUMMINGS:  I didn't hear that.
12        MS. CHOE:  I think Vanscoy, 38.
13        THE COURT:  All right.  Would you pick the jury?
14        THE COURTROOM CLERK:  Juror Number 20, Paula Martori.
15   Please come forward and have a seat in the jury box.
16        Juror Number 14, William Heaney, please come forward and
17   have a seat in the jury box.
18        Juror number 10, Gavin Fugere, please come forward and
19   have a seat --
20        THE COURT:  We need to have every other seat here.  I
21   think we got -- do we need other chairs?
22        THE COURTROOM CLERK:  Juror Number 9, Geoffrey Dick.
23        Juror Number 16, James Hruska.
24        Juror Number 36, Christopher Spadoni.
25        Juror Number 37, Paciencia Sunga.
```

1              Juror Number 31, Tristan Scoffield.

2              MR. CUMMINGS:  The defendant goes first?

3              THE COURT:  No, the other way.

4              MS. CHOE:  Your Honor, should we just do this -- excuse

5    me.  I have not exercised peremptories in this manner before.

6    Should I just remove a name if I wish to excuse it?

7              THE COURT:  Remove it and just put it down at the bottom.

8              MS. CHOE:  Okay.  Thank you, Your Honor.

9              THE COURTROOM CLERK:  Geoffrey Dick, will you please

10   return to your seat.  And Juror 14, William Heaney, will you also

11   return to your seat.

12             Will Juror Number 8, Ronald Collins, Jr. please come

13   forward?  And Juror Number 11, Krishna Gadicherla, please come

14   forward.

15             (Discussion had off the record.)

16             MR. CUMMINGS:  Do I have to exercise a peremptory at this

17   time?  I got my answer.  Thank you, Judge.

18             THE COURTROOM CLERK:  Will Juror Number 8, Ronald Collins,

19   Jr. please return to your seat.  Will Juror Number 34, Nola

20   Shere, please come forward.

21             Will Juror Number 34, Nola Shere, please return to your

22   seat.

23             Will Juror Number 32, Sonali Shah, please come forward.

24             Will Juror Number 32, Sonali Shah, please return to your

25   seat.

1        Will Juror number 26, John Rickards, Jr., please come

2    forward.

3        Will Juror Number 26, John Rickards, Jr., please return to

4    your seat.

5        Will Juror Number 33, Paul Shaw, please come forward.

6        Ladies and gentlemen of the jury, please stand, raise your

7    right hand and respond after the oath.

8        (Jury sworn.)

9        THE COURTROOM CLERK:  The jurors not selected are excused

10   until your next court date.

11       (Remaining jury venire excused at 10:27 a.m.)

12       THE COURT:  All right.  Members of the jury, now that you

13   have been sworn.  I'll give you some preliminary instructions

14   which I -- Marshal, could you move this back?  I can't see all

15   the jurors here.  Thank you.

16       I'll give you some preliminary instructions which I hope

17   will guide you in your participation in this trial.

18       It's going to be your duty to find from the evidence what

19   the facts are.  You and you alone are the judges of the facts.

20   You will then have to apply those facts to the law as the Court

21   will give it to you.  You must follow that law, whether you agree

22   with it or not.

23       Nothing that the Court may say or do during the course of

24   the trial is intended to indicate or should be taken by you as

25   indicating what your verdict should be.  The evidence from which

1    you'll find the facts will consist of the testimony of witnesses,

2    documents, and other things received into the record as exhibits,

3    any facts that the lawyers agree or stipulate to, or any facts

4    that the Court may instruct you to find.  Certain things are not

5    evidence and must not be considered by you.  Statements or

6    arguments and questions by lawyers are not evidence.

7        Objections to questions are not evidence.

8        Lawyers have an obligation to their clients to object when

9    they feel that evidence is being offered which is improper under

10   the Rules of Evidence.

11       You should not be influenced by the objection or by the

12   Court's ruling on it.

13       If the objection is sustained, ignore the question.  If it

14   is overruled, treat the answer like any other.

15       If you're instructed that some item of evidence is

16   received for a limited purpose only, you must follow that

17   instruction.  Testimony that the Court has excluded or told you

18   to disregard is not evidence, and must not be considered.

19       Anything that you may have seen or heard outside the

20   courtroom is not evidence in this case, and must be disregarded.

21   You're to decide the case solely on the evidence presented here

22   in the courtroom.

23       Now, there are two types of evidence, direct and

24   circumstantial.

25       Direct evidence is the direct proof of the fact, such as

1  the testimony of an eyewitness.

2       Circumstantial evidence is proof of facts from which you

3  may infer or conclude that other facts exist.

4       You may consider both kinds of evidence.

5       Now, it's going to be up to you to decide which witnesses

6  to believe and which witnesses not to believe, and how much of

7  any witness's testimony to accept or reject.  I'll give you some

8  guidelines on determining the credibility of witnesses at the end

9  of the case.

10       Now, just a few words as to your conduct as jurors.

11       I would instruct you that during the trial, you should not

12  discuss this case with anyone or permit anyone to discuss it with

13  you.  Until you retire to the jury room at the end of the case to

14  deliberate on your verdict, you simply should not talk about the

15  case.  Don't read or listen to anything touching the case in any

16  way.  If anyone should try to talk to you about it, bring it to

17  the Court's attention promptly.  Don't try to do any research or

18  any investigation about the case on your own.

19       And finally, don't form any opinion until all of the

20  evidence is in.  Keep an open mind until you begin your

21  deliberations at the end of the case.

22       Our case is going to start.  The lawyers will make an

23  opening statement.  You'll then hear witnesses that are called.

24  We will try to recess in the middle of the morning some time and

25  recess for lunch about 1:00.  We'll probably go to the

```
 1    neighborhood of 5:00 or thereabouts this afternoon, depending on

 2    where we are with the witnesses.

 3           All right.  Go ahead.

 4           MS. CHOE:  Thank you, Your Honor.

 5           Your Honor, may we have permission to use the

 6    demonstrative on the poster board?

 7           THE COURT:  Yes.

 8           MS. CHOE:  Thank you.

 9           THE COURT:  But you'll have to point to it.  I mean, we

10    can't be carrying it around.

11           MS. CHOE:  Understood.

12           THE COURT SECURITY OFFICER:  Is this good?

13           MS. CHOE:  Yes, thank you.

14             OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

15           MS. CHOE:  Good morning, ladies and gentlemen.  This is a

16    case about cheating.  It's about someone who cheated and thought

17    he could get away with it.  Christopher Clark is charged with

18    using inside information, information he wasn't supposed to have

19    to make hundreds of thousands of dollars in just a few weeks.

20           In late 2016, Mr. Clark, as you'll hear, got a hold of

21    highly confidential information about a big merger between two

22    companies that was about to be announced, and he used that

23    information to invest in one of those companies, a local company

24    based in Arlington called CEB.

25           During the weeks leading up to the merger, he bought
```

1     highly risky investments in CEB called "stock options."  Those

2     investments were so risky that, as you'll hear, if CEB stock

3     price didn't skyrocket in just weeks, Mr. Clark, who was already

4     falling behind on millions of dollars in debt, would lose all of

5     the money he'd invested.

6          Why was Chris Clark willing to make such aggressive bets?

7     Well, the evidence will show that he had an unfair advantage.  He

8     knew that the merger was going to be announced in early January,

9     and that when it was announced, CEB stock would soar.

10         In fact, he was so confident about what was going to

11    happen, that he brought his son on board so his son could share

12    in the winnings, too.  He was so confident, that even though

13    Mr. Clark couldn't pay off his growing mountain of debt, he went

14    out and took out another loan, mortgaging his car, and used that

15    money to bet on CEB.

16         Now, you might be wondering, how did Mr. Clark know that a

17    merger was about to be announced?  And the answer, ladies and

18    gentlemen, is that he had an inside connection, someone who

19    worked at CEB and was, in fact, a high-level executive there with

20    access to confidential information, and that person was

21    Mr. Clark's brother-in-law, whose name is Bill Wright.  Bill

22    Wright worked at CEB and he knew about the merger before it was

23    announced.  So all throughout December 2016, Chris Clark and his

24    son spent thousands and thousands of dollars buying highly risky

25    CEB stock options.  They made very aggressive bets on CEB, and on

1    January 5th, 2017, when the merger was announced, Mr. Clark's bet

2    paid off.  He made over $245,000, and his son made another

3    $53,000.  In just a few weeks, Mr. Clark alone earned a return of

4    over 740 percent.

5         But what Mr. Clark didn't bet on was that his trading

6    would draw the attention of the SEC and the FBI, and when the FBI

7    asked Mr. Clark to explain his trades, what did he do?  He lied,

8    ladies and gentlemen.  He lied about his connection to Bill

9    Wright and he lied about the fact that he told his son to trade

10   in CEB and his son lied to the FBI, too.

11        And that's really this case in a nutshell.  Mr. Clark

12   cheated, and he thought he could get away with it.  But that kind

13   of cheating, it's like having all the answers to the final exam

14   before you take the test.  It's not fair to everyone else and

15   it's against the law, and that's why we're all here today.  Now,

16   I'm going to spend the rest of my time this morning walking

17   through some of the evidence you're going to be seeing during

18   this trial, and as I do that, I'd like you to keep two key things

19   in mind; the trading and the lies.  Those two things are what

20   really matter in this case, and if you keep that in mind, it will

21   help you make sense of all the evidence that you'll be seeing.

22        Now, before we dive into some of that evidence, let me

23   start by introducing myself again.  My name is Olivia Choe, and I

24   represent the SEC.  And as you heard, I'm joined by my

25   colleagues, Daniel Maher, Sarah Hall, and John Lucas.  Now, what

1  is the SEC?  The SEC stands for the Securities and Exchange

2  Commission, and it's a federal government agency that protects

3  investors and tries to make sure the markets are a level playing

4  field.  That's its whole mission.  And one of the things that the

5  SEC does to carry out its mission is to file lawsuits for

6  violations of the federal securities laws.

7         The SEC can't file criminal charges and can't send anyone

8  to jail, but it can file civil lawsuits, and that's what's

9  happened here.  The SEC has sued Mr. Clark for violating the law

10  against insider trading.  And because this is a civil suit, the

11  SEC doesn't have to prove its case beyond a reasonable doubt,

12  which is the burden of proof that you may have heard about in a

13  criminal case.

14         Instead, as Judge Hilton will tell you, the SEC has to

15  prove its case by a preponderance of the evidence.  And what that

16  means is that the scales have to tip, even if it's just slightly,

17  in the SEC's favor.  And as you'll see during this trial, that is

18  a burden that the SEC will easily exceed.

19         So who are the other people you're going to be hearing

20  about during this case?  Well, you're going to be hearing from

21  the defendant, Mr. Clark.  And as you'll learn, Mr. Clark is a

22  mortgage broker who lives in Arlington with his wife and

23  children, and he also has an adult son named Andrew Nevins.

24  Mr. Nevins is the one who traded in CEB with his father.  And

25  you'll be hearing about Bill Wright, his brother-in-law, who

 1    worked at CEB for over a decade and was a very senior finance

 2    officer there.  In fact, you'll learn that by 2016, he was one of

 3    the most senior people there.  He held the position of corporate

 4    controller, and in that position, he routinely had access to

 5    sensitive and confidential information.

 6         And you're going to be hearing about someone else who

 7    worked at CEB with Bill Wright; his best friend, Barron Anschutz.

 8    Mr. Anschutz was one of the very first people at CEB who learned

 9    about the merger, and he was the one who told Bill Wright about

10    it.

11         So with that background, let's talk about what happened in

12    this case.  And to really understand what happened, we need to go

13    back to October of 2016.  Take a look at the top half of the

14    timeline.  In October 2016, a company called Gartner approached

15    CEB about a potential merger.  Gartner wanted to buy CEB.  The

16    company started negotiating, and all throughout November and into

17    early December, Gartner sent a series of offers, each time

18    increasing the price it was willing to pay.

19         Now, these negotiations were highly confidential because a

20    merger was a huge deal for CEB, so only a small group of people

21    knew about it.

22         On December 7th, Gartner finally made an offer that was

23    high enough for CEB.  And on December 9th, CEB's board voted to

24    go ahead with the deal.  About one month later, as you can see,

25    on January 5th, the companies publicly announced that they were

 1    going to merge, and CEB's stock price shot up.  It jumped over

 2    20 percent in a single day.

 3         Now, keeping these dates in mind, let's talk about

 4    Mr. Clark's trading.  And that's what you can see on the bottom

 5    half of the timeline.  On December 9th, the very day that CEB's

 6    board voted to go ahead with the deal, you'll see that Mr. Clark

 7    began buying CEB options.  Those yellow squares, those are

 8    Mr. Clark's trades.  And you're going to learn during this trial

 9    that in the weeks leading up to the announcement, right up until

10    the merger announcement, he spent over $33,000 buying CEB

11    options, and he told his son, Andrew Nevins, to buy the same

12    kinds of options.  Those green squares you see are Mr. Nevins'

13    trades.

14         Now, we've been talking about the fact that Mr. Clark

15    traded in options, and what you're going to hear during this

16    trial is that trading in options is like making a bet.  When you

17    buy an option, you're betting on whether the company's stock is

18    going to go up or down, and you're betting that that's going to

19    happen by a specific date.  And like any bet, if you're wrong,

20    you lose everything.

21         Now, you might be wondering, why would someone trade-in

22    stock options?  And the answer is pretty simple -- bigger risks,

23    bigger rewards.  Options give you leverage.  You get a much

24    bigger bang for your buck.  Options are cheaper than stock.  But

25    in exchange, you have to accept the risk of losing your entire

```
 1    investment.  And as you'll learn, that means that options are the
 2    perfect investment for someone who knows that a company's stock
 3    is about to move because they have inside information about that
 4    company.  So with that in mind, let's talk more about Mr. Clark's
 5    trading.  What you're going to hear is that the kinds of options
 6    that Mr. Clark and his son bought; they were highly aggressive.
 7    They were very, very risky.  They were betting that CEB stock
 8    price was going to increase dramatically in the very near future.
 9    And, in fact, you'll learn that as the merger got closer and
10    closer, they actually started making more and more aggressive
11    bets, buying options that were riskier.  And so by the end of
12    December, Mr. Clark was buying options that were so risky that he
13    and his son were literally the only investors in the world
14    willing to buy them.  And as you're going to hear, Mr. Clark
15    wasn't just willing to buy these kinds of options, he was
16    desperate to do so.
17         On December 9th, the day that CEB's board voted to go
18    ahead with the deal and the day he started trading, Mr. Clark
19    called E-Trade and sold literally everything in one of his wife's
20    retirement accounts.  A couple days later, he maxed out his line
21    of credit, borrowing thousands of dollars.  And just days after
22    Christmas, at the end of December, he went out and took out a
23    loan for $9,400 secured by his used car, and he used all of this
24    money to up his bet, to buy more options.
25         Ladies and gentlemen, this is truly striking behavior.
```

 1    Mr. Clark was borrowing thousands of dollars right around the
 2    holidays to finance what would have been a very risky bet for any
 3    other investor.  And as you'll learn, he was doing this when he
 4    already had millions of dollars in debt.  He had nine mortgages.
 5    He and his wife had each taken out loans against their 401(k)s.
 6    They had over $50,000 in credit card debt that they were not
 7    paying off.  And, in fact, as you'll see, in just 2016, they
 8    racked up almost $8,000 just in late fees and finance charges.
 9    But in December 2016, none of that stopped Mr. Clark from
10    borrowing more money so he could trade in CEB.
11         And, in fact, as you're going to learn during this trial,
12    the merger wasn't the first time that Mr. Clark traded in CEB,
13    and it wasn't the first time that he borrowed money to do so.
14         He's actually traded in CEB for years.  And his trading
15    throughout those years followed a very familiar pattern.  Year
16    after year, Mr. Clark bought risky stock options right before the
17    company was about to make an announcement.  And year after year,
18    his bet on which way the stock would move turned out to be right,
19    just as it was at the time of the merger.
20         Take July 2015.  After speaking to his brother-in-law,
21    Bill Wright, who had just received confidential information that
22    was about to be announced, Mr. Clark borrowed $15,000, bought a
23    bunch of CEB stock options, told his son to buy CEB options, and
24    then when the announcement came out, sold all of those options.
25    In just three days, he made over $80,000.

1          And so over the years, Chris Clark made hundreds of

2     thousands of dollars from trading in CEB, the company where his

3     brother-in-law happened to work.

4          And those CEB profits, they absolutely dwarfed anything he

5     ever made on any other company.  Was it just a coincidence that

6     Chris Clark was so successful just when it came to trading in the

7     company where Bill Wright worked?  Well, let's talk about the

8     connection between the two of them and the evidence that you're

9     going to see tying them together.

10          Now, ladies and gentlemen, let me tell you, you're not

11     going to hear anyone in this trial stand up and say, "I was there

12     when Bill Wright told Chris Clark about the merger."  There's no

13     wiretap recording.  There's no signed confession.  And frankly,

14     if there were, probably none of us would be here for a trial

15     today.

16          Instead, the kind of evidence you're going to hear about

17     is what Judge Hilton was telling you about, and that's called

18     "circumstantial evidence."  And as he said, that's the kind of

19     evidence where you look at the facts and you make inferences

20     about what happened.

21          Like if you see the empty cookie jar on the kitchen

22     counter, and you see a stepstool pulled up to the counter, and

23     then you see your toddler sitting on the counter with chocolate

24     all over his face, you know what happened to all of those

25     cookies.  That's what circumstantial evidence is.

1          THE COURT:  Counsel, you're getting into argument now.

2     Let's --

3          MS. CHOE:  I will --

4          THE COURT:  -- quickly move along, and they'll hear the

5     evidence when the witnesses are called.

6          MS. CHOE:  I will move along, Your Honor.

7          Let's talk about the evidence that you're going to see

8     connecting Chris Clark and his brother-in-law.

9          Mr. Clark and Mr. Wright have known each other for almost

10    two decades.  Mr. Clark was a groomsman in Mr. Wright's wedding,

11    and, in fact, he was one of just a couple of guys that Mr. Wright

12    invited to his bachelor party.

13         When the Wrights were looking for a house just down the

14    road from the Clarks and looking for a mortgage, Mr. Clark helped

15    them out.  And when Mr. Clark's car broke down, he borrowed one

16    from Mr. Wright.  Over the years, they played poker and

17    basketball.  And in 2016, right when all this was going on, their

18    daughters were on the same basketball team being coached by

19    Mr. Clark.

20         Sometimes the two of them would get together for breakfast

21    or lunch, and when they did, they would discuss Arlington

22    business news, real estate market, that kind of business gossip.

23         Now, Mr. Clark is probably going to tell you that

24    Mr. Wright and he were not so chummy.

25         THE COURT:  Counsel, that's argument again.

1      MS. CHOE:  Your Honor, I will move on.

2      You'll hear that the wives didn't always get along, and

3  you'll hear that the relationship between the families could

4  sometimes be frosty.  But I encourage you, ladies, to look --

5  ladies and gentlemen, to look at the actual evidence that will be

6  placed before you during the trial.  You're going to see e-mails

7  where Christopher Clark asks Bill Wright for investment advice,

8  which Mr. Wright is happy to offer.  You're going to see text

9  messages between the two of them talking about a major commercial

10  real estate deal before it's announced.

11      You're going to see Bill Wright passing along gossip that

12  he learns from the head of CEB to Mr. Clark.

13      And in December 2016, right when Mr. Clark was buying all

14  of these options, you're going to hear that the two of them were

15  actually in communication all the time, more than usual.  They

16  were talking, as you'll hear, about the fact that Bill Wright was

17  thinking of leaving CEB and moving to a new job, and Mr. Clark

18  was offering him advice.  And since it was December, you'll hear

19  that they were seeing each other at all of the usual family

20  holiday events.

21      In other words, in December, Mr. Clark and Mr. Wright were

22  in constant communication with each other.  And how do you know

23  that Bill Wright knew about the merger ahead of time?

24      MR. CUMMINGS:  Same objection, Your Honor.

25      THE COURT:  Objection sustained.  You're arguing again.

1      MS. CHOE:  Well, you're going to hear about the gentleman

2   I mentioned at the beginning, Mr. Anschutz.  You're going to hear

3   that Mr. Anschutz and Mr. Wright were extraordinarily close

4   friends.  They'd worked together for almost two decades, their

5   offices were right next to each other at CEB, and they had lunch

6   together pretty much every day.

7      You'll hear that they played poker on Thursday nights and

8   even owned a vacation house together.  And even on an average

9   day, they talked to each other more than they talked to their own

10   wives.  You'll also see that they shared confidential information

11   with each other, even when it violated company policy.  And what

12   you'll learn is that Mr. Anschutz, he learned about the merger in

13   November.  And you'll hear that as soon as he heard about it, he

14   knew that it was a huge deal for him and Mr. Wright because it

15   meant that they would probably lose their jobs.  And so you'll

16   see that all throughout November and December, Mr. Wright and

17   Mr. Anschutz exchanged hundreds of text messages and phone calls,

18   and you'll see e-mails that they sent each other in November

19   trying to figure out if a merger meant that they would lose their

20   CEB stock.

21      In other words, you'll see that Bill Wright and Barron

22   Anschutz were in constant communication and were extremely close

23   friends at the time that the merger was being negotiated, and

24   Mr. Anschutz knew about it.

25      So we've talked about Chris Clark's trades in CEB, and

```
 1    we've talked about his connection to Mr. Wright.  Now let's talk

 2    about what Chris Clark told the FBI.

 3         You're going to hear that in 2017, the FBI approached

 4    Mr. Clark and asked him about his trades in CEB.  And the FBI

 5    asked Mr. Clark if he knew anyone who worked at CEB.  How did he

 6    respond?  Well, you're going to hear he didn't say anything about

 7    the fact that his brother-in-law was a senior finance officer

 8    there for over a decade.  In fact, he didn't mention Mr. Wright

 9    at all.

10         MR. CUMMINGS:  Judge, this is definitely an argument.

11         THE COURT:  Yes, it is.  I'm going to give you two more

12    minutes now.  Just finish up, and let's get on with the evidence.

13    They'll hear all of this.

14         MS. CHOE:  Thank you, Your Honor.

15         You're going to hear that he just mentioned mortgage

16    clients whom he'd had in the past.

17         MR. CUMMINGS:  Judge, I thought you sustained my

18    objection.

19         MS. CHOE:  I'm discussing the statements they'll hear,

20    Your Honor.

21         THE COURT:  Let's move off the statement and finish up.

22    Wind up now, and let's get the evidence on.

23         MS. CHOE:  You're also going --

24         THE COURT:  I've already told you, what you're saying now

25    is not evidence in the case.
```

1          MS. CHOE:  I understand, Your Honor.

2          THE COURT:  Let's get to the evidence.

3          MS. CHOE:  You're also going to hear that when Mr. Clark

4    received a subpoena from the SEC requiring him to turn over text

5    messages and his cell phone, what he turned over, which you will

6    see, are text messages that started after the merger was

7    announced, none from the period when he was buying all those CEB

8    options.  And you're also going to hear from Mr. Clark that just

9    days before he was supposed to turn in his phone, he conveniently

10   managed to lose his phone.  So any messages that were on the

11   phone between him and Mr. Wright, they're gone.

12          Now, ladies and gentlemen, as I said at the beginning,

13   this case is about two things -- the trading and the lies.  And I

14   urge you throughout the trial to focus on those two things.

15   Focus on the evidence that you will see placed before you, and

16   don't be distracted by any sideshows.  And when you've heard from

17   all the evidence and the SEC has proved its case, my colleagues

18   and I will ask you to return the only verdict that fits with all

19   the evidence and that makes sense.  We will ask you at the

20   conclusion to find that Mr. Clark engaged in insider trading.

21          Thank you very much.  Thank you, Your Honor.

22          **OPENING STATEMENT ON BEHALF OF THE DEFENDANT**

23          MR. CUMMINGS:  (Removed his mask.)

24          Wow, that's a relief.  As I previously introduced myself,

25   my name is Mark Cummings.  With me is David Scher, my law

```
 1    partner.  Seated at counsel table between Mr. Scher and I is
 2    Mr. Clark, who you've been hearing a little bit about.  Behind
 3    them is Adam Collins and Taylor Byrd.  Adam is a fairly new
 4    lawyer, and Mr. Taylor is our paralegal.
 5          First of all, this is my opportunity to give you a little
 6    bit of a roadmap of what the defense intends to prove and show to
 7    you.  First of all, I want to make sure I've got your names
 8    correctly.
 9          Krishna Gadicherla.
10          A PROSPECTIVE JUROR:  (Raised hand.)
11          MR. CUMMINGS:  Thank you for being here.
12          Tristan Scoffield.
13          A PROSPECTIVE JUROR:  (Raised hand.)
14          MR. CUMMINGS:  Thank you for being here.
15          Paciencia Sunga.
16          A PROSPECTIVE JUROR:  (Raised hand.)
17          MR. CUMMINGS:  Did I pronounce that correctly?  Thank you.
18    Gavin Fugere.
19          A PROSPECTIVE JUROR:  Fugere.  (Raised hand.)
20          MR. CUMMINGS:  Fugere.  Thank you.
21          Christopher Spadoni.
22          A PROSPECTIVE JUROR:  (Raised hand.)
23          MR. CUMMINGS:  Thank you.
24          Paul Shaw.
25          A PROSPECTIVE JUROR:  (Raised hand.)
```

1      MR. CUMMINGS:  Thank you very much for being here, sir.

2      James Hruska.

3      A PROSPECTIVE JUROR:  Yes.

4      MR. CUMMINGS:  Thank you.

5      Paula Martori.

6      A PROSPECTIVE JUROR:  (Raised Hand.)

7      MR. CUMMINGS:  Thank you for being here.  I apologize for

8  the inconvenience.  You took an oath here recently, and I can't

9  tell you how much we appreciate you being here.  You agreeing to

10  that oath and agreeing to come down here is the framework that

11  makes the justice system work.  It's based on oaths.

12      The witnesses that come before you today will take an

13  oath, a solemn oath, before everything that's important to them.

14  They'll look you in the eye and they'll testify according to that

15  oath.  And I think that's very important for you to remember, and

16  it's the reason why the Judge told you what the lawyers say is

17  not evidence.  What is evidence is what comes from the witness

18  box over here and the documents that you'll be given at the end

19  of the case.  That's evidence.

20      What we say and what we argue, we're advocates.  That's

21  not evidence.  So I thank you.

22      The evidence will show that there's no dispute Mr. Clark

23  traded in CEB stock going back to 2008.

24      He'll testify that he follows local companies.  He's been

25  e-trading since 19- -- I believe, '92, and the government has

```
 1    subpoenaed all of his e-trade accounts for everything he's ever
 2    done.  It is amazing.  It takes up volumes of evidence.  So he is
 3    very experienced, he follows the market, he loves the market.  As
 4    you heard Ms. Choe say, the evidence will show that he's a
 5    mortgage broker.
 6         So there's no smoking gun here.  The evidence will show
 7    that there's no direct evidence, nothing which says that
 8    Mr. Clark got a tip, an illegal tip -- when I say "tip,"
 9    sometimes I'll miss "illegal."  If I tip one of you and say, Hey,
10    I heard about this new company.  It's really hot.  They sell
11    fruitcakes.  They're just the best fruitcakes in the world, and I
12    think the stocks are going crazy.  That's a legal tip.  That's us
13    trading stocks.  People are in clubs that talk about stocks.
14    It's a constant topic, investment in the U.S. economy.  And it's
15    why the SEC is such a useful organization, because they police
16    that.
17         As she said, they've obtained e-mails, laptops, cell phone
18    records, every imaginable document under the sun.  They overlook
19    nothing, and the evidence will show they found nothing.  They
20    have circumstances.  And for every circumstance that looks
21    questionable, there's a logical, reasonable answer that's
22    innocent.  And that's true of a lot of things in life.  That's
23    why the judge asked you, don't make up your mind until you've
24    heard all of the evidence.
25         Yeah.  I don't want to get into argument, so I'll restrain
```

1    myself here.  You'll hear from Mr. Clark, you'll hear from

2    Mr. Clark's wife, on how they manage a household with four

3    children who are all in parochial school.

4          He has a credit score of 760.  We'll describe their

5    finances in 2016, 2017.  She said they had a million dollars

6    worth of -- millions of dollars worth of debt.  Well, duh.  The

7    evidence will show they owned five or six investment houses.

8    They had mortgages.  We'll ask Mr. Clark, and he'll go through

9    his finances with you.  He'll show you every debt he had, and

10   there's no -- he's never been more than 30 days late on anything.

11   That's what the evidence is going to show.

12         The evidence will show that this is a classic example of

13   the government looking backwards with 20/20 vision.  They

14   conclude if it's suspicious, they must be guilty of violating

15   insider trading.

16         The evidence will show that in proving their case, they're

17   basing it on conjecture.  They want it all their way.  They don't

18   want you to hear the reasonable explanation for Mr. Clark's

19   trades.

20         MS. CHOE:  Objection.

21         THE COURT:  Objection sustained.

22         MR. CUMMINGS:  Is that too argumentative, Judge?

23         THE COURT:  Yes, it sounded like it to me.

24         MR. CUMMINGS:  Thank you, Judge.  I apologize.

25         Clark is a licensed mortgage broker, an e-trader.  He's

1    obsessed with the market.  The evidence will show he works

2    commissions.  He usually makes enough to cover his monthly.

3    Sometimes he doesn't, and his wife will explain how she

4    manages -- she's the general of the finance department in their

5    family, and she makes a salary, too.  She works.  She's got a

6    nonprofit company.  Sometimes they have to use debt to get by

7    some months, and then some months he'll get a big commission

8    check and they'll pay off that debt.  That's how they work.

9         Mr. Clark has a trading thesis for all his trades in CEB.

10   In this particular situation right here (indicating), the

11   evidence will show that he relied on a combination of factors

12   between December 9th, 2016, and January 5th, 2017.

13        As I told you, the evidence will show that he's been

14   interested in CEB for many years and that he followed market

15   analyst coverage.  You'll hear from Robin Pena, who is his

16   sister-in-law, who worked for him in his office.  She was his

17   loan processor during this period of time that he constantly had

18   the MSNBC finance station playing, constantly listening to

19   analysts, keeping up with trends in the market.  You'll hear him

20   testify that in August of 2016, the chief executive officer and

21   chairman, Tom Monahan of CEB who had been there for ten years,

22   the evidence will show he was a driving force in making that a

23   big winner in Arlington.  They had bought up companies, and they

24   were soaring.  He decides to retire, to step down.  But the

25   evidence will show he did not name a successor.  The evidence

```
 1    will show that that was a clue to Mr. Clark that something might

 2    be up, the company might be ripe for takeover.

 3           Then we have the presidential election of 2016.  And,

 4    surprise, a pro-business administration comes in.  And for the

 5    next 30 days, CEB stock went up about 30 percent and stayed

 6    there.  The entire stock market went up 2,000 points and pretty

 7    much stayed there.  That's not on here.  Okay.  We'll bring it

 8    out.

 9           I'm getting a dry mouth.  I apologize.

10           What's the evidence going to show about Bill Wright?  He's

11    an accountant.  And when you become an accountant, you agree to

12    ethics.  It's a booklet that thick (indicating).  It's going to

13    be in evidence about accounting, ethics, and accounting

14    responsibilities and not sharing insider information about the

15    company you're working on.

16           He was the comptroller of the company.  He was about three

17    or four steps down from the top.  So when they started talking

18    about the merger among the top, the evidence will show he was

19    left out of that until December 15th when Barron Anschutz, who

20    you've heard about, shared with him that a merger was in the

21    offering.  He signed a nondisclosure agreement, and he went to

22    the extra -- the evidence will show he went to the extra length

23    of asking his wife to sign to make sure she didn't leak it out

24    because he wanted to talk to her about it.  Because typically, a

25    merger means the finance people and the HR people, in a
```

1    reasonable time after the merger, they're generally the first

2    people to be let go.  So that was a concern.

3         The evidence will also show he wanted to be -- he didn't

4    want to just be a comptroller.  He wanted to be the chief

5    financial officer or a higher-up, and his best friend, Barron,

6    had that position.  So he was looking for other employment at the

7    time.

8         So, when he took his job with CEB, and you'll see the SEC

9    Exhibit 34, the CEB required him to sign a code of conduct,

10   required him once a year to go to an ethics seminar that CEB

11   sponsored.  And you didn't just go and daydream and doodle and

12   play Solitaire on your computer while you're listening to this

13   ethics seminar.  You had to take a test and pass it.  And if you

14   didn't pass the test, you had to take it over again.  He did that

15   once a year.  He is constantly, as the evidence will show, he is

16   constantly reminded of his obligation to protect inside

17   information.  And that's what accountants do, and it's a sacred

18   oath they take.

19        The evidence will show that sharing insider information

20   with Chris Clark or anybody violates the very reason for his

21   profession.  The evidence will show that he is a steadfast man

22   who believes in honesty.  He will take an oath.  He will come

23   before you -- well, whenever we get to it.  The evidence will

24   show he'll come in here, he'll take an oath, and he'll deny

25   giving Mr. Clark any information about this merger.  The evidence

```
 1   will show he's a good employee and a stickler for detail.
 2          Now, Ms. Choe kind of glossed over how the SEC learned --
 3   and the evidence will show this -- how they learned about this
 4   trade.  You know how they learned about it?  Mr. Wright reviewed
 5   a document that had all the names of everybody that traded around
 6   the merger, and he picked out -- well, Chris Clark and Tisha
 7   Clark, I know them.  So he brought --
 8          MS. CHOE:  Objection.
 9          MR. CUMMINGS:  That's what the evidence is going to show.
10          THE COURT:  Objection overruled.
11          MR. CUMMINGS:  The evidence will show that Mr. Wright
12   said, I know this guy who made this trade, and that's how the SEC
13   found out about this, and then they worked backwards.
14          Now, while I'm talking about Mr. Wright -- I'm almost
15   done -- the SEC can point to no monetary benefit to Mr. Wright.
16   They can't point to any gifts.  You think he would have bought
17   him a Rolex watch for making him a quarter-million dollars.  They
18   can't even show a congratulatory letter.  The evidence will show
19   there's not even a Christmas card, there's not even a box of
20   chocolates.
21          The evidence will show for every questionable
22   circumstance, there is an equally innocent explanation.
23          I think I'll leave it there.  Thank you, Your Honor.
24   Thank you.
25          THE COURT:  All right.  Who's your first witness?
```

```
 1              MR. CUMMINGS:  Judge, would this be a good time to take a

 2      convenience break?

 3              THE COURT:  I'll take one at 11:30.

 4              MR. CUMMINGS:  Very Good.  Thank you.

 5              MR. MAHER:  The SEC calls Dr. Matthew Cain.

 6              Your Honor, just a question.  Would Dr. Cain be able to

 7      draw just a couple of times on the flip sheet to help illustrate

 8      a couple of points?

 9              THE COURT:  Yeah.  The marshal will put it over there

10      beside him.

11              MR. MAHER:  That would be great.  Thank you, Your Honor.

12                 (MATTHEW CAIN, PLAINTIFF'S WITNESS, SWORN)

13              THE COURT:  Do you want that over beside the witness box?

14              MR. MAHER:  Just so the witness can draw on it a couple of

15      times.  Thank you, Your Honor.  Just facing the jury if possible.

16      If it could face the jury, we would be very grateful.  Thank you,

17      Your Honor.  Thank you.

18              THE COURT SECURITY OFFICER:  Can everybody see?

19              THE COURT:  All right.

20                  DIRECT EXAMINATION OF MATTHEW CAIN

21      BY MR. MAHER:

22      Q.      Good morning, Dr. Cain.  Can you tell us where you work?

23      A.      Yes, at University of California Berkeley.

24      Q.      Okay.  And what is your position there?

25      A.      I'm a senior fellow there.
```

1    Q.     In connection with that position, what are your primary

2    and professional activities?

3    A.     Primarily, I conduct academic research and I also teach.

4    Q.     Okay.  As a researcher, what do you focus on?

5    A.     I focus my research on areas of finance, and corporate

6    finance, and in particular, mergers and acquisitions, the impact

7    that mergers have on company's stock prices, as well as

8    shareholder trading, shareholder voting, investor ownership of

9    companies.

10   Q.     And, Dr. Cain, when you say "shareholder," what do you

11   mean?

12   A.     A shareholder is someone who is an investor and holds

13   shares or shares of stock or equity in a company, so they are an

14   investor or an owner of some small slice of -- if you think of a

15   company as a pie, they would own a slice of that pie.

16   Q.     And what is a stock?

17   A.     A stock is one of those small slices of that pie.  So if

18   you can think of a company as being owned by many different

19   individual investors, one stock or one share of stock would be

20   one small slice of that ownership stake in the company itself.

21   Q.     And can stocks be bought and sold?

22   A.     Yes, they can.

23   Q.     Now, does your area of study include stock trading or

24   stock buying and selling?

25   A.     Yes, it does.

 1    **Q.**     Okay.  Now you also mentioned "corporate mergers."  What

 2    does that refer to?

 3    **A.**     Yes.  A corporate merger is simply when two different

 4    companies come together or they merge together into one

 5    remaining company.

 6    **Q.**     Okay.  Has your research been published?

 7    **A.**     Yes, it has.

 8    **Q.**     In peer-reviewed journals?

 9    **A.**     Yes.

10    **Q.**     And what does that mean?

11    **A.**     So, for a peer-reviewed publication process, what that

12    means is that I would work on a research study, I would submit

13    it for consideration to an academic journal, and then they would

14    send that out to other peers of myself, which would be other

15    finance professors, law, econ professors, they would review the

16    study, give their feedback to the editors of the journal, and

17    then they would make a decision on whether to publish the study

18    or not.

19         THE COURT:  Are you trying to qualify him as an expert?

20         MR. MAHER:  We were going to do that for a little bit,

21    Your Honor, but if you would like us to move on.

22         THE COURT:  Any objection that he's an expert?

23         MR. CUMMINGS:  I sure do, Judge.  I have a motion to

24    exclude him that you never ruled on, but maybe you have.

25         THE COURT:  You think he's not qualified with what he said

```
 1   or --

 2        MR. CUMMINGS:  He's qualified as an expert on the stock

 3   market, I have no question about that and I think he's qualified

 4   to explain it, but my problem is he worked for the SEC while they

 5   investigated Mr. Clark.  I just don't see how he can be an

 6   objective witness in this case.

 7        THE COURT:  Well, that's a matter of argument.

 8        MR. CUMMINGS:  Okay.

 9        THE COURT:  He's an expert.  If you want his Curriculum

10   Vitae admitted, I'll admit that.

11        MR. CUMMINGS:  You don't need to do that.  I'll withdraw

12   the objection.  My problem is that he worked for the SEC whether

13   they were investigating my client.

14        THE COURT:  There will be a time to argue that.

15        MR. CUMMINGS:  Thank you.

16   BY MR. MAHER:

17   Q.    Now, Dr. Cain, as you just heard Counsel say, did you

18   work at the SEC?

19   A.    Yes, I did.

20   Q.    And what did you do there?

21   A.    I was a financial economist at the SEC, and I worked on a

22   variety of investigations, settlement negotiations, and trials

23   involving a wide variety of topics and cases at the SEC.

24   Q.    Okay.  And just to be clear, did you have any role in the

25   investigation of this case?
```

```
 1    A.      No, I did not.

 2    Q.      And besides your testimony here today, have you had any

 3    role in the litigation of this case?

 4    A.      No.

 5    Q.      Okay.  And just briefly before you were at the SEC,

 6    Dr. Cain, where did you work?

 7    A.      I was a finance professor at the University of Notre

 8    Dame.

 9    Q.      And while you were there did you do some teaching?

10    A.      Yes.

11            THE COURT:  I said I would admit the Curriculum Vitae, but

12    get to your questions about this case now.

13            MR. MAHER:  Okay.

14    BY MR. MAHER:

15    Q.      Dr. Cain, what is a "stock option"?

16    A.      A stock option is a security that gives the purchaser the

17    right to buy or sell additional shares of the underlying stock,

18    and so it's a way for somebody to make a bet that the stock

19    price will go up or go down by a certain amount.

20    Q.      And how does a stock option differ from just investing in

21    stock?

22    A.      It differs in a few ways.  So somebody who invests in a

23    stock can hold on to that stock for essentially an indefinite

24    amount of time -- for months or years and wait for that stock

25    price to increase.  In contrast, somebody who buys a stock
```

1     option has a very limited amount of time to wait for that stock

2     price to move, and, as a result, it's got significantly more

3     risk involved.

4     Q.     And can you explain the relative risks of the stock in an

5     option?

6     A.     Yes.  So, like I said, a stock has relatively moderate to

7     low risk because somebody who buys stock can just hold on to it

8     and wait for the stock price to increase.  An option is a much

9     greater risk than stock because if that option expires a few

10    weeks or a month or two from now and the stock price hasn't

11    moved sufficiently, then the purchaser of that option would lose

12    all of their money that they had invested in the stock, so a

13    much greater risk involved with investing in stock options.

14    Q.     So if an option has more risk than a stock, why would

15    someone buy one?

16    A.     Someone would buy stock options because it allows them to

17    make a bet that the stock price is going to move a certain way

18    and if they're right with that bet, then they can potentially

19    make far more money, far more profits through that investment of

20    the stock option as opposed to the actual stock.

21    Q.     And just so the jury has, you know, a clear sense, can

22    you give an example of how the relative risks and rewards of

23    stocks versus options, just by diagramming it there briefly?

24    A.     Yes.

25           MR. MAHER:  Thank you, Your Honor.

1          THE WITNESS:  So -- is this okay?

2     BY MR. MAHER:

3     **Q.**     Yes.

4     **A.**     So assume that someone has, say, $2,000 to invest --

5     $2,000 that they want to invest, and if they invest in stock

6     versus investing in options.  If that stock price increases

7     suppose, let's say, increases by 26 percent, and somebody makes

8     a profit of around $500, the corresponding increase in the value

9     of the stock option would be -- it would actually be off the

10    chart.  I would need several additional pages of paper to draw

11    it to scale.  The option in this example would increase by

12    1900 percent, or in terms of dollar profits, $38,000.

13         So in terms of the potential profits or rewards for

14    investing in an option for that same $2,000 investment in a

15    stock, it might generate $500 in profits for a modest increase.

16    The same investment in options would have a 1900 percent return

17    or $38,000 in profits.

18         But the thing to keep in mind is that there's also risk

19    involved, and if the stock price had increased by 26 percent,

20    that investor would lose $500, so their investment would only be

21    worth $1500 dollars.  If they instead invested in the options

22    and the price of the stock decreased, at the expiration of the

23    option they would lose everything -- they would lose the entire

24    investment.  So that's sort of a risk/reward tradeoff that we

25    think of with stocks versus options.

47

1    **Q.**      Thank you, Doctor.  Dr. Cain, are there different types
2    of options?
3    **A.**      Yes, there are.
4    **Q.**      And what are the two main categories?
5    **A.**      The two main categories would be what we call a "call
6    option," and a "put option."
7    **Q.**      Okay.  And what -- how does each of those interact with
8    the stock price?
9    **A.**      Yes.  A call option is a bet that the underlying stock
10   price is going to increase, or go up, and a put option is a bet
11   that the stock price is going to fall, that it's going to
12   decrease within a certain amount of time.
13   **Q.**      Okay.  And maybe you can help us with some terms the jury
14   is going to hear in this case.  What is a "strike price"?
15   **A.**      A strike price is the -- when the option states a strike
16   price, that's the underlying stock price at which the option
17   could generate a payoff or not.  So for example, if an investor
18   were to buy an option with a strike price of $65 per share, they
19   would be betting that the stock price is going to go up above
20   that strike price of $65 per share.
21   **Q.**      And an "expiration date," what does that mean?
22   **A.**      An expiration date just tells you how long the option is
23   in existence for, at what point does it expire.  So this would
24   typically be a few weeks or a month or two out from the time of
25   purchase, and at that expiration date, the option expires and

1    the pay off depends on where the current stock price is relative

2    to that strike price that I just mentioned.

3    Q.     And how does the expiration date impact the risk of price

4    of an option?

5    A.     The expiration date tells you how long you have for the

6    stock price to move in the direction of the bet that you placed.

7    So, if you've got an option with an expiration date of two

8    months, then you've got two months for that stock price to

9    increase above the strike price.  If you've got an option with

10   an expiration date of only three weeks, you've only got three

11   weeks instead of two months and so there's greater risk.  So the

12   shorter that expiration date is out from today, the greater the

13   risk is to a purchaser of an option.

14   Q.     And one more key term, what does it mean when an option

15   is "out of the money"?

16   A.     An option is "out of the money" if currently, as of

17   today's stock price, if it were to expire, it would expire

18   worthless.  And so going back to that example of an option with

19   a strike price of $65 per share, if you're betting that the

20   stock price is going to go above that, if the current stock

21   price is $60 or $61 per share, we would say that option is

22   currently "out of the money" because it's not going to generate

23   a profit if it were to expire.

24   Q.     What about "in the money"?

25   A.     In the money is the same concept, just that the stock

1    price has currently risen above that strike price.  So if the

2    stock price today is trading at $70, $74 per share, that's "in

3    the money" because you could exercise that option and make a

4    large profit.

5    **Q.**    Now, so is out-of-the-money option riskier than in the

6    money option?

7    **A.**    Yes.  Out-of-the-money option would definitely be riskier

8    because there's the risk that it's going to expire completely

9    worthless.

10   **Q.**    And just to be clear, what happens if the expiration date

11   passes and you haven't exercised your option?

12   **A.**    Yeah.  So, if the option expires out of the money, then

13   you'll lose everything.  It expires completely worthless, it

14   disappears, and all the money that the investor spent to

15   purchase that option, they lose the full amount of that

16   investment.

17   **Q.**    And then just one more question, if you could diagram the

18   answer a little bit.  If you buy an out of the money call

19   option, how many things can go wrong to make you lose your

20   investment?

21   **A.**    Sure.

22   **Q.**    If you could just show the jury.

23   **A.**    I'll just draw, sort of, a time graph and on the bottom

24   axis here, this is just the amount of time that's passed, and on

25   the vertical axis, would be the stock price.  So if we were to

1    look at, say, an option with a -- we'll say it's a strike price

2    of $65 per share, up through this expiration -- so, again, these

3    are the key terms that I just defined a few minutes ago.

4    Expiration -- at this point in time the option expires and it's

5    got a strike price of $65 per share, and if we were to look at

6    the different scenarios -- I'll draft out maybe five different

7    scenarios and four out of those five scenarios the option

8    expires worthless.  And so if we look at the current stock

9    price, say it's starting out somewhere around -- we'll call it

10   $60 per share, so that's currently out of the money.  If the

11   stock price goes down, then at the expiration date it expires

12   out of the money and the investor loses all of the investment in

13   that option.  If the stock price fluctuates and it stays roughly

14   the same through the expiration, again, the option expires out

15   of the money because the price is below the strike price.  If

16   the stock price increases somewhat but it still remains below

17   that stock price, the option still expires out of the money --

18   worthless.

19       The fourth scenario would be if the stock price increases

20   above the strike price but only after the expiration, the option

21   still expires out of the money on the expiration date and the

22   investor still loses money on the entire investment on the

23   expiration under each of these four different scenarios.

24       So the only scenario under which the option would become

25   profitable for the investor would be if the stock price actually

1    increases prior to that expiration date.  So, really, if we

2    think of this as, you know, five different possible outcomes,

3    investing in a call option that's out of the money like this,

4    it's really only this one scenario out of five, so I think when

5    you think about option investments, it's not like a coin flip

6    where you've got a 50/50 chance of making money or losing money.

7    You actually have a much greater chance of losing money on an

8    option investment unless there's really a large increase in the

9    stock price in a fairly short period of time.

10   Q.    Now, just to make sure I understood what you just said,

11   Dr. Cain, while you're more likely than not to lose all of your

12   money, if you do get your prediction right, you stand to make it

13   big?

14   A.    That's correct.  So there's certainly a significant risk

15   of losing a lot of money with option investing, but if you think

16   back to the previous slide, if you place a bet on an increase in

17   the stock price over a very short period of time, then the

18   profits are greatly magnified through a stock investment -- a

19   stock option investment.

20   Q.    Dr. Cain, who can invest in a stock option?

21   A.    Basically anybody can invest in options.

22   Q.    And how would an investor go about doing that?

23   A.    An investor would typically purchase options through

24   their brokerage account and that could be calling up a

25   stockbroker or, as many people do today, logging into their

1    brokerage accounts online or through even an app on their phone

2    and placing an order to purchase options.

3    **Q.**    Okay.  And can you buy and sell an option like you'd buy

4    and sell a stock?

5    **A.**    Yes, you can.

6    **Q.**    Okay.  Now, just one more term.  Can you explain what an

7    "option series" is?

8    **A.**    Yeah.  So an "option series" just refers to these

9    different combinations of expiration dates and strike prices for

10   either a call or a put option.  So you could have one option

11   series that expires in three weeks at a strike price of $65 per

12   share, you could have another series that expires in two months

13   with a different strike price and so when we just talk about

14   those different parameters or variables within the option, we

15   just talk about those different option series.

16   **Q.**    Now, Dr. Cain, before we get to the trading in this case,

17   I want to ask you:  If someone has an information advantage

18   about a company, something others don't know, is there a benefit

19   to investing in options?

20   **A.**    Yes, there is.

21   **Q.**    And can you explain what that would be?

22   **A.**    Yes.  So that benefit would be the potential to greatly

23   magnify the profits or the payoffs from an investment.  Again,

24   thinking back to that previous slide, if you think that the

25   stock price is going to increase by 26 percent, you could make a

1   26 percent return from an investment in the underlying stock or

2   you could make a 1900 percent return by investing in the

3   options.  So that information advantage allows someone to make

4   far greater profits, both on a percentage basis or a dollar

5   basis through an investment in the option as opposed to the

6   stock.

7   **Q.**    Now, is someone knowing ahead of time about a potential

8   merger an information advantage?

9   **A.**    Yes, it definitely is.

10  **Q.**    Why would that be?

11  **A.**    Because almost every merger announcement is made at a

12  premium for the target company's stock price, so companies, when

13  they acquire other companies, almost always pay significant

14  premium above the current stock price and as a result, as soon

15  as that announcement comes out -- as soon as the market learns

16  about that information, it's a very large increase in the target

17  company's stock price, so anyone who knows about that in advance

18  would be able to predict that there's going to be a very large

19  increase in the target company stock price over a very short

20  period of time.

21        THE COURT:  It's time for us to take a brief recess.

22        MR. MAHER:  Thank you, Your Honor.

23        (Thereupon, a break was had from 11:30 a.m. until

24  11:45 a.m.)

25        THE COURT:  All right.

54

1        MR. MAHER:  Thank you, Dr. Cain.  Thank you, Your Honor.

2   I've been asked to speak a little more slowly, so I will try to

3   remember.

4   BY MR. MAHER:

5   **Q.**    Dr. Cain, do companies take steps to keep information

6   about a potential merger secret?

7   **A.**    Yes, they do.

8   **Q.**    What kind of steps?

9   **A.**    They take a variety of steps to try to keep that

10  information confidential or secret.  For example, they will try

11  to limit the number of people who have access to that

12  information about merger negotiations because that information

13  is so valuable.  Early on in the process, they'll limit the size

14  of those groups or deal teams to as small as possible.  They

15  will also sign confidentiality agreements with anyone involved

16  with those negotiations, where they promise not to share that

17  information.  They will also use code names for the companies,

18  so if they're working on, say, a PowerPoint or other type of

19  presentation, if they're riding on the train and somebody is

20  sitting next to them and happens to see the presentation, it

21  will be in code names referring to the companies so that

22  somebody who happens to see it would not be able to understand,

23  you know, the specific details of what's being negotiated.

24  **Q.**    Now, based on your review, did CEB take steps like that

25  here?

1  **A.**     Yes, they did.

2  **Q.**     And what did they do?

3  **A.**     They limited the number of people who were involved in

4  the merger negotiations to a very small, select group of people.

5  They also signed confidentiality agreements and nondisclosure

6  agreements with both sides of the transaction that was being

7  negotiated, for example.

8  **Q.**     Okay.  Now, and based on your research, can you describe

9  generally how merger negotiations progress?

10  **A.**     Yes.  In general, they'll start out very informally.

11  Often you might have executives, even just the CEO of the two

12  companies will meet for dinner and talk informally.  They will

13  then start to keep the board apprised of those informal

14  negotiations, and then things will typically proceed to a more

15  formal process where the acquirer will make a formal offer to

16  purchase the target company at a certain price for share, and

17  then they may go back and forth.  Often they'll go back and

18  forth where the target is trying to get as good of a price as

19  they're able to get to push the acquirer up to pay a higher

20  price.  And then they will, as part of that process, also sign

21  those confidentiality agreements that I described, and agree on

22  an offer price, and then spend a few more weeks kind of

23  finalizing all the details before it's publicly announced to the

24  world.

25  **Q.**     And have you reviewed how the negotiations progressed in

```
 1    this case?

 2    A.     Yes, I have.

 3    Q.     Now, Dr. Cain, have you -- did you prepare a report in

 4    this matter?

 5    A.     Yes.

 6    Q.     Okay.  And in connection with that report, did you

 7    prepare certain exhibits?

 8    A.     Yes.

 9    Q.     Okay.  If you could look at the binder in front of you,

10    what has been admitted as SEC Trial Exhibit 283.

11    A.     Okay.

12    Q.     Dr. Cain, what is that?

13    A.     This is a timeline of those steps that were involved with

14    the merger negotiations leading up to the agreed merger

15    transaction and then, ultimately, the public announcement of

16    that.

17    Q.     And what did you base your exhibit on?

18    A.     I based this on the proxy statement that was mailed out

19    to shareholders to get their voting approval of the deal and

20    within the proxies, there's a section called, "The Background of

21    The Merger," where they describe all of these steps.

22    Q.     Okay.  And can you describe generally how the

23    negotiations involved in this case in November and December

24    2016?

25    A.     Yes.  In November, the acquirer, Gartner, made a first
```

1    offer to purchase the target company, CEB, and then they went

2    back and forth with increasing offers through the end of

3    November into the beginning of December.  And then right around

4    the first week, week-and-a-half of December 2019 -- or, 2016 is

5    when everything sort of solidified.  They reached agreement on

6    an actual offer price of $77 per share.  The board agreed that

7    they wanted to proceed with the transaction.  The company signed

8    those confidentiality or nondisclosure agreements right

9    around -- by December 13th.

10   **Q.**    Okay.  Now, did you also study the merger announcement by

11   CEB?

12   **A.**    Yes, I did.

13   **Q.**    And when did that occur?

14   **A.**    That was the morning of January 5th, 2017.

15   **Q.**    Okay.  And we'll come back to this a little bit, but

16   alternately was the merger announcement a big deal for CEB stock

17   price?

18   **A.**    Yes, it was.

19   **Q.**    Okay.  Now, Dr. Cain, have you reviewed Mr. Clark's

20   trading in CEB?

21   **A.**    Yes.

22   **Q.**    Okay.  And do you know who Andrew Nevins is?

23   **A.**    Yes.

24   **Q.**    Who is he?

25   **A.**    I believe he is the son of Mr. Clark.

1   Q.    Have you also reviewed Mr. Nevins' trading in CEB?

2   A.    Yes.

3   Q.    Okay.  Now, what about Mr. Clark's trading in other

4   companies?  Have you also reviewed that?

5   A.    Yes, I have.

6   Q.    Okay.  And when you say "reviewed," what did you review?

7   A.    I reviewed the brokerage statements, the brokerage

8   account statements as well as the trade blotters that

9   electrically recorded all of the trading activity.

10  Q.    Okay.  Generally for what time period?

11  A.    It was from around 2008 through 2019.

12  Q.    Okay.  And did Mr. Clark trade in CEB throughout that

13  time period?

14  A.    Yes, he did.

15  Q.    Okay.  And more specifically, did Mr. Clark and

16  Mr. Nevins trade in the weeks ahead of the merger announcement?

17  A.    Yes, they did.

18  Q.    So if I say Mr. Clark's "premerger trading," can we agree

19  we're talking about his trading in December 2016 and early

20  January 2017?

21  A.    Yes.

22  Q.    Okay.  Now, is that the trading that is reflected in what

23  has been admitted as SEC Trial Exhibit 285?

24  A.    Yes, it is.

25  Q.    And that exhibit, is that something else that you

1    prepared in connection with your report in this matter?

2    **A.**    Yes, it is.

3    **Q.**    Okay.  You can review it if this helps.  So when exactly

4    did the premerger trading begin?

5    **A.**    On December 9th, 2016.

6    **Q.**    Okay.  And when did it end?

7    **A.**    It ended the day before the merger was announced on

8    January 4th, 2017.

9    **Q.**    Now, did Mr. Clark use options for that premerger

10   trading?

11   **A.**    Yes, he did.

12   **Q.**    What kind?

13   **A.**    They were all call options.

14   **Q.**    Okay.  Can you provide some details on the strike prices

15   on those options?

16   **A.**    Yes.  They were all at strike prices of either $65 per

17   share or $70 per share.

18   **Q.**    And what was the trading range for CEB stock during that

19   time period?

20   **A.**    It was basically pretty flat and traded right around

21   between $59 per share and roughly 61 or $62 per share.

22   **Q.**    What about the expiration dates for Mr. Clark's premerger

23   trading.  What were those?

24   **A.**    Those ranged from either January, February, or March of

25   2017.

1    **Q.**    Okay.  Can you explain in practical terms for the jury

2    what had to happen for Mr. Clark to make money on his premerger

3    trading?

4    **A.**    Yes.  Because the current stock price was well below the

5    strike prices of those options, the only way that those options

6    would generate a profit at expiration would be if CEB stock

7    price increased quite significantly in a very short period of

8    time.

9    **Q.**    And what if CEB stock price did not go up high enough

10   during that expiration period?

11   **A.**    If it did not increase sufficiently above those strike

12   prices, then those options would expire out of the money,

13   worthless, and all of the money spent on those options would be

14   lost.

15   **Q.**    Okay.  Now, the next question I want to ask you:  Did you

16   observe any changes in the expiration dates in Mr. Clark's

17   premerger trading during that time period?

18   **A.**    Yes, I did.

19   **Q.**    And can you explain what those were?

20   **A.**    Yes.  In the beginning of his trading in early to

21   mid-December, he was generally purchasing options that expired

22   out in March, and then as the trading got closer to that actual

23   merger announcement on January 5th, he was purchasing

24   increasingly shorter expirations that would expire earlier in

25   February.

1    **Q.**    And what about -- were there any changes in the strike

2    prices during that period as well?

3    **A.**    Yes.  In general, the strike prices started out around

4    $65 per share in mid-December.  And then by late December and

5    early January, they were generally at higher strike prices of

6    $70 per share.

7    **Q.**    So in terms of risk, what conclusion do you draw from

8    those changes during Mr. Clark's premerger trading?

9    **A.**    Both of those changes would reflect increasing risk.  So

10   shorter expirations, higher strike prices, both of those would

11   be significantly riskier option purchases.

12   **Q.**    How about Mr. Nevins?  Did he also trade during that

13   premerger time period?

14   **A.**    Yes, he did.

15   **Q.**    And can you generally compare his trading to Mr. Clark's.

16   **A.**    It was generally similar to what I just described.

17   **Q.**    Now, looking at SEC Trial Exhibit 285, just so the jury

18   can have another example, what was Mr. Nevins' final CEB

19   investment before the merger was announced?

20   **A.**    It was a purchase of call options on CEB stock that

21   expired that same month, just a couple of weeks later in

22   January, at a strike price of $70 per share.

23   **Q.**    So can you again explain in practical terms for the jury

24   what would have had to happen for Mr. Nevins to make money on

25   that call option.

1    **A.**     Yeah.  The only way that that call option purchase would

2    make money would be if the stock price increased significantly

3    from where it was trading, around $61, $62 per share, up above

4    $70 per share.  So greater than 10 percent, greater than

5    15 percent return in just a couple of weeks.

6    **Q.**     Now, Dr. Cain, did you study how other people were

7    investing in CEB options during the premerger time period?

8    **A.**     Yes, I did.

9    **Q.**     And what did you review?

10   **A.**     I reviewed data that tracks the options purchase activity

11   of the -- the entire marketplace.  So any other investors

12   anywhere in the country or the whole world who had purchased CEB

13   options.

14   **Q.**     Okay.  And just to remind the jury one more time, what is

15   an option series?

16   **A.**     Yes.  So, an option series, again, refers to a specific

17   expiration date and strike price.  So expiring January with a

18   strike price of $70 per share, that would be one option series.

19   **Q.**     And what about the idea of open interest?

20   **A.**     So, open interest refers to the number of options that

21   have actually been created or sold to investors anywhere in the

22   marketplace for each given option series that is in existence.

23   **Q.**     And how does open interest reflect how investors perceive

24   the risk of a particular option series?

25   **A.**     So, with open interest, you can see basically what's the

1    demand for a given option series among all investors in the

2    marketplace.  So, if you look at the open interest and you can

3    see that there have been hundreds or thousands of options

4    contracts that have been sold to other investors, you can see

5    that that's something that the overall marketplace views as a

6    potentially attractive investment.  In contrast, if you look at

7    the open interest and you see that there have not been very many

8    of these option contracts that have been created and sold,

9    there's not much investor demand, and that's a reflection of

10   their view as that option series as having significant risk,

11   that there's a very high likelihood that it's not going to

12   generate any sort of profit for them.

13   Q.    Now, for the option series that Mr. Clark and Mr. Nevins

14   invested in during the premerger trading, did you make any

15   observations about other investors using those option series?

16   A.    Yes, I did.

17   Q.    And what did you observe?

18   A.    So, what I observed is that in four out of the six option

19   series that Mr. Clark and Mr. Nevins purchased, they were the

20   only buyers of those option series in the entire marketplace.

21   So, the entire country, the entire world, they were the only

22   ones who had bought four out of those six.  And overall, looking

23   at all six of their different option series that they traded in,

24   they represented over 88 percent or almost the entire market

25   demand for those option series.

1    **Q.**    Now, have you prepared grafts reflecting those

2    observations?

3    **A.**    Yes, I have.

4    **Q.**    And if you could take a moment to look, are those

5    reflected in SEC would've been admitted as SEC Trial Exhibits

6    15, 16, 17, and 18?

7    **A.**    Yes, that's correct.

8    **Q.**    Okay.  And what do those graphs show?

9    **A.**    Those graphs basically give sort of a visual

10   representation of what I just described.  So, the -- there's,

11   like, a blue line that grafts out the open interest in the days

12   leading up to the actual merger announcement, a number of

13   options contracts that have been sold to any investors anywhere

14   in the world.  And the shaded portion below that line represents

15   the number of option contracts that were purchased or held by

16   Mr. Clark and Mr. Nevins.  And for those graphs, again, this

17   just graphically shows that they held the entirety of the

18   marketplace, all of the options that had been created for these

19   series.

20       MR. MAHER:  Your Honor, the SEC would like permission to

21   publish those graphs to the jury.

22       THE COURT:  They can see them when they retire to

23   deliberate.

24       MR. MAHER:  Okay.

25   BY MR. MAHER:

1    Q.    Now, to make sure I understand, Dr. Cain, what you just

2    described, before the option series, Mr. Clark and Mr. Nevins

3    were the only investors?

4    A.    That's correct.

5    Q.    Okay.  Now, I just want to ask you, have you calculated

6    how much Mr. Clark invested in those premerger call options?

7    A.    Yes, I have.

8    Q.    And about how much?

9    A.    About $33,000.

10   Q.    Okay.  And what about for Mr. Nevins?

11   A.    For Mr. Nevins, it was about $5,300.

12   Q.    Okay.  Now, after the merger was announced, what did

13   Mr. Clark and Mr. Nevins do with their options?

14   A.    They immediately sold off almost all of those options

15   that they had purchased.

16   Q.    And did they make money on those sales?

17   A.    Yes, they did.

18   Q.    How much?

19   A.    For Mr. Clark, it was about $245,000.  And for

20   Mr. Nevins, about $53,000.

21   Q.    Now, if you stated that as a percent return on their

22   initial investment, what would that be?

23   A.    For Mr. Clark, that would be 742 percent return.  And for

24   Mr. Nevins, 1,000 percent return.

25   Q.    And if they had just bought CEB stock, what kind of

1    return would they have had at the merger announcement?

2    **A.**    It would have been somewhere in the ballpark of just

3    25 percent return.

4    **Q.**    Now, Dr. Cain, I want to talk to you about Mr. Clark's

5    and Mr. Nevins' earlier trading in CEB.  Before we do that,

6    though, I just want to ask you, for a company like CEB, what is

7    an earnings announcement?

8    **A.**    Yes.  An earnings announcement occurs when a company

9    announces their earnings; that's why it's called an earnings

10   announcement.  And basically, companies will, four times a year,

11   announce to investors, shareholders, the market, publicly how

12   well their financial performances been over the previous

13   quarter, the previous three months.

14   **Q.**    Okay.  And about how often do those occur for a company

15   like CEB?

16   **A.**    So, those occur very regularly on a quarterly basis.  So,

17   every three months or four times per year, once per quarter.

18   **Q.**    Okay.  Now, before earnings are publicly announced, is

19   that information confidential?

20   **A.**    Yes, it is.

21   **Q.**    Okay.  But is it conveyed ahead of time when the earnings

22   announcement will be?

23   **A.**    Yes.  Companies typically notify the marketplace when

24   they're going to announce their earnings.

25   **Q.**    And did CEB do that here for its quarterly earnings

1    announcement?

2    **A.**    Yes, they did.

3    **Q.**    Okay.  Now, do earnings announcements sometimes have an

4    impact on a company's stock price?

5    **A.**    Yes, they can.

6    **Q.**    Okay.  Now, if you could turn to what's been admitted as

7    SEC Trial Exhibit 290 and have a look at that.

8    **A.**    Okay.

9    **Q.**    Dr. Cain, is that another chart that you prepared in

10   connection with your report?

11   **A.**    Yes, it is.

12   **Q.**    Okay.  And just briefly, what is that?

13   **A.**    This lists out 17 different earnings announcements that

14   CEB had going back to 2008 in which Mr. Clark had traded around

15   those earnings announcements in CEB options.

16   **Q.**    And just to be clear, when you say he "traded around

17   those earnings announcements," he was buying options?

18   **A.**    That is correct.  He was buying options before the

19   earnings announcement and then selling them afterwards.

20   **Q.**    Okay.  Now, prior to his premerger training, generally,

21   what percentage of Mr. Clark's CEB training was around those

22   earnings announcements?

23   **A.**    It was about 95 percent, or almost all of his CEB trading

24   was done around earnings announcements.

25   **Q.**    Okay.  And typically, what kind of option did Mr. Clark

1    buy ahead of those earnings announcements?

2    **A.**     Almost all of those was put options.

3    **Q.**     And, again, what is a put option?

4    **A.**     A put option is a bet that the stock price is going to

5    drop or go down.

6    **Q.**     Okay.  And the one time he bought a call option, when was

7    that?

8    **A.**     That was in April of 2008, or almost ten years before the

9    merger announcement.

10   **Q.**     Okay.  Now, even in 2016 before his premerger trading,

11   did Mr. Clark invest ahead of CEB earnings announcements?

12   **A.**     Yes, he did.

13   **Q.**     And what did he buy?  Put -- I'm sorry -- put or call

14   options?

15   **A.**     He purchased put options.

16   **Q.**     So, even in 2016, he was still buying exclusively put

17   options?

18   **A.**     Yes.

19   **Q.**     Okay.  Now, as part of your analysis, did you review what

20   happened to CEB stock price after the earnings announcements

21   that are referenced here in this exhibit?

22   **A.**     Yes, I did.

23   **Q.**     Now, if you go to SEC Trial Exhibit 19.

24   **A.**     Okay.

25   **Q.**     And again, Mr. Cain, what is that?

1    **A.**    This lists out those 17 earnings announcements that CEB

2    had going back to 2008, and then it shows whether Mr. Clark

3    purchased puts or call options and the directional impact of the

4    stock price.

5    **Q.**    And what did your analysis show?

6    **A.**    So, what my analysis showed is that in the vast majority

7    of these, I think, 82 percent, the stock price moved in a

8    direction that was consistent with his purchase of calls or

9    puts.  So, what that means is, if he purchased a call, the stock

10    price, in fact, increased.  And if he purchased a put, the stock

11    price decreased in the vast majority of instances.

12    **Q.**    Now, did Mr. Clark make money on each of those occasions

13    even though he was right, you said 82 percent of the time, about

14    the direction of the stock price?

15    **A.**    No.  He did not make money on every case.

16    **Q.**    Why not?

17    **A.**    Because if you kind of think back to this chart that I

18    drew earlier, you can predict the direction correctly, for

19    example, if you're buying a call option where you're predicting

20    that the stock price is going to go up.  But if the stock price

21    only increases by a small amount or it increases gradually and

22    it takes longer than the expiration date, you'll still lose

23    money.  Those options will still expire worthless.

24    **Q.**    Okay.  But on the whole -- and you can refer to your

25    chart if you need to -- how did Mr. Clark perform on his

1    earnings trades?

2    **A.**    Overall, he performed quite well, generating, I think,

3    profits around -- earnings announcements of around 172 or

4    $173,000.

5    **Q.**    Okay.  Now, together with his premerger trading, then,

6    how much did Mr. Clark make total on CEB between 2008 and 2017?

7    **A.**    In total, it was around $416,000.

8    **Q.**    Okay.  Now, we talked earlier about how Mr. Clark

9    shortened the expiration dates of his options for the premerger

10   trades.  Did he invest similarly on the earnings trades?

11   **A.**    No, he did not.

12   **Q.**    Can you explain.

13   **A.**    Sure.  So as -- starting out with those merger trades, as

14   he drew closer to the actual merger announcement, he shortened

15   those expirations to riskier and more speculative options

16   trades.  And the earnings announcements, for the most part, he

17   just purchased a given expiration and did that a few days before

18   the earnings announcement.

19   **Q.**    Okay.  Now, I just want to go back to what you said about

20   Mr. Clark's earnings trades, that they were almost all

21   pessimistic about CEB stock price.  How does that compare to

22   Mr. Clark's premerger trades in December 2016 and January 2017?

23   **A.**    Yeah.  In contrast, the premerger trading would be the

24   opposite.  It would be what we would describe as optimistic

25   because he purchased call options that would be profitable only

1    on an increase in the stock price.

2    Q.    Okay.  Now, did you review Mr. Clark's investing in other

3    companies?

4    A.    Yes, I did.

5    Q.    For what time period?

6    A.    Going all the way back to 2008.

7    Q.    Now, just generally speaking, compared to his trading in

8    CEB, how often did Mr. Clark trade in other companies?

9    A.    Far less frequently.  So, I think that he traded 10 or 15

10   times more frequently in CEB than he did in any other single

11   company.

12   Q.    Okay.  And when he traded in other companies, did he

13   typically use option?

14   A.    No, he typically used stock.

15   Q.    Okay.  Now, we talked earlier about Mr. Clark's profits

16   on his trading in CEB.  Was his trading in other companies also

17   profitable?

18   A.    It was profitable, but much more marginally profitable.

19   Q.    And can you just compare his profits on his trading in

20   other companies compared to his profits on CEB.

21   A.    So, if you add up all of the trading profits for all

22   other companies in terms of a realized profit where he bought

23   and sold off, then that sums to about $27,000, or a rate of

24   return of around 16 percent.

25   Q.    And how does that compare to his trading in CEB?

1     A.     That's almost no comparison.  Far lower because the -- as

2     I said earlier, the CEB profits were around $416,000, or a rate

3     of return of over 700 percent.

4     Q.     Okay.  Now, we've talked also, too, about how Mr. Clark

5     traded typically in short-term options in CEB but mostly in

6     stock for other companies.  Have you compared how long Mr. Clark

7     typically held his positions in CEB versus how long he held it

8     for other companies?

9     A.     Yes.

10     Q.     Okay.  What did you find?

11     A.     For CEB options investments, the average holding period

12     was 13 days, or just under two weeks.  And the average holding

13     period for all other companies that he invested in was over two

14     years.  So, just under two weeks for CEB, over two years for all

15     other companies.

16     Q.     Okay.  Now, did you conduct -- this is the last topic.

17     Did you conduct a review to see whether a potential merger was

18     discussed in the market in December 2016 and January 2017?

19     A.     Yes, I did.

20     Q.     What did you find?

21     A.     I searched for -- I searched through news articles, news

22     stories, analyst reports, all available public information, and

23     I concluded that there was no leakage of the merger

24     negotiations.  There were no rumors that circulated of the

25     merger negotiations prior to the actual official announcement on

1    January 5th.

2    **Q.**     Did you find any analyst that asked about a potential

3    acquisition?

4    **A.**     Yes.  I did come across one analyst who asked about that

5    topic generally.

6    **Q.**     And what was the context for that question?

7    **A.**     The context was on CEB's earnings call at the end of

8    October 2016.  And the analyst asked if this could be a good

9    time to consider an investment to a private equity firm or a

10   sale to a private equity firm.  That was sort of the context.

11   **Q.**     And what was CEB's response to that question?

12   **A.**     CEB's response was -- well, it's a very common question

13   that executives get, and they give what is a very common

14   response, which is to say, you know, we're really focused on

15   proving operating performance, sort of looking into the

16   long-term profitability or benefits for the company.  So, they

17   did not give any sort of hints or indications of any upcoming

18   merger negotiations.

19   **Q.**     Okay.  Did you review that analyst's -- the CEB analyst's

20   statements about CEB during that time period?

21   **A.**     Yes, I did.

22   **Q.**     And what did they show?

23   **A.**     So, in that same time period, the analyst wrote a

24   research report on CEB, and he basically just kind of raised the

25   same question in his report that he had asked the executives.

1    You know, this might be an interesting thing for the company to

2    look into down the road if they can turn their operating profits

3    around.  In general, he was fairly pessimistic about the

4    near-term prospects for CEB, even going so far as to downgrade

5    his actual price target for the company itself.

6    **Q.**    Okay.  Just a final few questions then, Dr. Cain.  Do you

7    recall that I asked you earlier what an event study is?

8    **A.**    Yes.

9    **Q.**    Can you just remind the jury what that means.

10   **A.**    Yes.  So, an invent study is a tool that financial

11   economists, such as myself, use to assess the impact of

12   information on the stock price of a company, and ultimately to

13   ask whether a certain type of information, such as a merger

14   announcement, has had an impact on the value of the stock, or

15   the stock return.

16   **Q.**    Did you conduct an event study on CEB's merger

17   announcement?

18   **A.**    Yes, I did.

19   **Q.**    Can you just explain a little bit about your methodology

20   for doing that?

21   **A.**    Yes.  So, the methodology is that I look at the

22   information that comes out, the merger announcement.  I rule out

23   any other potential sources of information on the same date.

24   And I then looked at CEB's stock return on the announcement,

25   when that information came out.  And then I also look at, was

 1    there anything else going on in the overall market or the

 2    industry that could have explained that return.  And I also

 3    compare that relationship over the past 6 or 12 months time

 4    period.

 5    Q.    Okay.  And what did this event study show about the

 6    relationship between the merger announcement and CEB's stock

 7    price?

 8    A.    What this event study showed was that the merger

 9    announcement had a very large statistically significant impact

10    on the stock price, causing CEB's stock price to jump up

11    immediately by roughly 21 percent.

12    Q.    And to make sure I understand, the sudden increase in

13    CEB's stock price demonstrates that other investors in CEB did

14    not anticipate a merger?

15    A.    That's correct.

16    Q.    Okay.  Now, besides the price, were there other

17    indications the market did not anticipate a merger?

18    A.    Yes.

19    Q.    And what were those?

20    A.    So, I also looked at the trading volume in CEB's stock,

21    and when the merger was announced, there was a huge spike in

22    trading volume as investors reacted to this new information.

23    There was no spike in trading volume prior to the official

24    merger announcement, so that shows that their announcement was

25    new information to the market, the investors did not anticipate

1    this announcement.  And as I discussed earlier, I also looked at

2    the open interest or the number of outstanding options series on

3    CEB, and did not find sort of widespread buying activity among

4    investors all around the country or the world.

5    **Q.**    Okay.  And finally, Dr. Cain, to make sure the jury

6    understands, are you being compensated for your testimony today?

7    **A.**    Yes, I am.

8    **Q.**    How much?

9    **A.**    $700 per hour.

10   **Q.**    Is your payment for that testimony dependent in any way

11   on what you say here?

12   **A.**    No, it's not.

13   **Q.**    Is it dependent in any way on the outcome of this trial?

14   **A.**    No.

15   **Q.**    Okay.  Thank you.

16          MR. MAHER:  That's it, Your Honor.

17          THE COURT:  All right.  Cross-exam.

18                  CROSS-EXAMINATION OF MATTHEW CAIN

19   BY MR. SCHER:

20   **Q.**    Good afternoon, Mr. Cain.

21   **A.**    Good afternoon.

22   **Q.**    My name is David Scher.  I represent Mr. Clark.  So, just

23   to sort of go backwards a little bit in your testimony, you were

24   making the point that this was an all-or-nothing proposition.

25   If the call options expired, he would lose all his money --

1   **A.**      I don't think --

2   **Q.**      -- is that what you said?

3   **A.**      I don't think that's exactly what I said, no.

4   **Q.**      What did you say, then?

5   **A.**      Sure.  So what I was doing was explaining how the value

6   of the stock option, or the payoff to a stock option investment,

7   depends on the path of the underlying stock price.  And I was

8   kind of illustrating that through the cutoff of the option

9   expiration.

10          Obviously, as I discussed also earlier, options can be

11  purchased and sold at any point in time before expiration.  But

12  this graph was meant to illustrate the payoff upon expiration.

13  **Q.**      So the fact of the matter is, is it not correct to say

14  that it was an all-or-nothing proposition for Mr. Clark.  He

15  could have sold those options at any time and mitigated a loss

16  if he wanted to.

17  **A.**      Are you referring to the merger trades or the earnings

18  announcements trades or a certain --

19  **Q.**      I am referring to the --

20  **A.**      -- trade in particular?

21  **Q.**      -- merger trades.  So, my question is, is whether or not

22  it's an all-or-nothing, as was described to the jury in the

23  opening statement and as you've described to the jury here, that

24  if that expiration date comes, he loses all his money.  That's

25  not true, is it?

1    **A.**    So the graph is true.  If the stock price does not

2    increase above the strike price of a call option by the

3    expiration date, then the option will expire out of the money,

4    and at that point, it's an all-or-nothing type of investment

5    for --

6    **Q.**    But during the period of time that he owns the option, he

7    could sell it at any time, and he could mitigate his loss?

8    **A.**    He could sell --

9    **Q.**    So, for --

10    **A.**    Sorry.

11    **Q.**    Just let me finish.  So, for instance, if he bought an

12    option that had a strike price of $65 and the option period was

13    coming, you know, it was right in the middle of it and he

14    decided maybe he wanted to minimize his risk, he could sell it

15    and lose less money than all of the money, correct?

16    **A.**    Yes.  He could sell prior to the expiration or prior to

17    the merger announcement.  In this case, he did not do that.  But

18    that's obviously --

19    **Q.**    Well --

20    **A.**    -- an opportunity to trade at any point in time.

21    **Q.**    Yeah.  And so, that situation, as he's watching it going

22    up or not, he can make a decision as to whether he wants to

23    mitigate his loss or not.  He doesn't have to, you know, hold it

24    to the end and let it all just expire and that's the end of it?

25    **A.**    Absolutely.  And that's what I actually explained with

1    one of my answers.  He did not hold these to expiration.  He

2    actually realized the profits right after the merger was

3    announced.  So, it's not something that you have to wait until

4    expiration.  That's why it's called an option, because you have

5    the option to --

6    **Q.**    Right.

7    **A.**    -- exercise it, or to sell it, as he did.

8    **Q.**    So, in his case, when he bought an option at 65, just so

9    the jury's clear, if the stock goes to 65, he exercises his

10   option and he makes the profit, right?

11   **A.**    Only if the stock increases above 65.

12   **Q.**    65.  And then he makes a profit, his profit?

13   **A.**    If it's above that, correct.

14   **Q.**    And the real, you know, key to this whole business of

15   making so much more money on options is the fact that he buys a

16   contract, right, for the option.  One contract, two contracts,

17   three contracts.  In this case, he bought a lot of contracts,

18   correct?

19   **A.**    He did buy a lot of contracts.  I'm not sure that I would

20   say that's the only key to making money --

21   **Q.**    I'm not saying it's the only key.  But the point is, is

22   when he buys an option contract, he's buying a hundred shares

23   that he's controlling, not one share?

24   **A.**    Each option contract covers 100 shares, correct.

25   **Q.**    Right.  So, if he bought one share of CEB stock and it

80

1    went from 50 to 55, he'd make $5 on that one share, right?

2    **A.**    Correct.

3    **Q.**    But if he bought an option, he would make $5 on a hundred

4    shares?

5    **A.**    Well, obviously it depends on how the option price moves,

6    but --

7    **Q.**    Obviously.

8    **A.**    -- that's generally correct.

9    **Q.**    But conceptually, we're correct and talking the same

10   language, right?

11   **A.**    Correct.

12   **Q.**    Okay.  So, when Mr. Clark bought this stock, you did some

13   analysis into the history of the stock prices of that stock

14   right before this merger and after the merger, correct?

15   **A.**    Generally, yes, that was part of my analysis.

16   **Q.**    Okay.  And so, when you did your chart that you did

17   charting the value of the stock, you picked a date to start it

18   from, right?  And what was the date you picked?

19   **A.**    Which -- can you tell me which chart you're referring to.

20   **Q.**    So, I think it would be Exhibit Number 19, I believe.

21   SEC Exhibit Number 19.

22   **A.**    I think that's the earnings announcement table.

23   **Q.**    So, when you look at the price of the stock, okay,

24   from when the announcement was made, it went up approximately,

25   you said --

1    **A.**     21.

2    **Q.**     -- 21 percent?

3    **A.**     Right.

4    **Q.**     Isn't it a fact that the stock had gone up 23 percent

5    from in the month before?

6    **A.**     Um, so it actually fluctuated significantly all the way

7    back through 2008.  So it --

8    **Q.**     But I'm just talking about --

9    **A.**     -- fluctuated quite a bit --

10   **Q.**     -- the month before.

11   **A.**     -- but -- I'm not finished, so...

12   **Q.**     Okay.  Go ahead, sir.

13   **A.**     So it fluctuated quite a bit all the way back through

14   2008.  And I do recall that -- I think it was a couple months

15   before the actual announcement.  It might have been back

16   including some of November.  I don't recall the specific amounts

17   off of the top of my head, but there was some -- certainly

18   fluctuations in the stock price.

19   **Q.**     The stock price -- just to be clear, okay?  On November

20   the 4th, 2016, okay, the stock price was trading for $47.95.  Do

21   you disagree with that?

22   **A.**     I don't have that number in front of me, so I --

23   **Q.**     And by December the 8th, 2016, it was trading at $59.35,

24   so in that 33 days prior to Mr. Clark even buying any options in

25   this situation, the stock had increased 23.8 percent?

1          MR. MAHER:  Objection, Your Honor.  There's no foundation

2     for this question.

3          MR. SCHER:  Yes, sir.  It's in his report.

4          THE COURT:  Objection overruled.

5          THE WITNESS:  That ballpark sounds reasonable to me.  Like

6     I said, I don't have the number in front of me, but that's --

7     BY MR. SCHER:

8     Q.     Okay.

9     A.     -- consistent with my recollection of the price.

10    Q.     And that 23 percent in that period of time would be a

11    large increase in the value of that stock, correct?

12    A.     Well --

13    Q.     That's --

14    A.     I think that -- that would be a good increase, but

15    obviously, nowhere close to the 21 percent return in the single

16    day when the merger was announced.

17    Q.     I agree it's not in a single day, but it is the direction

18    that the stock was headed during that period, right?

19    A.     Well --

20    Q.     It was heading up.  It was what they call a "bull

21    market."

22    A.     Well, certainly, not at the time that he was purchasing

23    the call options, no.  It was fairly flat, as I mentioned

24    earlier today.  It traded with an extremely narrow range while

25    he was buying call options between roughly $58 and $62 per

1    share.

2    **Q.**    So, what you're saying is on November 4th, when it was

3    trading at 47.95 to December 8th, 2016, when it started trading

4    at almost $60, after that it stayed a bit flat?

5    **A.**    That's correct.

6    **Q.**    And when he bought that stock at 59 -- and it was trading

7    at 59.35 on December 8th, and he's buying, I guess, a week after

8    January -- December 9th.  When he's buying that stock on

9    December 9th, he's buying it at strike price.  As you've called

10   the strike price it's $65, right?

11   **A.**    Correct.

12   **Q.**    So it would have to go up another $5 for him to be in the

13   money?

14   **A.**    For that one, and he was, as I also said, buying with the

15   strike price of $70 per share, so that could go up further.

16   **Q.**    But if it went up to 65, a bunch of his options that he

17   had bought would be in the money if it went above 65?

18   **A.**    For those specific options, they would have been --

19   **Q.**    And if he sold those, it would be logical that he would

20   be making a lot of money, right, because he's buying it, you

21   know, in a hundred shares per contract?

22   **A.**    Well, he would only make a lot of money if the stock

23   price increased significantly above the strike price.  So,

24   again, if the stock price increases only to $65 per share right

25   at the strike price, then he would still lose money on the

1    premiums that he had paid for those options.  So you would need

2    a stock price increase that goes well above the strike price in

3    order to get a lot of money as you're describing.

4    **Q.**    So let's address ourselves to that.  Okay.  So, in this

5    particular case, would you say that he was buying the stock as

6    it was in an upwards trajectory?

7    **A.**    So, again, when he was purchasing the call options, the

8    stock was trading in a fairly narrow range of 58 to $62 dollars

9    per share, so it was relatively flat during that time period of

10   purchasing the call options.

11   **Q.**    When Mr. Clark is making his judgment as to whether to

12   buy these call options or not, okay, he's betting on the fact

13   that the stock is going to go up in price.

14   **A.**    That would be -- the call options would be consistent

15   with a bet on an increase in the stock price.

16   **Q.**    So, he was betting that it was going to go up?

17   **A.**    Correct.

18   **Q.**    And it had gone up in -- since November 4th, from 47 to

19   60, or $62.

20   **A.**    Yes, it's --

21   **Q.**    I mean, we would agree that that's a pretty large

22   increase in the stock price.

23   **A.**    Again, like I said, there were -- if you look at the

24   history of the stock price, there were periods where it went up

25   and periods where it went down.  So, there was actually certain

1  amount of volatility in the stock price.

2  **Q.**   Yeah.  I get you on the volatility part, but on the part

3  in terms of it generally going up, from 47.95 to 59.35, an

4  increase of 23.8 percent, two months prior to the announcement

5  of this merger, that would be consistent with your

6  understanding?

7  **A.**   Yes.  That was part of that volatility that I described.

8  **Q.**   At the point in time, I noticed that you did this little

9  timeline of public announcements and things that the public knew

10 and things that the public didn't know.

11 **A.**   Uh-huh.

12 **Q.**   Okay.  And one of the things that I didn't see in your

13 chart was the announcement of Mr. Monahan as the CEO retiring.

14     Would that be correct?

15 **A.**   I don't recall putting that in the timeline of merger

16 negotiations.

17 **Q.**   Well, it's not in there and -- but you would consider

18 that a significant public event, would you not?

19 **A.**   I'm not sure what -- what do you mean by significant

20 public event?

21 **Q.**   Well, would you say that it's material information that a

22 CEO is going to step down as the CEO?

23 **A.**   Not necessarily.

24 **Q.**   So you don't think so?

25 **A.**   So I think it really depends on a specific situation.  So

1    the way that -- as a financial economist, when I talk about

2    "materiality," I'm really referring to economic materiality in

3    terms of was there a statistically significant stock price

4    reaction to a piece of news or information.  And so, what I

5    would do, if I were trying to assess the materiality of the

6    announcement that the CEO is going to retire and be replaced, I

7    would look at that announcement and I would run that event study

8    to make an assessment as to whether it had a statistical

9    significant impact on the stock price when it was announced.

10   **Q.**    Did you do that?

11   **A.**    No.  I didn't need to do that in this case.

12   **Q.**    Why not?

13   **A.**    Because I was, as I have been explaining, looking at the

14   trading that was leading up to the merger announcement.  And so

15   the question that I was concerned with in my report was whether

16   the information about those confidential merger negotiations

17   that were taking place, was that information value relevant to

18   investors, and did it have a significant impact on the stock

19   price when it was publicly released.

20   **Q.**    So in terms of whether or not there might be a merger in

21   the offing, the fact that a CEO retires and no CEO replacement

22   is announced, would you think that that might be a significant

23   thing for an investor to consider?

24   **A.**    Well, I guess, I would say a couple of things.  And the

25   first thing I would say is once the information has been

87

1    announced, then it's publicly available and it's going to

2    quickly be impounded into the stock price.  So to the extent

3    that investors view the CEO retirement as value-relevant, once

4    it's publicly announced, they know what that information is.

5    And at that point, it becomes very difficult to actually trade

6    profitably on that information because that information is

7    already impounded into the stock price.

8    Q.    So, in this particular case, when Mr. Monahan announced

9    his retirement, would it be reasonable for an investor like

10   Mr. Clark to take that into consideration as to the potential

11   aspect of a merger in the coming days and the future?  Is that

12   something that an investor might think might be in the offing?

13   A.    Well, I guess, I would, again, come back to, once this is

14   publicly announced, it's available to all investors and that's

15   going to quickly going to be priced into the stock price and the

16   options prices, and so it would be difficult to actually

17   generate a profit based off of information like that that's been

18   publicly announced.  I certainly recall that the -- as I

19   discussed earlier, the analyst who asked CEB on the earnings

20   call and sort of speculated in his analyst report about this,

21   had in mind this question of the CEO retirement, but ultimately,

22   the analyst expressed a pretty significant amount of pessimism

23   in terms of the near-term prospects for CEB when he wrote up his

24   analyst report that included that information.

25   Q.    When that analyst did that, okay, that's Mr. Bisbee?

1   **A.**     Yes.

2   **Q.**     Okay.  And he was curious as to whether or not there was

3   a potential merger in the offing because Mr. Monahan had stepped

4   down and no CEO had been announced to take his place?

5   **A.**     I think he was -- he was actually more interested, the

6   way he articulated it, and the idea that a financial sponsor

7   could be interested in CEB, which would not be quite the same

8   thing as a merger.

9   **Q.**     And it affects the stock price?

10  **A.**     It would depend.

11  **Q.**     Okay.  So is it fairly clear in your mind that if

12  Mr. Clark had not been given a heads-up by Mr. Wright and he had

13  no inside information, that his trades are perfectly legal?

14  **A.**     That's not a question that I've been asked to assess --

15  **Q.**     I'm asking you.

16  **A.**     -- within my report.  So, I don't -- as a rule -- as an

17  independent financial expert, I don't weigh in on questions of

18  legality.  My understanding is that's why we have a jury and

19  people to make those types of determinations, but that's not

20  something that I've investigated or reached any sort of opinions

21  on.

22  **Q.**     So, if Mr. Clark was thinking in those terms, you

23  wouldn't have any opinion as to whether that was good or bad or

24  anything in-between?

25  **A.**     None of my opinions touch on state of mind or intent or

1    good or bad or any of these types of questions.

2    **Q.**    But it's pretty clear, though, that if he did not get

3    inside information, his trades were perfectly legal.  That's a

4    simple "yes" or "no."

5    **A.**    Again, it's the same answer.  I'm not assessing legality

6    of any trading activity at this --

7    **Q.**    If he didn't get any insider information, he wouldn't be

8    here, would he?

9    **A.**    Again, same answer.  I'm not opining on the legality of

10   the trading.

11   **Q.**    All right.  So, would we agree, I think, at least, that

12   the fact of the merger was material information?

13   **A.**    Yes.  Clearly, from a financial and economic standpoint,

14   which I've evaluated it, it is economically material for

15   shareholders.

16   **Q.**    So then the possibility of a merger would, at least from

17   the point of view of investors and even Mr. Bisbee as an

18   analyst, would take that into consideration?

19   **A.**    Well, investors and analysts are always aware of the fact

20   that merger negotiations are taking place confidentially around

21   many companies around the country.  So, I think everybody is

22   aware that there's always a possibility of a merger with any

23   sort of company.

24   **Q.**    So, in essence, what you're saying is, options trading is

25   not unusual at all, is it?

1   **A.**     No.  I didn't -- that's not what I said.

2   **Q.**     But is that true?

3   **A.**     Is it true that options trades occur?

4   **Q.**     It's not unusual for people to trade-in options.  It's

5   done thousands of times a day every day, right?

6   **A.**     I think it depends on what you're referring to.  If

7   you're just talking about the general options market, similar to

8   the stock market, people buy and sell stocks, people buy and

9   sell options, but also, I just remind you, as I explained

10  earlier, the options trading activity that Mr. Clark and

11  Mr. Nevins engaged in was unusual because they represented the

12  entirety of any investor interest anywhere in the world in four

13  out of the six option series that they had purchased.  So, I

14  would not describe that as sort of common or usual.

15  **Q.**     Sir, the amount of options that Mr. Clark could have

16  purchased and Mr. Nevins could have purchased, that's very

17  limited, isn't it?

18  **A.**     Well, it depends on how many options a willing seller is

19  willing to create or sell.

20  **Q.**     In this case --

21  **A.**     Correct.

22  **Q.**     -- it's limited?

23  **A.**     No.  It just depends on how many willing sellers there

24  are in the marketplace at any given point in time.

25  **Q.**     So under your scenario, going back to 2008, there's

```
 1   earnings announcements every quarter?
 2   A.    Yes.
 3   Q.    Okay.  And so between 2008 and 2016, if Mr. Wright were
 4   giving Mr. Clark advance knowledge of earnings, you would be
 5   saying that he would be committing that -- every time he did it,
 6   he would be committing a crime?
 7   A.    I think I tried to answer this previously.  I'm not
 8   opining on whether anyone committed a crime, whether they've
 9   done anything legal or illegal, good, bad.  These are -- none of
10   this is within the scope of my report.
11   Q.    I see.  You worked for the SEC?
12   A.    No, I'm --
13   Q.    You did work for the SEC?
14   A.    Yes.  I did previously work for the SEC from about 2014
15   through 2018.
16   Q.    And so, when I ask you if every time Mr. Wright would
17   give inside information about earnings, that that would be a
18   crime, you're not willing to give an opinion on that?
19   A.    Again, I've never given an opinion along those lines of
20   whether somebody has committed a crime.  That's not my role as
21   an independent expert and as a --
22   Q.    -- you know the answer to the question, though --
23         THE COURT REPORTER:  I'm sorry.  I didn't hear you.
24   A.    So, that's not the role that I play as an independent
25   financial expert and as a financial economist.  I don't opine on
```

1    whether people have committed crimes.

2    Q.    But you know the answer to the question, do you not?

3    A.    No, that's -- again --

4    Q.    You don't know whether or not it would be improper and

5    criminal for Mr. Wright to give Mr. Clark information in advance

6    about earnings of CEB?

7    A.    So, again, same answer.  That's well beyond the scope of

8    what I opine on or analyze in my work.

9    Q.    And you would also be aware that Mr. Wright would have in

10   the taking of the different courses that he has to take and the

11   things that he must sign as to confidentiality, that he would

12   then be aware that he's not allowed to share information that

13   would be confidential with anyone, much less Mr. Clark?

14        MR. MAHER:  Objection, Your Honor.  There's not a single

15   thing on Mr. Wright and in Dr. Cain's report or testimony well

16   beyond.

17        THE COURT:  Objection sustained.

18        MR. SCHER:  Thank you, Your Honor.

19   BY MR. SCHER:

20   Q.    I guess you must have read the complaint in this case,

21   did you not?

22   A.    Yes, I did.

23   Q.    Okay.  Did you note in the complaint that there was a

24   representation in the complaint, an allegation that Mr. Wright

25   was concerned that the merger would actually cause the stock

```
 1   price of CEB to go down?

 2   A.    I don't recall specific details from the complaint at

 3   this point.

 4   Q.    Okay.  Well, would you take my word for it that it says

 5   that at paragraph 23 of the complaint?

 6   A.    I want to read through anything in front of me before

 7   opining on it.

 8         MR. MAHER:  Your Honor, we would be grateful if Counsel

 9   would show that to the witness if, in fact, it says that.

10   BY MR. SCHER:

11   Q.    So, let me read you paragraph 23 just to save a little

12   time.  "News of the potential merger worried the CAO [sic] who

13   feared that he and Wright could lose their jobs as a result.  He

14   was also concerned that the merger could cause CEB stock to lose

15   value."

16   A.    I really would like to see the paragraphs preceding what

17   you just quoted before giving any sort of impression.

18   Q.    All right.

19         (Brief pause in proceedings.)

20         THE WITNESS:  Okay.  I've reviewed this.

21   BY MR. SCHER:

22   Q.    Would you agree that was the allegation of the SEC in

23   their complaint?

24   A.    No.  Actually, I think you took it out of context.

25   Q.    Okay.
```

1   **A.**     So if you read the paragraph that follows what you

2   quoted, it says, "They had an e-mail exchange discussing how

3   their CEB stock awards might not vest upon a change in control

4   of CEB."  So, that actually refers to a view that they had

5   certain restricted stock awards that were not yet vested, and if

6   they were to be terminated as a result of the merger, they could

7   lose out on those stock awards and that seems to be the context

8   that they're talking about when it refers to their stock

9   holdings losing value because they would lose those restricted

10   stock awards upon a change in control.

11   **Q.**     Okay.  So, if they lost their stock, that would be one

12   thing.  And if the value of the stock went down, that would be

13   another thing, and that's the distinction you're making?

14   **A.**     Right.  At least this paragraph here seems to be

15   referring not to the actual price or value of the stock, but

16   rather the value of their holdings in terms of them being

17   restricted and not yet vested.

18   **Q.**     But it does say the value of the stock might go down?

19   **A.**     No.  Again, I think you need to read the full context to

20   be able to understand that they're referring to their restricted

21   stock awards that were not vested and, therefore, their value

22   holdings would decrease if they were to lose out on those.

23   **Q.**     So when Mr. Wright allegedly -- and not for a moment do I

24   believe this -- gave Mr. Clark inside information, he would have

25   believed that he was giving him information that would have

1    helped him to make money in this trading?

2         MR. MAHER:  Objection.  It's totally beyond what he can

3    testify about.

4         THE COURT:  Objection overruled.

5         THE WITNESS:  So, I've not assessed any sort of tipping

6    chain or information transmission to people or their state of

7    mind or their beliefs, so that's outside of the scope of what

8    I've looked at in my report.

9    BY MR. SCHER:

10   **Q.**    So, in your report, as you did -- you did a fairly

11   thorough investigation?

12   **A.**    I looked deeply and thoroughly into the issues that I was

13   asked to investigate.

14   **Q.**    Did you see anything in all of that investigation that

15   would indicate to you that Mr. Wright had done anything that was

16   improper?

17   **A.**    That's not a question that I was asked to evaluate, so

18   that's just not something that I was looking at one way or

19   another either way in terms of the work that I did.

20   **Q.**    So, in your effort to do the work that you did, would you

21   consider your testimony here today objective?

22   **A.**    Yes, I would consider myself objective.

23   **Q.**    You're not on the side of the SEC?

24   **A.**    I'm an independent expert witness.

25   **Q.**    Okay.

1          (Brief pause in proceedings.)

2    BY MR. SCHER:

3    **Q.**    So, I mean, you may not know the answer to this

4    precisely, but do you have an idea while you were working at the

5    SEC as to how many investigations you actually worked on?

6    **A.**    What do you mean -- I guess -- what do you mean when you

7    say "worked on investigation," because I was not part of

8    enforcement so I didn't actually investigate companies or

9    individuals?  I just essentially analyzed data, presented the

10   results, the findings to enforcement staff, and then potentially

11   participated in settlement negotiations or occasionally testify

12   at trial.

13   **Q.**    So you didn't work on any investigations as such?

14   **A.**    So, again, I'm not --

15   **Q.**    The question "worked on" I guess is --

16   **A.**    Yeah.  I'm not sure what you mean.

17   **Q.**    You weren't in charge of any?

18   **A.**    No.  I was not -- I'm not a lawyer.  I'm not part of -- I

19   was never part of the enforcement division within the SEC, so I

20   never led any investigations in that respect.

21   **Q.**    In connection with your compensation here today, you said

22   your rate was 700 an hour?

23   **A.**    Yes.

24   **Q.**    For some reason, at the back of my mind, I thought it was

25   750, not that it makes a big difference, but...

1    **A.**     750 is my standard rate, and I have a government rate

2    that's offered to any government agencies.

3    **Q.**     So you discount your rate if you're working for the SEC;

4    is that what you're saying?

5    **A.**     For any government agencies.

6    **Q.**     And you work for other agencies?

7    **A.**     Correct.

8    **Q.**     I see.

9           (Brief pause in proceedings.)

10   BY MR. SCHER:

11   **Q.**     So, getting back to the -- your efforts to try and

12   determine whether or not any -- there was any leakage of

13   information regarding this merger, you said that you'd gone back

14   and looked to see if there was any publication about it, and I

15   thought there were at least two.  One, Mr. Bisbee who asked a

16   question directly at a meeting involving an earnings thing, and

17   of course, the corporate answer you said, was pretty standard,

18   right?  But that's a good indicator to people like Mr. Bisbee

19   and investors that they might be the object of an acquisition by

20   an equity group or a merger, but there could be a big change --

21   see change in the company's status; isn't that true?

22   **A.**     Absolutely not, no.  So, to go back to the beginning of

23   your question where you, I think, characterized the analyst's

24   question and research report as some sort of leakage or rumor or

25   publication, that's definitely not the case.  So what I would

1    describe as merger rumors or leakage, what that would refer to

2    is any information about these merger negotiations that the rest

3    of the marketplace learned about publicly.  And that would

4    include the identity of the target company, potential price,

5    potential time frame within which they might be acquired.

6         And so I -- as I described earlier, reviewed analyst

7    reports, news, media, any sources, other data, stock price data,

8    trading volume, options, open interests, all of these were

9    extremely consistent with one another, that there was no leakage

10   of the merger negotiations prior to the announcement.

11        In contrast, the question that the analyst asked on an

12   earnings call is a very common question.  Analysts ask these

13   types of questions all the time and company executives deflect

14   those questions all the time.  So it's actually quite standard

15   and routine for these types of questions to come up from company

16   to company, and those questions and a company's deflection of

17   those questions, that's certainly not leakage of the actual

18   merger negotiations into the public marketplace.

19   Q.   Yeah.  But the fact of the question -- forget the leakage

20   for a second, forget the answer -- the fact of the question is

21   that the public and this analyst was aware that, you know,

22   because Monahan had stepped down, that perhaps there could be,

23   and there's some sort of activity going on, some opportunity as

24   he put it for the company to transcend into a new company to be

25   merged or be purchased by an equity company, something of that

99

1    nature, right?  And that's the reason the question was asked.

2    **A.**     So, I guess to start off with the end of your question,

3    the reason the question was asked is because analysts ask these

4    types of questions routinely just so they understand what the

5    outlook of a company is.  But then to back up a little bit, if

6    you would actually put the text of the analyst report up and we

7    were to walk through what he said, it's actually fairly

8    different from what you're characterizing.

9         He was actually articulating that in the analyst report

10   that he wrote up that maybe down the road a number of quarters

11   or even a year or two down the road, if the company could turn

12   its operations around and improve profitability, then the

13   company, at that point, could become an attractive opportunity

14   for something like a private equity investor.  But in the near

15   term, the outlook the analyst had was actually pessimistic.  He

16   felt that the stock price was -- he actually lowered his price

17   target for what he thought the stock was worth and, I think,

18   again, just kind of going back to the actual trading, this is --

19   if you were to think that this is something that could happen

20   two years down the road, then buying an option that expires in

21   three weeks is not going to capture any sort of value that's --

22   that longer-term value that the analyst was speculating could be

23   manifested over the next couple of years.

24   **Q.**     Mr. Bisbee put a high price on the stock when he was

25   putting a range of the stock at 70; is that correct?

1   **A.**     Actually, he lowered his price target.  And I don't

2   recall the exact amount, but he lowered it at that time that he

3   published the report where he was talking about this.

4   **Q.**     But he -- he mentioned the word "70," did he not?

5   **A.**     Well, if you want to put the analyst report in front of

6   me, I'll be happy to read through it and --

7   **Q.**     Well, I --

8   **A.**     -- let you know what it says.

9   **Q.**     I don't.  And the jury is going to get that.

10          There was also one analyst from Barclays who had

11  estimated that the potential value of the company long term

12  could be as high as 90.

13          Did you see that?

14  **A.**     Oh, sure.  This is actually quite common that there's --

15  this is something that I've studied before, which is that

16  analysts and investment banks have these upward biases.  They

17  actually have an incentive to say, oh, we think the stock price

18  is worth 90 or 100 or 150 because it makes the company

19  executives and management feel good about their projections, and

20  then they're more likely to engage the investment banks to

21  provide either research or investment banking services for the

22  company.  So, as a result -- like, if you were to look at CEB

23  and the analyst reports covering CEB all the way back to 2008,

24  you would see a similar pattern where analysts are putting these

25  price targets that are high on the company's stock in an attempt

1    to curry favor, essentially, with management.  So that's nothing

2    unique to the time period of the actual premerger trading in

3    2016, but you would see that similar pattern all the way back to

4    2008.

5    **Q.**    So if we go back to 2008, just for a second, the

6    government's theory and the one that you looked at in the

7    complaint is, Mr. Wright was giving Mr. Clark insider

8    information every 90 days for eight years secretly?  That's your

9    theory?

10   **A.**    Again, as I said several times, I don't have any sort of

11   theory about tipping, or good, bad, legal, illegal, criminal,

12   not criminal.  My role, as I said, I think, several times, was

13   to analyze the merger, analyze the trading, describe the trading

14   that took place around the merger, contrast that with the

15   trading around the earnings announcements.  But I'm not here to

16   articulate or form any sort of legal theory of the case.

17   **Q.**    Okay.  So, my partner has just, you know, handed me the

18   question that Mr. Bisbee asked of Mr. Monahan, and I'm going to

19   just show you this and ask you to read it.  It might be easier

20   than asking you a question.  And you can look at the portion

21   that's highlighted in yellow.

22           THE COURT:  Well, what's your question?

23   BY MR. SCHER:

24   **Q.**    Would you please read that out loud?  And do you agree if

25   that's the actual question?

1    **A.**    I --

2         MR. MAHER:  Your Honor, just a housekeeping question.  Can

3    he just identify what exhibit it is that's being referred to

4    here.

5         MR. CUMMINGS:  Defense 157 --

6         MR. MAHER:  Thank you.

7         MR. CUMMINGS:  -- page 9.

8         THE WITNESS:  Yeah, so this is just one page.  I don't

9    have the entire transcript of the earnings call.

10         THE COURT:  Well, that's not -- answer his question.

11    Repeat your question.  Just answer the question.

12    BY MR. SCHER:

13    **Q.**    Would you please read that, what's highlighted.

14    **A.**    Okay.  "Tom, I guess a question for you.  First, I guess

15    I should say congratulations on the decision to move on to

16    something else at some point.  But in the process of discussing

17    that with the board, has there been any discussion or thought

18    about potentially considering a sale of the company?  Just

19    stepping back from what's going on now, I'd look at it and I'd

20    say, hey, acquisition multiples for data information research

21    assets have risen in the last couple of years."  That's all

22    that's highlighted.

23    **Q.**    All right.  So, would you agree that that was a question

24    that Mr. Bisbee put to Mr. Monahan, the CEO?

25    **A.**    Yes, that is my recollection from my --

| | |
|---|---|
| 1 | **Q.**   All right.  Thank you. |
| 2 | **A.**   -- review in this case. |
| 3 | **Q.**   Thank you very much. |
| 4 | MR. SCHER:  Thank you, Your Honor. |
| 5 | THE COURT:  Do you have anything further? |
| 6 | MR. MAHER:  Just a couple minutes, Your Honor. |
| 7 | THE COURT:  All right. |
| 8 | REDIRECT EXAMINATION OF MATTHEW CAIN |
| 9 | BY MR. MAHER: |
| 10 | **Q.**   Dr. Cain, do you remember being asked a number of |
| 11 | questions about Mr. Monahan's decision to leave CEB? |
| 12 | **A.**   Yes. |
| 13 | **Q.**   Do you know when that occurred? |
| 14 | **A.**   Um, I think it was in the fall of 2016. |
| 15 | **Q.**   If I said August 2016, would that be right? |
| 16 | **A.**   Yeah, that sounds right. |
| 17 | **Q.**   Now, you've studied Mr. Clark's trading in this matter, |
| 18 | correct? |
| 19 | **A.**   Yes, I have. |
| 20 | **Q.**   Did Mr. Clark buy any CEB options in August of 2016? |
| 21 | **A.**   No, he did not. |
| 22 | **Q.**   What about September of 2016? |
| 23 | **A.**   No. |
| 24 | **Q.**   October? |
| 25 | **A.**   No. |

**Q.**     What about in November, when, as you heard counsel ask

you, CEB stock price was going up?

**A.**     No, he did not buy then.

**Q.**     Okay.  And during the period of time when he bought

options in December and January of 2016, did CEB's stock price

continue to go up?

**A.**     No.  It was relatively flat during that time.

**Q.**     And over that time period, did Mr. Clark's trading get

riskier or less risky?

**A.**     It became increasingly riskier and more speculative over

that time.

**Q.**     Okay.  Now, just to review -- actually, let me step back.

You've heard some questions about what other investors in the

market might have perceived about the information that was

available.  Did any other investor buy in most of the options

series Mr. Clark and Mr. Nevins traded in in their premerger

trading?

**A.**     No.  In the majority of those series, there was no other

buying activity from any other investors anywhere in the world.

**Q.**     And do you remember your testimony about an event study

about the impact of the merger on CEB's stock price?

**A.**     Yes.

**Q.**     And what did that show, Dr. Cain, about what other

investors in the market, based on the information available,

thought about whether there would be a merger?

1   **A.**     Yeah.  So, what that shows is that when the merger was

2   announced, the stock price spiked quite significantly.  And if

3   other investors -- if any other investors had actually been

4   expecting a merger to take place, they would have priced that in

5   prior to the announcement.  So, the fact that the stock was flat

6   and then jumped right at the announcement shows that the rest of

7   the marketplace did not expect or anticipate any sort of merger

8   news.

9   **Q.**     Okay.  Now, do you remember being asked -- this is the

10  last set of questions -- some questions about an analyst named

11  Gary Bisbee's price target for CEB?

12  **A.**     Yes.

13  **Q.**     In the fall of 2016?

14  **A.**     Yes.

15  **Q.**     Did the defense show you a document or anything in

16  connection with that?

17  **A.**     They did not give me that analyst report, no.

18  **Q.**     Okay.  I'm going to, if I may, with the court's security

19  officer's permission, provide you with SEC Trial Exhibit 277.

20  **A.**     Thank you.  Okay.

21  **Q.**     Do you recognize what that is, Dr. Cain?

22  **A.**     Yes.  This is an analyst report by this analyst that

23  we've been discussing.

24  **Q.**     And what's the date of that report?

25  **A.**     This one is November 28th, 2016.

1    **Q.**    What is the analyst price target for CEB in that

2    document?

3    **A.**    The price target is $60 per share.

4    **Q.**    And if you look at the first sentence of the report in

5    blue highlighting, what is Mr. Bisbee's view of the future of

6    CEB's stock price?

7    **A.**    He says, "We are downgrading CEB to sector perform after

8    a strong postelection run."  So, what he's saying is that there

9    was a strong run-up in the stock price right after that election

10   in November, but his view is that that run is over, basically,

11   and he's downgrading the stock, not projecting any strong

12   performance or any further increase in the stock price.  And

13   that's why he's giving that price target of $60 per share, which

14   is actually right around where the stock is trading at that

15   time.

16   **Q.**    Thank you.

17        MR. MAHER:  No further questions, Your Honor.

18        THE COURT:  All right.  Thank you.

19        You may step down and be excused.  And we'll recess for

20   lunch until 2:15.

21        (Thereupon, a luncheon recess was had beginning at

22   1:02 p.m.)

23

24

25

1

2

**C E R T I F I C A T E**

3

4             I, Scott L. Wallace, RDR-CRR, certify that
the foregoing is a correct transcript from the record of
5      proceedings in the above-entitled matter.

6

/s/ Scott L. Wallace                    12/8/21
7      ---------------------------        ----------------
       **Scott L. Wallace, RDR, CRR              Date**
8         **Official Court Reporter**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25