UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND** | : | |
| **EXCHANGE COMMISSION,** | : | |
| | : | Civil Action |
| **Plaintiff,** | : | No. 1:20-cv-01529-MSN-JFA |
| | : | |
| **v.** | : | |
| | : | December 8, 2021 |
| **CHRISTOPHER CLARK,** | : | 2:15 p.m. |
| | : | |
| **et al.,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |
| | : | |
| ............................ | : | |

**DAY 1 – AFTERNOON SESSION**
**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE CLAUDE M. HILTON,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:                    **Olivia S. Choe, Trial Attorney**
                                      Securities and Exchange Commission
                                      100 F Street, NE
                                      Washington, DC 20549
                                      202-551-5100
                                      Email: Choeo@sec.gov

                                      **Daniel J. Maher, Trial Attorney**
                                      Securities and Exchange Commission
                                      100 F Street, NE
                                      Washington, DC 20549
                                      202-551-5100
                                      Email: Maherd@sec.gov

                                      **John Lucas, Trial Attorney**
                                      Securities and Exchange Commission
                                      100 F Street, NE
                                      Washington, DC 20549
                                      202-551-5798
                                      Email: Lucasj@sec.gov

APPEARANCES:   (Cont.)

For the Plaintiff:          **Sarah Marie Hall, Trial Attorney**
                            US Securities & Exchange Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-4784
                            Fax: 202-661-5849
                            Email: Halls@sec.gov


For the Defendants:         **Mark Davis Cummings, Esq.**
                            Sher, Cummings & Ellis
                            3800 N. Fairfax Drive
                            Suite 7
                            Arlington, VA 22203-1703
                            703-525-1200
                            Email:
                            Mcummings@sherandcummings.com

                            **David Edward Sher, Esq.**
                            Sher Cummings & Ellis
                            3800 N. Fairfax Drive
                            Suite 7
                            Arlington, VA 22203-1703
                            703-525-1200
                            Email: Sher@sherandcummings.com

                            **Adam Michael Collins, Esq.**
                            Sher, Cummings and Ellis
                            Virginia
                            3800 N. Fairfax Drive
                            Suite 7
                            Arlington, VA 22203
                            571-212-9192
                            Email: Acollins@sherandcummings.com

Court Reporter:             **Scott L. Wallace, RDR, RMR, CRR**
                            Official Court Reporter
                            United States District Court
                            401 Courthouse Square
                            Alexandria, VA  2231-5798
                            Office: 703.549.4626
                            Cell: 202.277.3739
                            Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                        **Page**

DIRECT EXAMINATION OF JEREMY DESOR            4
BY MS. CHOE

CROSS-EXAMINATION OF JEREMY DESOR             15
BY MR. CUMMINGS

DIRECT EXAMINATION OF ANDREW NEVINS           23
BY MR. MAHER

CROSS-EXAMINATION OF ANDREW NEVINS            46
BY MR. CUMMINGS

REDIRECT EXAMINATION OF ANDREW NEVINS         56
BY MR. MAHER

RECROSS-EXAMINATION OF ANDREW NEVINS          59
BY MR. CUMMINGS

DIRECT EXAMINATION OF JAMES WELLS
BY MR. LUCAS                                                           59

CROSS-EXAMINATION OF JAMES WELLS              66
BY MR. CUMMINGS

DIRECT EXAMINATION OF CHRISTOPHER CLARK       68
BY MS. CHOE

## EXHIBITS

**DESCRIPTION**                                                        **Page**

1          **MORNING SESSION, DECEMBER 8, 2021**

2     (2:15 p.m.)

3          THE COURT:  I understand that somebody raised the issue of

4     having something on Pacer.  I prefer that you all not take notes

5     but rather listen to the evidence as it comes in.  Rely on your

6     collective recollection and, of course, you'll have exhibits with

7     you when you deliberate.  All right.

8          MS. CHOE:  Thank you, Your Honor.  The SEC calls

9     Jeremy Desor.

10               DIRECT EXAMINATION OF JEREMY DESOR

11    BY MS. CHOE:

12    **Q.**     Good afternoon.

13    **A.**     Good afternoon.

14    **Q.**     Could you tell the members of the jury your full name.

15    **A.**     Yes, it's Jeremy Desor, D-E-S-O-R.

16    **Q.**     Where do you work?

17    **A.**     I work for the FBI.

18    **Q.**     And how long have you worked for the FBI?

19    **A.**     About 17 years.

20    **Q.**     Can you tell us what you're position is at the FBI?

21    **A.**     I'm a special agent on a white collar securities fraud

22    squad.

23    **Q.**     Agent Desor, how long have you been part of the

24    securities fraud squad?

25    **A.**     My current squad out of the Washington Field Office for

```
 1    just over five years.  Prior to that, I was on securities fraud
 2    squads in San Francisco and Chicago.
 3    Q.     Can you tell us as a special agent in the securities
 4    fraud group, just generally, what are your duties and
 5    responsibilities day-to-day?
 6    A.     Sure.  I investigate financial crimes -- investment,
 7    fraud, Ponzi scheme-type cases, insider trading, securities
 8    fraud -- that involves reviewing evidence.  It could be evidence
 9    obtained through search warrants, bank records, interviewing
10    witnesses, victims.
11    Q.     Before you joined the FBI, I guess you said 17 years ago,
12    what did you do?
13    A.     I worked in finance.
14    Q.     Agent Desor, I want to draw your attention to 2017.  At
15    some point that year, did you become involved in an FBI
16    investigation involving an individual named Christopher Clark?
17    A.     Yes.
18    Q.     Can you tell us briefly how you became involved in that
19    investigation?
20    A.     I believe I received a phone call from representatives
21    from the SEC who gave me some background about the case and
22    asked if I would like to hear more about the case and
23    potentially consider opening a criminal investigation.
24    Q.     Just to be clear, did you work after that on the SEC
25    investigation or the FBI investigation?
```

1    **A.**      The FBI investigation.

2    **Q.**      And on the FBI's investigation, what was your role?

3    **A.**      I was the lead case agent.

4    **Q.**      Now, Agent Desor, I'd like to draw your attention to

5    October 24th of 2017.  Did you conduct an interview that day as

6    part of your investigation?

7    **A.**      Yes.

8    **Q.**      Who did you interview?

9    **A.**      Christopher Clark.

10   **Q.**      And can you tell us where the interview took place?

11   **A.**      It took place at a table outside a coffee shop in

12   Arlington, Virginia.

13   **Q.**      And approximately what time was the interview, what time

14   of day?

15   **A.**      It was in the morning.  That's all I remember.

16   **Q.**      Was it very early morning, or mid/late morning?

17   **A.**      I'd say mid-morning, probably.

18   **Q.**      Was anyone else at this interview besides you and

19   Mr. Clark?

20   **A.**      There was a second FBI agent with me.  His name is

21   Cameron Mizell.

22   **Q.**      And can you tell the members of --

23           MR. CUMMINGS:  Excuse me.  I didn't hear the last name.

24           THE WITNESS:  Mizell.

25   BY MS. CHOE:

1  **Q.**    Can you tell the members of the jury how the interview

2  began?

3  **A.**    Sure.  We approached Mr. Clark in the parking lot and

4  introduced ourselves and asked if he would be willing to sit

5  down with us.

6  **Q.**    When you approached Mr. Clark, what was your demeanor

7  like?

8  **A.**    Calm, conversational.

9  **Q.**    Did either you or Special Agent Mizell have your weapons

10  drawn at any point?

11  **A.**    No.

12  **Q.**    What tone of voice were you using when you approached

13  Mr. Clark and spoke to him?

14  **A.**    Just a normal conversational tone.

15  **Q.**    And can you describe Mr. Clark's demeanor when you spoke

16  to him?

17  **A.**    He seemed surprised at the time.

18  **Q.**    About how long did the interview last?

19  **A.**    I think it was less than an hour.  Somewhere between 30

20  to 60 minutes, I would say.

21  **Q.**    And during the course of the interview, was Mr. Clark

22  free to leave?

23  **A.**    Yes.

24  **Q.**    At any point when you spoke to him, was he physically

25  restrained in any way?

1    A.    No.

2    Q.    At any point, did Mr. Clark ask to have an attorney

3    present?

4          MR. CUMMINGS:   Judge, I have to object to the leading

5    questions.  This is their witness.

6          THE COURT:  Objection sustained.

7    BY MS. CHOE:

8    Q.    Let's talk about what happened during the interview.

9          During the interview, did the topic of Mr. Clark's trades

10   in CEB --

11         MR. CUMMINGS:  Same objection.  She can ask it a different

12   way that's not leading.

13         MS. CHOE:  I'm just trying to lay a foundation.

14         THE COURT:  I don't believe that was leading.  Objection

15   overruled.

16         MR. CUMMINGS:  All right.  I apologize.

17   BY MS. CHOE:

18   Q.    Did the topic of Mr. Clark's trades in CEB before the

19   announcement of the CEB/Gartner merger, did that come up?

20   A.    Yes.

21   Q.    And can you tell us what you asked Mr. Clark?

22   A.    A series of questions about why he placed the trades at

23   the time he placed them.

24   Q.    And how did Mr. Clark respond to your questions?

25   A.    Uh, well, initially, we talked sort of about his history

1   of trading in CEB around earnings announcements for the company.

2   And then we asked about the trades that happened before the

3   merger.  His initial response was that he did those trades in

4   connection with an earnings announcement, which I explained to

5   him, there was no earnings announcement scheduled at that time.

6   And then after that point, he never really offered any specific

7   explanation as to why he placed the trades.

8   Q.    So, just to make sure I have this clear, Mr. Clark said

9   that his trades in December 2016 and early January 2017 were

10  part of an earnings trade?  Is that what you said?

11  A.    That was his initial response.

12  Q.    And how did you respond?

13  A.    I explained that there was no earnings announcement on

14  the calendar at that time.

15  Q.    What other sorts of questions did you ask him about the

16  types of trades he was making in December 2016?

17  A.    A lot of sort of repetitive questions about why he placed

18  the trades, did he have information about the merger in advance

19  of placing these trades, did he talk to anyone else about the

20  trades, why did he choose calls versus puts.  Those sorts of

21  questions.

22  Q.    And in response to those questions, what did Mr. Clark

23  say to you?

24  A.    Well, let's see.  On the general question of why he

25  placed the trades, it was a lot of me asking questions or

1    explaining things that I had seen and the evidence and not

2    getting much of a response.  A lot of silence, moments of

3    just -- where he wasn't responding.  No specific explanation

4    about why he placed the trades for calls versus puts.  At one

5    point, he did say there was an upswing in the market.  That's

6    why he chose calls.

7        He said he did not speak to any family members when we

8    asked him about that.  Family members or friends, he said he did

9    not discuss the trades with any family members or friends.

10   **Q.**   I want to go back to something you said a moment ago

11   about when you pointed out there was no scheduled earnings

12   announcement.

13       What, if anything, did Mr. Clark say to you about trying

14   to get in early before an earnings announcement?

15   **A.**   Nothing.

16   **Q.**   At any point during your interview of Mr. Clark, did the

17   topic of CEB's CEO resigning, did that come up at any point?

18   **A.**   No.

19   **Q.**   And you told us a moment ago that you asked Mr. Clark if

20   he had any advanced knowledge of the merger; is that right?

21   **A.**   Correct.

22   **Q.**   And what was Mr. Clark's response?

23   **A.**   He said he did not have any advanced knowledge.

24   **Q.**   At any point, did Mr. Clark tell you that he saw signs of

25   a merger?

1    **A.**    No.

2    **Q.**    What, if anything, did Mr. Clark say to you about making

3    trades based on reading analyst reports?

4    **A.**    Nothing.

5    **Q.**    What, if anything, did he say to you about making trades

6    based on the recent election of Donald Trump?

7    **A.**    Nothing.

8    **Q.**    At any point during the interview, did you and Mr. Clark

9    discuss hedge fund trading activity?

10    **A.**    No.

11    **Q.**    Now, during the interview, did you ask any questions

12    about Mr. Clark's connection to CEB?

13    **A.**    Yes.

14    **Q.**    Can you tell us about that?

15    **A.**    We asked him if he knew anyone who worked at the company.

16    **Q.**    How did he respond?

17    **A.**    Initially, he said, being that it was a local company and

18    he was in the mortgage industry, he had clients, mortgage

19    clients over the years who had worked for CEB.  He gave one

20    specific name.  I think it was -- the last name he gave us,

21    Maguire, I think, Jonathan Maguire.  And that was it for the

22    initial time we discussed this topic.

23    **Q.**    And then did you continue to discuss the topic?

24    **A.**    Yes.  I revisited the topic at some point later in the

25    interview.  And at that point, he mentioned that his

1    brother-in-law, Bill Wright, had worked for the company.

2    **Q.**    Just to be clear, who brought up Bill Wright first?  Was

3    it him, or was it you?

4    **A.**    I don't recall if, when I revisited it, if I specifically

5    asked him about his brother-in-law or if he -- I think he just

6    said his brother-in-law worked there.

7    **Q.**    And did he offer any explanation for failing to mention

8    his brother-in-law the first time you raised the topic?

9    **A.**    Not that I recall.

10   **Q.**    Did you ask him if he had discussed the merger with

11   Mr. Wright?

12   **A.**    Yes.

13   **Q.**    What did he say?

14   **A.**    He said he had not discussed it with Mr. Wright.

15   **Q.**    Did he say anything about his relationship with

16   Mr. Wright?

17   **A.**    Generally, that they did not have a close relationship.

18   They saw each other at family functions, but that they, you

19   know, did not have a close relationship.

20   **Q.**    What, if anything, did Mr. Clark say about Mr. Wright

21   potentially leaving CEB being a reason for his trades?

22   **A.**    Nothing.

23   **Q.**    What, if anything, did Mr. Clark say about the fact that

24   he was helping Mr. Wright sell a condo around the time of the

25   merger?

 1   **A.**     He didn't say anything about that.

 2   **Q.**     During the interview, did you ask Mr. Clark any questions

 3   about other family members?

 4   **A.**     Yes.

 5   **Q.**     What did you ask him?

 6   **A.**     We asked him generally, did you discuss these trades with

 7   any family members or friends, or recommend that anyone else

 8   make these trades, and he said he did not.

 9   **Q.**     Why did you ask him that question?

10   **A.**     Because we knew that his son, Andrew Nevins, had also

11   placed trades in advance of the merger, sometimes in the same

12   options on the same day as his father.

13   **Q.**     When he told you that he had not discussed trading in CEB

14   with any family members, did you follow up?

15   **A.**     Yes.  I specifically asked him about his son, given that

16   we knew about his trades.

17   **Q.**     And what did he say?

18   **A.**     He said he did not discuss the trades with his son, and

19   the fact that the son did similar or the same trades as him may

20   have been because his son had the log-in information for his

21   account and may have logged in, seen that Mr. Clark had placed

22   these trades, and decided to do the same thing on his own.

23   **Q.**     So, he told you that his son might have made those trades

24   you'd observed because he had somehow logged into the account

25   and just mimicked them; is that right?

```
 1   A.      Correct.

 2   Q.      Do you know, Agent Desor, if Andrew Nevins was

 3   interviewed as part of the FBI's investigation?

 4   A.      Yes, he was interviewed.

 5   Q.      And how do you know that?

 6   A.      Because, at least for the initial interview, I requested

 7   that agents interview him.

 8   Q.      How many times was he interviewed?

 9   A.      Twice.

10   Q.      When did the first interview occur?

11   A.      The same day as Mr. Clark's interview.

12   Q.      October 24th?

13   A.      If that's what the documents say, yes.

14   Q.      Were you present for Mr. Nevins' interview?

15   A.      I was not present for that interview.

16   Q.      And when did the second interview of Mr. Nevins occur?

17   A.      I think it was just before Thanksgiving.  So, about a

18   month later.

19   Q.      And were you present for that interview?

20   A.      I was not.

21           MS. CHOE:  Nothing further at this time, Your Honor.

22           THE COURT:  All right.  Do you have any questions?

23           MR. CUMMINGS:  Yes, just a few, Your Honor.  I shouldn't

24   say a few; not that many.

25
```

1          CROSS-EXAMINATION OF JEREMY DESOR

2    BY MR. CUMMINGS:

3    **Q.**    How are you today, this afternoon?

4    **A.**    Good.  How are you?

5    **Q.**    So, Agent Desor, this occurred -- let's see.  This

6    interview occurred on October 24th, 2017, correct?

7    **A.**    Correct.

8    **Q.**    I think that's the date.  So, that was not quite a year,

9    maybe ten months after the trades you were going to ask him

10   about, correct?

11   **A.**    Correct.

12   **Q.**    Okay.  And you first got into the case on June 6th, 2017?

13   **A.**    I don't recall --

14   **Q.**    Okay.

15   **A.**    -- exactly when I first --

16   **Q.**    All right.

17   **A.**    -- became involved.

18   **Q.**    I thought that was the date I wrote down, but that's all

19   right.  Can you tell me who attorneys Michael Rinaldi and Ankush

20   Khardori are?

21   **A.**    Yes.  They were trial attorneys at the fraud section for

22   the Department of Justice.

23   **Q.**    Okay.  And you were working with them on this case?

24   **A.**    They were the initial prosecutors assigned to the case.

25   **Q.**    Okay.  And they don't do civil cases, do they?

1  A.    No.

2  Q.    Okay.  They were investigating a crime and whether or not

3  they were going to indict Mr. Clark and possibly Mr. Wright for

4  securities fraud?

5  A.    Correct.

6  Q.    Isn't that what you were considering, a criminal

7  indictment, to find him guilty of a felony and may perhaps go to

8  prison?

9  A.    Correct.  It was a criminal investigation.

10 Q.    Thank you.  Now, was this an arranged interview?  Did you

11 call him up and say, hey, can we get together?

12 A.    No.

13 Q.    Okay.  So, you basically stalked him, didn't you?

14 A.    I wouldn't -- I don't know what you mean by "stalked."

15 Q.    Sir, you followed him.  He came out of a coffee shop, and

16 you approached him in a parking lot.

17 A.    That's correct.

18 Q.    That's correct.  He didn't -- he had no advanced notice,

19 correct?

20 A.    That's correct.

21 Q.    You showed him your badge, said, would you like to talk

22 to us?

23 A.    Correct.

24 Q.    And he agreed to go back into the coffee shop and sit

25 with you?

1    **A.**    We sat outside, but --

2    **Q.**    All right.  Well, this is October.  I guess it was a nice

3    day.

4          So you went back into the coffee shop, and until you sat

5    down, he had no idea what this was about, did he?

6    **A.**    Until we sat -- I think that's correct, right.  Until we

7    sat down.

8    **Q.**    Okay.  And did you tell him -- and we talked about this

9    at your deposition -- that his son had been videotaped, or was

10   taking $50,000 of cash out of a bank at that very moment?

11   **A.**    At the very moment that we were interviewing Mr. Clark?

12   **Q.**    Or earlier that day or week.  Didn't you tell him his son

13   had taken $50,000 of cash out of a bank?

14   **A.**    I told him that we had bank records showing his son had

15   made a large withdrawal from his bank account sometime in the

16   weeks or months following these trades.

17   **Q.**    Okay.  So you started out saying, your son took out a

18   large amount of cash from a bank shortly following these trades,

19   is that what it was?

20   **A.**    That's not how we started.  This is something I

21   mentioned, I think, at the very end of the interview to

22   Mr. Clark.  We did not start the interview by telling him that,

23   no.

24   **Q.**    Bear with me.

25         All right.  Did you take notes?

```
1   A.     I did not take notes.  The other agent who was present

2   took notes.

3   Q.     All right.  So you do recall telling -- about Nevins

4   taking out a large amount of cash shortly after the trades, and

5   you think that was toward the end of the interview?

6   A.     I know it was towards the end of the interview.  I don't

7   know if I said "cash."  I know I said that there was a large

8   withdrawal made by Mr. Nevins.

9   Q.     Okay.  And so, he didn't give you much information at all

10  about why Mr. Nevins -- I think you testified that he said that

11  Mr. Nevins may have gotten into his E*TRADE account.  Now, did

12  you have any of his E*TRADE account records when you met with

13  him for him to review?

14  A.     You mean, did I bring them with me to the interview?

15  Q.     Yeah.

16  A.     I did not bring E*TRADE records with me to the interview,

17  I don't think.

18  Q.     All right.  Directing your attention to your deposition.

19  Do you recall your deposition?

20         (Discussion had off the record.)

21  BY MR. CUMMINGS:

22  Q.     June 22nd of 2020, your deposition was taken.  Do you

23  recall that?

24  A.     I believe it was in 2021.

25  Q.     2021, sorry.
```

```
 1   A.      Yes, I recall it.

 2   Q.      And at page 187 --

 3           MR. CUMMINGS:  I'm sorry.  Page 188, Ms. Choe.

 4   BY MR. CUMMINGS:

 5   Q.      Question, line 5.  "Okay.  And then you asked him about

 6   his son, Mr. Nevins.  Do you recall explaining to him that you

 7   had a videotape of Mr. Nevins withdrawing $48,000 in cash while

 8   Mr. Clark was on a cell phone call with him?

 9           "Answer:  I don't recall saying anything about a

10   videotape.  I do recall referencing a bank transaction that

11   occurred at or around the time Mr. Clark was speaking to him on

12   the phone.

13           "Okay.  And is that referenced in this 302?

14           "It is not."

15           Does that help refresh your recollection?

16           MS. CHOE:  Objection, Your Honor.  I don't know that the

17   witness has had a chance to review the transcript that he's

18   referencing.

19           MR. CUMMINGS:  I just asked him if that helps his

20   recollection.  I'm happy to hand it up to him.

21           THE COURT:  All right.

22           THE WITNESS:  My recollection is still the same, that I

23   mentioned this transaction to him, but it's not how we started

24   the interview.

25   BY MR. CUMMINGS:
```

1    **Q.**    Okay.  That's your best recollection --

2    **A.**    That's my recollection.

3    **Q.**    -- here, like, however long it is?  Okay.  Now, when you

4    started the interview and when you sat down with him, did you

5    tell him he had a right to have a lawyer?

6    **A.**    No.

7    **Q.**    Did you tell him he could leave?

8    **A.**    No.

9    **Q.**    Okay.  Now, this thing about Mr. Wright, at the time of

10   the interview, you asked him who worked at CEB, correct, if he

11   knew anybody who worked at CEB?

12   **A.**    You mean, did I specifically say, "At this time"?

13   **Q.**    Are you saying present tense or --

14   **A.**    I asked him if he knew anyone who worked at CEB.

15   **Q.**    Okay.

16   **A.**    I don't recall --

17   **Q.**    All right.

18   **A.**    -- the exact phrase that I used.

19   **Q.**    And he mentioned a Maguire.  And then after a question or

20   two, he says, oh, my brother-in-law used to work there.  Is that

21   what he said?

22   **A.**    I just remember that he said his brother-in-law had

23   worked at the company.  I don't remember exactly what --

24   **Q.**    Okay.  So -- okay.  So he said his brother-in-law worked

25   at the company, and then he denied his brother-in-law gave him

1    any insider information, correct?

2    **A.**     Correct.

3    **Q.**     Okay.  Now, do you recall him telling you that he had had

4    breakfast with Mr. Wright that morning?

5    **A.**     I don't believe he said he had breakfast with him that

6    morning.

7    **Q.**     Okay.  You don't recall at all him showing you a text on

8    his phone before the interview was over?

9    **A.**     He didn't show me a text message.  He told me that he had

10   texted him that morning -- Mr. Clark or Mr. Wright had exchanged

11   a text message about getting breakfast, nothing about that they

12   had breakfast.  And he didn't show me a text message.

13   **Q.**     Okay.  All right.  Well, thank you.  That's an

14   interesting recollection that he told you that.

15          But it sounds like he clammed up about his son,

16   Mr. Nevins, or he didn't say -- all he allowed about Mr. Nevins

17   is, maybe he had access to my E*TRADE account?

18   **A.**     Right.  He said he did not discuss the trades with him,

19   and that maybe that he logged in, saw his trades, and --

20   **Q.**     Okay.

21   **A.**     -- placed the same trades, basically.

22   **Q.**     Right.  All right.  And did there come a time when the

23   Department of Justice and the FBI declined to prosecute

24   Mr. Clark criminally for any alleged violations?

25   **A.**     Yes.

1    **Q.**    And that would have been in the summer of 2020?

2    **A.**    I don't recall when.

3    **Q.**    All right.  But you do recall they dropped the

4    investigation?

5    **A.**    We closed our case, correct.

6    **Q.**    Okay.  And the case was over for about three-and-a-half

7    years?

8    **A.**    Again, I don't recall when we closed it, so --

9    **Q.**    Okay.  Whatever length of time that was, nothing else

10   happened, no civil case was filed, basically the case sat in

11   limbo until the Department of Justice and the FBI decided

12   whether or not they were going to prosecute, correct?

13   **A.**    I don't recall when the civil case was filed.

14   **Q.**    I didn't ask you that.  I just asked you, during the

15   time -- whether it's one year, four years, three-and-a-half

16   years, I don't care about that -- but during that period of time

17   when the FBI and the Department of Justice had this case,

18   nothing else happened with the SEC.  The SEC didn't file this

19   civil complaint until after the Department of Justice decided

20   we're throwing the case out, we're not going forward with this,

21   correct?

22   **A.**    That's what I was trying to say.  I don't recall when the

23   SEC filed their civil case in relation --

24   **Q.**    Well --

25   **A.**    I don't recall the timing of us closing our case versus

```
 1   the SEC filing their case.

 2   Q.    Okay.  So if I mentioned that in December of 2020, about

 3   approximately a year ago the complaint was filed, that doesn't

 4   refresh your recollection?

 5         MS. CHOE:  Objection, scope.  This is way beyond the

 6   scope.

 7         THE COURT:  Objection sustained.

 8         MR. CUMMINGS:  Withdraw the question.

 9   Thank you so much.

10         THE WITNESS:  Thank you.

11         MS. CHOE:  No redirect, Your Honor.

12         THE COURT:  Thank you.  You may step down.  You may be

13   excused.

14         MR. MAHER:  Your Honor, the SEC calls Mr. Andrew Nevins.

15           (ANDREW NEVINS, GOVERNMENT'S WITNESS, SWORN)

16             DIRECT EXAMINATION OF ANDREW NEVINS

17   BY MR. MAHER:

18   Q.    Good afternoon, Mr. Nevins.  Can you just give your full

19   name for the jury.

20   A.    Andrew James Nevins.

21   Q.    How old are you?

22   A.    31.

23   Q.    Okay.  And where do you work?

24   A.    Summit Community Bank.

25   Q.    Since when?
```

1    **A.**     December 2020.

2    **Q.**     Okay.  And what do you do there?

3    **A.**     I'm an commercial real estate lender.

4    **Q.**     Okay.

5          MR. CUMMINGS:  Your Honor, excuse me.  Could we ask the

6    witness to take his mask off?  We're having trouble hearing.

7          THE COURT:  All right.

8    BY MR. MAHER:

9    **Q.**     Prior to your current position, did you work at some

10   other banks and financial institutions?

11   **A.**     Yes, I did.

12   **Q.**     Okay.  What is your highest level of education?

13   **A.**     Graduate studies.

14   **Q.**     Okay.  Do you have an undergraduate degree?

15   **A.**     Yes, I do.

16   **Q.**     And what was that in?

17   **A.**     Finance.

18   **Q.**     Okay.  And you say "graduate studies."  Have you taken

19   some course work, as well, after college graduation?

20   **A.**     I started pursuing a master's degree that I did not

21   finish.

22   **Q.**     Okay.  And what was that generally that course work in?

23   **A.**     Finance.

24   **Q.**     Okay.  Mr. Nevins, are you someone who generally follows

25   the stock market?

1    **A.**    Generally.

2    **Q.**    Okay.  And do you consider yourself an informed investor?

3    **A.**    More than the average person.

4    **Q.**    Okay.  Have you traded in individual stocks?

5    **A.**    I have.

6    **Q.**    Okay.  And have you used options to invest, too?

7    **A.**    I have.

8    **Q.**    When did you first begin trading options?

9    **A.**    2013.

10   **Q.**    Okay.  Now, as part of your experience at banks and your

11   education in finance, are you familiar with the concept of

12   "material nonpublic information"?

13   **A.**    Yes.

14   **Q.**    Okay.  And do you understand, at least generally, what

15   "insider trading" is?

16   **A.**    Generally, yes.

17   **Q.**    Okay.  Mr. Nevins, I think we all know now that

18   Christopher Clark is your father.  Do you consider yourself

19   close to your father?

20   **A.**    I do.

21   **Q.**    Okay.  How often do you communicate with him?

22   **A.**    It varies.  It can sometimes be a couple times a day or

23   week, sometimes we don't talk for a couple weeks.

24   **Q.**    Okay.  Now, is investing in the stock market one of the

25   things that you discuss with your father?

1  **A.**    From time to time.

2  **Q.**    What about real estate investment?

3  **A.**    From time to time.

4  **Q.**    Okay.  Do you have a general sense of the kinds of stock

5  investments your father makes?

6  **A.**    Occasionally, sure.

7  **Q.**    Okay.  And have you also shared with him, at least

8  generally and occasionally, the kinds of things that you invest

9  in?

10 **A.**    Um-hmm, yes.

11 **Q.**    Was that a yes?  Thank you.  And from time to time, have

12 you also discussed with him at least generally your personal

13 finances?

14 **A.**    On occasion.

15 **Q.**    Okay.  Now, Mr. Nevins, would you consider yourself

16 someone with a lot of financial discipline?

17 **A.**    To some degree.

18 **Q.**    Okay.  In the past, have you sort of made a strict

19 personal budget and been able to follow that?

20 **A.**    At times.

21 **Q.**    Okay.  Now, thinking back -- and I just want to focus

22 your attention to the 2015, 2016 time period; is that okay?

23 **A.**    Sure.

24 **Q.**    At that point, when it came to your investing in

25 securities, were you a pretty conservative investor?

1    **A.**      It depends how you look at it.

2    **Q.**      Okay.  Let me ask you this:  Were you also investing in

3    real estate at the time?

4    **A.**      Yes.

5    **Q.**      Would you characterize your investments in real estate as

6    being a little more risky than your stock investing at the time?

7    **A.**      At the time, sure.

8    **Q.**      Okay.  Now, at that time -- 2015, 2016 -- you had some

9    investments in well-known companies like Apple, some index

10   funds, some mutual funds?

11   **A.**      Is there a question?

12   **Q.**      I'm sorry.  Were those -- does that generally describe

13   the nature of your investments at the time?

14   **A.**      Yes, it does.

15   **Q.**      Okay.  Now, prior to 2017, sitting here today, do you

16   recall how many times you traded in options?

17   **A.**      A handful.

18   **Q.**      Okay.  Now, I want to put aside the CEB trades for a

19   moment.  Aside from CEB prior to 2017, do you recall how many

20   times you ever traded in options?

21   **A.**      A couple -- not an exact number, but multiple times.

22   **Q.**      Okay.  Would that be -- does option investment

23   ConocoPhillips ring a bell?

24   **A.**      Yes, it does.

25   **Q.**      What about on Mastercard?

1    **A.**     Yes.

2    **Q.**     Do you recall any others sitting here today?

3    **A.**     I don't recall, no.

4    **Q.**     Okay.  And when it came to ConocoPhillips and Mastercard,

5    did your father have anything to do with those trades?

6    **A.**     I don't think so.

7    **Q.**     Okay.  I just want to focus in on the July 2015 trading

8    and CEB.  If you could look at Tab 192 in your binder, which is

9    what's been admitted as SEC Trial Exhibit 192.  We put a green

10   flag on what we'd like you to look at there.

11   **A.**     The green --

12   **Q.**     The green flag, correct.

13   **A.**     Okay.

14   **Q.**     Do you recognize that document, Mr. Nevins?

15   **A.**     I do.

16   **Q.**     And what is it?

17   **A.**     It is my July 2015 E*TRADE brokerage statement.

18   **Q.**     Okay.  Now, if you look at the last page of that account

19   statement, do you see where it says "transaction history"?

20   **A.**     Bear with me a moment.

21   **Q.**     And, please, take your time and feel free to review the

22   document as needed.

23   **A.**     Okay.

24   **Q.**     Now, now does that show on July 28th, 2015, you bought

25   three CEB put options?  It's the top row there.

1    **A.**     I apologize.  I don't think we're looking at the same

2    page.

3    **Q.**     If you have it, it's the one -- it says Bates label 17858

4    in the bottom-right corner?

5    **A.**     The last page, I apologize, is 17931.  Can you please

6    repeat that number?

7    **Q.**     Sure, absolutely.  17858 and I should have been clear.

8    We're talking about the last page of the July account statement.

9    **A.**     Here we go.  17858.

10   **Q.**     And just take a moment to review it now that you've found

11   it.

12          Does that show on July 28th, 2015 you bought three CEB

13   put options?

14   **A.**     It does.

15   **Q.**     Okay.  And that you spent $357.32 to buy those options?

16   **A.**     It does.

17   **Q.**     Okay.  And does it show those options had an expiration

18   date of August 21st, 2015?

19   **A.**     Yes, it does.

20   **Q.**     Okay.  But this time, was it your father, Mr. Clark, who

21   told you to buy those options?

22   **A.**     That is based on his advice, yes.

23   **Q.**     Okay.  Now --

24          MR. CUMMINGS:  I apologize.  He said based on what?

25          THE WITNESS:  Advice.

1          MR. CUMMINGS:   Advice.

2     BY MR. MAHER:

3     **Q.**     Now, from time to time, Mr. Nevins, would your father

4     recommend investments to you?

5     **A.**     He would.

6     **Q.**     Okay.  Like investments in Gilead or Apple stock?

7     **A.**     Correct.

8     **Q.**     Okay.  Did he tell to you buy Gilead or Apple options?

9     **A.**     He did not.

10    **Q.**     Okay.  The only time he ever told to you buy options was

11    for CEB, right?

12    **A.**     I think so.

13    **Q.**     When he did that, did you ask him why the difference?

14    **A.**     I did not.

15    **Q.**     Now at that time -- 2015, 2016 -- what did you even know

16    about CEB?

17    **A.**     Um, I don't think I knew anything.

18    **Q.**     Okay.  Take a look at Tab 32 in the binder I provided.  I

19    put a yellow flag on the page I'd like to direct your attention

20    to, which is Page 35 and 45.

21          Do you have that?

22    **A.**     I do.

23    **Q.**     Okay.  Now, do you remember you bought those options on

24    July 28th, 2015, correct?  And, again, take your time to refresh

25    your recollection as needed.

1    **A.**    The last one was 858, the green tab?

2    **Q.**    Correct.

3    **A.**    And the date that you said was?

4    **Q.**    July 28th, 2015.

5    **A.**    Correct.

6    **Q.**    Okay.  Now, if you look back to Page 35 and 45 in

7    Exhibit 32, do you see what the stock price was for CEB -- and I

8    should tell you, this is a historical stock prices and trading

9    volume for CEB.  Do you see what the stock price is on July

10   28th, 2015?

11   **A.**    80 -- 86.70.

12   **Q.**    Okay.  And if you -- if you look further back in that

13   price -- CEB stock price history, how far back do you have to go

14   until CEB stock was trading below $80?

15   **A.**    March 31st.

16   **Q.**    So it had been four months -- almost four months since

17   CEB's stock had traded below $80 when you bought that $80 put

18   option; is that correct, Mr. Nevins?

19   **A.**    Yes, short of four months.

20   **Q.**    Okay.  And so based on your father's advice, on July

21   28th, 2015, you bought put options that were betting that CEB

22   stock price would shortly within the next few weeks drop below

23   $80; is that right?

24   **A.**    Within three or so weeks, yes.

25   **Q.**    Okay.  Now, was that because you were assuming that CEB's

1    earning announcement -- CEB's earning announcement would impact

2    CEB's stock price?

3    **A.**    I don't recall.

4    **Q.**    Okay.  Now, keeping Exhibit 32 open, do you see CEB stock

5    price on July 29th, 2015?  And, again, if I'm going too fast

6    with these exhibits, just let me know.

7    **A.**    Exhibit -- we're on the pricing table, correct?

8    **Q.**    Correct, 32.

9    **A.**    29th.  Yes, I do.

10   **Q.**    What's the price there?

11   **A.**    Just under 77.

12   **Q.**    So just the day after you bought your put options, CEB

13   stock price dropped from almost $87 to about $77.  Do you see

14   that?

15   **A.**    I do.

16   **Q.**    Okay.  Does that strike you as a coincidence, Mr. Nevins?

17          MR. CUMMINGS:  Objection, calls for speculation.

18          THE COURT:  Objection sustained.

19          MR. MAHER:  Okay.

20          THE COURT:  It's argumentative at best.

21          MR. MAHER:  Okay.  That's fine.

22   BY MR. MAHER:

23   **Q.**    Mr. Nevins, do you recall if you made a profit on that

24   put option that you purchased on July 28th, 2015?

25   **A.**    I don't.  But we have --

1    Q.     If we could look at -- if you go back to Exhibit 192 and

2    you turn to Page 17852.

3    A.     17852.

4    Q.     Just to make sure, you're looking at the transaction

5    history for your August E*TRADE account statement, correct?

6    A.     Correct.

7    Q.     Okay.  Does that show that you sold CEB options that day?

8    A.     It appears that I sold, I guess, on two separate days.

9    Q.     Okay.

10   A.     Two options, yes.

11   Q.     Okay.  So you made, I mean, 7 or $800 on this trade?

12   A.     Um, more like $400.

13   Q.     Okay.  So more than double your initial investment?

14   A.     Approximately.

15   Q.     Okay.  Now, was July 2015 the first time you invested in

16   CEB options?

17   A.     It was not.

18   Q.     Had you also invested in October of 2013?

19   A.     I certainly invested sometime in '13.  I don't remember

20   the dates -- it was 8,9 years ago.

21   Q.     I understand completely.  Did you also make that based on

22   your father's advice?

23   A.     I did.

24   Q.     Do you recall if you made money on that investment?

25   A.     I did not.

```
 1   Q.     You lost money?

 2   A.     Correct.

 3   Q.     Correct.  Now, do you remember why you lost money?

 4   A.     The options expired and were not at the price point for

 5   them to be profitable.

 6   Q.     In other words, you had bought an out-of-the-money put

 7   option and the stock price didn't go down enough?

 8   A.     I don't remember if it was put or call, but options were

 9   involved, yes.

10   Q.     Was it out-of-the-money option?

11   A.     I don't recall.

12   Q.     Okay.  I just have a question:  If you lost money trading

13   in CEB based on your father's advice in 2013, why did you listen

14   to him in 2015?

15   A.     I don't recall.

16          MR. CUMMINGS:  Pardon?

17          THE WITNESS:  I don't recall.

18   BY MR. MAHER:

19   Q.     Back to Exhibit 192 again, Mr. Nevins.  This time the red

20   flag.

21          Do you recognize that document, sir?

22   A.     Just so we're on the same page, 17750?

23   Q.     Correct.

24   A.     Yes, I do.

25   Q.     And what is that?
```

1    **A.**     It is my December 2016 E*TRADE brokerage statement.

2    **Q.**     Okay.  Can you flip to the page that says, "Transaction

3    History" for your December E*TRADE brokerage statement.  It's

4    755.

5    **A.**     Thank you.

6    **Q.**     Have you had a chance to review that?

7    **A.**     Okay.

8    **Q.**     If I'm reading correctly, and you can correct my math if

9    I'm wrong, it looks like in December of 2016 you bought 55 CEB

10   call options between January 12th, 2016 and January 20th?  I'm

11   sorry -- December 12th and December 20th.  Forgive me.

12   **A.**     That appears correct.

13   **Q.**     Okay.  Now, again, was that trading based on instructions

14   from your father?

15   **A.**     That is correct.

16   **Q.**     Now, if you just go to the pink flag in Exhibit 192.

17   **A.**     17743?

18   **Q.**     That's correct, Mr. Nevins.  And what is that document?

19   **A.**     The January 2017 brokerage statement from E*TRADE.

20   **Q.**     Okay.  And once again, can you turn to the transaction

21   history for your January 2017 brokerage statement?  Have you had

22   a chance to review that, Mr. Nevins?

23   **A.**     I have.

24   **Q.**     Okay.  Now, if I'm looking at this correctly, it also

25   shows that you bought 30 CEB call options on January 4th, 2017?

1    **A.**    That is correct.

2    **Q.**    And those call options had January 20th, 2017

3    expirations?

4    **A.**    Correct.

5    **Q.**    In other words, they would have expired in about 16 days?

6    **A.**    Yeah, about.

7    **Q.**    Okay.  And just for the record, it looks like you bought

8    them between 2:45 and 3:00 that day?

9    **A.**    Yes.

10   **Q.**    Mr. Nevins, do you recall speaking with your father

11   shortly before making those trades?

12   **A.**    I don't.

13   **Q.**    Okay.  If we could just look at SEC Trial Exhibit 130A --

14   130A for a moment.  It's been admitted as a summary of your

15   communications with your father between December 1st, 2016 and

16   February 1st, 2017.

17           Do you have that, Mr. Nevins?

18   **A.**    I do.

19   **Q.**    Okay.  Can you look at Row 18 for me?

20   **A.**    Okay.

21   **Q.**    Do you see the date of that call is January 4th, 2017?

22   **A.**    Okay.

23   **Q.**    Do you see that the time is 1:27 p.m.?

24   **A.**    Yes.

25   **Q.**    And that's a call from your father's cell phone to your

1   cell phone.  Do you see that?

2   **A.**    I do.

3   **Q.**    And the call lasted about five-and-a-half minutes?

4   **A.**    Okay.

5   **Q.**    Does that refresh your recollection at all about talking

6   to your father about that January -- the purchase of the January

7   call options?

8   **A.**    It does not.

9   **Q.**    Now, Mr. Nevins, you are a sophisticated investor --

10  relatively sophisticated, correct?

11  **A.**    Well, thank you.  I don't know if I would classify myself

12  that way.

13  **Q.**    I think it was "informed," the word you used earlier?

14  I'm sorry.

15  **A.**    I think that was your word, but I know more than perhaps

16  the average person.

17  **Q.**    Okay.  Did you ask your father why were you directing me

18  to buy call options that expire in just a couple of weeks?

19  **A.**    I did not.

20  **Q.**    You just took his advice and executed those trades?

21  **A.**    I did.

22  **Q.**    Now, if you go back to Exhibit 32 one more time.

23  **A.**    32.

24  **Q.**    This is the orange flag this time.  Do you see that's

25  CEB's price and volume history for January 4th, 2017 to March

1    3rd, 2017?

2    **A.**    To March.  Yes.

3    **Q.**    So, on January 4th, 2017 when you purchased those call

4    options at your father's direction, what was CEB's stock price?

5    **A.**    61.90.

6    **Q.**    Okay.  And those options that you bought had a strike

7    price of $70?

8    **A.**    I think 65 and 70.

9    **Q.**    65 and 70.  Okay.  What happened to CEB's stock price the

10   next day?

11   **A.**    It closed at 74.85.

12   **Q.**    And what did you do with your options?

13   **A.**    I sold my options.

14   **Q.**    Did you make a profit on those sales?

15   **A.**    I did.

16   **Q.**    So, just to make sure I understand, once again, the very

17   next day after you bought some short term CEB options, CEB stock

18   price, again, in this case went up dramatically; is that right?

19   **A.**    It went up.

20   **Q.**    Do you recall how much you ended up netting on your

21   trading in CEB call options in December and January -- December

22   2016 and January 2017?

23   **A.**    I don't, but it was probably 40, 50, somewhere in that

24   range.

25   **Q.**    Was that 40 or $50,000?

1    **A.**     Correct.

2    **Q.**     Okay.  And as a percentage return, is that about ten

3    times what you invested or about a thousand percent?

4    **A.**     Somewhere around ten times.

5    **Q.**     Okay.  Mr. Nevins, just to be clear, when you had your

6    conversations with your father about these trades, did Mr. Clark

7    ever mention Bill Wright?

8    **A.**     He did not.

9    **Q.**     He never said to you, you know, Bill Wright works at CEB

10   and I'm investing in that company?

11   **A.**     He did not.

12   **Q.**     Did you know when you made these trades where Mr. Wright

13   worked?

14   **A.**     I did not.

15   **Q.**     Okay.  Was that something you had ever discussed prior to

16   this trading with your father?

17   **A.**     It was not.

18   **Q.**     Mr. Nevins, in October of 2017, were you interviewed by

19   the FBI?

20   **A.**     I was.

21   **Q.**     Okay.  Did they ask you questions about your trading in

22   CEB?

23   **A.**     I don't recall.

24   **Q.**     Would it help you to see your transcript of your

25   deposition to see if that would refresh your recollection?

1    **A.**     It may.

2    **Q.**     Okay.  If you could look at Page 65 of your transcript.

3           Now, Mr. Nevins, while you're looking at it, I just want

4    to make sure you understood that when you gave this deposition

5    testimony, you were under oath?

6    **A.**     I do -- or, I did.

7    **Q.**     Okay.  And do you recall being deposed?

8    **A.**     I do.

9    **Q.**     Have you had a chance to review Page 65 and the pages

10   around it?

11   **A.**     I did.

12   **Q.**     Are you being asked questions in those pages concerning

13   an interview with the FBI?

14   **A.**     I was.

15   **Q.**     And on Lines 19 to 21 you were asked, "Okay.  And did

16   they ask you about your CEB trading?"  Do you see your response?

17   **A.**     I do.

18   **Q.**     And you said, "They did ask me?

19   **A.**     They did, yes.

20   **Q.**     Does that help refresh your recollection?

21   **A.**     I do remember this.  You know, we're talking about an

22   event that was over four years ago.

23   **Q.**     Did they ask you whether or not your father was involved

24   in your trading?

25   **A.**     Correct.

1    **Q.**    And what did you tell them?

2    **A.**    I told them no.

3    **Q.**    Was that honest?

4    **A.**    It was not and I corrected that a couple of weeks later

5    when I met with the FBI again.

6    **Q.**    Do you recall what you told the FBI about why you made

7    the trades?

8    **A.**    I do not.

9    **Q.**    Do you recall if you told them that it was because CEB

10   was undervalued?

11   **A.**    I do not.

12   **Q.**    If you look at Page 185 of your deposition?

13   **A.**    Which page?  I apologize.

14   **Q.**    185.  And, again, if you need to read more of that page

15   and on to the following page, please take your time if that

16   helps you refresh your recollection.

17        Have you had a chance to review it?  I just have a couple

18   of questions about that.

19   **A.**    Yes.

20   **Q.**    At lines 185, lines 23 to 25, [sic] the question is, "Did

21   you tell the FBI that your trades were based on your opinion

22   that CEB stock was undervalued?"

23        Do you see your answer?

24   **A.**    I apologize.  185...

25   **Q.**    23 to 25.

1   **A.**     Yes, I do.

2   **Q.**     And that is, in fact, what you told the FBI?

3   **A.**     According to this, yes.

4   **Q.**     I just want to be clear.  And when you gave that

5   testimony, you were testifying honestly and under oath?

6   **A.**     That is correct.

7   **Q.**     Okay.  Was it true that that's why you made those

8   premerger trades?

9   **A.**     I don't understand the question.

10  **Q.**     Was it true that you made the premerger trades because

11  you thought CEB's stock was undervalued?

12  **A.**     I made the trade because my father said it was a good

13  investment.

14  **Q.**     I'm sorry?

15  **A.**     Because, yeah, he said it was a good investment.

16  **Q.**     Okay.  Did you also tell the FBI that you would be a

17  little surprised to learn that your father had traded in CEB?

18  **A.**     I did.

19  **Q.**     Was that true?

20  **A.**     It was not, and I corrected that when we met with the FBI

21  a couple weeks later.

22  **Q.**     Okay.  And I know I've asked this question before, so

23  forgive me.  But I just want to make sure that in October 2013,

24  in July 2015, in December 2016, your father never mentioned that

25  Bill Wright works at CEB?

1   **A.**      That is correct.

2   **Q.**      Or that anything about Bill Wright was a factor in his

3   recommendations to you?

4   **A.**      That is correct.

5   **Q.**      In that first FBI interview, did they ask you if you knew

6   that Bill Wright worked at CEB?

7   **A.**      I don't recall.

8   **Q.**      Now, after your first interview, do you remember if your

9   father came to see you?

10  **A.**      He did.

11  **Q.**      And had he also been interviewed by the FBI when he came

12  to see you?

13  **A.**      He was.

14  **Q.**      Did you discuss the substance of your interviews?

15  **A.**      We did not.

16  **Q.**      It did not come up, the questions that you'd been asked?

17  **A.**      I don't recall.  This was four years ago.

18  **Q.**      Do you remember asking him anything about, you know, did

19  you -- why didn't you tell me that Bill Wright works at CEB?

20  **A.**      I did not, no.

21  **Q.**      Okay.  Now, as you've mentioned, Mr. Nevins, you had a

22  second interview with the FBI?

23  **A.**      That is correct.

24  **Q.**      And in that interview, you endeavored to tell the truth?

25  **A.**      Correct.

1    **Q.**    Okay.  In that interview, did you tell them that it was

2    your dad that told you to invest in CEB, correct?

3    **A.**    I did.

4    **Q.**    And that, in fact, specifically, it was your father that

5    told you which options to purchase in December 2016 and January

6    2017, right?

7    **A.**    Correct.

8    **Q.**    Now, did you tell the FBI that -- let me just pause

9    there.  I have a different question.  Did you explain to the FBI

10   why you had said certain things that were not true in your first

11   interview?

12   **A.**    I was nervous.

13   **Q.**    Is that what you told the FBI?

14   **A.**    It was.

15   **Q.**    Were you nervous that your father was in trouble?

16   **A.**    I was not.

17   **Q.**    Why were you nervous?

18   **A.**    It's not every day that the FBI shows up on your

19   doorstep.

20   **Q.**    Were you nervous at all that, as an informed investor who

21   had had a couple of successful trades in CEB, that your father

22   might be in trouble?

23   **A.**    I was not.

24   **Q.**    Okay.

25          (Brief pause in proceedings.)

1    BY MR. MAHER:

2    Q.    On that last answer, Mr. Nevins, do you recall telling

3    the FBI that your father -- that you were nervous about your

4    father?

5    A.    Which meeting are we talking about?

6    Q.    At the second one.

7    A.    Gosh, I don't recall.

8    Q.    Would it help you to review a summary of that

9    interview --

10   A.    It would.

11   Q.    -- to see if that refreshes your recollection?

12   A.    Please.

13   Q.    Just for the record, this is a Form 302 of an FBI

14   interview with Mr. Nevins on November 21st, 2017.

15        Mr. Nevins, if you turn to page 8 of 9 at the bottom, and

16   then read over onto the top of page 9.  Does that refresh your

17   recollection, Mr. Nevins, that you told the FBI that you may

18   have lied because it was possible that Mr. Clark had inside

19   information related to CEB?

20   A.    No, it doesn't.  This is four years ago.

21   Q.    Okay.

22   A.    I just -- I don't recall.

23   Q.    Okay.

24        MR. MAHER:  That's all, Your Honor.

25        THE COURT:  All right.  Cross-examination.

1          MR. CUMMINGS:  Thank you, Your Honor.

2              CROSS-EXAMINATION OF ANDREW NEVINS

3   BY MR. CUMMINGS:

4   Q.    Mr. Nevins, I want to get something clear right off the

5   bat.  The prosecutor -- I'm sorry -- Mr. Maher asked you, and he

6   used the terms he "directed," he "told" you to invest, he

7   "directed" you to invest.  He never told you to invest in

8   anything, did he?  He suggested or recommended, didn't he?

9   A.    A recommendation would be a more fair categorization.

10  Q.    A recommendation would be more fair.

11         And on the December 2016 trades, in your deposition,

12  didn't you tell these lawyers that your dad said, "CEB call

13  options would be a good investment"?  Did he tell you that?

14  A.    He did.

15  Q.    He didn't make you invest, did he?

16  A.    That's correct.

17  Q.    He didn't hold a gun to your head.  But he knows you like

18  to invest, you like to save your money, you own two houses.

19  A.    That's correct.

20  Q.    You work hard.  You're a banker.  You work in commercial

21  real estate, correct?

22  A.    That is correct.

23  Q.    Okay.  And so, when he made this recommendation, well, he

24  didn't say anything about Bill Wright, did he?

25  A.    He did not.

1    **Q.**     Why would he?  Is there any reason why he would mention

2    Bill Wright?

3    **A.**     He would not.

4    **Q.**     Okay.  So, you didn't just take his word for it and go

5    down -- run down to your E*TRADE account and start investing,

6    did you?  You made a Google search, didn't you?

7    **A.**     I did.

8    **Q.**     Maybe more than one Google search, right?  You read up on

9    CEB.  You're no dummy, are you?

10   **A.**     Correct.

11   **Q.**     You may not have done extensive research because you

12   relied -- because you knew your dad did a lot of work on the

13   stock market, didn't you?

14   **A.**     Correct.

15   **Q.**     He'd been a serious investor for years and years?

16   **A.**     For as long as I can remember, yes.

17   **Q.**     For as long as you can remember.  Did you look at any

18   charts on how the stock had moved?

19   **A.**     I did.  I do remember it was volatile.

20   **Q.**     It was a volatile stock.  It had a pretty good November,

21   didn't it?

22   **A.**     Correct.

23   **Q.**     Right.  And the reason it had a good November, the new

24   president that was coming in was going to be sworn in in

25   January, wasn't he?

1   **A.**     He was.

2   **Q.**     So January looked pretty rosy to you, didn't it?

3   **A.**     I did.

4   **Q.**     And you're sure you looked at charts?

5   **A.**     I do remember, yes.

6   **Q.**     And that was a long time ago.  There may have been more,

7   but that's what you remembered when they took your deposition.

8   So, when the FBI came in, they didn't call ahead, did they?

9   **A.**     They did not.

10  **Q.**     They showed up at your door with their badges.  They

11  didn't tell you you could get a lawyer, did they?

12  **A.**     They did not.

13  **Q.**     They didn't tell you that you didn't have to talk to

14  them, did they?

15  **A.**     They did not.

16  **Q.**     And you were a little scared and nervous?

17  **A.**     Correct.

18  **Q.**     And you realized you'd made a mistake?

19  **A.**     That's right.

20  **Q.**     And you went back, what, two or three weeks later?  It

21  was soon, wasn't it?

22  **A.**     It was.

23  **Q.**     And you made a clean slate?

24  **A.**     Correct.

25  **Q.**     And you still didn't say anything about Bill Wright?

```
 1    A.     That is correct.

 2    Q.     And you're telling the truth then, weren't you?

 3    A.     I was.

 4    Q.     And you're telling the truth here today, aren't you?

 5    A.     I am.

 6    Q.     And you never heard anything about Bill Wright giving

 7    your dad a tip, did you?

 8    A.     That is correct.

 9    Q.     And you don't have any knowledge at all that Bill Wright

10    gave your dad a tip, do you?

11    A.     That is correct.

12    Q.     Let me back up a little bit.  Now, in my opening

13    statement, I said that Chris Clark had four kids.  That's not

14    right, is it?

15    A.     That is not correct.

16    Q.     Okay.  Can you explain?  You're the fifth kid, right?

17    A.     Correct.  I'm the oldest of five.

18    Q.     You're the oldest of five.  He's married to Tisha Clark

19    now, isn't he?

20    A.     Correct.

21    Q.     Okay.  And Tisha Clark has had four children with him?

22    A.     That is correct.

23    Q.     And they're still married?

24    A.     They are.

25    Q.     Okay.  And what's your mother's name?
```

1    **A.**    My biological mother?

2    **Q.**    Yes.

3    **A.**    Beth Wagner -- or excuse me.  Beth Nevins is her maiden

4    name, and she was recently divorced, so...

5    **Q.**    Okay.  So, you took your biological mother's maiden name?

6    **A.**    Correct.

7    **Q.**    And you lived with her?

8    **A.**    Correct.

9    **Q.**    For how long?

10   **A.**    Until I was a freshman in high school.

11   **Q.**    Okay.  And what happened when you were a freshman in high

12   school?

13   **A.**    I moved in with my father and stepmother, and, at the

14   time, my one sister.

15   **Q.**    So you moved in with your father and your stepfather --

16   I'm sorry.

17   **A.**    My father, stepmother, and at the time, my one sister.

18   They only had one kid at the time.

19   **Q.**    Is that him?

20   **A.**    Yes.

21   **Q.**    Okay.  I'm sorry if I'm a little confused.  Okay.  So you

22   moved in as a freshman in high school.  So, you did your high

23   school years living in your dad's home with your stepmother, one

24   kid.  And how many kids did they have while you were living

25   there?

1    **A.**    My brother was born -- well, three more.  So, four total.

2    **Q.**    Three more.  So, there's a total of four now?

3    **A.**    Correct.

4    **Q.**    Okay.  All right.  And when you lived in that house, you

5    had to obey the house rules, correct?

6    **A.**    Correct.

7    **Q.**    Okay.  So, if they said you had to go to church every

8    Sunday, you went?

9    **A.**    I did.

10   **Q.**    And you didn't like it?

11   **A.**    It wasn't my favorite, no.

12   **Q.**    Okay.  But you stayed on until, I think, in your 21,

13   22 -- did you stay at their house for --

14   **A.**    Um, I moved out of the house when I was 18.  I moved back

15   in -- I was probably about 23, and I stayed there for about a

16   year after I graduated.

17   **Q.**    Okay.  Did you have to go to church?

18   **A.**    I went to my own church at that point --

19   **Q.**    Okay.

20   **A.**    -- so...

21   **Q.**    All right.  But why'd you stay there when you were 22?

22   **A.**    Fresh out of college.  I was finishing my final semester

23   of college, and then --

24   **Q.**    You were saving money?

25   **A.**    I was saving money my, kind of, first year of working.

1    Q.    Okay.  So Tisha Clark is your stepmother.  Who is Robin

2    Pena?

3    A.    Robin Pena is Tisha's sister.

4    Q.    Okay.  That's Tisha's sister.  Now, is there another

5    sister?

6    A.    She has another sister, yes.

7    Q.    And her name is Leslie?

8    A.    That's correct.

9          MR. MAHER:  Objection.  This is well beyond the scope.

10         MR. CUMMINGS:  Well, they brought it out on direct that he

11   was the stepson.  I'm just trying to explain for the jury how he

12   fits in, and I'm almost done.

13         THE COURT:  The objection is sustained.  We understand.

14         MR. CUMMINGS:  Okay.  All right.

15   BY MR. CUMMINGS:

16   Q.    So, in 2016, in December 2016, about the time of these

17   trades, how often did you visit your father's office?

18   A.    December '16... gosh, occasionally.

19   Q.    Okay.  And he was a mortgage broker at the time, right?

20   A.    Correct.

21   Q.    All right.  And who was his loan processor?

22   A.    Robin.

23   Q.    Okay.  And when you went to his office, was the financial

24   station constantly playing every time you went there?

25   A.    He always had CNBC on the TV, yes.

1    **Q.**    All right.  The CNBC businesses channel?

2    **A.**    Correct.

3    **Q.**    Do you know if he was a member of the Washington Business

4    Journal?

5    **A.**    I don't know.

6    **Q.**    Okay.  So, did you spend your Christmas holidays going

7    around with the three sisters' families, the Trumans, the

8    Wrights, and the Clarks?

9    **A.**    Is there a specific Christmas you're referring to, or...

10   **Q.**    2016.

11   **A.**    I was not local for that.  I was visiting my mom and her

12   family in California.

13   **Q.**    Okay.  So you split your -- one year you go visit your

14   mom, one year you stay here?

15   **A.**    Correct.  I swapped Thanksgiving and Christmas.

16   **Q.**    Okay.  So, you weren't even around in 2016 Christmas

17   holidays?

18   **A.**    Correct.

19   **Q.**    You were in a business endeavor, weren't you, called Fly

20   Me To The Moon Bounce with your stepmother and father?

21   **A.**    That is correct.

22   **Q.**    And how old were you when you were doing that?

23   **A.**    Oh, goodness.  I started when I was 18 or 19, and

24   probably stopped around 24.

25   **Q.**    Okay.  And did you get a portion of the proceeds from

1    that business?

2    **A.**     I did.

3    **Q.**     What kind of a business was it?

4    **A.**     It's a moon bounce business, or an inflatable bouncy

5    house that you would have for like a kid's birthday or some sort

6    of festivity.

7    **Q.**     Okay.  So, and it's mostly weekends?

8    **A.**     Mostly weekends.

9    **Q.**     Okay.  So, your weekends were spent helping your

10   parents -- well, helping yourself, too --

11   **A.**     Sure.

12   **Q.**     -- in this family business?

13          You talked to your dad about a number of things.  You

14   talked about your life, your real estate investments, the stock

15   market.  You enjoy and he enjoys talking to you about these

16   kinds of things, doesn't he?

17   **A.**     He does.

18   **Q.**     And he likes to advise you on your house purchases?

19   **A.**     He does.

20   **Q.**     And how many houses did you purchase?

21   **A.**     To today's date, or at the time of the event?

22   **Q.**     At the time.

23   **A.**     Two.

24   **Q.**     Okay.  Was one of them an FHA house?

25   **A.**     Both of them were.

1    **Q.**     Okay.  Did he help you with the financing?

2    **A.**     Correct.

3    **Q.**     And when I say, "Help with the financing," he didn't give

4    you money, did he?

5    **A.**     He did not.  His help was verbal advice, and he also

6    acted as my mortgage broker.

7    **Q.**     Okay.  Can you describe what you know about your dad's

8    trading.

9    **A.**     I know he's been trading for -- probably since his 20s.

10   He's generally done well over time.

11   **Q.**     Can you describe, based on your observations, what his

12   relationship with Bill Wright is like?

13   **A.**     There's not much of a relationship there.  I mean, we've

14   seen the Wrights around at -- I always kind of describe them as

15   Christmas and Easter family.  You know, you'd see them around

16   the holidays.  And they have kids our age -- or the same age as

17   my siblings.  You know, they would interact on the same sports

18   teams from time to time, but I wouldn't describe them as close.

19   **Q.**     Okay.  Do you recall taking a large amount of money,

20   around $50,000, out of a bank around the time you were

21   interviewed by the FBI agents?

22   **A.**     I do not.

23   **Q.**     You don't recall taking some money out for a down

24   payment?

25   **A.**     Well, I was interviewed by the FBI in October, but I

```
 1    didn't take out any large money around that --

 2    Q.    Spring.  Probably in the spring that year.

 3    A.    Oh, sure.

 4    Q.    What was that money for?

 5    A.    I bought a property, a two-unit building.

 6    Q.    Okay.

 7    A.    So --

 8    Q.    And did your dad give you advice on that?

 9    A.    He did.

10    Q.    Okay.  And when this lawyer over here says he told you,

11    he directed you, he told you, that's not true.  He advised you,

12    didn't he?

13    A.    Correct.

14    Q.    You make your own financial decisions?

15    A.    I do.

16    Q.    Thank you.

17          MR. MAHER:  Your Honor, just a couple of questions.

18                REDIRECT EXAMINATION OF ANDREW NEVINS

19    BY MR. MAHER:

20    Q.    Mr. Nevins, obviously we've had some questions now about

21    "advise," "recommend" versus "tell you" to or "direct you."

22    A.    Sure.

23    Q.    Okay.  If you could open up the transcript from your

24    deposition again.  Go to page 189.

25    A.    I apologize.  Where are we focused?
```

1    **Q.**    Page 189 of the transcript.  And I just want to

2    reiterate, you testified truthfully during this deposition,

3    correct?

4    **A.**    That is correct.

5    **Q.**    Do you have that open?

6    **A.**    I do.

7    **Q.**    Okay.  On line 6, I'm going to read it.  "Did you tell

8    the FBI that Mr. Clark told you what the expiration date should

9    be for the options you purchased?

10          "Answer:  I did."

11          Turn to page 6 of 9 in the upper right.  You say, "Okay."

12          "Question:  In the middle of that first paragraph, it

13   looks like you told the FBI that Mr. Clark told you what the

14   strike price and expiration date should be for the CEB options

15   that you purchased; is that right?

16          "Answer:  Yes.

17          "Question:  Was that true?

18          "Answer:  Yes.

19          "Question:  So, Mr. Clark told you to buy the January 70

20   options?

21          "Answer:  I just said, 'yes.'"

22          Is this testimony accurate, Mr. Nevins?

23   **A.**    It is.

24   **Q.**    Now, you recall that counsel shouted out some rationales

25   for Mr. Clark's trading, but do you have that Form 302 in front

1    of you?

2    **A.**    This is the one here?

3    **Q.**    That's correct.  Oh, forgive me.  If you see the last

4    paragraph on the bottom of that page --

5    **A.**    On the first page?

6    **Q.**    Correct.  Beginning, "Nevins first told..."

7          Do you see where it says, "Mr. Nevins clarified to say

8    that he spent approximately five minutes reviewing CEB's stock

9    history over the past month or year time period"?

10         Do you see that?

11   **A.**    I do.

12   **Q.**    Was that the extent of your research on CEB after your

13   father told you what options to purchase?

14   **A.**    It was brief.  I mean, it was moments, certainly not

15   hours.

16   **Q.**    And in that second interview, just the final question

17   here, did you volunteer to go to that interview?

18   **A.**    We're talking about this one?

19   **Q.**    Yes.

20   **A.**    I did.

21   **Q.**    Okay.  Are you aware if you were under a subpoena at that

22   time?

23   **A.**    Not for this meeting, I wasn't.

24   **Q.**    Okay.

25         MR. MAHER:  That's all, Your Honor.  Thank you.

```
1          MR. CUMMINGS:  Judge, could I have one follow-up?  Okay.

2          Go back to that deposition, page 189.

3                RECROSS-EXAMINATION OF ANDREW NEVINS

4     BY MR. CUMMINGS:

5     Q.    Isn't it a fact that your dad told you he was doing his

6     strike price --

7     A.    That is correct.

8     Q.    And you voluntarily did your own investment?

9     A.    That is correct.

10    Q.    You did it yourself in your own E*TRADE account?

11    A.    Correct.

12    Q.    Thank you.

13         THE COURT:  All right.  Thank you.  You may step down and

14    may be excused.  Please call your next witness.

15         MR. LUCAS:  Your Honor, the SEC calls James Wells.

16            (JAMES WELLS, GOVERNMENT'S WITNESS, SWORN)

17                DIRECT EXAMINATION OF JAMES WELLS

18    BY MR. LUCAS:

19    Q.    Good afternoon, sir.  Would you please say and spell your

20    full name for the record.

21    A.    It's James Wells, J-A-M-E-S, W-E-L-L-S, Junior.

22    Q.    Thank you.

23         THE COURT:  Mr. Wells, you can take off your mask.

24         MR. LUCAS:  Thank you, Your Honor.

25    BY MR. LUCAS:
```

1    **Q.**    And where do you work, Mr. Wells?

2    **A.**    Verizon Wireless.

3    **Q.**    Okay.  And how long have you worked there?

4    **A.**    Almost 14 years.

5    **Q.**    And what is your current position there?

6    **A.**    I'm an executive relations supervisor.

7    **Q.**    And can you please tell the members of the jury basically

8    what it is you do as a Verizon supervisor on a daily basis?

9    **A.**    I supervisor and train a team of individuals that act as

10   custodian of records for Verizon Wireless business records.

11   **Q.**    And very briefly, can you tell us what it is a custodian

12   of records does at Verizon.

13   **A.**    We review records that are provided to people --

14   attorneys, prosecutors, or defense, and verify that they are

15   what we store in our records.

16   **Q.**    Now, have you had any involvement in this action or the

17   SEC investigation that preceded it, other than being called to

18   testify here today?

19   **A.**    No.

20   **Q.**    And do you have any personal knowledge of any of the

21   facts alleged in the SEC's complaint?

22   **A.**    No.

23   **Q.**    And have you reviewed any of the documents or data

24   produced by Verizon to the SEC in this case?

25   **A.**    No.

1    **Q.**    If I can draw your attention to the topic of text

2    messages.  Does Verizon maintain records of its cell phone

3    subscribers' text message activity?

4    **A.**    Yes.

5    **Q.**    And are you familiar with these records?

6    **A.**    Yes.

7    **Q.**    And is that through your work at Verizon?

8    **A.**    Yes.

9    **Q.**    Are these text message records one of the things Verizon

10   produces in response to legal orders like subpoenas?

11   **A.**    Yes.

12   **Q.**    Does your knowledge cover Verizon's records as they were

13   kept during the 2016 to 2017 time period?

14   **A.**    Yes.

15   **Q.**    Okay.  Would you briefly describe the types of

16   information included in Verizon's text message records to the

17   best of your knowledge.

18   **A.**    Things like the text message server, the subscriber

19   information, telephone number, account number, stuff like that.

20   **Q.**    Would it include, for example, the date and time that a

21   text message was sent or received?

22   **A.**    Yes.

23   **Q.**    And would it also include the sending and receiving phone

24   numbers, for example?

25   **A.**    Yes.

1    **Q.**    Okay.  And now, these Verizon text message records, do

2    they reflect a specific type of text message?

3    **A.**    I'm not sure what you're saying.

4    **Q.**    Do the message -- do the records reflect messages that

5    are sent through a particular technology or system?

6    **A.**    Just text messages.

7    **Q.**    Okay.  Can you just briefly describe sort of how the text

8    messages you're testifying about, how they're sent.

9    **A.**    So, when people think of text messages, there are two

10   different types of text messages.  One is a text message, a

11   short message service, SMS, and that's what most people use that

12   have, like, Androids or traditional phones.  If you have an

13   iPhone, you might be using iMessage, which is another type of

14   message, but it's not sent through the short message service.

15   **Q.**    So you had mentioned SMS, which you testified was a short

16   message service?

17   **A.**    Yes.

18   **Q.**    Do you mind just very briefly explaining how that system

19   works -- how that technology works?

20         THE COURT:  Do we really need to know all about that?  Are

21   you trying to get the records admitted here?

22         MR. LUCAS:  No, Your Honor.  We're actually -- we're

23   asking about just the way certain text message records appear in

24   Verizon's records, not the actual underlying records themselves,

25   which are not objected to in our -- my understanding is already

1     admitted.  Hopefully --

2          THE COURT:  You have the messages in.  What makes it

3     different?

4          MR. LUCAS:  I'm happy to explain it to you more.

5     Hopefully, it will become apparent in the next few minutes.

6          THE COURT:  All right.

7          MR. LUCAS:  Thank you, Your Honor.

8     BY MR. LUCAS:

9     Q.    Is it accurate to say that Verizon's text message records

10    only reflect SMS text messages?

11    A.    Yes.

12    Q.    Okay.  But are there other ways to send text

13    communications on your phone, other than these SMS text

14    messages?

15    A.    Any virtual phone service, like a Google Voice or --

16    there's a bunch of virtual phone services that you could send

17    text messages through a data service.

18    Q.    Okay.  Can you give some examples of those types of --

19    A.    Google Voice is the one that I use that comes to mind.  I

20    don't know --

21    Q.    Okay.  Are you familiar with iMessage, as well?

22    A.    Yes.

23    Q.    Okay.  And is it fair to describe these Google Voice,

24    iMessages, is it fair to describe them as "messaging apps"?

25    A.    Yes.

1  **Q.**    Okay.  And in general, are there any fundamental

2  differences in the way these messaging apps, like Apple

3  Messages, operate as opposed to the SMS text messages you were

4  just describing?

5  **A.**    They use technology that uses the Internet to send and

6  receive versus the short message service.

7  **Q.**    And if the messaging apps use the internet, what does the

8  short messaging service use?

9  **A.**    That uses the Verizon service -- short message service is

10 Verizon service.

11 **Q.**    Okay.  With respect to Apple's Messages app, are you

12 familiar with that app specifically?

13 **A.**    Yeah.

14 **Q.**    And how did you become familiar with it?

15 **A.**    I use it personally.

16 **Q.**    Are you an iPhone user?

17 **A.**    Yes.

18 **Q.**    Okay.  Just, if you could just briefly explain what the

19 messages app -- what it is, what it does?

20 **A.**    It looks the same as any other messaging app but you can

21 tell that you're using iMessage.  Your text will be blue as

22 opposed to green.  If you're an iPhone user, you may see those

23 two different colors -- your text message bubble appears

24 differently.

25 **Q.**    Okay.  So what types of phones can use the Apple Messages

1    app?

2    **A.**     Apple products.

3    **Q.**     Okay.  So if you have an Android phone or some other type

4    of phone, you wouldn't be able to use it, correct?

5    **A.**     No.

6    **Q.**     Okay.  You had mentioned "blue bubbles."  Do you have an

7    understanding of any differences between messages in an app that

8    appear in different colored bubbles?

9    **A.**     No.

10   **Q.**     So, if you saw blue and gray bubbles, for example, would

11   that indicate to you a particular type of message was being

12   sent?

13   **A.**     I could make the assumption.  I don't -- blue and gray?

14   **Q.**     The blue bubble conversation, would that indicate to you

15   that a particular-

16   **A.**     Yeah.  If it's on an iPhone and it's blue and gray, the

17   gray is what you received, and blue is what you sent.

18   **Q.**     And what type of messages are those?

19   **A.**     The Apple Messages.

20   **Q.**     And would those appear in Verizon's text message records?

21   **A.**     No.

22   **Q.**     Therefore -- so if two iPhone users are texting each

23   other and all blue and gray bubbles -- in other words,

24   communicating through iMessgaes -- would any of those texts

25   appear in Verizon's text message records?

1   **A.**      No.

2          MR. LUCAS:  No further questions.

3          MR. CUMMINGS:  What did you say?

4          THE COURT:  Pardon, do you have any questions?

5          MR. CUMMINGS:  Yes, Your Honor.  I want to show him

6   Government's Exhibit 129, if I can hand it to the court security

7   officer.

8                  CROSS-EXAMINATION OF JAMES WELLS

9   BY MR. CUMMINGS:

10  **Q.**      Who did you say you work for?

11         THE COURT REPORTER:  Counsel, I'm sorry.

12         THE COURT SECURITY OFFICER:  Go to the podium.

13         MR. CUMMINGS:  I'm terribly sorry.

14  BY MR. CUMMINGS:

15  **Q.**      Do you recognize this as a summary of communications

16  between William Wright and Christopher Clark?  You might not

17  know the names, but the telephone numbers are there, and you can

18  see on the "To and From" column, Clark's cell and Wright's cell.

19  Take a minute, if you need to.  Are you there?  Are you with me?

20  **A.**      Yes.

21  **Q.**      Now, let's go down to Number 20 on the first page.  It

22  shows that at 3:57:54 p.m., there was a phone call from Wright's

23  work phone to Clark's cell phone.  Do you see that?

24  **A.**      Yes.

25  **Q.**      And it says two seconds?

 1          MR. LUCAS:  Your Honor, we object.  This is outside of the

 2    scope of the direct.

 3          MR. CUMMINGS:  I think I'm entitled to cross.  They

 4    brought him out here.  I didn't object to him, and I think --

 5          THE COURT:  I don't know what any of this has to do with

 6    the case.

 7          MR. CUMMINGS:  Well --

 8          THE COURT:  Unless you're trying to tie up telephones,

 9    apparently telephone calls between individuals and that wasn't

10    done in the direct.

11          MR. CUMMINGS:  Oh, I see.  Okay.  So basically he just

12    described the --

13          THE COURT:  All he did was give us a general discussion of

14    cell phone use.

15          MR. CUMMINGS:  Okay.  Well, then.

16          THE COURT:  I don't know what the purpose is.  I guess

17    we'll figure it out.

18    BY MR. CUMMINGS:

19    **Q.**    Well, let me ask you this:  Looking at that, can you tell

20    the difference between a text and a cell phone call?

21    **A.**    No.

22    **Q.**    Well, if you look -- you see there's a lot of blank

23    spaces.  For example, look at Number 79 through 89?

24          MR. LUCAS:  Your Honor, we have the same objection.

25          MR. CUMMINGS:  I think this is relevant, Judge.

1          MR. LUCAS:  Judge, the witness has never seen the

2     document.

3          THE COURT:  Well, it isn't relevant on

4     cross-examination -- it's what he testified to on direct.

5          MR. CUMMINGS:  I appreciate that, Your Honor, but I just

6     want to ask one question --

7          THE COURT:  Objection sustained.  I already sustained it.

8          MR. CUMMINGS:  Thank you.  Thank you for coming.

9          MR. LUCAS:  No further questions.

10          THE COURT:  All right.  Thank you.  You may step down.

11     You may be excused.  At this time, let's take a brief recess.

12          (Thereupon, a recess in the proceedings occurred from

13     3:44 p.m. until 4:02 p.m.)

14          MS. CHOE:  Thank you, Your Honor.  The SEC calls

15     Christopher Clark.  Your Honor, while the witness is taking the

16     stand, just for housekeeping, could we mark the poster board used

17     in opening as SEC Demonstrative 1, and the two flip charts as

18     Demonstratives 4 and 5?

19          THE COURT:  All right.

20          MS. CHOE:  Thank you, Your Honor.

21          (CHRISTOPHER CLARK, GOVERNMENT'S WITNESS, SWORN)

22               DIRECT EXAMINATION OF CHRISTOPHER CLARK

23     BY MS. CHOE:

24     **Q.**     Good afternoon, Mr. Clark.

25     **A.**     Good afternoon.

1    **Q.**    How old are you?

2    **A.**    53.

3    **Q.**    And where do you live, Mr. Clark?

4    **A.**    Arlington, Virginia.

5    **Q.**    What do you do for a living?

6    **A.**    I'm a mortgage lender.

7    **Q.**    And how long have you been a mortgage lender?

8    **A.**    25 years.

9    **Q.**    Is that also the same thing as a mortgage broker?

10   **A.**    A little bit different, but I supply loans for people to

11   buy homes.  A lender has their own money, a broker goes out and

12   sources it from elsewhere, so our company has its own money.

13   **Q.**    And what company is that?

14   **A.**    Intercoastal Mortgage.

15   **Q.**    Have you ever worked in the securities industry?

16   **A.**    I have not.

17   **Q.**    And, Mr. Clark, are you married?

18   **A.**    I am.

19   **Q.**    What is your wife's name?

20   **A.**    Tisha Clark.

21   **Q.**    And are you related to William Wright?

22   **A.**    Not by blood.

23   **Q.**    Are you related to him?

24   **A.**    By marriage.

25   **Q.**    Can you explain to the members of the jury how you're

```
 1   related to Mr. Wright?

 2   A.      My wife's younger sister Leslie's husband is Bill.

 3   Q.      And your wife's name -- I can't recall if you said is --

 4   A.      Tisha.

 5   Q.      Tisha Clark.  So your wife is Tisha Clark, her sister is

 6   Leslie Wright, and Ms. Wright is married to Bill Wright; is that

 7   correct?

 8   A.      That's correct.

 9   Q.      And about how long have Mr. and Mrs. Wright been married?

10   A.      I believe 2007, maybe 2008.

11   Q.      And so, is it fair to say that you've known Mr. Wright

12   since at least that time?

13   A.      Correct.

14   Q.      Did you actually meet him a year or two before they got

15   married?

16   A.      Probably.  Maybe 2005, 2006, somewhere in there.

17   Q.      Mr. Clark, I'd like to talk to you about your trading in

18   CEB.  Is it fair to say that you've been trading in CEB since at

19   least 2008?

20   A.      Correct.

21   Q.      And throughout that time, from about 2008 up until 2017,

22   Mr. Wright was working at CEB, correct?

23   A.      Yes.

24   Q.      Now, we're going to talk about the CEB trades from

25   December in a little bit, but before we get to those, I want to
```

1    ask you about your earlier trading in CEB.  Is it fair to say

2    that up until the end of 2016, your strategy when you traded in

3    CEB was to trade around CEB's earnings announcements?

4    **A.**    I would trade around their announcements, correct.

5    **Q.**    Those would come out every quarter, correct?

6    **A.**    Correct.  That's when the volatility would be in the

7    stock to gain additional moves, moving up or down, based off the

8    announcement and guidance that the company may be given.

9    **Q.**    So, you'd buy options in CEB just before a quarterly

10   announcement came out and then you would sell soon after, within

11   days; is that fair to say?

12   **A.**    Yes.

13   **Q.**    And would you agree with me that these were pretty

14   short-term trades in CEB?

15   **A.**    Depends on short-term, but, I mean, usually the

16   expiration would be within a 30-day period.

17   **Q.**    Okay.  So the options were within 30 days typically, but

18   your activity was also in and out within a matter of days; is

19   that fair to say?

20   **A.**    For most of them.  And that's because I was trading on,

21   you know, the volatility of the announcements.

22   **Q.**    And is it also correct that when you traded in CEB, you

23   traded in options, stock options?

24   **A.**    Yes.

25   **Q.**    From 2008 to 2016, any time you traded in CEB, you were

1    trading in options, correct?

2    **A.**     Yes.

3    **Q.**     Now, over the years, CEB wasn't the only company that you

4    traded in; is that right?

5    **A.**     Correct.

6    **Q.**     Is it fair to say that between 2008, 2016, '17 you traded

7    in dozens of other companies?

8    **A.**     Yes.

9    **Q.**     But when you traded in those other companies, you didn't

10   trade around earnings announcements, did you?

11   **A.**     No.

12   **Q.**     And so those weren't the kind of short-term trades we've

13   been talking about, correct?

14   **A.**     I was buying the individual stock first options.

15   **Q.**     So you were buying stock instead of options, and you were

16   also basically a buy and hold kind of investor in these other

17   companies; is that fair?

18   **A.**     Um, I mean, I traded -- I'd buy them, sell them, buy

19   others.

20   **Q.**     But you would tend to hold them for a longer period of

21   time than you held CEB options, correct?

22   **A.**     Correct.

23   **Q.**     And we were talking about how you traded options in CEB.

24   Is it true that after 2012, the only company where you traded

25   options was CEB?

1   A.     I believe that's correct, yes.

2   Q.     Why did you trade earnings announcements in CEB but not

3   in any of these other dozens of companies you were trading in?

4   A.     It was a local company that I had been following for

5   years.  I had clients that had worked there that I had done

6   loans for going all the way back to the early 2000s, and you

7   come across some 25, 26, 27-year-old person that was making

8   quite a bit of money, it would catch your attention.  It was

9   based in Arlington or moved to Arlington probably mid-2000s, so

10  it was a company that I was very familiar with and would watch

11  as they purchased companies and was, you know, kind of familiar

12  with it.

13  Q.     So let's talk about some of the things you just said.

14  You mentioned that one of the reasons you bought earnings in CEB

15  but not in any other companies was because it was a local

16  company, correct?

17  A.     Correct.  I followed local companies.  I grew up on

18  learning stocks from my grandmother.  That's what she had done,

19  and lived off dividends and other stocks that she had had, so

20  CEB was a local company that I had followed.

21  Q.     There are a lot of local companies based in the Northern

22  Virginia area, aren't there?

23  A.     There are.

24  Q.     General Dynamics?

25  A.     They are here in the area, as well.

```
 1    Q.    Hilton Hotels?

 2    A.    Hilton, yes.  They recently moved here.

 3    Q.    E*TRADE?

 4    A.    E*TRADE, yes.

 5    Q.    Northrop Grumman?

 6    A.    Yes.

 7    Q.    Capital One?

 8    A.    Yes.

 9    Q.    You didn't invest in any of those local companies, did

10    you?

11    A.    I didn't, but I didn't follow any of those either.

12    Q.    Just CEB?

13    A.    Out of local companies that I invested in, CEB was the

14    company that I was following.

15    Q.    Were you following CEB in particular out of all these

16    local companies because that was where Bill Wright worked?

17    A.    No.

18    Q.    It didn't have anything to do with it?

19    A.    No.

20    Q.    You also mentioned that one of the reasons you traded

21    earnings and options in CEB but not in these other companies you

22    invested in was because you saw folks there who were clients

23    were making quite a bit of money; is that right?

24    A.    I had clients of mine that worked at CEB that I would do

25    loans for their home purchases, so I would be able to see how
```

1    much, you know, some of these young kids that were 25 to 30 were

2    making, and it was a hot growing company, and a lot of them were

3    happy that they were working there, and it was kind of on an

4    upward swing over the years.  It grew quite a bit.

5    **Q.**    So you were -- you're saying you were investing because

6    you saw the company moving up?

7    **A.**    It was a company that I was familiar with with some of

8    the stuff that they were doing, yes.

9    **Q.**    Isn't it true that over the years, until December 2016,

10   when you traded in CEB, you traded almost exclusively in put

11   options?

12   **A.**    No. Later half of it, yeah, but early on when I started

13   trading in it, it was much lower and went higher and then it

14   came back down, so, you know, it -- you know, at one point in

15   early or mid-2000s, it was probably well over a $100.

16   **Q.**    My question is whether you bought almost exclusively put

17   options as opposed to call options when you were investing in

18   CEB over the years.

19   **A.**    In the timeframe that you just mentioned, yes.

20   **Q.**    And when you buy a put option, aren't you betting that

21   the company's stock is going to go down?

22   **A.**    That is correct.

23   **Q.**    And so you weren't really investing in CEB because you

24   thought it was an up-and-coming company, correct?  You were

25   betting that its stock price was going to move down over and

1    over again?

2    **A.**    Early on you asked me, I believe, when I started to

3    invest in CEB, what drew me to it.

4    **Q.**    And what kept you there year after year was not that you

5    thought it was an up-and-coming local company, correct?

6    **A.**    Early on when you asked what drew me to it, in the

7    beginning it was.  It kind of plateaued and then started going

8    down.  And when you say "invest," yes, you can invest with it

9    going down or it going up.  You can make money both ways.

10   **Q.**    Between 2008 and the fall of 2016, you traded around CEB

11   earnings 17 different times, correct?

12   **A.**    Um, that is the number that you've given.  I haven't gone

13   back and counted.

14   **Q.**    Does that sound accurate to you?

15   **A.**    I would accept that, but I haven't gone back and counted

16   that number.  That's the number you guys have come up with.

17   **Q.**    Do you have a different number?

18   **A.**    Like I said, I haven't gone back and counted.

19   **Q.**    And you didn't make money every time you traded around

20   CEB earnings, correct?

21   **A.**    Correct.

22   **Q.**    But over those 17 earnings trades, you did make over

23   $172,000 in profits; is that right?

24   **A.**    I profited off the sale of options on CEB, yes.

25   **Q.**    And, in fact, between the earnings trades and the

1    premerger trades in December, fair to say you made over $416,000

2    trading in CEB, correct?

3    **A.**    Repeat the question, please.

4    **Q.**    Between the earnings trades we've been talking about over

5    the years and then the December merger trades, is it fair to say

6    you made over $416,000 just from trading in CEB options?

7    **A.**    Um, I don't know if the wording on that question when you

8    call it "the merger trade" --

9    **Q.**    I can refer to it as --

10        MR. CUMMINGS:  Can he finish his answer?

11        MS. CHOE:  Oh, excuse me.  Please go ahead.

12        THE WITNESS:  Referring it to as "the merger trade" would

13   imply that I was purchasing the options knowing that there was a

14   merger.

15   BY MS. CHOE:

16   **Q.**    I can refer to them as the December trades -- December

17   2000 --

18   **A.**    Please.

19   **Q.**    And, so, would you agree with me that between those

20   December trades and the earnings trades over the years we've

21   been talking about, you made over $416,000 trading in CEB

22   options?

23   **A.**    Based off the information that you've shared with us,

24   yes.

25   **Q.**    And you don't have any disagreement with those numbers,

1    do you?

2    **A.**     Correct.  We have not disagreed on any of our -- any of

3    my financial statements.

4    **Q.**     And would you agree that $416,000 is way more than you

5    ever earned in profits from any other single company that you

6    traded in over that same time period?

7    **A.**     I would say that I've made more off of CEB transactions

8    than I have of any other stock, correct.

9    **Q.**     Isn't it true that the next highest amount you ever

10   earned in from any other company in realized profits was just

11   about $8,000?

12   **A.**     I do not know the answer to that question.

13   **Q.**     You also, over the years, invested way more money in

14   CEB --

15   **A.**     I'm sorry.  Going back to the last question.  Are you

16   talking up until 2016 or are we talking until now?  What's the

17   timeframe that we're speaking of?

18   **Q.**     Well, I think the analyses that were provided to you were

19   for the time period 2008 to 2019, technically.

20   **A.**     Okay.

21   **Q.**     That you heard Dr. Cain testify about earlier today, and

22   so those were the analyses showing that your profits in CEB were

23   416,000 and the next highest was 8,000.

24   **A.**     Then I would disagree with that.

25   **Q.**     You would disagree with?

1    **A.**    If we're going through 2019, I've made a ton more on

2    Apple stock than $8,000.

3    **Q.**    And were those realized profits or unrealized profits?

4         MR. CUMMINGS:  I really wish she would let him finish the

5    statement before you pose your next question.

6         MS. CHOE:  I apologize, Your Honor.  I thought he was

7    finished.

8    BY MS. CHOE:

9    **Q.**    Please go ahead.

10   **A.**    So Apple stock, I've made fivefold on, so I'm not sure

11   what he's looking at or what he's discussing in that, but

12   realized gain is in an IRA so it hasn't been sold to this point,

13   but it's made -- I've got I bet you probably sevenfold.

14   **Q.**    Are you aware that Dr. Cain's analysis -- actually, let

15   me back up.

16        You said it's still sitting there your account, your

17   investment in Apple?

18   **A.**    Correct.

19   **Q.**    And that's in Apple stock, right?

20   **A.**    Correct.

21   **Q.**    Because you're buying and holding that stock, right?

22   **A.**    Correct.  There's no reason to sell it.

23   **Q.**    It's not short-term options trades in Apple?

24   **A.**    It is not.  There's no reason to sell it.

25   **Q.**    And are you aware that Dr. Cain's analysis shows that

1   even when you take into account the Apple stock sitting in your

2   account, it's less than 10 percent of what you've made on CEB

3   over the years?

4   **A.**     Please repeat the question, and let me know what's less

5   than 10 percent.  I'm not following the parameters in the

6   numbers that you're using.

7   **Q.**     Are you aware that Dr. Cain's analysis shows that whereas

8   you earned $416,000 in these short-term options trades in CEB,

9   in Apple stock, even if you look at what the value of the

10  account has been from just sitting there, it's less than

11  10 percent in profits?

12  **A.**     I would say that's inaccurate.

13  **Q.**     So you disagree with Dr. Cain's analysis?

14       MR. CUMMINGS:  He had an "and."  Again, same objection.

15       MS. CHOE:  I apologize.  Please go ahead.

16       THE WITNESS:  No problem.  I mean, if you look at when I

17  bought Apple -- I don't know the year, maybe 2010 -- to where it

18  is now, it's up probably 1000 percent, and that was from probably

19  10 or $11,000 investment and it's up over $200,00 now, so

20  actually that's 20 times.  So, I'm not sure what Cain was

21  reviewing on that, but that's in my E*TRADE statement right next

22  to all the other trades.

23  BY MS. CHOE:

24  **Q.**     You invested way more in CEB than in any other company,

25  correct?

1    **A.**      When?

2    **Q.**      Between 2008 and 2016.

3    **A.**      So, run me through, if you could, please, your definition

4    of "investing" and "at different times."

5    **Q.**      Well, if you take a look in the binder that's before

6    you --

7    **A.**      Please.

8    **Q.**      And you take a look at SEC Trial Exhibit 288 that's been

9    admitted.

10   **A.**      Did you say 288?

11   **Q.**      2-8-8.

12   **A.**      Thank you.

13   **Q.**      And let me know when you have the exhibit.

14   **A.**      One second.  It's a little packed in here.

15   **Q.**      Do you see 288?

16   **A.**      I do.

17   **Q.**      And do you see that this is Dr. Cain's Exhibit 5B2,

18   Securities Trades by Ticker In Clark Accounts between February

19   2008 and April 2019?  Do you see that at the title?

20   **A.**      Pardon me one second.  I left my glasses over here.  If I

21   may grab them?

22           THE COURT SECURITY OFFICER:  Do you to clean them off?

23           THE WITNESS:  Actually, yes, please.

24   BY MS. CHOE:

25   **Q.**      Do you see that this is Dr. Cain's Exhibit 5B2 Securities

1    Trades by Ticker In Clark Accounts February 2008 to April 2019?

2    **A.**    Correct.

3    **Q.**    And do you see that at the top there are two rows -- one

4    is "Merger CEB," but we can refer to that as "December/January

5    CEB," and the next row is "Other CEB."  Do you see that?

6    **A.**    Yes.

7    **Q.**    And then if you go all the way to the right-hand

8    column -- right-most column -- do you see that the total dollars

9    purchased between those two rows is $33,050 in the first row and

10   $264,785 in the second row?

11   **A.**    I see the merger CEB.  The far-right one is $33,050,

12   correct?

13   **Q.**    Correct.

14   **A.**    And what was the other one that you're pointing to?

15   **Q.**    The second row -- "Other CEB Trading."

16   **A.**    Yes.

17   **Q.**    And the total purchased dollars is $264,785.  Do you see

18   that?

19   **A.**    I do see that.

20   **Q.**    So fair to say you invested approximately $300,000

21   trading in CEB over the years?

22   **A.**    Yes.  With one piece of that, though -- a bulk of that

23   was probably based off two trades in January after the merger

24   where the drop-down window had purchase versus sell on it, and I

25   believe each of those were probably 40 or $50,000 transactions,

1   so I would imagine that this number would probably be 80 to

2   $100,000 less.

3   **Q.**    So you're saying instead of buying $300,000 in CEB over

4   the merger, your estimate is that it's somewhere closer to

5   $200,000?

6   **A.**    I'm saying that I believe that this number in here

7   includes two trades that were in January after the merger.

8   **Q.**    Because it goes through April of 2019, correct?

9   **A.**    Correct.

10  **Q.**    So --

11  **A.**    There's probably 80 or $100,000 less than that.

12  **Q.**    So in CEB --

13  **A.**    Yes.

14  **Q.**    -- you invested approximately $300,000 over the years,

15  correct?

16  **A.**    No.  I said minus 80 to 100,000 on that.

17  **Q.**    But those were investments in CEB, right?

18  **A.**    Yeah.  I mean, if you want to say that.  You know, the

19  merger was already out and I was selling my options, and the

20  purchase box was on, at first, the sale box on E*TRADE.  I mean,

21  it's in my statements.

22  **Q.**    Are you saying that those were a mistake?

23  **A.**    The purchases that were made after the merger were a

24  mistake.  They were supposed to be sales.  And if you look, I

25  turned and sold them right away after I purchased them --

1    **Q.**      And if you look --

2    **A.**      -- the same day.

3    **Q.**      Excuse me.  I apologize.  If you look at Exhibit 288,

4    there's no other company where you invest anywhere over $100,000

5    during this time period, correct?

6    **A.**      Um, I mean, this doesn't take into account any of my

7    retirement funds, that some of those accounts have over 2, 3,

8    400,000, depending on the timeframe.  And some of these were,

9    you know, probably over 400,000.  And in addition to this, these

10   numbers here were spread throughout three different accounts in

11   E*TRADE; two retirement accounts, and one securities account.

12   **Q.**      So you're referring to the fact that the trading that's

13   analyzed here is the trading in your E*TRADE accounts, correct?

14   **A.**      Correct.  And your question was that, you know, I haven't

15   purchased anything else more than this.  And I know that we have

16   at least one 401(k) account that has over $400,000, so I would

17   say that that would be more than what was invested in CEB at the

18   time.

19   **Q.**      And your 401(k) account, does that offer sort of like a

20   set menu of investment options?

21   **A.**      It has, you know, a variety of -- each of the 401(k)s

22   probably have a variety of 20 to 40 different mutual funds with

23   different objectives to them.

24   **Q.**      So, it's not like you can go into those 401(k)s and

25   invest in whatever you want, correct?

1    A.     I could go into them and invest in whatever options on

2    the mutual funds.

3    Q.     Not stock options, but the mutual funds they're offering.

4    Is that what you mean?

5    A.     Yeah.  You can't do stock options for 401(k) loans -- I

6    mean, 401(k) accounts, pardon me.

7    Q.     So, you can only do short-term options trades in your

8    E*TRADE account, correct?

9    A.     Or with a broker.

10   Q.     And the --

11   A.     You can do them -- I'm sorry.  I talked over you.

12   Q.     The 401(k) that you were referring to that has, I think

13   you said, a couple $100,000, is that spread out in mutual funds,

14   or is any of that in one single company?

15   A.     It's in a single company's mutual fund.

16   Q.     And a mutual fund is made up of a bunch of different

17   underlying stocks or annuities, correct?

18   A.     Correct.

19   Q.     So is it fair to say that CEB is the only company where

20   you've invested over $100,000 over the years?

21          THE COURT:  Counsel, you've asked him that very question

22   seven times at least.

23          MS. CHOE:  I agree, Your Honor.  I'm just trying to get an

24   answer.  I'll --

25          THE COURT:  He's answered it every time.  You don't like

1    the answer, but he's answered it every time.

2         MS. CHOE:  I can move on, Your Honor.

3         THE COURT:  Thank you.

4    BY MS. CHOE:

5    **Q.**    Did you ever talk about your investments in CEB with

6    Mr. Wright?

7    **A.**    I have not.

8    **Q.**    So this was a company where you invested, whether it was

9    200,000, 300,000, and where you netted profits of 416,000, but

10   you never talked about it with your brother-in-law who worked

11   there?

12   **A.**    I did not.

13   **Q.**    Over the years, did you sometimes tell your son,

14   Mr. Nevins, that he should trade in CEB, too?

15   **A.**    I discussed with him trading in CEB, yes.

16   **Q.**    And did you tell him that he should buy CEB options?

17   **A.**    You know, we kind of went through this earlier when he

18   was up here, and I think it was kind of a -- you know, what was

19   the verb, you know, whether it was "told" or "advised," or

20   whatnot.  I don't remember the exact word, but we'd never say

21   buy that, or buy that now, or -- but, you know, I would discuss

22   with him what I was doing and share with him along those lines.

23   **Q.**    And so I think -- is it fair to say you never commanded

24   him to do this, to trade in CEB options, is that what you're

25   saying?

1    **A.**     I would say, yeah.  I mean, the way you asked the

2    question earlier, it seemed like I was directing him to do it

3    now, like in an authoritative manner.  You know, we had

4    conversations on it.

5    **Q.**     Would you agree with me that you recommended to your son

6    which options he should buy?

7    **A.**     Yes.

8    **Q.**     And that included as far as the expiration date and the

9    strike price of the options; is that correct?

10   **A.**     On a few occasions, yes.

11   **Q.**     Your son, were you aware that he didn't usually invest in

12   options?

13   **A.**     I don't believe he was a seasoned -- or had done it many

14   times before.

15   **Q.**     And were you aware he didn't invest in short-term

16   out-of-the-money options on a regular basis?

17   **A.**     I wasn't aware, but it wouldn't surprise me if he didn't

18   on a regular basis.

19   **Q.**     So, when you recommended that he invest in these CEB

20   options, did you tell him why you thought it would be a good

21   investment?

22   **A.**     I don't recall the exact wording that I had with him on

23   why we did or why I was doing it.

24   **Q.**     Understanding you don't remember the exact wording, do

25   you think that you did share with him the reasons why you

1    thought it would be a good investment?

2    **A.**    Yes.

3    **Q.**    And when you and he talked about trading in CEB and why

4    you thought it was a good investment, did the fact that

5    Mr. Wright, your brother-in-law, worked there, did that ever

6    come up?

7    **A.**    No.

8    **Q.**    Let's talk about December 2016.

9    **A.**    Uh-huh.

10   **Q.**    Now, up until that time, we were discussing earlier, when

11   you traded in CEB, you almost always traded in put options,

12   correct?

13   **A.**    Previous trades I had were puts.

14   **Q.**    In fact, earlier that year in 2016, you traded in CEB

15   three different times around earnings, correct?

16   **A.**    Yes, I believe so.

17   **Q.**    And each of those times in February, April, and July, you

18   bought CEB put options, correct?

19   **A.**    Yes.

20   **Q.**    But on December 9th, 2016, you started buying call

21   options, correct?

22   **A.**    Correct.

23   **Q.**    And a call option, just to make sure we're on the same

24   page, you're betting the price is going to go up, right?

25   **A.**    Correct.

1  **Q.**     And the call options that you bought, you know, I think

2  we've heard, you agree that these were out-of-the-money call

3  options, 65 or $70 call options, betting that CEB's stock price

4  was going to go up in early 2017?  Would you agree with that?

5  **A.**     I would agree that I bought options at 65 and 70 with the

6  anticipation the stock would go up with the market, yes.

7  **Q.**     And all of the options that you bought were set to expire

8  either in January, February, or March of 2017, correct?

9  **A.**     The bulk of them, February and March.

10  **Q.**     You're aware that in December, when you started buying

11  these options and continued buying these options, CEB's stock

12  price, it hovered around $60.  You know that, right?

13  **A.**     Yes.  That's about the entry level that I purchased in.

14  **Q.**     Well, you bought 65 and $70 options, right?

15  **A.**     Yeah.  But when I purchased those options, the stock

16  price was hovering around 60.

17  **Q.**     And on December 9th, the day that you started buying

18  these call options, you sold everything in your wife's E*TRADE

19  IRA account, right?  That's one of the accounts you were

20  referring to earlier.

21  **A.**     I sold a holding that she had in her -- her E*TRADE

22  account that had about $4,000 in it.  And with that, it was --

23  it was transferred over from a previous employer along the lines

24  and had been sitting there not doing anything for a while.  And

25  our E*TRADE accounts -- so, if I may take a second to explain,

1    we have our 401(k) accounts that are our family investment that

2    are under the direction of a financial advisor, and that's where

3    we keep our conservative investments.  E*TRADE is more for

4    aggressive investments that I can do and don't have to call up a

5    broker to do any of the trades.  She had an IRA there of $4,000

6    that had been sitting there.  Keep in mind, it was 100 percent

7    of that account.  However, she had 250 to $300,000 in her 401(k)

8    account.  So, saying it's 100 percent of her retirement is kind

9    of misleading.

10   **Q.**    I don't think I said it was 100 percent of her

11   retirement.  I said you sold everything in that E*TRADE IRA

12   account; is that right?

13   **A.**    That is what you said.  But it also implies that we sold

14   100 percent of her retirement without mentioning that she had

15   other accounts.

16   **Q.**    Did you sell everything in that E*TRADE IRA account?

17   **A.**    The $4,000 of that account we did sell, yes.

18   **Q.**    And did you use all of that money to buy CEB options?

19   **A.**    Yes.

20   **Q.**    And then do you recall that a few days later, on December

21   12th, you drew $6,000 on a line of credit that you had at

22   Arlington Credit Union?

23   **A.**    Correct.

24   **Q.**    And that pretty much maxed out that line of credit,

25   right, it took the balance up to near the $20,000 limit?

1    **A.**    Correct.

2    **Q.**    And did you also use that money to buy CEB call options?

3    **A.**    I did.

4    **Q.**    And then do you recall on December 27th, the first day

5    the bank was open after Christmas, that you took out about a

6    $9400 loan on one of your cars?

7    **A.**    I did.

8    **Q.**    And did you use -- I guess, do you recall you used about

9    900 to pay off another car loan, but you used the rest of that

10    to buy more CEB options; is that right?

11    **A.**    Correct.

12    **Q.**    Now, in 2016, did you see Mr. Wright over the holidays?

13    **A.**    Yes.

14    **Q.**    Is there an annual Christmas party, Truman Christmas

15    party, that's held involving a couple of the families?

16    **A.**    Yes.

17    **Q.**    And Truman is your wife's maiden name and Leslie Wright's

18    maiden name; is that right?

19    **A.**    That's correct.

20    **Q.**    Okay.  And so, did you see Bill Wright at that Truman

21    Christmas party that year?

22    **A.**    Yes.

23    **Q.**    And did you also see him on Christmas Eve and Christmas

24    day?

25    **A.**    Yes.  I saw him at church on Christmas Eve, and we saw --

1     our families saw each other on Christmas Eve -- Christmas day,

2     pardon me.

3     **Q.**     Twice on Christmas day, is that the tradition?

4     **A.**     Usually, yes.

5     **Q.**     And did he also come to your holiday open house that year

6     on December 30th?

7     **A.**     Yes.

8     **Q.**     When you saw him at these events in late December, did

9     you talk to him at any point about how you were investing in

10    these CEB call options?

11    **A.**     No.

12    **Q.**     Did you talk to him about the money that you were

13    borrowing in order to invest in his company?

14    **A.**     No.

15    **Q.**     Now, we were just talking a moment ago about, you know,

16    your recommendations to your son.  Just to be clear, in December

17    2016, you recommended to your son that he buy CEB options,

18    correct?

19    **A.**     Yes.

20    **Q.**     And do you recall how many times you and your son talked

21    about these recommendations during December and early January?

22    **A.**     I do not.

23    **Q.**     Do you recall if it was multiple times?

24    **A.**     We had multiple conversations, yes.

25    **Q.**     Do you recall talking to him on the afternoon of January

```
 1   4th, the day before the announcement, at about 1:30 p.m. for

 2   five minutes?

 3   A.     I don't recall talking to him, but I know it exists

 4   because you've shared the phone records with us.

 5   Q.     Those were the records we saw earlier today?

 6   A.     Yes.

 7   Q.     Okay.  But you don't remember if you talked about trading

 8   in CEB on that phone call?

 9   A.     I don't.  I don't remember the phone call.

10   Q.     Do you recall that about an hour after that, around 2:30

11   p.m., you texted your son and asked him to give you a call at

12   work?

13   A.     I know that that text message exists, yes.

14   Q.     I think you --

15   A.     I don't recall it.

16   Q.     -- said, "I'm in the office, give me a call" around

17   2:30 -- it was around 2:30 p.m.  Do you recall that text

18   message?

19   A.     Yes, I've seen that text message.

20   Q.     And during that phone call, do you recall whether you and

21   your son talked about buying CEB's stock options?

22   A.     No, I don't recall the call.

23   Q.     And you saw earlier today that about 15 minutes after

24   that text message, starting around 2:45, that was when

25   Mr. Nevins, your son, started buying January call options.  Do
```

```
 1    you recall seeing that?

 2    A.     I did see that, yes.

 3    Q.     Did the purchase of those January 70 call options come up

 4    in any of your communications with him that day?

 5    A.     I don't recall the calls, so I don't know how I would

 6    remember that.

 7    Q.     And you told your son which strike price and which

 8    expiration date you recommended when he bought CEB options,

 9    correct?

10    A.     We had discussed in the past.

11    Q.     And do you recall whether on that day you recommended

12    that he buy those options?

13    A.     Like I said, I don't recall the conversation, so, you

14    know, what I will go back to discuss is on -- looking at my

15    orders that I had in on those days.  And so, what I'm thinking

16    is, maybe he had purchased the wrong month at that time because

17    I had orders in that afternoon, and they were for February and

18    March, if I'm not mistaken.  So, if he went through with those

19    on January, maybe he had had the wrong month put in there.  But

20    my orders that didn't get filled when I was trying to buy were

21    for February and March.  So it wasn't lining up with what I had

22    in.

23    Q.     So what you're saying is, you tried to buy options that

24    day as well?

25    A.     Yes.
```

1   **Q.**     Okay.

2   **A.**     I have orders that weren't filled that day.

3   **Q.**     Okay.  And those were for February options?

4   **A.**     They were February and March.  I don't recall exactly,

5   but they were for either one.  That would have been out past the

6   earnings call.

7   **Q.**     Okay.

8           Now, we were just talking about some loans from December

9   of 2016, but is it fair to say that that wasn't the first time

10  that you borrowed money in order to trade in CEB options?

11  **A.**     Correct.

12  **Q.**     And do you recall that you traded around a CEB earnings

13  announcement that came out on Tuesday, July 28th, 2015?

14  **A.**     Yes, I've repeated the trades.

15  **Q.**     And is it fair to say you would typically decide whether

16  or not to trade around an earnings announcement a couple of

17  weeks before that announcement came out?

18  **A.**     Yes.

19  **Q.**     So, the announcement was on July 28th -- scheduled for

20  July 28th.  Do you recall that on July 23rd and July 24th, a few

21  days before that, you called Mr. Wright three different times?

22  **A.**     I don't recall that.  I've seen it in the phone records,

23  but I don't recall it.

24  **Q.**     Okay.  So, you don't dispute that there were those calls,

25  you're saying you don't remember what happened?

1   **A.**      I've seen the phone records on it.

2   **Q.**      Do you recall that on Saturday, July 25th, Mr. Wright

3   called you back, and the two of you spoke for about 12 minutes?

4   **A.**      I don't recall the call, but I've seen the phone records.

5   You know, we are going back like six years, so...

6   **Q.**      Fair enough.  And do you recall that two days after that,

7   on Monday, July 27th, you started buying CEB options in advance

8   of that July 28th announcements?

9   **A.**      I've reviewed my statements.

10  **Q.**      And from reviewing your statements, would you agree with

11  me that between July 27th and July 28th, you bought over $27,000

12  in CEB put options?

13  **A.**      Yes.

14  **Q.**      Those were also all out-of-the-money options, correct?

15  **A.**      Yes.

16  **Q.**      You were betting that CEB's stock price was going to drop

17  significantly?

18  **A.**      That it was going to drop.

19  **Q.**      A sizable drop?

20  **A.**      I was investing that the stock was going to go down.

21  **Q.**      And those options were also all set to expire in August,

22  correct?

23  **A.**      Yeah, August 21st, I believe.

24  **Q.**      So, just a few weeks after you were buying them, right?

25  **A.**      Three weeks -- three or four weeks.  Three-plus weeks.

1    Q.    Now, in order to buy those options, did you borrow money?

2    A.    I believe -- yes.

3    Q.    Do you recall that on that Monday, July 27th, you

4    actually opened up a line of credit at your bank?

5    A.    Yes.

6    Q.    And that you drew $15,000 on that line of credit right

7    away?

8    A.    Yes.

9    Q.    And all of that money you used to buy some of these

10   options, correct?

11   A.    Correct.

12   Q.    Do you recall you actually called E*TRADE to find out,

13   like, when the money was going to arrive?  Do you recall that

14   call?

15   A.    Yes, I listened to that.

16   Q.    I'm sorry, what did you say?  You listened to that?

17   A.    I've listened to the tape that you've supplied for that.

18   Q.    And that's because you wanted to make sure the money

19   would arrive in time for you to buy options before the

20   announcement came out at the end of the day on the 28th, right?

21   A.    That is correct.

22   Q.    Do you recall what made you so confident that CEB's stock

23   price was going to go down that you were willing to borrow

24   $15,000?

25   A.    It was the downward pressure in the market at that time.

1    And if you -- and if you looked -- actually, towards the end of

2    August is when the market had really gotten hit, and I wish I

3    held onto them longer.  I would have made a lot more money.

4    But, you know, looking at the trading.  And what I would look at

5    previously would be the different acquisitions that CEB was

6    doing.  They were purchasing companies, and a lot of times when

7    they would purchase a company, there would be -- or in general,

8    not just CEB.  But a lot of times when companies have a merger

9    or a purchase, stock prices tend to go down.  That's my theory

10   and thesis on it.

11   **Q.**    So you referred just now to there was downward pressure

12   in the market.

13   **A.**    Um-hmm.

14   **Q.**    And then you also referred to acquisitions.

15   **A.**    Um-hmm.

16   **Q.**    Okay.  The downward pressure in the market, how did that

17   indicate to you that the price was going to drop -- that CEB's

18   stock price in particular was going to drop in the next couple

19   weeks?

20   **A.**    So, when you go to purchase CEB options, they're only in

21   $5 increments.  Depending on companies, some larger trading

22   companies may have them in $0.50 increments, $0.25 increments,

23   but CEB only has them in $5 increments.  So, those were the

24   ones -- depending on what the price was at that time, the next

25   pricing coupon would have been out-of-the-money that you

1  referred to, and that's probably where we ended up purchasing

2  them.

3  **Q.**    So --

4  **A.**    So, if they're only available in -- for example, if the

5  stock price is $89, the only option to buy is 85.  There's not

6  an 88, 87, 86.  So, it's only done in $5 increments.  So,

7  there's 86 and 85 -- or pardon me -- 85 and 80 options that you

8  can purchase.

9  **Q.**    I understand.  My question had to do with the reference

10  to downward pressure and why that made you think that the stock

11  price was going to go down, understanding the increments, but

12  that it was going to go down in the next couple weeks.

13  **A.**    The market was oversold at that point.

14  **Q.**    When you say, "The market," are you referring to the

15  market generally?

16  **A.**    Yeah, the whole stock market.

17  **Q.**    But it wasn't anything in particular about CEB's stock?

18  **A.**    Well, there was the Peace Stone acquisition.  I can't

19  remember the name of the company, but they had an acquisition

20  earlier that spring, if I'm not mistaken.

21  **Q.**    So, let's talk about the acquisitions point that you

22  made.  Do you recall that earlier in this case you provided

23  sworn written responses to some questions that the SEC sent you

24  as part of the litigation process?

25  **A.**    Yes.

1    **Q.**     Okay.  And those are called "interrogatory responses."

2    Are you aware of that?

3    **A.**     Yep.

4    **Q.**     Okay.  And when you provided those responses, you were

5    providing truthful and accurate responses, correct?

6    **A.**     Yes.

7    **Q.**     Okay.

8         MS. CHOE:  If I might, Your Honor, with the assistance of

9    the court security officer, hand Mr. Clark SEC Trial Exhibit 149,

10   which has been admitted.

11        THE WITNESS:  Thank you, sir.

12   BY MS. CHOE:

13   **Q.**     And do you recognize these as one of the sworn --

14        THE COURT:  Can you give him a chance to catch up.

15        MS. CHOE:  Oh.

16        THE WITNESS:  I'm there now.  Thank you.

17   BY MS. CHOE:

18   **Q.**     Do you recognize this as one of the set of sworn

19   responses you provided in this case?

20   **A.**     Yes.

21   **Q.**     And if I could ask you to turn to page 3.  It really

22   begins on the bottom of page 2.  You see at the bottom of page

23   2, you were asked to describe in detail the reason -- the

24   reasons you purchased CEB put options during the period July

25   21st, 2015, to August 1st, 2015.  Do you see that?

**A.**    Yes.

**Q.**    And then if you could review your response at the top of the next page, and let me know when you're done.

**A.**    I'm done.

**Q.**    Do you see anything in there about acquisitions being the reason for your trading in July 2015?

**A.**    If you would like, I can read the whole thing.  Would that work?

**Q.**    I'm just asking whether you see anything about acquisitions in that paragraph.

**A.**    Well, I mean, I think it would help for the whole paragraph to be read so, you know, everyone can see what I'm looking at.

**Q.**    Well, I'm asking you if you see anything about acquisitions being a reason for your trade in July 2015.

**A.**    I do not.

**Q.**    Now, you referred to an acquisition, I think you said, in the spring of 2015 being the reason why you made these July trades; do I have that right?

      MR. CUMMINGS:  He said "a" reason, if I recall correctly.

BY MS. CHOE:

**Q.**    Was it a reason?  I'm just trying to figure out if I have the timing right.  I didn't hear if you said spring or --

**A.**    I mean, it sounds like you're looking for one in particular thing.  There's multiple things that, you know, go

```
 1   in.  It could be the way I felt when I woke up that morning a
 2   little bit.  I mean, you know, you're looking for like a
 3   pinpoint thing, but, correct.  You know, a company purchasing
 4   other companies is a reason I believe that a company stock goes
 5   down.
 6   Q.    I mean, whatever it was, it was something that made you
 7   confident enough that you borrowed $15,000 and told your son
 8   also to trade in CEB put options, correct?
 9   A.    You know, we're back to the word "told" again, but --
10   Q.    Recommended.
11   A.    -- correct, we discussed, yes.  And I did, as I said
12   earlier, borrowed $15,000, and I did invest in CEB options.
13   Q.    The acquisition that is not referenced anywhere in your
14   sworn response but that you're referring to today, what
15   acquisition was that?
16   A.    I said earlier that I didn't -- I don't know the name of
17   the company.
18   Q.    Do you recall the timeframe?
19   A.    It was earlier that year.
20   Q.    Earlier in 2015?
21   A.    I believe so, yes.
22   Q.    And why would that information, having come out months
23   earlier, make you think that CEB's stock was going to drop
24   between when you started purchasing in late July and when they
25   were going to expire these options in the next couple of days?
```

1   A.    Well, it was my belief that when a company buys another

2   company, and they have to shell out millions and millions of

3   dollars to purchase that company, it impacts the bottom line on

4   the purchasing company.

5   Q.    So you thought that the information that had come out

6   some months earlier was going to have an impact during this time

7   period between July 28th and August 20th, I think you said; is

8   that right?

9   A.    Correct.

10  Q.    Do you recall that between when you started to buy these

11  options on July 27th and then when you continued on July 28th to

12  buy them, that at 8 a.m. on the morning of July 28th, you called

13  Mr. Wright again?

14  A.    I do not recall, but I've seen in the phone records.  Do

15  you have the -- how long that call was for?

16  Q.    You know, I don't.  If you'd like, we can look it up.

17  But you do know that you called him that morning, correct?

18  A.    I don't recall it, but I've seen it in the phone records,

19  yes.

20  Q.    But you don't remember why you were calling him?

21  A.    Correct.

22  Q.    Did it have anything to do with borrowing money, $15,000,

23  to invest in the company where he was working?

24  A.    As I said, I don't recall making the call.

25  Q.    Is that something you think you would have called him to

1   tell him?

2   **A.**     No, absolutely, no.

3   **Q.**     So, after the earnings announcement came out at the end

4   of the day, after the market closed on July 28th, do you recall

5   that CEB's stock price fell over 10 percent in a single day?

6   **A.**     Yes.

7   **Q.**     And do you recall that that drop in the stock price came

8   when CEB announced that its bookings -- its sales had not been

9   as strong as expected?

10   **A.**     I recall the stock going down, and I thought it was for

11   the guidance, but I'm going back on a few years memory here.

12   **Q.**     Okay.

13   **A.**     I thought they may have changed their guidance, but maybe

14   it was sales could have tied into the guidance.

15   **Q.**     Did you know that Mr. Wright was the head of bookings at

16   CEB?

17   **A.**     I did not.

18   **Q.**     And the profits that you ultimately made around this

19   earnings trade, it was over $82,000; is that correct?

20   **A.**     I believe that's what we said earlier, yes.

21   **Q.**     Do you recall being interviewed by the FBI in October

22   2017?

23   **A.**     I do.

24   **Q.**     And do you recall that they wanted to talk to you about

25   your trading in CEB before the announcement of the merger?

1    **A.**     That was part of the conversation.

2    **Q.**     And one of the questions they asked you was whether you

3    had discussed trading in CEB with anyone from your family; is

4    that correct?

5    **A.**     That is correct.

6    **Q.**     And when they asked you that, you said no, right?

7    **A.**     Well, at the time -- and I wish I handled it

8    differently -- and with the agent up here earlier, and bringing

9    it up.  When he, you know, tells you that they have you on

10   video -- or your son on videotape taking $50,000 of cash out

11   from a bank while you're talking to him on the phone, I probably

12   went more into defense mode and, I mean, I really wish I had

13   handled it differently at the time, but I did answer to him that

14   I did not discuss it with family.

15   **Q.**     I mean, if he's asking you if you've talked about your

16   trading in with CEB with anyone in your family, he's not talking

17   about a videotape or a withdrawal, correct?  He's just asking

18   you if you've talked about it with anyone in your family; is

19   that right?

20   **A.**     I think I answered the question that I answered to him,

21   no.  But it was under a different premise than, hey, did you

22   talk to anyone?  You know, it was saying that we have you on

23   videotape -- we have your son on videotape with you talking to

24   him on the phone at the teller and him taking out $50,000 cash,

25   making it sound like it's in a duffel bag going out.  And I had

1    no idea what that was talking about, so I immediately -- as a

2    parent, with a son -- said no.  And, like I said, I wish I

3    probably handled it differently, but that's at that time what

4    occurred.

5    Q.    Did you say to Agent Desor, "I have no idea what you're

6    talking about," or did you just go straight to saying, "No, I

7    didn't talk to anyone"?

8    A.    I was saying no and I was shutting down at that point.

9    He was asking a lot of questions, and as he said, I wasn't

10   giving responses to him on a lot of them, so at that point, I

11   was shutting down, like, I didn't want to talk with him anymore,

12   nor was I required to.

13   Q.    So at that point, after you were asked whether you had

14   talked to anyone in your family about trading in CEB, at that

15   point the agents asked you specifically about your son's

16   trading, correct?

17   A.    I don't remember the chronological order, but he had

18   asked about my son's trading.

19   Q.    At some point, he specifically asked you about

20   Mr. Nevins's trading in CEB?

21   A.    Correct.

22   Q.    And when he specifically asked about Mr. Nevins, you told

23   him that you had never discussed trading in CEB with your son,

24   correct?

25   A.    He asked the question once, and I had answered it once.

1    I don't know if he switched around the wording that many times.

2    **Q.**    And you told the FBI, when they asked about your son's

3    trading, that the reason why he might have made these nearly

4    identical trades was because maybe he logged into your account

5    without you knowing; is that right?

6    **A.**    That was probably said more sarcastically to him.  I was

7    like, I don't know, maybe he logged into my account?  You know,

8    like, I don't know.  So I was shutting the interview down at

9    that time.  I had -- I answered as many questions as they had

10   early on, and then after they brought up my son taking $50,000

11   out of a bank and implying that it was going elsewhere, that's

12   when I started shutting things down on the interview because it

13   became very threatening at that point.

14   **Q.**    Well, it wasn't true that your son somehow secretly

15   logged into your account, correct?

16   **A.**    It wasn't necessarily accurate that I said that in a

17   serious tone of voice.  When I said, oh, maybe he signed into my

18   account, you know, like, you know, how am I -- you know, I was

19   shutting things down.  I was ending it.

20   **Q.**    But you knew at that point when you said that --

21        THE COURT:  You're just arguing with him now.  Move on to

22   something else.

23        MS. CHOE:  I will, Your Honor.

24        THE COURT:  In fact, how much longer?  It's about time for

25   us to quit for the day.  How much longer do you plan to be?

1        MS. CHOE:  I do have some more, Your Honor.  I would say

2   I'm probably about halfway and can try to streamline over the

3   evening.

4        THE COURT:  All right.  Well, that would be good, good to

5   streamline.  We will adjourn now until 10:00 tomorrow morning.

6   And I'll tell all of you, I have a plea that I must take right at

7   10:00, so we'll probably start a few minutes after 10:00, maybe

8   15 minutes after or whatever.  But I've got to take care of that

9   matter before we start again here, but we'll start promptly.  All

10  right.

11       (Jury out at 5:00 p.m.)

12                   **C E R T I F I C A T E**

13

14            I, Scott L. Wallace, RDR-CRR, certify that
         the foregoing is a correct transcript from the record of
15       proceedings in the above-entitled matter.

16

         /s/ Scott L. Wallace                    12/8/21
17       ----------------------------        ----------------
         **Scott L. Wallace, RDR, CRR**            **Date**
18       **Official Court Reporter**

19

20

21

22

23

24

25