UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

UNITED STATES SECURITIES AND    :
EXCHANGE COMMISSION,            :
                               :  Civil Action
            **Plaintiff**,       :  No. 1:20-cv-01529-MSN-JFA
                               :
      **v.**                     :
                               :  December 9, 2021
**CHRISTOPHER CLARK**,           :  2:15 p.m.
                               :
            **et al.**,          :
                               :
                               :
            **Defendants**.      :
                               :
............................. :

**DAY 2 – AFTERNOON SESSION**
**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE CLAUDE M. HILTON,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiff:          **Olivia S. Choe, Trial Attorney**
                            Securities and Exchange Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-5100
                            Email: Choeo@sec.gov

                            **Daniel J. Maher, Trial Attorney**
                            Securities and Exchange Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-5100
                            Email: Maherd@sec.gov

                            **John Lucas, Trial Attorney**
                            Securities and Exchange Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-5798
                            Email: Lucasj@sec.gov

APPEARANCES:   (Cont.)

For the Plaintiff:          **Sarah Marie Hall, Trial Attorney**
                            US Securities & Exchange Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-4784
                            Fax: 202-661-5849
                            Email: Halls@sec.gov


For the Defendants:         **Mark Davis Cummings, Esq.**
                            Sher, Cummings & Ellis
                            3800 N. Fairfax Drive
                            Suite 7
                            Arlington, VA 22203-1703
                            703-525-1200
                            Email:
                            Mcummings@sherandcummings.com

                            **David Edward Sher, Esq.**
                            Sher Cummings & Ellis
                            3800 N. Fairfax Drive
                            Suite 7
                            Arlington, VA 22203-1703
                            703-525-1200
                            Email: Sher@sherandcummings.com

                            **Adam Michael Collins, Esq.**
                            Sher, Cummings and Ellis
                            Virginia
                            3800 N. Fairfax Drive
                            Suite 7
                            Arlington, VA 22203
                            571-212-9192
                            Email: Acollins@sherandcummings.com

Court Reporter:             **Scott L. Wallace, RDR, RMR, CRR**
                            Official Court Reporter
                            United States District Court
                            401 Courthouse Square
                            Alexandria, VA  2231-5798
                            Office: 703.549.4626
                            Cell: 202.277.3739
                            Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                        **Page**

CONTINUED CROSS-EXAMINATION OF CHRISTOPHER CLARK        4
BY MR. CUMMINGS
REDIRECT EXAMINATION OF CHRISTOPHER CLARK              28
BY MS. CHOE:

DIRECT EXAMINATION OF JAMES BARRON ANSCHUTZ           31
BY MS. CHOE:
CROSS-EXAMINATION OF JAMES BARRON ANSCHUTZ            57
BY MR. CUMMINGS
REDIRECT EXAMINATION OF JAMES BARRON ANSCHUTZ         69
BY MS. CHOE:

DIRECT EXAMINATION OF ANDREA FOX                      70
BY MR. MAHER:
CROSS-EXAMINATION OF MS. FOX                          81
BY MR. CUMMINGS:

## EXHIBITS

**DESCRIPTION**                                                        **Page**

1        <u>**AFTERNOON SESSION, DECEMBER 9, 2021**</u>

2    (2:15 p.m.)

3        <u>CONTINUED CROSS-EXAMINATION OF CHRISTOPHER CLARK</u>

4    BY MR. CUMMINGS:

5    **Q.**    Are you ready?

6    **A.**    Yes, sir.

7    **Q.**    I just want to clear one minor thing up, and then I want

8    to finish up with these texts.  Then I want to go to your

9    interrogatory, and then I think we might be done.

10        Do you remember we were talking about -- I don't know if

11    it's Ted Nugent or Jim Nugent.  Ted Nugent is some movie star.

12    But do you know who I'm talking about?

13    **A.**    Correct.

14    **Q.**    The veteran who was going to buy the condo, Bill Wright's

15    condo?

16    **A.**    Correct, his tenant.

17    **Q.**    And you were talking about a $2,000 savings, somebody's

18    getting a $2,000 credit?

19    **A.**    Credit, yes.

20    **Q.**    That was Mr. Nugent, not Mr. Wright, correct?

21    **A.**    Correct.  That would have been credited to him on the

22    closing costs from MVB Mortgage.

23    **Q.**    Okay.  And then going back to the document that's in

24    front of us, the text that you were asked on direct about on

25    page 17.  Do you have the text in front of you?

1   **A.**     I do.

2   **Q.**     Okay.  And there was an article in business, Biz Journals

3   about Advisory Board Company?

4   **A.**     Correct.

5   **Q.**     And why did you send that on Monday, February 6th, why

6   did you send that to Mr. Wright?

7   **A.**     I believe it was an e-mail with a link to this article

8   that I received either daily or a couple of times during the

9   day, and it -- I had gotten this over and pulled it up, and I

10  forwarded it to Bill as Advisory Board was the company that CEB

11  had spun off of.

12  **Q.**     Okay.  And you thought that might be of interest?

13  **A.**     I did.

14  **Q.**     Okay.  Well, incidentally, these texts we're doing -- did

15  somebody in my office help you get these ready and we gave them

16  to the SEC?

17  **A.**     Correct.

18  **Q.**     And who in my office helped you that?

19  **A.**     That was Grace Williams.

20  **Q.**     Okay.  And she's our young lawyer that was in my office

21  at the time?

22  **A.**     Correct.

23  **Q.**     Okay.  And the next page deals with, I think, Nugent.  Is

24  this about the contract on the house with the VA loan?

25  **A.**     On page 18?

1    **Q.**    Page 18, right.  I want to try to get through this.

2    **A.**    Correct.  He wound up putting together a contract for

3    purchase.

4    **Q.**    All right.  What -- then turn to page 19.

5    **A.**    Yes.

6    **Q.**    And 19, 20, what's going on there?

7    **A.**    From Friday, March 17th, there's a couple of pictures of

8    the backyard portion of my beach house and the decking around

9    the pool.  I was having some work done there, and Bill had gone

10   by -- I hadn't heard from the contractor in a while, and didn't

11   know really what was happening, going on, so he went by and took

12   a couple of pictures and sent them to me.

13   **Q.**    Because he was down there and you knew that?

14   **A.**    Correct.

15   **Q.**    And you had a problem with maintenance on the pool or the

16   deck, whatever it is?

17   **A.**    The pool was leaking and they were tearing the deck up to

18   try to get underneath the pool to see where the leak was coming

19   from.

20   **Q.**    So he sent you the pictures?  There's two there?

21   **A.**    Correct.

22   **Q.**    And just to note --

23   **A.**    Three.

24   **Q.**    Three.

25           From Tuesday, February 14th to Friday, March 17th, there

1    was no text communication?

2    **A.**    Pardon me.  Going back to the last question, there's

3    actually two.  I switched the page, but it was a duplicate

4    picture.

5    **Q.**    Okay.  And then what happens?  And then it looks like the

6    next one's in August?

7    **A.**    Correct.

8    **Q.**    And is that you on the beer pong?

9    **A.**    No, that's Bill.  I'm blue.

10   **Q.**    Okay.  And he says, "They're hanging in the pool; we even

11   have beer pong on a pool float."

12   **A.**    Correct.  I talked about this earlier.  This was one of

13   the occasions that we had talked about possibly trying to get

14   together while we were at the beach at the same time.

15   **Q.**    And did you?

16   **A.**    We did not.

17   **Q.**    All right.  What's the next item?

18   **A.**    The next page?

19   **Q.**    Yeah, 21.

20   **A.**    Um, it said, "Drinking a bit too much -- I assume to mean

21   drive -- so said he's hanging at home.  He said, "Got it.  What

22   about the next couple of days?  We should get together."  He

23   said, "Yeah, let us know.  The weather looks like crap but

24   trying to go to the beach when we can."  I said, "I will be

25   touch" -- I assume meaning I will be in touch -- "and go this

1    week with the" -- "and go this week with the weather."  I don't

2    know.  I didn't type exactly too well there.  "Currently awesome

3    out."  And then I followed up on the 9th, said, "Going to fish

4    heads, 10 cent shrimp, cold beer.  Come on down.  Kids playing

5    on the beach and acoustic guitar on the pier."  And that was it

6    but we never met up.

7    **Q.**    You never met up?

8    **A.**    No.

9    **Q.**    Okay.  And when's the next entry?

10   **A.**    September 3rd.

11   **Q.**    Okay.  What's he telling you there?

12   **A.**    He said, "What is DOJ neighbor name across the street?"

13   **Q.**    Did you respond to that?

14   **A.**    I had not responded to that.

15   **Q.**    And what does DOJ refer to?  Is that the Department of

16   Justice, or do you know?

17   **A.**    Well, at the time when I got it, I think we were at a

18   barbecue or something, and I thought he meant DJO, meaning

19   Denis J. O'Connell, my high school.

20   **Q.**    Oh.

21   **A.**    And --

22   **Q.**    DJO is short for Denis J. O'Connell High School?

23   **A.**    Yeah.  But he was referring to DOJ across the street from

24   my house.  My neighbor is an attorney at the Department of

25   Justice.

1    **Q.**    Okay.  It had nothing to do with this case?

2    **A.**    Absolutely nothing to do with this case.

3    **Q.**    Okay.  All right.  So then it looks like -- that was

4    September 3 and the next entry is October 21st?

5    **A.**    Um-hmm.

6    **Q.**    And he's asking about -- let's try to get through this

7    quick.  He's asking about Caitlin; that's his daughter?

8    **A.**    I'm asking.

9    **Q.**    Oh, you're asking.  Okay.

10   **A.**    So I said, "Hey, Kate" -- I said, "Hey, what time is

11   Caitlin's game?  Kate wants to know" -- Kate is my daughter --

12   "if she can have lunch and nails for a late birthday outing."

13   So it was just past my daughter's birthday and she wanted her

14   cousin Caitlin and a couple of other friends were going to go

15   for lunch and get their nails done.

16   **Q.**    All right.  So, is it customary when your daughter or his

17   daughter has a birthday that the kids try to get the kids

18   together for a little party?

19   **A.**    Yes.

20   **Q.**    Okay.  How often did that happen and did they get

21   together?

22   **A.**    Just for the birthday, and it was always -- any time it

23   was Caitlin's birthday, only Kate was invited, not Molly.  And

24   if it was Hailey's birthday, it was only Molly invited and not

25   Kate; so they wouldn't invite both cousins.

1   Q.     Okay.  Is that an issue?

2   A.     Not an issue, just kind of strange.

3   Q.     All right.  What's this on the bottom of 23?  Can you

4   describe what that is?

5   A.     On Tuesday, October 24th, there's two --

6   Q.     This is October 24th, 2017.

7   A.     Correct.

8   Q.     Okay.

9   A.     There's one entry that says "DY" with a question mark.

10  And then I resent it with "DT," question mark.  And DT was for a

11  District Taco.  And he responded, "gym," meaning that he could

12  go, he was at the gym.

13  Q.     Okay.  And then we skipped to -- am I going backwards

14  here?  It looks like page 24 we're going backwards to October

15  23rd, Monday.

16  A.     The back page is a conversation.  That was a three-way

17  conversation between myself, Bill, and Leslie.  The previous one

18  was just Bill and I.

19  Q.     Okay.  And this has to do with Wreck basketball.

20  A.     I just asked him -- yeah, about their daughter, if she

21  was going to play basketball again this fall.

22  Q.     Did she have an injury?  Is that what that refers to?

23  A.     Yeah.  He said -- first, I reached out to both Bill and

24  Leslie on a text message.  I said, "Hey, Bill and Leslie, CYO

25  basketball is starting up.  Are you guys in this year?"  Leslie

```
1   responded, "Hey, I signed her up for Wreck last week, not
2   knowing if she would even play because of her collarbone.  Not
3   sure if we want to do both because there's indoor soccer, too."
4   And then I followed up to that message saying, "If you decide to
5   do two games/teams, would love to have her play."
6   Q.    Okay.  Is that the end?
7   A.    That is the end.
8   Q.    All right.  That's the whole ball of wax.
9         Now, do you recall when Ms. Choe asked you or mentioned
10  that you conveniently lost your phone in late 2017.  Do you
11  remember that?
12  A.    Yes.
13  Q.    Okay.
14        MR. CUMMINGS:  Where is that document?  Okay.
15  BY MR. CUMMINGS:
16  Q.    I'm going to hand you what's been marked --
17        MR. CUMMINGS:  Is this our Exhibit 46?  Is there a copy?
18  Go ahead.  I can do it without a copy.
19        THE WITNESS:  Thank you.
20        MS. CHOE:  For the record, what document is this?
21        THE WITNESS:  Exhibit 46.
22  BY MR. CUMMINGS:
23  Q.    Identify it by date and what it is.
24  A.    Um, this is an e-mail chain that I had sent to the
25  president of our company.  This one was December 27th, 2016.
```

1    **Q.**    Okay.

2    **A.**    And I said, "Hey, Pete.  I hope you're enjoying the

3    holiday season."  Sorry, December 27th, 2016.  "Hey, Pete.  I

4    hope you're enjoying the holiday season.  I'm in need of a new

5    phone and eligible for an upgrade exceeding" -- "according to

6    Craig.  I was at the Apple store this morning trying to get mine

7    fixed without any success.  Can you please approve?"

8    **Q.**    Okay.  Tell us about that.  What do you mean your phone

9    needs to get fixed, and you're eligible for an upgrade.

10   **A.**    So my phone wasn't reading my finger going over it, and

11   so -- an Apple phone, essentially, you're not able to navigate

12   anywhere with it.  I went to the Apple store to see if it was

13   some kind of bug that was in it, and they just said that it was

14   unfixable.  So, I had e-mailed the president of our company to

15   approve getting a new phone.

16   **Q.**    All right.  So this was inconvenient for you?

17   **A.**    Yes.  This was before -- this was December 2016.

18   **Q.**    Got that.  There were no subpoena, there was no request,

19   there was no SEC, there was no FBI.

20   **A.**    At that point, correct.

21   **Q.**    Okay.

22   **A.**    And Craig ordered me a new phone.  I went to the office,

23   turned in my old phone to him, and got the new phone.

24   **Q.**    All right.  And they own it.  You don't own it.

25   **A.**    Correct.

1   **Q.**    All right.  Did they download what was on your old phone

2   onto the new phone, or...

3   **A.**    No.  He gave me the new one and he had all of the --

4   apparently, somehow, our contacts are all backed up.  He put all

5   the new contacts on my new phone and that was it.  It just went

6   on about -- I didn't have any of the photos or anything from

7   that.

8   **Q.**    You lost your photos?

9   **A.**    Um-hmm.

10  **Q.**    Did you lose your texts?

11  **A.**    Yes.

12  **Q.**    Okay.  So you have a new phone -- starting out a new

13  year, you got a new phone, company pays for it, you're a happy

14  guy, and how many phones do you have then?

15  **A.**    I only have one phone.

16  **Q.**    Okay.  So, got your new phone upgrade.  That's the 29th,

17  and then we go -- we're into 2017, 2017, January, February,

18  March, April, May, June, July, August, October.

19  **A.**    Yes.

20  **Q.**    And I think it was mid to late October, I don't remember

21  the date, it's not important, you were stalked and stopped by

22  two FBI agents in a parking lot, correct?

23  **A.**    Yes.

24  **Q.**    And you described what happened.

25  **A.**    I just finished up an appointment with a client at a

1    local coffee shop in Arlington, and I was going to get into my

2    car, and a gentleman walked into the front of the car as I was

3    getting ready to sit down, and he said, "Chris Clark," and I

4    said, "Yes."  And I was trying to figure out where I knew him

5    from or if I knew him.  I thought maybe it was a Realtor or

6    something.  And he's like -- I forget the gentleman's name.  It

7    wasn't the agent that was here.

8    **Q.**    McGillicuddy [sic]?

9    **A.**    And he said --

10   **Q.**    McGillicuddy?

11   **A.**    You can say it.  I don't remember the agent's name.  He

12   mentioned it yesterday, the agent that was here.  And he's like,

13   "Do you have a second?"  And I said, "Yeah."  And so I walked

14   out in front of the car and they're like, "Let's go sit down at

15   this table over here."

16   **Q.**    Okay.

17   **A.**    And we sat down.

18   **Q.**    And I think we've been over this; is there anything new

19   to add?

20   **A.**    No.

21   **Q.**    Okay.  And just so we're clear, they showed you their

22   FBI, silly little FBI badge?

23   **A.**    When we sat down.

24   **Q.**    Okay.  They're still tiny, do you remember?

25   **A.**    I don't remember.

1    **Q.**    Okay.

2    **A.**    They showed me credentials.

3    **Q.**    Okay.  And they didn't say "You could get a lawyer;" they

4    didn't say, "You were under investigation;" they didn't say "You

5    didn't have to talk to them"?

6    **A.**    Correct.

7    **Q.**    Okay.  And you did, you've already testified about that.

8    I don't think we need to rehash that.

9    **A.**    Correct.

10   **Q.**    Okay.  So, during that interview, did you have your cell

11   phone with you?

12   **A.**    Yes.

13   **Q.**    Okay.  Tell us, anything dealing with that cell phone

14   with those two guys?

15   **A.**    As we were talking through the night, you know -- or

16   through the conversation, they were asking me when was the last

17   time I had talked to Bill or had any correspondence or

18   conversation with him.  And I think it was that morning, and I

19   showed him the text that was on that phone.  I said, "Yeah, we

20   were just texting this morning."

21   **Q.**    And you showed him the phone?

22   **A.**    Yes.

23   **Q.**    And you showed him the text?

24   **A.**    Yes.

25   **Q.**    I don't think he remembered it when you testified but

1    you've got a pretty good recollection; you showed him the phone?

2    **A.**    Yes.

3    **Q.**    Okay.  Did they ask you, "Hey, hang on to that phone"?

4    **A.**    No.

5    **Q.**    Or "Can we have the phone?"

6    **A.**    No.

7    **Q.**    "Can we download the phone?"

8    **A.**    No.

9    **Q.**    If they had asked to download the phone, do you know if

10   you would have given it to them or not?

11   **A.**    I probably -- I may have had the same response, that you

12   would have to go talk to my employer; it's their phone.

13   **Q.**    It wasn't your phone?

14   **A.**    It's got -- it's my employer's phone, and it has people's

15   confidential information and financial information on it of

16   others.

17   **Q.**    And you're charged with protecting your clients' --

18   people who applied for a mortgage, their confidential

19   information is important?

20   **A.**    Correct.

21   **Q.**    Okay.  So, that was your phone, so that was in October,

22   and then when you -- so, there wasn't anything -- there wasn't

23   anything -- listen to my question.

24        There wasn't anything on that particular phone that you

25   possessed when you interviewed with those FBI agents in October

1    2017, relating to texts you may have had in December or November

2    or before -- since your trades in December and early January?

3    **A.**      That's correct.

4    **Q.**      Okay.  So, what happens next with that phone?  Your

5    company phone, the one you showed the FBI agent in October.

6    **A.**      Um-hmm.

7    **Q.**      What was the next thing that happened?

8    **A.**      Well, a week or two later, we received a subpoena.

9    **Q.**      Right.

10   **A.**      From the FBI.

11   **Q.**      Okay.

12   **A.**      And that's when I couldn't turn the phone over and we

13   explained to him it was a company phone but they were interested

14   in all the communications, so that's when Grace and I went --

15   **Q.**      Grace, Grace Williams?

16   **A.**      -- Grace Williams --

17   **Q.**      -- a lawyer in my office --

18   **A.**      -- yeah, an attorney in your office -- went through the

19   phone and took all of the messages that were off that phone

20   pertaining to myself and Bill and myself and Andrew and did

21   screenshots on every single text message from -- I guess from

22   when I got that phone until that day that we did that.

23   **Q.**      Okay.  So you worked with an attorney responding to the

24   subpoena, and you -- she screenshotted all your texts with your

25   son or Bill Wright that were on there?

1    **A.**    Yep.

2    **Q.**    And as far as you know, Grace Williams gave them to

3    the -- I guess to the Department of Justice at that time?

4    **A.**    Correct.

5    **Q.**    Okay.  Because it was a criminal investigation?

6    **A.**    Correct.

7    **Q.**    Okay.  And so you turned them over and then it was up to

8    your -- they then subpoenaed, I think, your company to get that

9    phone?

10   **A.**    Correct.

11   **Q.**    But there wouldn't be anything on that phone related to

12   your trades in December 2016?

13   **A.**    Correct.  Because it was out -- I got that phone after

14   those trades.

15   **Q.**    All right.  So, this sinister suggestion that you

16   conveniently lost the phone wouldn't make a hill of beans, would

17   it, to this investigation?

18         MS. CHOE:  Objection, argumentative.

19         THE COURT:  Objection sustained.

20   BY MR. CUMMINGS:

21   **Q.**    There wouldn't be anything on the phone that would help

22   the SEC?

23   **A.**    On that phone, there is absolutely -- everything they

24   asked for is right here -- contained right here with these text

25   s messages.

1    **Q.**    Okay.  So how did you lose that phone?

2    **A.**    It was December 31st.

3    **Q.**    2017?

4    **A.**    2017, New Year's Eve, during the day.  I had taken my --

5    two or three of my kids and a couple of their friends, there's

6    probably six kids total, to a movie at Tysons Corner, and it was

7    an extremely cold day.  And when -- after the movie, they did a

8    little bit of shopping, and then we had -- we were heading out

9    to the car in the parking garage, and I had my coat and gloves

10   on, and when we got to the car, I sat my phone down on the

11   bumper to take my gloves off so I can get the keys out of my

12   pocket, opened the backdoor and the side doors, all the kids

13   in --

14   **Q.**    Was the car -- what is it?

15   **A.**    Yeah.  It's a Toyota Sequoia.  It's my wife's car.  And

16   we got in the car and went to drive home, made it all the way to

17   Arlington down Dulles toll road and 66, and I went to, you know,

18   get my phone or see if, you know, I had a text message or

19   anything.  It wasn't anywhere in the car, so I pulled over to

20   the side, the car, and -- the side of the street, and then I

21   realized that I had placed it on the bumper.

22   **Q.**    Did you go back and look?

23   **A.**    A couple of times.  I went back with all the kids back to

24   the parking garage, retraced the way we went, had them with

25   the --

1    **Q.**    I mean that night, right then at that time with all those

2    kids in the car?

3    **A.**    Yeah.  I immediately turned around and hopped back on the

4    66 and back to the -- until Tysons Corner.

5    **Q.**    The phone had confidential information on it, didn't it?

6    **A.**    Correct.

7    **Q.**    Okay.  So you went back and what happened when you got

8    back?

9    **A.**    We retraced everything that we did.  I asked the parking

10   attendant if anyone had turned in a phone.  I drove back slowly

11   on the highway, even partially on the shoulder when we could.

12   With the windows down looking.  We couldn't find anything.  We

13   tried, Find My iPhone off my wife's phone, but the battery was

14   so low at the time because of the -- during the movie, we went

15   to a kids' move, and I was following the Redskins game, and so I

16   was virtually, like at 5 percent, under 10, probably, and, you

17   know, it just didn't work for a Find My iPhone, or it fell off,

18   it was destroyed and not responding.

19         And then the next morning, my wife and I did it all over

20   again -- well, actually, we went back to Tysons, checked with

21   security to see if anyone had turned it in.  Left my name and

22   phone number there.  And then my wife and I did a slower search,

23   like even got out of the car on the shoulder on Dulles toll road

24   in a couple of places to look and see if it went into the grass

25   if it fell off the bumper and we couldn't find it.

1   **Q.**    Did you ever hear back from Tysons' security?

2   **A.**    No.  But I called two or three times afterwards.

3   **Q.**    I may have missed this.  You went back the next day, too.

4   **A.**    That was when I checked with the security the next day.

5   New Year's Day.

6   **Q.**    All right.  Ms. Choe indicated -- there were a few

7   questions she asked you about.  You were asked about phone calls

8   that you -- and I'm not clear whether you called Mr. Wright or

9   he called you.  I think you called him at 1:30 in the morning.

10      Do you remember that?

11  **A.**    Yes, in a deposition earlier.

12  **Q.**    And in the deposition, she said, "What are you doing

13  calling Mr. Wright in the middle of the night?"

14      Do you remember that?

15  **A.**    Yes.

16  **Q.**    Okay.  And your response was?

17  **A.**    That I would have been in bed sleeping.

18  **Q.**    Yeah.  Okay, so --

19  **A.**    I wouldn't have been on the phone.

20  **Q.**    So at the time in your mind, if there was a 1:30 phone

21  call on a phone record, it was either -- didn't happen, a

22  mistake, or something wrong?

23  **A.**    Correct.

24  **Q.**    Because you never talked to him in the middle of the

25  night?

1    **A.**    Correct.

2    **Q.**    Okay.  And it turns out that whoever put those phone

3    records together at the Securities and Exchange Commission,

4    didn't understand what Greenwich Mean Time meant, correct?

5    **A.**    That was my understanding, correct.

6    **Q.**    Okay.  And Greenwich Mean Time is what the time is in

7    Greenwich, England?

8    **A.**    Correct.

9    **Q.**    So the phone record gave a time, 1:30 a.m., GMT, right?

10   **A.**    Correct.

11   **Q.**    That's why she was asking about a 1:30 phone call?

12   **A.**    Correct.

13   **Q.**    But the phone call -- there was a phone call, but it was

14   five or six hours earlier.  I don't know if we were Eastern

15   Standard or Daylight Savings?

16   **A.**    Correct.  And neither do I.  I don't know.

17   **Q.**    And so if you have made a call, because of the mistake

18   the SEC made about Greenwich Mean Time, the call probably was

19   around 6:00 or 7:00 and a decent time to call somebody?

20   **A.**    Correct.

21   **Q.**    Okay.  Now --

22        MR. CUMMINGS:  Almost done, Judge.

23   BY MR. CUMMINGS:

24   **Q.**    You were asked about the Securities and Exchange

25   Commission Trial Exhibit 149.

1          Do you have that?

2    **A.**    One second.  Yes.

3    **Q.**    Okay.  Now, first of all, this is sworn -- you swore to

4    this, correct?

5    **A.**    Yes.

6    **Q.**    All right.  You were asked about your response to

7    question 2.

8    **A.**    Yes.

9    **Q.**    Correct?  And you wanted to read it.  Could you read your

10   response -- read the question and read your response to question

11   2.

12   **A.**    "Question 2:  Describe in detail reasons you purchased

13   CEB call options during the period, December 9th, 2016 to

14   December" -- or pardon me -- "January 5th, 2017.  As part of

15   your answer, explain why you purchased options with certain call

16   dates and strike prices.

17          "My response:  Based on my best recollection, a

18   combination of factors led to my purchase of CEB call options

19   between December 9th, 2016, and January 5th, 2017.  First, I had

20   been interested in CEB stock for many years prior to the dates

21   referenced during which time I followed the market analyst

22   coverage for CEB and from time to time traded CEB futures,

23   usually ahead of quarter earning announcements.  In late 2016,

24   CEB chairman Chief Executive Officer Tom Monahan announced he

25   was resigning without naming a successor and CEB was getting

1    increasingly favorable coverage."

2    **Q.**    You missed a word.

3    **A.**    "Favorable analyst coverage."  Pardon me.

4         "Additionally, the 2016 presidential election brought

5    pro-corporation -- Trump administration -- resulting in large

6    swing in the stock markets --"

7    **Q.**    Upswing.

8    **A.**    Pardon me.

9         "And a large upswing in the stock market with the DJIA."

10   **Q.**    What's DJIA?  What's that?

11   **A.**    Dow Jones --

12   **Q.**    -- Industrial Average?

13   **A.**    Yes.

14        "Rising approximately 2,000 points in a 30-day span after

15   the election with CEB stock price gaining more than 20 percent

16   in a single month, November 2016.

17        Further, I learned the rights were seriously

18   contemplating a move to Charleston, South Carolina.  The

19   combination of these factors gave me confidence in CEB's

20   significant near-term upside which guided me to CEB investment

21   decisions.

22        CEB call options are only offered in single expiration

23   dates -- with single expiration date in each month as opposed to

24   others, which have weekly expiration dates.  With one exception,

25   the CEB options I purchased during the period referenced had

1    expirations of February 17th and March 17th, 2007 -- '17."

2    Q.    '17?

3    A.    "Which I believed at the time would have been CEB's 2016

4    year-end earnings announcement in early -- in early February

5    2017.  The first CEB purchase order I made during the referenced

6    period with expiration date of January 20, 2017, was made in

7    error as I intended to select a later date in either February or

8    March.

9          "I felt it was likely CEB's stock price would continue

10   upward trajectory in early 2017."

11   Q.    Now, let's talk about this "Wright seriously

12   contemplating a move to Charleston."  He contacted you in early

13   December about a mortgage question, correct?

14   A.    Correct.

15   Q.    What did he share with you?

16   A.    He told me that -- he asked me what the -- his ability of

17   being able to buy a home in Charleston, South Carolina while

18   still having his house here, because he told me he and Leslie

19   were contemplating moving there and he was interviewing for a

20   job.

21   Q.    Did he tell you there was a merger in the offing?

22   A.    He did not.

23   Q.    Did you ask him?

24   A.    I did not.

25   Q.    Okay.  But that occurred to you as a possibility?

1   **A.**     As a factor.

2   **Q.**     Okay.  You since found out it had nothing to do with the

3   merger, did it?

4   **A.**     It did not.

5   **Q.**     And he didn't even know about the merger then?

6   **A.**     That's my understanding, correct.

7          MS. CHOE:  Objection to counsel testifying; move to

8   strike.

9          THE COURT:  Well, it was a leading question.

10         MR. CUMMINGS:  Thank you.

11         THE COURT:  Okay.  Objection's stained.

12         MR. CUMMINGS:  Well, all right.  So.

13         THE COURT:  Don't ask it again.  Go do something else.

14         MR. CUMMINGS:  I've got something else to go to.  Thank

15  you.

16  BY MR. CUMMINGS:

17  **Q.**     You were then asked about the next question, too, which

18  describe the detailed reasons or purpose CEB put options during

19  the period of July 21, 2015 and August 1st, 2015.  And there was

20  questions about, "Well, why didn't you put the fact that there

21  were acquisitions in response to number 2?"

22         Do you remember those questions?

23  **A.**     Yes.

24  **Q.**     And why didn't you put it in here?

25  **A.**     Well, the downward pressure in the market can be caused

1    by acquisitions, so in my mind, it was kind of included

2    underneath that.

3    **Q.**    Now, there's downward pressure on a stock, there can be

4    multiple reasons, one reason, several reasons, correct?

5    **A.**    Correct, many reasons.

6    **Q.**    And acquiring a company can contribute to downward

7    pressure because the company has to borrow or use its cash to

8    buy the other company, correct?

9    **A.**    Correct.

10        MS. CHOE:  Objection, leading.

11        THE COURT:  Objection --

12        MR. CUMMINGS:  I can ask leading questions.

13        THE COURT:  He's cross-examining.

14        MR. CUMMINGS:  Pardon?

15        THE COURT:  Go ahead.  Go ahead with your question.

16    Objection is overruled.

17        MR. CUMMINGS:  Thank you.

18        THE COURT:  But let's move along.  We've been on this

19    witness forever.  Let's finish up here real quick.

20    BY MR. CUMMINGS:

21    **Q.**    So that explains why there's downward pressure?

22    **A.**    Yes.

23        MR. CUMMINGS:  Thank you.

24        THE COURT:  Do you have anything further?

25        MS. CHOE:  I have a few questions, Your Honor.

1          THE COURT:  Make it about five minutes.

2          MS. CHOE:  Five minutes.

3          THE COURT:  This witness has been far too long for both of

4    you.  Let's move it.

5               REDIRECT EXAMINATION OF CHRISTOPHER CLARK

6    BY MS. CHOE:

7    **Q.**    Mr. Clark, you talked earlier in response to your

8    attorney's questions about the $9400 car loan --

9    **A.**    Yes.

10   **Q.**    -- that you took out in December.

11         Do you recall that?

12   **A.**    Yes.

13   **Q.**    And you testified about the fact that you were receiving

14   a car allowance from work that would allow you to make the loan

15   payments, correct?

16   **A.**    Yes.

17   **Q.**    So you took out the loan and you used the money to buy

18   CEB options, correct?

19   **A.**    Partially, most of it, yes.

20   **Q.**    Almost all of it?

21   **A.**    I want to say it was 8,000, maybe.  I think you may know

22   the number.

23   **Q.**    And your plan was to -- your employer, who gives you the

24   car allowance, gives you the car allowance so you can use your

25   car for your job, correct?

1    A.      They just have a company-wide policy that everyone gets a

2    car allowance.

3    Q.      But they're not giving you the car allowance so you can

4    take out a loan and use the money to buy options, correct?

5    A.      They give us the money to do whatever we want with it.

6    Q.      Is it a general allowance or a car allowance?

7    A.      It's on our pay stubs as car allowance and we are allowed

8    to do anything that we want with it.  They just don't want

9    separate car allowances for everyone so they just do a flat

10   allowance for everyone to have that amount.

11   Q.      And did you tell --

12   A.      Everyone in the company.

13   Q.      And did you tell your employer you were using your car

14   allowance to buy these options?

15   A.      No, I wasn't obligated to tell them that.  Once again,

16   you can have that -- those funds to do whatever you want with.

17   They don't ask where it goes to, nor do I think they care.

18   Q.      And you testified that you didn't tell Agent Desor the

19   truth because he asked you about seeing your son on videotape,

20   correct?

21   A.      I said I went into a defensive mode after he had brought

22   that up.

23   Q.      You heard Agent Desor testify yesterday that he didn't

24   recall asking you any questions referencing having your son on

25   video.

1          Did you hear that testimony?

2    **A.**    Um, I heard him testify that he mentioned about the

3    $48,000.

4    **Q.**    Yes.  He testified, do you recall, that he asked you a

5    question about a withdrawal your son had made, correct?

6    **A.**    Yes.  That and I think also he said he didn't remember

7    anything about -- talking about video.

8    **Q.**    Correct.  He was asked about it several times by your

9    counsel, right?

10   **A.**    Correct.

11   **Q.**    And he said he didn't remember asking you any of those

12   questions.  And he also testified multiple times that he didn't

13   refer to the withdrawal until the end of the interview, correct?

14   **A.**    I'm sorry, repeat that again.

15   **Q.**    He didn't refer to your son's withdrawal of almost

16   $50,000 until the end of the interview, correct?

17   **A.**    He thought he didn't think it came up until the end of

18   the interview, but then, again, it wasn't even in his notes so

19   I'm not sure I agree with it that it was at the end.  It was

20   much earlier in the interview.

21   **Q.**    So are you saying that Agent Desor did not testify

22   truthfully yesterday?

23   **A.**    I'm not saying that.  He said he thought from what he

24   remembered, and I remember that it was earlier than that.

25   **Q.**    And that $50,000, that's about how much that your son

```
 1    made trading on CEB in December 2016, correct?
 2    A.      Approximately.
 3            MS. CHOE:  No further questions, Your Honor.
 4            THE COURT:  All right.  Thank you.  You may step down.
 5    Who's next?
 6            MS. CHOE:  The SEC calls Barron Anschutz.
 7            THE WITNESS:  Does this get left up here, or do I move it?
 8            MS. CHOE:  You can give it to the court security officer.
 9         (JAMES BARRON ANSCHUTZ, PLAINTIFF'S WITNESS, SWORN)
10              DIRECT EXAMINATION OF JAMES BARRON ANSCHUTZ
11    BY MS. CHOE:
12    Q.      Good afternoon, Mr. Anschutz.
13    A.      Good afternoon.
14    Q.      Could you please tell the jury your full name?
15            MR. CUMMINGS:  Could we ask the witness to take his mask
16    off?
17            THE COURT:  Yes.  You may take your mask off.
18            THE WITNESS:  James Barron Anschutz.
19    BY MS. CHOE:
20    Q.      And, Mr. Anschutz, where do you live?
21    A.      In Rockville, Maryland.
22    Q.      Where do you work?
23    A.      At Tenable Holdings?
24            MR. CUMMINGS:  Excuse me.  Can the jury hear?
25            THE JURY PANEL:  No.
```

```
 1          MR. CUMMINGS:  Could you keep your voice up?

 2          THE WITNESS:  Yes.  I didn't know if this was a microphone

 3  or not.

 4          MR. CUMMINGS:  If it is, it's not -- could you get it a

 5  little closer to you?

 6          THE COURT:  Just speak up a little bit.

 7          THE WITNESS:  Okay.

 8  BY MS. CHOE:

 9  Q.    Mr. Anschutz, how long have you been at Tenable?

10  A.    Almost four years.

11  Q.    Where did you work before that?

12  A.    Corporate Executive Board.

13  Q.    Also known as CEB?

14  A.    Correct.

15  Q.    And how long did you work at CEB?

16  A.    From roughly 2006 to 2017, somewhere in that time frame,

17  about 11 years.

18  Q.    In 2016 and 2017, what was your position at CEB?

19  A.    Please repeat that.  What time frame?

20  Q.    2016 and 2017?

21  A.    I was the chief accounting officer.

22  Q.    Were you second in line to the chief financial officer?

23  Was he who you reported to?

24  A.    Yes.

25  Q.    So fair to say you were one of the more senior people in
```

1    the finance department?

2    **A.**    Yes.

3    **Q.**    Mr. Anschutz, do you know someone named William Wright?

4    **A.**    Yes.

5    **Q.**    Can you tell the jury how you know him?

6    **A.**    He's a former colleague that I worked with.  Not only at

7    CEB but prior to that at Ernst & Young.

8    **Q.**    How long have you known him?

9    **A.**    Roughly or approximately 20 years.

10   **Q.**    And how long did you work with him when you were both at

11   CEB?

12   **A.**    Pretty much the entire time.

13   **Q.**    Did Mr. Wright play any role in you coming to work at

14   CEB?

15   **A.**    Yes.

16   **Q.**    What was that?

17   **A.**    He alerted -- he alerted me of the opportunity that they

18   were looking for a comptroller and provided, you know --

19   provided me with the opportunity to interview with the team

20   there.

21   **Q.**    So, is it fair to say he helped you?

22   **A.**    He made the connection to interview with the former --

23   the other comptroller and the CFO that was there, yes.

24   **Q.**    In 2016 and 2017, what was Mr. Wright's position at CEB?

25   **A.**    I don't remember his exact title, but comptroller I

1    think.

2    **Q.**    Does corporate comptroller sound right?

3    **A.**    Probably, yes.

4    **Q.**    And did he report to you?

5    **A.**    Yes.

6    **Q.**    Where were your offices at CEB at that time?

7    **A.**    They were next to each other.

8    **Q.**    And what floor were you on?

9    **A.**    Um, the 22nd floor.

10   **Q.**    Were -- what other members of the executive team sat on

11   that floor, the 22nd floor?

12   **A.**    The CEO, the CFO, our in-house counsel, our CHRO.

13   **Q.**    When Mr. Wright got married in 2006, were you in the

14   wedding?

15   **A.**    Yes.

16   **Q.**    Were you one of the groomsmen?

17   **A.**    Yes.

18   **Q.**    And is it fair to say that in addition to working

19   together, you and Mr. Wright have been friends for many years?

20   **A.**    Yes.

21   **Q.**    Did you and Mr. Wright own a house together?

22   **A.**    Yes.

23   **Q.**    Where was that?

24   **A.**    In Kitty Hawk, North Carolina.

25   **Q.**    North Carolina?

```
 1    A.     Correct.

 2    Q.     And you owned that house in the 2016 time period?

 3    A.     Yes.

 4    Q.     When you and Mr. Wright purchased that house together,

 5    did you get a mortgage together?

 6    A.     Yes.

 7    Q.     And in 2016 and 2017, how often did you and Mr. Wright

 8    see each other at work in person on a daily basis?

 9    A.     Yes.

10    Q.     Did you eat lunch together?

11    A.     Yes.

12    Q.     How often?

13    A.     Most days.

14    Q.     And in addition to you seeing each other at work, would

15    you and Mr. Wright also, you know, have phone calls, speak on

16    the phone, text one another?

17    A.     Yes.

18    Q.     Was it fair to say that that was frequent communication

19    between the two of you?

20    A.     Yes.

21    Q.     Did you and he ever talk on the phone late at night?

22    A.     Yes.

23    Q.     Not uncommon?

24    A.     No, not uncommon, correct.

25    Q.     And did you and he often have long phone conversations
```

1    with each other?

2    **A.**    Yes.

3    **Q.**    Is it fair to say that in that time period, 2016 and

4    2017, you and he likely talked and texted more with each other

5    than, for example, than you did with your own wife?

6    **A.**    Yes.  I don't text with my wife that often.

7    **Q.**    Was he one of your closest friends in that time period?

8    **A.**    He's a good friend, yes.

9    **Q.**    And in these phone conversations and texts and in the

10   office, what kinds of things did you and Mr. Wright talk about?

11   **A.**    We would talk about sports, golf, just typical things

12   that friends would talk about.

13   **Q.**    Did you talk about, you know, work issues?

14   **A.**    Sometimes, yes.

15   **Q.**    Because you worked together?

16   **A.**    Yes.

17   **Q.**    Family issues?

18   **A.**    Yes.

19   **Q.**    A range of things; is it fair to say?

20   **A.**    Correct.

21   **Q.**    At some point in late 2016, did you become aware that CEB

22   and Gartner were discussing a potential merger?

23   **A.**    I believe I became aware sometime in the middle part of

24   November of '16.

25   **Q.**    Did you say November?

1    **A.**    Yes.

2    **Q.**    And how did you recall it was in November?

3    **A.**    I remember it being close to the holidays for

4    Thanksgiving, which is an important time of year for my family

5    and I.  We, typically, go down to my sister's house and -- I

6    just remember wondering what kind of implications that might

7    have on the ability to go down there and spend the holidays with

8    them.

9    **Q.**    You were wondering if it would ruin your Thanksgiving,

10   correct?

11   **A.**    Yes.

12   **Q.**    Mr. Anschutz, could I ask you again to try to keep your

13   voice up?

14   **A.**    I'm sorry.  I just had a little coffee.

15   **Q.**    Are you aware that in early 2017, after the merger was

16   announced, CEB created a list of when certain people at the

17   company were made aware of the merger?

18   **A.**    I'm sorry.  Could you repeat that, please?

19   **Q.**    Are you aware that in early 2017, CEB made a list for

20   FINRA, of when certain people at the company became aware of the

21   potential merger?

22   **A.**    Yes.

23   **Q.**    And you know what FINRA is?

24   **A.**    Yes.

25   **Q.**    It's sort of a self-regulatory organization for financial

1    institutions.

2    **A.**     Yes.

3    **Q.**     Are you aware that FINRA investigates insider trading?

4    **A.**     Yes.

5    **Q.**     And are you aware that CEB listed the date that you

6    became aware of the merger as November 1st, 2016?

7    **A.**     Yes.

8    **Q.**     When you learned about the merger, what was your

9    reaction -- or the potential merger, what was your reaction?

10   **A.**     I just wasn't sure what that meant.  Again, learning

11   about it close to the holidays, I was worried about what that

12   meant for Thanksgiving.  You know, I wasn't sure what my role in

13   the transaction would be, and I wasn't sure what would transpire

14   afterwards as we integrated the companies.

15   **Q.**     When you say you weren't sure "what would transpire

16   afterwards when the companies integrated," what did you mean?

17   **A.**     I didn't know -- like, when we had done acquisitions

18   before, sometimes we kept the accounting staff on in the

19   instance of an HSR acquisition that we did.

20          I'm sorry, I'm going to need some water or I'm going to

21   start coughing.

22   **Q.**     Of course, yes.

23   **A.**     I'm sorry.  Can you repeat that, please?

24   **Q.**     I think you were just telling us you weren't certain what

25   would happen after the merger because in previous acquisitions

```
 1    sometimes accounting staff had been integrated and then you were

 2    going to say...

 3    A.     Yes.  Sometimes we had integrated companies, sometimes we

 4    hadn't so, you know, just trying to understand what the

 5    transition plan would be and how that --

 6    Q.     When you -- I apologize.

 7    A.     Sorry, I don't know.

 8    Q.     When you say integrated versus not integrated, do you

 9    mean that sometimes the people at the company that was bought

10    would be fired and would lose their job?

11    A.     Well, if they weren't integrated, sometimes they could

12    stand on their own and operate independently or if that would be

13    integrated within the -- within the company.

14    Q.     Did you have concerns about job security after the merger

15    occurred?

16    A.     Yeah, it's understandable.

17    Q.     And did it occur to you that Mr. Wright might also lose

18    his job?

19    A.     I wasn't sure what was going to happen.

20    Q.     At this time, were you aware that Mr. Wright was

21    interviewing for a job in South Carolina?

22    A.     Yes, sometime in that time frame.

23    Q.     He had talked to you about potentially leaving CEB?

24    A.     Yes.

25    Q.     In general, did Mr. Wright ever tell you, you know, he
```

1   felt limited at CEB and wanted more responsibility?

2   **A.**      Yes.

3   **Q.**      And was that part of the reason he was looking for

4   another job at that time?

5   **A.**      I don't know his exact reasons, but it's probably likely

6   that that was one of them.

7   **Q.**      Do you agree that it would have been important for

8   Mr. Wright to know he might lose his job at CEB after a merger

9   when he was deciding whether to move to a new job?

10          MR. CUMMINGS:  Calls for speculation, "might."

11          THE COURT:  What was the question again?

12   BY MS. CHOE:

13   **Q.**      Would you agree that it would have been important for

14   Mr. Wright to know that he might lose his job because of a

15   merger?

16          THE COURT:  The objection is sustained.

17   BY MS. CHOE:

18   **Q.**      When you found out about the merger in November, did you

19   tell Mr. Wright?

20   **A.**      I didn't tell him until sometime in December.

21   **Q.**      You knew that he could lose his job if there were a

22   merger, correct?

23   **A.**      It's a possibility.  I didn't know what was going to

24   happen then.

25   **Q.**      And you knew that he was looking elsewhere at the time,

```
 1    right?
 2    A.     Yes.
 3    Q.     And he was one of your closest friends, correct?
 4    A.     He's a good friend, yes.
 5    Q.     But you didn't tell him this very important news that
 6    could have a huge impact on him?
 7    A.     We didn't know.
 8           THE COURT:  It's been asked and answered, hasn't it?
 9           MR. CUMMINGS:  I believe so.
10           THE COURT:  Objection's sustained.
11    BY MS. CHOE:
12    Q.     If you could take a look at -- oh.
13           MS. CHOE:  With the assistance of the court security
14    officer, may I hand up this binder for Mr. Anschutz.
15    BY MS. CHOE:
16    Q.     Mr. Anschutz, if you could flip to SEC Trial
17    Exhibit 128-A.
18    A.     You said 128-A.
19    Q.     128-A.
20           Do you see that this is a summary of communication
21    between William Wright and Barron Anschutz between November 1st,
22    2016, and January 5th, 2017?  Do you see that?
23    A.     Yes.
24    Q.     And do you see that in that time period, there were
25    hundreds of entries in this chart?
```

1    **A.**    Through what period?

2    **Q.**    Through the end, November to the beginning of January.

3    **A.**    Yes, there's roughly 363 entries.

4    **Q.**    And in November alone, there are 200 times when you and

5    Mr. Wright talked and texted each other, correct?

6    **A.**    Yes.

7    **Q.**    Would it surprise you to learn that in November, you

8    spoke with him for over 400 minutes on the phone?

9    **A.**    Would it surprise me?  No.

10   **Q.**    And that wouldn't include, you know, conversations in

11   person in the office or at Poker, right?

12   **A.**    No.  It's something we would typically talk on the phone

13   a lot.

14   **Q.**    And did you play Poker with Mr. Wright at this time, late

15   2016?

16   **A.**    I believe so.  I don't remember, you know, the exact

17   days, but quite possibly.

18   **Q.**    Did you have a weekly game on Thursday nights?

19   **A.**    Yes.

20   **Q.**    Are you familiar with the term "RSU"?

21   **A.**    Yes.

22   **Q.**    What does that stand for?

23   **A.**    Restricted stock unit.

24   **Q.**    And what does that mean?  What's an RSU?

25   **A.**    It's a form of equity that companies may issue in terms

1   of -- and some compensation to employees.

2   **Q.**     Did you receive restricted stock as part of your

3   compensation at CEB?

4   **A.**     Yes.

5   **Q.**     And did Mr. Wright?

6   **A.**     Yes.

7   **Q.**     And do you know what it means for restricted stock to be

8   unvested?

9   **A.**     Yes.

10   **Q.**     What does that mean?

11   **A.**     That you have not met the service component for earning

12   the right to receive that form of equity.

13   **Q.**     Does it mean that it's kind of locked until you've been

14   in the company for a certain amount of time?

15   **A.**     I don't -- you haven't earned it.

16   **Q.**     So it's not vested, you can't go out and sell it or do

17   whatever you like with it, correct?

18   **A.**     Correct.

19   **Q.**     And in November and December 2016, were some of your

20   restricted stock units unvested at the time?

21   **A.**     Yes.

22   **Q.**     When you heard about the merger, were you concerned about

23   the impact that it could have on those unvested restricted stock

24   units?

25   **A.**     Please repeat the question.

1    **Q.**    When you heard about the merger in November, were you

2    concerned about the impact it could have on your unvested

3    restricted stock units?

4    **A.**    I believe when I heard about the merger, I don't know

5    that I knew what the treatment would be for the unvested units.

6    **Q.**    So you had some uncertainty?

7    **A.**    There wasn't any clarification or guidance as to what

8    would happen to those.

9    **Q.**    I'm going to hand you -- do you recall being deposed in

10   this matter in May of 2021?

11   **A.**    Yes.

12         MS. CHOE:  With the Court's permission, may I hand up a

13   copy of his transcript with the court security officer?  Thank

14   you.

15   BY MS. CHOE:

16   **Q.**    And when you provided the testimony in that deposition,

17   you were under oath, correct?

18   **A.**    Yes.

19   **Q.**    If you could turn to page 150 of your transcript.  And do

20   you see at line 25 -- oh, I'm sorry, you're still getting there.

21         MR. CUMMINGS:  Did you say 150?

22         MS. CHOE:  Page 150.

23   BY MS. CHOE:

24   **Q.**    Do you see page 150?

25   **A.**    Yes.

Q.     Do you see at line 25 you were asked:  "You had a
question mark about your own unvested restricted stock units,
right?"

A.     Yes.

Q.     And you answered "Yes," correct?

A.     Yes.

Q.     And then you were asked:  "And you knew that he had the
same unvested restricted stock units, correct?  Maybe not the
same number but you knew he had them as well, right?"

A.     Yes.

Q.     And you answered "Yes," correct?

A.     Yes.

Q.     And do you understand the references to him to be
references to Mr. Wright?

A.     Yes.

Q.     And then you were asked:  "And so then there was a
question about what would happen to his RSUs, right?"

A.     Yes.

Q.     Do you see that?

A.     Yes.

Q.     And you answered:  "He was in a similar situation as I
was," correct?

A.     Yes.

Q.     And your restricted stock at the time was over $250,000,
correct?

46

A.      I don't remember how much it was worth.

Q.      Can you turn to SEC Trial Exhibit 197 in your binder?
Are you there?  And do you recognize this as your E*TRADE
statements in October of 2016?

A.      Yes.

Q.      And if you could look at the last page of the document,
do you see the section on the top is unvested restricted stocks
and it's all CEB?

A.      It's on the top of page 6?

Q.      Yes.

A.      Yes.

Q.      And do you see that the total amount is $258,915?

A.      Yes.

Q.      Now, at some point in November, you and Mr. Wright tried
to figure out what the impact of a merger would be on your
unvested RSUs, correct?

A.      I don't know that that was on my unvested RSUs.

Q.      Or actually on Mr. Wright's unvested RSUs; is that fair
to say?

A.      I don't remember the exact context of that question.

Q.      Could you take a look at SEC's Trial Exhibit 67?  Do you
see that this is an e-mail exchange between you and Mr. Wright
on November 3rd, 2016?

A.      Yes.

Q.      And do you say that the two of you are discussing the

1    effect of a change in control and termination of employment on

2    unvested restricted stock?

3    **A.**    Yes.

4    **Q.**    Did you answer?

5    **A.**    I said, "Yes."

6    **Q.**    I'm sorry, I didn't hear you.

7         And a change in control, that refers to a merger,

8    correct?

9    **A.**    I don't know if it specifically refers to a merger.  I

10   mean, a change in control would be a change in ownership.

11   **Q.**    And a merger is a change in control, correct?

12   **A.**    It's a form of it, yes.

13   **Q.**    And this e-mail was in November, 2016, right?

14   **A.**    Correct.

15   **Q.**    Which is the month that you found out about the merger

16   between CEB and Gartner, right?

17   **A.**    It is a month.  But like I said, I found out about it

18   sometime in the middle of November.

19   **Q.**    Sometime in November, right?

20   **A.**    Right.

21   **Q.**    And you were having this discussion with Mr. Wright

22   because he was looking to leave CEB and trying to understand

23   what would happen to his RSUs in the event of a change in

24   control, correct?

25   **A.**    I don't remember the context of why we were looking at

1    that.

2    **Q.**    Could you, in your deposition transcript, take a look at

3    page 169.  Actually, if you could start with 168, the bottom

4    line, line 25.  Do you see you were asked:  "So this was just a

5    hypothetical discussion that you and Mr. Wright were having on

6    November 3rd?"

7         Do you see that question?

8    **A.**    Yes.

9    **Q.**    And do you see that you responded:  "It was more

10   specific, you know.  I don't know exactly the context but I

11   thought it was more we were talking about what was happening.

12   This was under a period of time where Bill was looking to leave

13   and was trying to understand if something did happen, how would

14   that impact if he was in the middle of leaving and not having

15   the event take place before then.  So I think it was related to

16   something along those lines."

17        Do you see that?

18   **A.**    Yes.

19   **Q.**    So Mr. Wright was trying to understand what would happen

20   to his restricted stock if there were a change in control like a

21   merger and if he left the company, correct?

22   **A.**    Again, I don't remember the specific context of the

23   question, but, you know, as part of evaluating questions that

24   would come up on equity, Bill and I would be the ones that would

25   administer the plans and look into these questions, and so I

```
 1   think, you know, in the context -- in the context of looking at

 2   this, I don't think it was unreasonable that we were probably

 3   looking at this as it related to our own personal situation as

 4   well.

 5   Q.    Including Mr. Wright's personal situation, correct?

 6   A.    Correct.

 7   Q.    In the same month that the merger is being negotiated.

 8   A.    I don't know when the -- the specifics of the merger

 9   being negotiated was because I was not a part of that.

10   Q.    Fair to say it was no later than November when you found

11   out about it, correct?

12   A.    I don't know the, you know, exact timing on when that

13   stuff was done.  I don't think it was finalized until sometime

14   in December or even early January when it was announced.

15   Q.    That's when the merger was announced, correct?

16   A.    Yes.

17   Q.    Yeah.  But it was being negotiated before it was being

18   announced, right?

19   A.    Yes.

20   Q.    You've testified that you didn't tell Mr. Wright about

21   the merger when you found out, correct?

22   A.    Correct.

23   Q.    But you did tell him about it, right?

24   A.    Say that again.

25   Q.    You did tell him about the potential merger with Gartner,
```

1   correct?

2   **A.**     In December, yes.

3   **Q.**     And when is it that you say that you told him?

4   **A.**     Sometime we were on a work trip in London.  I think it

5   was somewhere around the early, mid part of December, around the

6   10th, or somewhere in that time frame; early December when we

7   were on a trip.

8   **Q.**     And what was Mr. Wright's reaction when you told him

9   about this potential merger?

10   **A.**     I don't remember what his reaction was.

11   **Q.**     Was he upset with you for not telling him before?

12   **A.**     I don't know.

13   **Q.**     Did he say, "Wait a minute, we were just talking about a

14   change in control in early November and what might happen to our

15   unvested restricted stock, how come you didn't tell me about it

16   if you knew I had those questions?"

17          Did he ever say anything like that?

18   **A.**     I don't remember that.

19   **Q.**     Do you recall being interviewed by the FBI in August

20   2018?

21   **A.**     Yes.

22   **Q.**     And do you recall them asking you when Mr. Wright became

23   aware of the merger?

24   **A.**     No, I don't.

25   **Q.**     So you don't recall saying that you didn't remember when

```
 1    he became aware of the merger?
 2    A.    I don't remember that.  It was a few years ago.
 3    Q.    Do you recall that in March 2017, you were asked to
 4    review a list of people who had traded in CEB around the time of
 5    the merger?
 6    A.    Yes.
 7    Q.    And did you recognize anyone on that list?
 8    A.    Yes, I recognized two people.
 9    Q.    Who were those two people?
10    A.    Chris Clark and Tisha Clark.
11    Q.    And how did you recognize them?
12    A.    I knew them as being Bill's brother and sister-in-law.
13    Q.    Had you met Mr. Clark before?
14    A.    Yes.
15    Q.    Did you, in fact, get a mortgage through Mr. Clark?
16    A.    Yes.
17    Q.    So, when you saw their names, did you talk about that
18    with Mr. Wright?
19    A.    I don't remember the exact conversation.  I might have
20    mentioned that they were on the list to him.
21    Q.    And when you provided a response to this letter, did you
22    identify Mr. Clark and Mrs. Clark?
23    A.    Yes.
24    Q.    And did you tell Mr. Wright that you were going to
25    identify them?
```

1    **A.**     I don't remember the conversation.

2    **Q.**     But do you think you would have talked to him about the

3    fact that they were on the list and not talked about your

4    response?

5    **A.**     I mean, I would have put them on there because I knew

6    that they were -- that I had identified them.

7    **Q.**     Did you and Mr. Wright discuss the fact that Mr. Clark's

8    son, Andrew Nevins, was also on that list?

9    **A.**     I didn't know who -- I knew he had a son; I didn't know

10   that his last name was different.

11   **Q.**     You don't know Mr. Nevins?

12   **A.**     I probably met him a long time ago, but I don't know --

13   really know who he is.

14   **Q.**     So, is it fair to say that you and Mr. Wright talked

15   about identifying Mr. Clark and Mrs. Clark but didn't discuss

16   Mr. Nevins being on this list?

17   **A.**     I don't remember that as being a part of it, no.

18   **Q.**     In your roles at CEB, did you and Mr. Wright have access

19   to confidential, nonpublic CEB information?

20   **A.**     Yes.

21   **Q.**     And would it be fair to say that Mr. Wright had access to

22   that kind of information throughout the time that he worked at

23   CEB?

24   **A.**     Yes.

25   **Q.**     Did that information include nonpublic information about

1  quarterly earnings results?

2  **A.**    Yes.

3  **Q.**    Are you familiar with CEB's code of conduct?

4  **A.**    Yes.

5  **Q.**    And did that conduct -- excuse me -- code of conduct

6  prohibit you from disclosing confidential CEB information to

7  people outside of CEB?

8  **A.**    Yes.

9  **Q.**    Did it prohibit you from sharing that kind of information

10  even within CEB unless someone had a need to know?

11  **A.**    I don't remember the exact words within the policy.

12  **Q.**    Can you take a look at SEC Exhibit 34.  Do you see that

13  document?

14  **A.**    Yes.

15  **Q.**    And could you turn to page 43 at the bottom, the long

16  string ending in 43?  Do you see that page?  It says CEB 00043

17  at the bottom of the page.

18  **A.**    Sorry, I was looking at the wrong page here.  Yes.

19  **Q.**    Do you see the blue box that says "Apply the code"?

20  **A.**    Yes.

21  **Q.**    And the first bullet says, "Do not share CEB's inside

22  information outside CEB," yes?  Do you see that?

23  **A.**    Yes.

24  **Q.**    And do you see the second bullet says, "Only share CEB's

25  inside information within CEB on a need-to-know basis"?

1    A.     Correct.

2    Q.     And does that refresh your recollection on whether that

3    was a rule?

4    A.     Yes.

5    Q.     Did CEB's code of conduct prohibit you from taking

6    confidential information with you when you left CEB?

7    A.     Um, I don't know.  I don't know how that's referenced in

8    here.

9    Q.     Do you want to take a look at page 37?

10          MR. CUMMINGS:  You said page 37 of the document or --

11          MS. CHOE:  The one ending in 37, yep.  The long string

12   ending on 37.

13          MR. CUMMINGS:  The long string on the bottom.

14          MS. CHOE:  Yes.

15          MR. CUMMINGS:  Thank you.

16   BY MS. CHOE:

17   Q.     Do you see that page?

18   A.     Yes.

19   Q.     Do you see the bullet in the blue box that says, "Return

20   all confidential and proprietary information upon leaving CEB"?

21   A.     Yes.

22   Q.     When did you leave CEB approximately?

23   A.     Sometime in August '17.

24   Q.     Whether you left CEB, did you take any CEB documents with

25   you?

1    **A.**     I didn't take any documents.  I had a computer.

2    **Q.**     Electronic documents on your computer?

3    **A.**     Yes.  I had a computer that had documents on my hard

4    drive.

5    **Q.**     And in fact, were there hundreds of documents on that

6    hard drive?

7    **A.**     I don't remember how many documents were on there.

8    **Q.**     Could you take a look at your deposition, page 54?  I'm

9    directing your attention to line 15.  Do you see you were asked,

10   "In between all the subfolders, you would say there were

11   hundreds of documents that you've retained?  And you answered

12   "Yeah."

13          Do you see that?

14   **A.**    Yes.

15   **Q.**    Does that refresh your recollection about whether you

16   took hundreds of documents with you when you left CEB?

17   **A.**    Yes.

18   **Q.**    And some of them contained confidential information,

19   correct?

20   **A.**    Yes.

21   **Q.**    Did you and Mr. Wright sometimes send each other internal

22   CEB documents using your personal e-mail accounts?

23   **A.**    Please repeat that.

24   **Q.**    Did you and Mr. Wright sometimes send each other internal

25   CEB documents using your personal e-mail accounts?

1   **A.**    On occasion.

2   **Q.**    Was that also against company policy?

3   **A.**    Um, I don't know if that's specifically outlined.

4   **Q.**    Did that continue after you left CEB?

5   **A.**    I think we -- from the files we produced, there was a

6   handful of documents, three or four documents that we had

7   exchanged.

8   **Q.**    And did Mr. Wright send you nonpublic information from

9   the company where he went to work after CEB?

10  **A.**    There was a file that he sent over that had financial

11  information in there.

12  **Q.**    Before you worked at CEB, where did you work?

13  **A.**    Sunrise Senior Living.

14  **Q.**    And were you the chief accounting officer there as well?

15  **A.**    Yes.

16  **Q.**    When you -- when did you leave Sunrise?

17  **A.**    I don't remember the exact date, but sometime, I believe,

18  in 2006.

19  **Q.**    And when you left, Sunrise was about to restate their

20  financials, correct?

21  **A.**    Yes.

22  **Q.**    And that means they were going to correct some mistakes

23  they had made in earlier SEC filings; is that right?

24  **A.**    Correct.

25  **Q.**    And you knew when you left in 2006, that Sunrise was

```
 1   going to come out with this restatement, right?
 2   A.    Yes.
 3   Q.    It was going to publicly announce its numbers should have
 4   been different in some way?
 5   A.    I believe it was already announced.
 6   Q.    The restatement had already come out when you left or it
 7   came out after you left?
 8   A.    I -- I'd have to look at the timing but I believe the
 9   announcement came out that it was going to have to restate prior
10   to my leaving.
11   Q.    And around the time that you left Sunrise, you sold some
12   Sunrise stock options, correct?
13   A.    I don't remember the timing of when I sold that.
14   Q.    You did sell Sunrise stock options; do you recall that?
15   A.    I remember having some.  I was only at Sunrise a short
16   period of time, like a little over a year or so.
17   Q.    And when you sold those stock options, you knew that
18   Sunrise was going to come out with this restatement, correct?
19   A.    I don't -- I don't remember the timing of when I sold
20   those versus when it was known that the financials were going to
21   be restated.
22         MS. CHOE:  Nothing further at this time, Your Honor.
23         THE COURT:  All right.  Cross-exam.
24              CROSS-EXAMINATION OF JAMES BARRON ANSCHUTZ
25   BY MR. CUMMINGS:
```

1    Q.    Mr. Barron, you were the chief financial officer at CEB?

2    A.    No.

3    Q.    What was your job title?

4    A.    Chief accounting officer.

5    Q.    Chief accounting officer.

6          So, if Tom Monahan is on the top, where is Mr. Lindahl?

7    A.    He's a direct report of his.

8    Q.    He's what?  I'm sorry?

9    A.    He's a direct report of Tom Monahan's.

10   Q.    So he directly reports to Tom Monahan, and then under

11   Lindahl, who is under him?

12   A.    I was.

13   Q.    You were?  So you're two down?

14   A.    Correct.

15   Q.    Okay.  And I want to talk a little bit about the

16   relationship you had with Mr. Wright, and Mr. Wright was anxious

17   to rise in the company; is that correct?

18   A.    Yes.

19   Q.    Okay.  And you were his best friend, and the job that he

20   would aspire to would probably be your job, would it not?

21   A.    I -- No, I was a good friend of his.  He had aspirations

22   to be a CFO and not only --

23   Q.    Did you say -- I'm sorry, you said, he had aspirations?

24   A.    He had aspirations to become a CFO, even higher than a

25   chief accounting officer.

1    Q.    Okay.  He had aspirations; you were one of his closest

2    friends?

3    A.    Yes.

4    Q.    You owned a beach house with him?

5    A.    Yes.

6    Q.    Vacationed with him.

7          She showed you, I don't know, 363 calls.  And so when

8    he -- when you heard he was interviewing with a company down in

9    South Carolina, that didn't surprise you --

10   A.    No.

11   Q.    -- correct?

12         And you were very careful in response to her questions to

13   say, well, a change in control doesn't mean there was a merger

14   coming, correct?

15   A.    Correct.

16   Q.    Okay.  And you weren't the -- she said, well, FINRA

17   indicated that your date of awareness was January 1st or 2nd,

18   but that's not your recollection, correct?

19   A.    No.  Like I said, I thought it was sometime in the middle

20   of November.

21   Q.    Okay.  Well, in November 1st and 2nd, there was a board

22   meeting, right, at CEB?

23   A.    Yes.

24   Q.    Okay.  And weren't you asked to leave that meeting at a

25   particular point?

1   **A.**    I don't remember the specifics of it, but I would not sit

2   through an entire board meeting.

3   **Q.**    Okay.  And there were times when everybody but

4   Mr. Monahan, perhaps Mr. Lindahl and the actual board members

5   would have everybody leave, and they would talk about sensitive

6   things like the merger that ended up happening, and we know it

7   happened, so we can relate back, correct?

8   **A.**    Yes.  There would be executive sessions that I would not

9   be a part of.

10  **Q.**    Right.  You wouldn't be privy to that information.

11  There's no need for you to know, correct?

12  **A.**    No.

13  **Q.**    And the SEC requires very strict confidentiality to

14  protect that information?

15  **A.**    Yes.

16  **Q.**    Okay.  And as an employee that high up, you would want to

17  protect that information, wouldn't you?

18  **A.**    Yes.

19  **Q.**    All right.  If you disclosed -- and you think you -- you

20  think it was close to Thanksgiving where you were brought in --

21  what they call brought in under the tent, correct?

22  **A.**    Yeah.  Sometime in the middle of November.

23  **Q.**    Pardon?

24  **A.**    Sometime in the middle of November.

25  **Q.**    Okay.  And you executed a nondisclosure agreement when

1    you were brought in under the tent, correct?

2    **A.**    Yes.  But I don't remember the timing of when that was

3    entered into.

4    **Q.**    Okay.  Well, that document is missing but we have a

5    sample nondisclosure agreement.  But you would have executed

6    one, correct?

7    **A.**    I would have thought that I did.

8    **Q.**    Okay.  And you would have protected that information as

9    the chief -- what did you say, chief financial officer?

10   **A.**    Accounting officer.

11   **Q.**    Chief accounting officer, sorry.

12          CAO, the chief accounting officer.  You realize how

13   sensitive that information is, don't you?

14   **A.**    Yes.

15   **Q.**    I mean, that's highly sensitive.  It's a felony to give

16   that information outside of CEB, is it not?

17   **A.**    Yes.

18   **Q.**    It violates, I think, it's 10b-5, the Securities and

19   Exchange Commissions Act.  I think that's right.

20   **A.**    I don't know.

21   **Q.**    You're an accountant; I'm a lawyer.  I wouldn't expect

22   you to know, so, let me move on.

23          So Mr. Wright wouldn't be privy to that information,

24   correct, in November?

25   **A.**    I don't know if he was or not.  I didn't tell him.

1    **Q.**    Okay.  So that's closely held information.  You sure as

2    hell didn't tell him, and you didn't talk about this.  You're

3    able to keep a secret even from a friend, aren't you?

4    **A.**    Yes.

5    **Q.**    Okay.  And you kept that secret, didn't you?

6    **A.**    Yes.

7    **Q.**    All right.  Now, did there come a time in December where

8    you and Mr. Wright flew to London for the company?

9    **A.**    Yes.

10   **Q.**    Okay.  What was the purpose of that trip?

11   **A.**    It was a business trip.  We had a subsidiary over there,

12   and we would typically go over there two or three times a year

13   to meet with the accounting staff that we had over there.

14   **Q.**    So there was a CEB office in London with staff there?

15   **A.**    Correct.

16   **Q.**    All right.  So CEB did the same kind of work in London

17   and I guess other European countries, possibly Abu Dhabi, places

18   like that where you-all would pedal the kind of services you do,

19   best practices, and that sort of thing?

20   **A.**    Yeah.  We had an office in London, yes.

21   **Q.**    Okay.  And it would have been December 10th or 11th when

22   you went?

23   **A.**    Sometime in that time frame.  I don't remember the exact

24   dates.

25   **Q.**    Okay.  And you were there, you stayed at the same hotel?

1   A.     Yes.

2   Q.     Okay.  And you had meetings in the London office, and did

3   you have dinners with the local executives?

4   A.     Yes.

5   Q.     Okay.  And you left on the 15th of December.  Does that

6   ring a bell?

7   A.     Again, I don't remember the exact date I left, but

8   sometime in that time frame.

9   Q.     Okay.  And on the trip back or on the verge of the trip

10  back, you brought him in under the tent?

11  A.     Sometime while we were over there.

12  Q.     Okay.  Was he surprised?

13  A.     I don't remember what his reaction was.

14  Q.     Okay.  And so when you got back to Arlington after that

15  trip, did you go to -- I think it's Victoria's husband or one of

16  the other people in the legal department to tell them you had

17  disclosed the merger negotiations.  Because, I don't think it

18  was even final then to Mr. Wright?

19  A.     At some point after I told him, yes, I went to her.  And

20  I don't know the exact date, if that was while I was still over

21  there or when I got back.

22  Q.     Okay.  But it was mid-December?

23  A.     Yes.

24  Q.     Okay.  And when you got back, were you aware that

25  Mr. Wright then executed a nondisclosure agreement?

```
 1    A.     I don't remember.

 2    Q.     Okay.  But -- all right.  But you had already executed

 3    your nondisclosure agreement?

 4    A.     I thought I did, but I -- I don't know if you're saying

 5    that one wasn't found.

 6    Q.     Are you part of the Corporate Leadership Team?

 7    A.     At my company now?

 8    Q.     No, but -- I'm sorry.  Let me put it in context.  In --

 9    let me back up.  On August 31st, 2016, Mr. Monahan publicly

10    announced he was stepping down?

11    A.     Yes.

12    Q.     Okay.  He did not announce a successor?

13           MS. CHOE:  Objection, scope.

14           THE COURT:  I'm sorry, I didn't hear you.

15           MS. CHOE:  Objection, beyond the scope of direct.

16           MR. CUMMINGS:  But we've been talking about the merger and

17    it's --

18           THE COURT:  Objection overruled.

19           MR. CUMMINGS:  Thank you.

20    BY MR. CUMMINGS:

21    Q.     And I'm going to show you a document that's been marked

22    as Defense Exhibit 83.  It is a CLT confidential not for further

23    distribution concerning CEO transition, key messages, and FAQs.

24    I'm going to direct your attention to page 6.

25           THE COURT:  What's your question?
```

```
 1   BY MR. CUMMINGS:
 2   Q.    Do you see there that there's a list of possible
 3   questions that might come up, concerning Mr. Monahan's
 4   departure?
 5   A.    Yes.
 6   Q.    And is -- what does that indicate one of the questions
 7   would be?
 8   A.    You've got it highlighted here it says, "Mike is being
 9   offered an opportunity to consider selling the company."
10   Q.    And does it suggest what upper executives or employees of
11   CEB, how they should respond to that?
12   A.    Yeah.  It says nothing about Tom's decision, changes our
13   view of the company, or its place in the market.
14   Q.    Okay.  And that's to caution employees and executives,
15   you're not just an employee, you're a high-level executive in
16   that company, on how to deal with questions about a possible --
17   questions about, does this mean there's a merger?  And they --
18   that's -- they're directing you on how to respond to it,
19   correct?
20   A.    Yes.
21   Q.    Okay.  And you complied with that, correct?
22   A.    I don't remember the -- I don't remember this document.
23   I don't know if this -- again, if this was something that I saw
24   when he announced his -- that he was stepping down.
25   Q.    Okay.  But you recall there was some speculations about a
```

1    potential merger or would this be a good time to consider being

2    acquired?

3    **A.**    I mean, there would be -- any time a CEO would step down

4    it's going to bring a lot of uncertainty into what was going to

5    transpire at the company.

6    **Q.**    Thank you.

7         On those weekly poker games, did you ever see this man at

8    those weekly Poker games, Mr. Clark?

9    **A.**    No.

10   **Q.**    Okay.  When you were in the beach, North Carolina, with

11   Mr. Wright and his family -- your families went together; is

12   that correct?

13   **A.**    No.

14   **Q.**    Didn't always go together?

15   **A.**    I think I was only down there may be a couple times with

16   him for one night at the most to do some maintenance on the

17   house.

18   **Q.**    Okay.

19   **A.**    But we never vacationed down there with my whole family

20   and his whole family.

21   **Q.**    You took turns with your family.  How many bedrooms was

22   it?

23   **A.**    It's a five-bedroom house.

24   **Q.**    Okay.  So how many people are in your family?

25   **A.**    My wife and three kids.

1  **Q.**     Would you sometimes bring guests?

2  **A.**     Yes.

3  **Q.**     Other kids?

4  **A.**     Yes.

5  **Q.**     And do you have in-laws?

6  **A.**     Yes.

7  **Q.**     And you occasionally invite them?

8  **A.**     (No audible response.)

9  **Q.**     And if Mr. Wright was contemplating getting another job

10 in South Carolina or wherever he was interviewing, wouldn't that

11 be a logical question to ask what's going to happen to my

12 unvested stock if I leave and there's any kind of change control

13 in the company?  A shakeup in the leadership, wouldn't that be

14 something that he might ask you -- reasonably ask you about

15 without violating your knowledge about when you got that

16 knowledge about the merger in mid-November or closer to

17 Thanksgiving?  Wouldn't it be a logical thing for him to ask you

18 about?

19 **A.**     Yes.

20 **Q.**     Okay.  In those documents that she said that you traded

21 and they were CEB documents, CEB actually wasn't even in

22 existence, was it, after what, the spring of 2017.  Didn't it

23 become a different company, Gartner?

24 **A.**     Gartner was the company that acquired CEB.

25 **Q.**     Right.  And when did CEB officially go out of existence?

1    **A.**    I don't know if it officially went out of existence.  I'm

2    sure there were still subsidiary that was there that was owned

3    by Gartner.

4    **Q.**    Okay.  And the documents that you traded with Mr. Wright,

5    they were mostly templates and stuff you all worked on together,

6    correct?

7    **A.**    I believe one was a template from his company that he was

8    using to develop a reporting pack or tool to analyze financial

9    statements on a regular basis.  We had produced something

10   similar at CEB, and so he was just trying to get some input on

11   the types of information to include in there.

12   **Q.**    All right.  So he wasn't giving you valuable, protected

13   information.  He was giving you a template.  Describe to the

14   jury what a template is because some of them may not know what a

15   template is in the accounting jargon?

16   **A.**    It was just an Excel workbook that had various analytics

17   on different types of financial information.

18   **Q.**    Okay.  And you wouldn't lie for Mr. Wright, would you?

19   **A.**    No.

20   **Q.**    There you wouldn't commit a felony for Mr. Wright, would

21   you?

22   **A.**    No.

23   **Q.**    You wouldn't lie today for Mr. Wright, would you?

24   **A.**    I'm sorry, I wouldn't what?

25   **Q.**    You wouldn't lie today in this room, would you?

```
 1    A.     No.

 2    Q.     You took that oath seriously, didn't you?

 3    A.     Yes.

 4    Q.     And everything you've said is truthful?

 5    A.     Yes.

 6           MR. CUMMINGS:  Thank you.

 7           REDIRECT EXAMINATION OF JAMES BARRON ANSCHUTZ

 8    BY MS. CHOE:

 9    Q.     Mr. Anschutz, you were just asked some questions about --

10    I believe it's Defense Exhibit 83, the Q and A.

11           Do you recall that?

12           It was a Defendant's Trial Exhibit 83.

13    A.     Oh, this, yes.

14    Q.     Yes, the Q and A.  The title at the top says, "CLT

15    confidential not for further distribution."

16           Do you see that?

17    A.     Yes.

18    Q.     And then below that in italics, it says, "For use by CLT

19    members with their direct reports."

20           Do you see that?

21    A.     Yes.

22    Q.     This was for answering questions internally from your

23    direct reports, correct?

24    A.     Yes.  For the CLT direct reports.

25    Q.     This wasn't a document that was being shared with the
```

```
1    public, was it?

2    A.      What do you mean by "public"?

3    Q.      It wasn't being shared outside of CEB, was it?  It says

4    "not for further distribution."

5    A.      No.  It would not have been shared outside of CEB.

6            MS. CHOE:  Thank you.  Nothing further.

7            THE COURT:  All right.  Thank you.  You may step down, and

8    you may be excused.  We'll take a brief recess.

9            (Thereupon, a recess in the proceedings occurred from

10   3:46 p.m. until 4:04 p.m.)

11           MR. MAHER:  Good afternoon, Your Honor.  The SEC calls

12   Andrea Fox.  And, Your Honor, this is the SEC's last witness.  It

13   should just take 15 or 20 minutes.

14           THE COURT:  Very good.

15           (ANDREA FOX, PLAINTIFF'S WITNESS, SWORN)

16                DIRECT EXAMINATION OF ANDREA FOX

17   BY MR. MAHER:

18   Q.      Good afternoon, Ms. Fox.  Where do you work?

19   A.      At the Securities -- U.S. Securities and Exchange

20   Commission.

21   Q.      Okay.  How long --

22           MR. CUMMINGS:  I'm sorry, I didn't hear that.  What did

23   you say?

24           THE WITNESS:  The U.S. Securities and Exchange Commission.

25   Yeah.
```

```
 1    BY MR. MAHER:
 2    Q.    And your name, full name for the record, please?
 3    A.    It's Andrea Fox.
 4    Q.    Okay.  How long have you worked at the SEC?
 5    A.    A little over five years.
 6    Q.    What is your position there?
 7    A.    A staff accountant.
 8    Q.    Okay.  And where did you --
 9          MR. CUMMINGS:  I'm sorry, could you speak up, please?
10          THE WITNESS:  A staff accountant.
11          MR. CUMMINGS:  Staff accountant.  Thank you.
12          THE COURT:  Marshal, maybe move that microphone back where
13    it was.  You moved it for the last witness, and I think it's much
14    worse than it was.  Thank you.
15    BY MR. MAHER:
16    Q.    Ms. Fox, where did you work prior to the SEC?
17    A.    At PricewaterhouseCoopers.
18    Q.    And how long have you worked there?
19    A.    About 14 years.
20    Q.    And what was your position at PWC?
21    A.    Um, it varied but it started off as an associate, and I
22    worked my way up to director.
23    Q.    Okay.  Now, in connection with your work at the SEC, do
24    you review financial records?
25    A.    I do.
```

1    Q.    And in connection with your work at the SEC, do you also

2    review trading records?

3    A.    I do.

4    Q.    Okay.  And did you -- in your prior position at PWC, did

5    that also involve reviewing financial trading and related

6    records?

7    A.    Yes.

8    Q.    Okay.  Can you explain to the jury what you understand

9    your role to be in this case?

10   A.    Yes, I'm a summary witness.  So, in my role as a summary

11   witness, it's just taking a large volume of data and summarizing

12   it into a more user-friendly format.

13   Q.    Okay.  If you could just speak up just a little bit, I

14   would be grateful.

15   A.    All right.

16   Q.    Did you do any work in connection with the investigation

17   in this matter?

18   A.    No.

19   Q.    Now, have you reviewed financial records related to

20   Christopher Clark?

21   A.    Yes.

22   Q.    Okay.  What type of financial accounts did you review

23   pertaining to Mr. Clark?

24   A.    Things like bank records, broker records, credit card

25   statements, 401(k), accounts.

```
 1    Q.     Okay.  Do you have in front of you what has been admitted
 2    as SEC Trial Exhibit 4-A?
 3    A.     Yes.
 4    Q.     And do you recognize that document, Ms. Fox?
 5    A.     Yes.
 6    Q.     What is that?
 7    A.     This is a summary that I prepared.  It's a 2016
 8    nonmortgage debt summary that represents debt held by the Clarks
 9    from the period of December 2015 through January of 2017.
10    Q.     And to make sure I heard you, it's a summary of the
11    Clarks' nonmortgage debt between December 2015 and January 2017?
12    A.     Correct.
13    Q.     Okay.  And by "nonmortgage," what do you mean?
14    A.     Debt that was outstanding, not related to a mortgage, so
15    it would include things like credit cards, 401(k) loans,
16    personal line of credit.
17    Q.     Okay.  Briefly, then, how much nonmortgage debt did the
18    Clarks have in December 2016?
19    A.     $169,280.
20    Q.     Okay.  And how much nonmortgage debt did they have in
21    December 2015, a year earlier?
22    A.     $111,504.
23    Q.     So, how much did their nonmortgage December increase over
24    the course of 2016?
25    A.     $57,776.
```

1    **Q.**    Okay.  And just a couple more questions about that

2    summary exhibit.  How much debt did the Clarks -- excuse me --

3    nonmortgage debt did the Clarks have at the end of January 2017?

4    **A.**    $99,992.

5    **Q.**    Okay.  Based on your review, what did the Clarks use to

6    pay down so much of their nonmortgage debt in January of 2017?

7    **A.**    The proceeds from the sale of CEB options.

8    **Q.**    Okay.  Now, Ms. Fox, if you could open up tab 4-B in your

9    binder.  It's SEC Trial Exhibit -- what's been admitted as SEC

10   Trial Exhibit 4-B.

11        Do you recognize that document?

12   **A.**    I do.

13   **Q.**    What is that?

14   **A.**    This is a schedule that I prepared that shows the detail

15   of the 2016 nonmortgage debt held by the Clarks for the period

16   of December 2015 through January of 2017.

17   **Q.**    Okay.  So the jury understands when they're provided this

18   summary, you have -- the last column there before your notes,

19   you have some as asterisks, what do they represent?

20   **A.**    Those represents -- represent accounts where the debt

21   that was held in December of 2016, was paid off in full in

22   January of 2017.

23   **Q.**    Now, if you could turn to tab 280-A in your binder.

24        MR. CUMMINGS:  280-A?

25        MR. MAHER:  Yes.

1          MR. CUMMINGS:  Thank you.

2    BY MR. MAHER:

3    **Q.**     This is what's been admitted as SEC Trial Exhibit 280-A.

4          Ms. Fox, do you recognize that document?

5    **A.**     Yes.

6    **Q.**     And is that another summary you created?

7    **A.**     Yes.

8    **Q.**     And what does it show?

9    **A.**     This is the summary of all debt held by the Clarks as of

10   12-31-2016.

11   **Q.**     As of the end of 2016?

12   **A.**     Correct.

13   **Q.**     Okay.  Now, adding it up, in addition to the over

14   $160,000 in nonmortgage debt we've already heard about, how much

15   mortgage debt did the Clarks have at the end of 2016?

16   **A.**     Um, there was a total of $1,297,652 in mortgage debt.

17   **Q.**     Now, did Mr. Clark, based on Exhibit 280-A, also have

18   some debts through entities that he was the coowner of?

19   **A.**     Yes.

20   **Q.**     Okay.  And how much was his exposure to mortgage debt

21   through those entities?

22   **A.**     $830,000.

23   **Q.**     So in addition to the $1,297,000 you just described?

24   **A.**     Yes.

25   **Q.**     Okay.  And just moving quickly, Ms. Fox, if you could

1    open up SEC Trial Exhibit 281-A.

2        Do you have that in front of you?

3    **A.**    I do.

4    **Q.**    Do you recognize that document, Ms. Fox?

5    **A.**    Yes.

6    **Q.**    And what is that?

7    **A.**    This is another summary that I prepared that shows loan

8    interests and fees charged to the Clarks in 2016.

9    **Q.**    Now, to make sure I understand, does this include any

10   interest payments or anything on mortgages?

11   **A.**    Um, no.  So, just I guess to elaborate a little bit, this

12   shows any time there was a late fee that was charged on a credit

13   card or a mortgage payment, and then any interest charged that

14   was charged on a credit card or on the personal line of credit,

15   but there's no mortgage-related interest or personal -- or car

16   loan interest included on this schedule.

17   **Q.**    So this is for the year 2016, all the times they were

18   charged a late fee or interest payment on a credit card balance

19   or something like that?

20   **A.**    Yes.

21   **Q.**    Okay.  Now, looking at the last page of that document, do

22   you add up the total late fees and credit card interest charges

23   the Clarks incurred in 2016?

24   **A.**    Yes.

25   **Q.**    And how much was that?

1    **A.**      $7,948.95.

2          MR. CUMMINGS:  I'm sorry, what was that figure?

3          THE WITNESS:  $7,948.95.

4    BY MR. MAHER:

5    **Q.**      Okay.  And just one final question about this summary,

6    Ms. Fox.  Have you made any corrections to it after you

7    initially provided it to the counsel for the SEC?

8    **A.**      I did.

9    **Q.**      And what were those?

10   **A.**      I think there was maybe one or two dates that I changed

11   by a day, and then there were two dollar amounts that I had

12   changed.  One of them was just an incorrect amount that I

13   entered, and the second one was because it was for interest over

14   a four-month period and the last month was January of 2017.  So

15   I just wanted to correct that to exclude the 2017 amount and

16   just include the three months for 2016.

17         MR. CUMMINGS:  I'm terribly sorry.  I can't -- I don't

18   know if you can hear, Judge.  I don't think the jury can hear.  I

19   can't hear.

20         THE COURT:  Yeah, I can hear.  Did you all hear?

21         THE JURY PANEL:  (Nodded head affirmatively.)

22         MR. CUMMINGS:  Okay.  Thank you.

23   BY MR. MAHER:

24   **Q.**      Now, Ms. Fox, please do your best to speak loudly.

25         How did you become aware of the need to correct the

1    errors in this summary?

2    **A.**    I performed a quality control review.  So I took each of

3    the items in the summary and just double-checked it back to the

4    source document to make sure the numbers or the information that

5    was entered was accurate.

6    **Q.**    Now, is it your general practice to quality control your

7    work before it's used in a trial or investigation?

8    **A.**    Yes.

9    **Q.**    Now, Ms. Fox, if you could look -- just flip through tab

10   127-A through 130-A.  Actually, those may not be in there.

11   **A.**    I don't have those.

12   **Q.**    Okay.  Ms. Fox, are you familiar with the phone record

13   summary the SEC has prepared in this case?

14   **A.**    Yes.

15   **Q.**    Okay.  Did you personally prepare those summaries?

16   **A.**    I did not.

17   **Q.**    Okay.  Now, have you reviewed those summaries and checked

18   them for accuracy?

19   **A.**    I have.

20   **Q.**    Okay.  What did you do to do that?

21   **A.**    I took the summaries and I verified the information that

22   was provided in them to the source documents.  So as an example,

23   I think Verizon was one of the records.  So I take what was in

24   the summary and make sure that it matched what was in the

25   documents that were provided by Verizon.

1    **Q.**    So for each of the entries in the communication

2    summaries, you would check the underlying communications record

3    like a Verizon record or something like that?

4    **A.**    Correct.

5    **Q.**    Did you identify any corrections that needed to be made

6    in the communications summaries?

7    **A.**    I did.

8    **Q.**    Can you describe what those were generally?

9    **A.**    A large portion of them related to time zone corrections,

10   so everything that was provided in the summaries was in Eastern

11   Standard Time but not all of the source documents, all the

12   records were in Eastern so they needed to be converted.  So I

13   found instances where the time zone was wrong, so I updated

14   those.

15   **Q.**    Okay.  And can you just give us a sense, how pervasive

16   were those errors in the communications summaries?

17   **A.**    Um, it just ended up being a handful of corrections that

18   needed to be made.

19   **Q.**    Across thousands of entries?

20   **A.**    Correct.

21   **Q.**    Okay.  Now, if you could look in your binder at what's

22   been admitted as SEC Trial Exhibit 5-A.

23        Do you recognize that document, Ms. Fox?

24   **A.**    I do.

25   **Q.**    Now, we're not going to walk through it but just so the

1    jury understands, what is SEC Trial Exhibit 5-A?

2    **A.**      This is a timeline that I prepared that summarizes

3    certain trading communications and financial activity that took

4    place between November 1st, 2016, through February 3rd of 2017.

5    **Q.**      Specifically, who's trading does it summarize?

6    **A.**      The Clarks.

7    **Q.**      Okay.  And just generally, what about -- who's

8    communications does it reflect?

9    **A.**      It reflects communications between Mr. Clark and

10   Mr. Wright, between Mr. Wright and Mr. Anschutz, and between

11   Mr. Clark and Mr. Nevins.

12   **Q.**      Okay.  Now, could you look at what has been admitted as

13   SEC Trial Exhibit 7-A.

14   **A.**      Okay.

15   **Q.**      Same questions for this document, Ms. Fox.

16          Is this another summary you prepared?

17   **A.**      It is.

18   **Q.**      And what is it?

19   **A.**      It's a timeline that summarizes certain trading,

20   communications, and financial activity of the Clarks for the

21   period between July 23rd, 2015, and August 6th, 2015.

22   **Q.**      And the very last one, Ms. Fox.  SEC Trial Exhibit 9-A.

23          Is that another summary you prepared?

24   **A.**      It is.

25   **Q.**      And what is that?

**A.**    It's also a timeline that I prepared summarizing certain

trading, communications, and financial activity of the Clarks,

but this time between the period of January 11th, 2016, and

March 21st, 2016.

**Q.**    Okay.

MR. MAHER:  No more questions, Your Honor.

THE COURT:  All right.  Cross-exam.

<u>CROSS-EXAMINATION OF MS. FOX</u>

<u>BY MR. CUMMINGS:</u>

**Q.**    Hi, Ms. Fox.  My name is Mark Cummings.  I don't think

we've had occasion to meet.

**A.**    I don't think so.

**Q.**    And I apologize if I complained about your voice.  You

have a lovely soft voice, but it's sometimes a little difficult

to hear.  So thank you for being here.

Let's start with the last exhibit, 9-A.  So what I'm

understanding what your methodology is here, is you have

summarized beginning in 1-11-2016 -- that's January 11 -- these

are phone calls -- summary of certain trading communication and

financial activity with a phone call communication, correct?

So, 1-11-2016 at 5:21 p.m., that's a call from Clark to

Wright.  It was a two-minute call, correct?

**A.**    Correct.

**Q.**    And on 1-11-2016 Wright cell to Clark cell, 15-minute

phone call.  And then on 1-19-2016 -- excuse me, it's so

1    small -- bought 10 CEB put options at $3.70, an option premium.

2    And that was in Mr. Clark's E*TRADE account, correct?

3    **A.**    Correct.

4    **Q.**    Okay.  Those two calls on -- and 1-11 is -- that's, what,

5    seven days, eight days before there was a phone call that lasted

6    15 minutes.  And then a week later, there's a put by Mr. Clark.

7          Do you have any idea why it's so -- do you have any idea

8    what was in that phone call?

9    **A.**    No.

10   **Q.**    You don't.  So you don't know if it has anything to do

11   with the put on 1-19, correct?

12   **A.**    Correct, I don't know.

13   **Q.**    It may have been a 15-minute phone call.  They could have

14   been talking about a basketball game, correct?  It could be

15   anything.

16   **A.**    I have no idea what was said in that phone call.

17   **Q.**    Okay.  You would agree with me that it's not illegal to

18   make a phone call.

19   **A.**    I have no idea what was said in that phone call.

20   **Q.**    Likewise, on the phone call of 1-11-2016, at 5:21 p.m.,

21   and you verified these times, correct?

22   **A.**    Correct.

23   **Q.**    With, what, the original Verizon record?

24   **A.**    Yes.

25   **Q.**    Okay.  I'll have more on that in a minute.  So, let's

1  see, there were trades, 10 other CEB, trades at 3:30 on

2  1-19-2016, and 20 CEB put options on 1-20.  And this is 2016,

3  1-20 --

4      MR. MAHER:  Your Honor, objection.  The jury can read the

5  documents for themselves.  They don't need Mr. Cummings to read

6  it.

7      MR. CUMMINGS:  Well, I'm just trying to understand the

8  document, Your Honor.

9      THE COURT:  Well, I think the jury and you both

10  understand.

11      Objection's sustained.

12      MR. CUMMINGS:  Thank you.  I'll move along.

13  BY MR. CUMMINGS:

14  **Q.**    So, what you've done here in 9-A at the request of your

15  supervisors at the SEC or at the request -- I don't mean to be

16  demeaning at all, is -- go ahead.

17  **A.**    Just to clarify, I'm not doing this work at the -- like,

18  the attorneys are not my supervisors.

19  **Q.**    Okay.  Who is your supervisor?

20  **A.**    My supervisor is an accountant.

21  **Q.**    Okay.  And you're an accountant, correct?

22  **A.**    Correct.

23  **Q.**    Okay.  And you do this sort of work for the SEC

24  routinely?

25  **A.**    Things similar to this.

1   Q.    Okay.  So, what they ask you to do is take calls from

2   Mr. Wright and put them on this page and cross around

3   Mr. Clark's trading, kind of suggest there might be some sort of

4   a conspiracy going on, correct?

5   A.    Um, I wouldn't characterize it that way.  What I was

6   asked to do was to summarize communications that occurred

7   between certain dates, and to summarize trades that happened

8   between certain dates and put them into a summary.

9   Q.    Okay.  All right.  But you weren't asked to look at

10  anything else that was going on in the lives of these two

11  gentlemen during this period, just the phone calls from the

12  Verizon?

13  A.    I was asked to review the communication records, the

14  trading records, and their financial records.

15  Q.    Okay.  I'm going to get to those phone records in a

16  minute.  All right.  So, let's look at 7-A for a minute.

17       MR. CUMMINGS:  Would you indulge me for a minute?

18       (Brief pause in proceedings.)

19  BY MR. CUMMINGS:

20  Q.    The phone call on 7-28-2015 is a one-minute phone call,

21  correct?

22  A.    At what time?

23  Q.    8:01 a.m.

24  A.    Yes.

25  Q.    All right.  How do you know that's even a conversation?

1   **A.**     Um, I know that there was a call placed from Mr. Clark's

2   cell phone to Mr. Wright's cell phone that lasted for one

3   minute.

4   **Q.**     Okay.

5   **A.**     That's all I know.

6   **Q.**     Did it last for one minute, or did it last for an amount

7   of seconds, and then they rounded it up to one minute?

8   **A.**     Um, I don't recall specifically on that record if it was

9   one minute or rounded up to one minute.

10  **Q.**     Okay.  I'll tell you why.  If you look at exhibit -- if

11  you take a look at exhibit SEC Exhibit 129 --

12  **A.**     I don't believe I have a copy of that.

13         (Discussion had off the record.)

14  BY MR. CUMMINGS:

15  **Q.**     Have you got it?

16  **A.**     I do not.

17         (Discussion had off the record.)

18         MR. CUMMINGS:  That's 128-A.  Show her that one.

19         (Discussion had off the record.)

20  BY MR. CUMMINGS:

21  **Q.**     Here's Exhibit 129-A.

22         Now, can you start on 1-9-2015.  Now, let's just go all

23  the way across to the right.  Do you see duration to the right?

24  **A.**     I do.

25  **Q.**     All right.  Do you see the first one there, right,

```
1    1-9-2015, Clark cell to Wright cell for one minute?

2    A.    Yes.

3    Q.    Let's go real quick through this because I would like to

4    finish up before 5:00.  The second one is two minutes, the next

5    two are one minute, one minute, next one is 16 minutes, are you

6    following me?

7    A.    I am.

8    Q.    Okay.

9          MR. MAHER:  Your Honor, he's still asking him about the

10   document.  The jury can see --

11         THE COURT:  What's the point?

12         MR. CUMMINGS:  The point is, Judge, every one is an exact

13   minute, and then when you get in here later --

14         THE COURT:  She didn't testify to the contents of the

15   length.  All she did was said she picked up and summarized what

16   was on the other sheets.

17         MR. CUMMINGS:  Okay.  Well, what --

18         THE COURT:  Objection's sustained.  She doesn't know what

19   these are.

20         MR. CUMMINGS:  All right.  Well --

21         THE COURT:  Or the length or the duration or whatever.

22   BY MR. CUMMINGS:

23   Q.    Well, you don't know if a one-minute phone call was --

24         THE COURT:  Objection's sustained.

25         MR. CUMMINGS:  Okay.
```

1         THE COURT:  Please move on to some other subject.

2    BY MR. CUMMINGS:

3    **Q.**    You don't know if it was a conversation or not is my

4    point.  That's all I'm trying to get at.

5    **A.**    I think I've already stated that I'm unaware of the

6    contents of the conversations.

7    **Q.**    Okay.  Thank you.

8         Now, looking again at 5-A, halfway down, 12-9-2016, do

9    you see that call at 8:20:16 a.m.?

10   **A.**    I'm sorry, 12-9 at what time?

11   **Q.**    12-9-2016.  It's on page 2 of 8.

12   **A.**    At what time?

13   **Q.**    8:20 -- 8:20 and 16 seconds a.m.

14   **A.**    I see that.

15   **Q.**    Okay.  Wright home to Clark cell, 23-second phone call.

16        Do you see that?

17   **A.**    I do.

18   **Q.**    All right.  When it says "Wright home" that refers to a

19   landline, correct?

20   **A.**    Um, I assume so.

21   **Q.**    Okay.  Moving right along.  12-15-2016 at 11:50:48, it's

22   about 7 or 8 down.

23        Do you see that one?

24   **A.**    I'm sorry, you said 12- 15 or?

25   **Q.**    12 -- one, five, 15.

1   **A.**      Okay.

2   **Q.**      2016 at 11:50:48 a.m.  Wright cell to Anschutz cell,

3   7-minute, 50-second phone call, correct?  Do you see that?

4   **A.**      I see that.

5   **Q.**      On 12-15.

6            All right.  And that's one you put on here, and this is

7   Exhibit 5-A.

8            All right.  127-A are all the phone calls between

9   Wright -- William Wright and Barron Anschutz from January 1,

10   2016 to June 30, 2017, correct?

11   **A.**      I don't have a copy of that in front of me.

12   **Q.**      Oh, jeez.  Let's just move on.  I don't think it's that

13   critical.  This is the one that -- tab 128-A.  And again, these

14   calls -- do you know who these calls are from?  Oh, I see.

15   These are all Anschutz and Wright and there are about 363 calls

16   there, correct?

17   **A.**      I don't have a copy of that in front of me.

18   **Q.**      Just take a look and verify that.

19   **A.**      I don't -- I'm missing the first four pages of this.

20   **Q.**      All right.  Well, go to the last page and tell me what

21   the last number is.

22   **A.**      I'm on page 56 of 57 shows 1,221 records.

23   **Q.**      1000- -- how many 200?

24   **A.**      221.

25   **Q.**      And that's between Mr. Anschutz and Mr. Wright, correct?

1    **A.**     That's what it looks like.

2    **Q.**     Thank you.  Let's go back to 5-A for just a second.

3    **A.**     Okay.

4    **Q.**     All the way at the bottom, page 1 of 8, are there any

5    phone calls in the month of November 26th between Chris Clark

6    and Andrew Nevins?

7    **A.**     Um, so in November of 2016, I don't see any records in

8    the summary of calls between Mr. Wright and Mr. Nevins, but I

9    don't know whether there were calls that took place, or I just

10   wasn't provided a record of those or not.

11   **Q.**     Well, we'll look at 12-1.  Look at 12-1-2016.  What's

12   that one?

13   **A.**     Right.  I believe your question was were there any calls

14   in November?

15   **Q.**     Right.  But there was -- well, there's nothing between

16   Andrew Nevins and Chris Clark in the month of November, but

17   there's one for December the 1st.

18   **A.**     Correct.  So as I just stated, I'm not certain if there

19   were calls that were made in the month of November, but I wasn't

20   provided with the detailed record of those, maybe I was only

21   provided the records starting on December 1st, but there are no

22   records shown on this summary of calls between Mr. Wright and

23   Mr. Nevins in the month of November.

24   **Q.**     How could that be?

25            MR. MAHER:  Your Honor --

```
 1              THE WITNESS:  I don't know.

 2              MR. MAHER:  Objection, Your Honor.  She has no idea why

 3     she has --

 4              THE COURT:  Objection's sustained.

 5     BY MR. CUMMINGS:

 6     Q.    And then 130-A.

 7              THE COURT:  You know, Mr. Cummings, you need to stay there

 8     at the podium so we can hear you.

 9              MR. CUMMINGS:  Oh.

10              THE COURT:  You're down there talking into your desk.

11              MR. CUMMINGS:  I apologize.

12              THE COURT:  Or the table or whatever it is.

13              MR. CUMMINGS:  130-A.

14              THE WITNESS:  I don't have a copy of 130-A.

15     BY MR. CUMMINGS:

16     Q.    Can you tell us what that document is?

17     A.    This is the summary of communications between Mr. Clark

18     and Mr. Nevins from December 1st, 2016, to February 1st of 2017.

19     Q.    Okay.  And how many transactions -- or communications?

20     A.    71.

21     Q.    Okay.  So, do you know why you don't -- why you have them

22     there but you don't have anything between Nevins and Clark in

23     November, if you know?  I know you're trying to summarize, but I

24     just don't understand why there's nothing between Nevins and

25     Clark in November.
```

1          MR. MAHER:  Your Honor, I think she just testified that

2     this summary is from December 2016 to February 1st, 2017.

3     BY MR. CUMMINGS:

4     Q.    All right.  So you weren't asked to look into November

5     then for Nevins and Clark?

6     A.    Correct.

7     Q.    Oh.  And then 281-A, and I'm going backwards here.

8          And how do you characterize -- what do you consider a

9     late fee?  Is that a fee that's paid after 50-day late or 30

10    days late, or do you know, did you qualify it at all?

11    A.    I put in this summary anything that said late fee on the

12    statement that I read it from.

13    Q.    Okay.  So you don't know if it could have been forgiven

14    or not?

15    A.    Um, forgiven in -- I'm sorry, forgiven like in a future

16    period?

17    Q.    Well, a check and a late fee notice may have crossed in

18    the mail.  You'd have no idea of knowing that?

19    A.    Um, so, each time I saw a late fee, I entered it into the

20    spreadsheet, and then I checked at the end of the year to see

21    total fees year-to-date to make sure that it added up to my

22    amount, so I --

23    Q.    Did you -- I'm sorry, did you finish?

24    A.    So I think if there had been something that had been

25    subsequently reversed, it would have reflected that in the total

1    year-to-date amount.  So I would have gone through each

2    statement, and I don't recall seeing like a reversal of a

3    payment -- of a late fee payment.

4    **Q.**    And you came up with a total of 7,948- --

5         THE COURT REPORTER:  I'm sorry, I can't hear you.

6         MR. CUMMINGS:  I apologize.

7    BY MR. CUMMINGS:

8    **Q.**    And you came up -- I've got to get away from that desk.

9         You came up with a total of $7,948.95 that year --

10   **A.**    Correct.

11   **Q.**    -- based on your review?

12   **A.**    Correct.

13   **Q.**    Do you know if $7,948.95 was actually paid?

14   **A.**    Um, I do not.  I know that that was the amount charged in

15   2016.

16   **Q.**    Fair enough.  And that is also true with your summary in

17   281-A, correct?

18   **A.**    Um, we're in 281-A now.

19   **Q.**    Oh, I apologize.  All right.  Let's look at 280-A, and we

20   just have two more after this and we're done.  All right.  And

21   do you know what Zalla is down there, halfway down under 1 where

22   it says -- do you know what Zalla is?

23   **A.**    I understand that Zalla is a business venture that

24   Mr. Clark held a percentage of ownership in.

25   **Q.**    Okay.  And what you've done here -- okay, I see that you

1    gave him credit for 50 percent and that figure was 50 percent of

2    the Zalla mortgages that came to $375,000; is that right?

3    A.    There are two mortgages and there's a line of credit.

4    And 50 percent of that total amount represents the $375,000.

5    Q.    Okay.  Okay.  And you didn't do any qualification about

6    who the other partners were?  You weren't asked to do that?

7    A.    I -- I know that the Clarks had a 50 percent ownership,

8    and so I took 50 percent of the total value.

9    Q.    Okay.  Very good.

10          And then you got the Toyota Sequoia loan and the 2010

11   Ford Edge, and that reflects a $9,402 balance, correct?

12   A.    For the Ford Edge.

13   Q.    For the Ford Edge?

14   A.    Correct.

15   Q.    And that was one of the debts that was paid with some of

16   the proceeds Mr. Clark earned in his out-of-cash calls?

17   A.    Yes.

18   Q.    Thank you.

19          Okay.  On the 2016 nonmortgage debt details, how many of

20   these are Tisha's credit cards?

21   A.    So you're in 4-B now?

22   Q.    I'm in 4 -- SEC Trial Exhibit 4-B.  I'll let you catch

23   up.

24   A.    Okay.  Um, so I noted one, two, three, four -- I noted

25   four instances of debt that were in Mrs. Clark's name.

1    **Q.**    Okay.  But you didn't back those out, you just added them

2    all up together because they're husband and wife?

3    **A.**    I included debt for the Clarks.

4    **Q.**    All right.  And I'm looking now at -- that was 4-B.  I'm

5    looking at 4-A, and I just want to make sure I understand what

6    you've done here.  In December of 2015, the loan credit card

7    debt was $111,405.  The next month, it was reduced to 108,661,

8    correct?

9    **A.**    It was reduced to 108,661.

10   **Q.**    So it looks like it went back up, and then in January

11   2017, it's down to 99,992.  And were all these debts paid off

12   with the proceeds from the out-of-cash calls in January of 2017?

13   **A.**    Um --

14   **Q.**    If you know.

15   **A.**    -- so, at the end of January 2017, there's still $99,992

16   of debt that's outstanding.  So there was a reduction in debt in

17   January 2017, from the $169,280 balance --

18   **Q.**    Okay.

19   **A.**    -- in December of '16, and the --

20   **Q.**    All right.  So the change from the prior year was 57,776

21   and that's a change to the positive, not the negative?

22   **A.**    The amount of debt increased.

23   **Q.**    Oh, it increased but then it was eradicated in 2017?

24   **A.**    It wasn't eradicated.  It was reduced to $99,992 as of

25   the end of January 2017.

1    **Q.**    Okay.  I see.  Thank you for putting up with me.

2    **A.**    Welcome.

3           MR. MAHER:  No questions, Your Honor.

4           THE COURT:  All right.  The witness may step down and be

5    excused.

6           THE WITNESS:  Thank you.

7           MS. CHOE:  Your Honor, the SEC rests its case in chief.

8           THE COURT:  All right.  Very good.  Well, we'll adjourn

9    until Monday morning.  We don't have time to --

10          MR. CUMMINGS:  Judge, I will have a motion to argue Monday

11   morning.

12          THE COURT:  All right.  That will be fine.  I'll hear it

13   then.  And we'll recess now until Monday morning at 10:00.

14          (Proceedings adjourned at 4:42 p.m.)

15
                        **C E R T I F I C A T E**
16

17               I, Scott L. Wallace, RDR-CRR, certify that
             the foregoing is a correct transcript from the record of
18           proceedings in the above-entitled matter.

19
             /s/ Scott L. Wallace                12/9/21
20           ---------------------------    ----------------
             **Scott L. Wallace, RDR, CRR**          **Date**
21              **Official Court Reporter**

22

23

24

25