```
                    UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA


     UNITED STATES SECURITIES AND      :
     EXCHANGE COMMISSION,              :
                                       :   Civil Action
                        Plaintiff,     :   No. 1:20-cv-01529-MSN-JFA
                                       :
          v.                           :
                                       :   December 13, 2021
     CHRISTOPHER CLARK,                :   10:15 a.m.
                                       :
                   et al.,             :
                                       :
                                       :
                Defendants.            :
                                       :
     ............................. :
```

### DAY 3 – MORNING SESSION
#### TRANSCRIPT OF JURY TRIAL PROCEEDINGS
#### BEFORE THE HONORABLE CLAUDE M. HILTON,
#### UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:          **Olivia S. Choe, Trial Attorney**
                            Securities and Exchange Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-5100
                            Email: Choeo@sec.gov

                            **Daniel J. Maher, Trial Attorney**
                            Securities and Exchange Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-5100
                            Email: Maherd@sec.gov

                            **John Lucas, Trial Attorney**
                            Securities and Exchange Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-5798
                            Email: Lucasj@sec.gov

```
APPEARANCES:  (Cont.)

For the Plaintiff:          Sarah Marie Hall, Trial Attorney
                            US Securities & Exchange Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-4784
                            Fax: 202-661-5849
                            Email: Halls@sec.gov


For the Defendants:         Mark Davis Cummings, Esq.
                            Sher, Cummings & Ellis
                            3800 N. Fairfax Drive
                            Suite 7
                            Arlington, VA 22203-1703
                            703-525-1200
                            Email:
                            Mcummings@sherandcummings.com

                            David Edward Sher, Esq.
                            Sher Cummings & Ellis
                            3800 N. Fairfax Drive
                            Suite 7
                            Arlington, VA 22203-1703
                            703-525-1200
                            Email: Sher@sherandcummings.com

                            Adam Michael Collins, Esq.
                            Sher, Cummings and Ellis
                            Virginia
                            3800 N. Fairfax Drive
                            Suite 7
                            Arlington, VA 22203
                            571-212-9192
                            Email: Acollins@sherandcummings.com

Court Reporter:             Scott L. Wallace, RDR, RMR, CRR
                            Official Court Reporter
                            United States District Court
                            401 Courthouse Square
                            Alexandria, VA  2231-5798
                            Office: 703.549.4626
                            Cell: 202.277.3739
                            Email: Scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

1          **MORNING SESSION, DECEMBER 13, 2021**

2    (10:14 a.m.)

3          MR. CUMMINGS:  Yes, Your Honor.  How are you this morning,

4    Judge?

5          Judge, I wanted to argue a Rule 50 motion for judgment.

6          THE COURT:  Can you take your mask off?

7          MR. CUMMINGS:  Pardon?  Oh.

8          A Rule 50 motion for judgment based on the evidence so far

9    from the government.  First of all, there's no positive direct

10   evidence that there was a tip of material insider information.

11   The government's evidence thus far is speculative.  There are

12   circumstances that point to the fact that the two gentlemen

13   involved in this case were brothers-in-law.  There's absolutely

14   no evidence that Mr. Wright provided Mr. Clark any insider

15   information.  The evidence so far from Mr. Clark who was on the

16   witness stand for two days -- the better portion of a day

17   explains his thesis, basically, based on the bullish market, and

18   that he'd been trading in CEB since 2008.  It's not a situation

19   where he makes one trade at the last minute and he's never made

20   trades before.  He's a seasoned investor.

21         So you have absolutely nothing, I don't think, Judge, that

22   you can hang your hat on to let this case go forward.  I don't

23   think it should go to the jury based on the fact, and we've

24   listened to two days of testimony.  There's not a document in

25   evidence, there's not any testimony in evidence, that establishes

1   beyond a preponderance of the evidence or even close to a

2   preponderance of the evidence that a tip of insider information

3   occurred.  It's as simple as that, Judge.  And I don't think I

4   need to go through chapter and verse of every witness who

5   testified.  We all heard the testimony, and basically, they've

6   established nothing in terms of insider information being

7   transferred.  What they have is an impression that Mr. Clark made

8   trades that were profitable, out of cash calls, puts.  He had

9   been doing that kind of thing since 2008, and there's no evidence

10  at all that Mr. Wright gave him a tip.  In fact, on December 9th,

11  when Mr. Clark started making his trades, the evidence was clear

12  that Mr. Wright wasn't informed, and wasn't informed until

13  December 15th when he got back from London.  So he's making out

14  of cash call -- out of cash calls, I think $65 was the strike

15  price, on December 9th before Mr. Wright even knew there had

16  been -- or there was going to be a merger in the offing.  And

17  they didn't call Mr. Wright.  So where are we with their

18  evidence?  I just think as a matter of law, you don't have enough

19  here to send it to the jury.  It's a simple argument, Judge,

20  based on the evidence we all heard.  Thank you.

21       MR. MAHER:  Your Honor, first of all, under Rule 50 of the

22  standards, a reasonable jury would not have a legally sufficient

23  basis to find for the SEC.  That is obviously not the case here.

24  While counsel says there's no evidence, what he means is, there's

25  no direct evidence.  But in an insider trading case, the case law

1    is clear.  Circumstantial evidence is a totally sufficient basis

2    for judgment.

3         Now here the circumstantial evidence is overwhelming.

4    There is highly suspicious trading, not just in December of 2016,

5    but throughout the preceding decade for Mr. Clark.  That trading

6    is preceded again and again by extensive communications between

7    Clark and a high-level corporate executive at CEB who knew about

8    the inside information.  That trading in December and January was

9    followed by sweeping efforts to conceal the misconduct.

10         Now, there's no dispute, first of all, this trading was

11    highly risky.  Clark and Nevins were the only ones engaged in the

12    trading.  The trading was a complete reversal of Clark's practice

13    of betting that CEB was going to go down over the preceding

14    decade.  Just weeks before the merger, all of a sudden he's

15    betting CEB's stock price is going to suddenly go up.  There's no

16    dispute he made huge profits again and again on CEB while just

17    being an average investor in other stocks he was investing in.

18    There's no dispute he told his son to trade on January 4th, 2017,

19    literally the day before the merger was announced.

20         Mr. Clark's vague, ever-shifting explanations, none of

21    those were actually provided to the FBI when they asked him in

22    October of 2017.  All of those explanations, imprecise and muddy

23    and unclear, inconsistent with this trading as they are, they're

24    all new, and they've been invented since then.

25         There's also literally no explanation for Mr. Clark's July

1    2015 trading where he opened up a credit line, took out $15,000,

2    and suddenly bought a ton of options immediately after speaking

3    with Mr. Wright, who was the head of the bookings team at CEB,

4    only to have, a couple days later, CEB announce that it had a

5    surprise bad bookings quarter driving the stock down.

6         Now, there's no dispute whatsoever that Clark and Wright

7    interacted extensively in December -- November, December,

8    January; the relevant time period.  There's no dispute that

9    Mr. Wright got a personal benefit under the law by giving a tip

10   to a trading relative and friend, and also, as the exhibits will

11   show and Mr. Wright's testimony will make clear, a decade of

12   Mr. Clark helping Mr. Wright with real estate matters, including

13   in December of 2016 and January of 2017 when he was helping

14   Mr. Wright sell his condo.

15        There's no -- there is enormous evidence that Mr. Wright

16   knew about the merger before December 9th.  We heard Mr. Anschutz

17   talk about they had e-mails concerning a change in control on

18   November 3rd.  We heard Mr. Anschutz talk about their close

19   relationship.  We heard Mr. Anschutz talk about the fact that it

20   was their practice to keep confidential CEB information and share

21   it with one another in violation of CEB company policies, a

22   practice they continued even after they both left CEB, as I'm

23   sure we'll hear from Mr. Wright today.

24        There was also in the record at least two e-mails where

25   Mr. Wright claimed to have knowledge of the merger in November of

1    2016, and, if Mr. Wright testifies, I'm sure we'll see those

2    today as well.  The bottom line, the jury has heard extensive

3    testimony and absolutely should be allowed to evaluate the

4    contrasting explanations of the witness's truthfulness to

5    determine the facts in this case.  Thank you, Your Honor.

6          THE COURT:  What e-mails do you use to say that?

7          MR. MAHER:  I'm sorry?

8          THE COURT:  What e-mails are there that say that he

9    mentioned a merger?

10         MR. MAHER:  So exhibits --

11         THE COURT:  Before December.  Because your witness,

12   Mr. Anschutz, testified that he didn't tell Wright until -- in

13   December when he came back from England, if I'm correct.

14         MR. MAHER:  That is correct, Your Honor.  That is a fair

15   characterization of Mr. Anschutz's testimony.

16         Let me say two things.  One is, we think he's not being

17   truthful.  I think that his testimony is undermined by the fact

18   that the two of them on November 3rd, 2016, exchanged e-mails

19   concerning the effects of a changed control at CEB.  It's also

20   undermined just in the record by Mr. Wright's representations to

21   employers, that he was working on the merger in November of 2016.

22         It's also undermined by Mr. Anschutz's and Mr. Wright's

23   practice over the years of keeping and exchanging confidential

24   CEB information, a clear violation of CEB company policies.

25   There's every reason to think, given the extent of their

1   relationship, the frequency of their communications, that

2   Mr. Anschutz informed Mr. Wright about the merger, the final

3   evidence of which is that following Mr. Wright's extensive

4   communications with Mr. Clark, you can see Mr. Clark's, I mean,

5   ludicrously implausible trading take place in December and

6   January.

7          THE COURT:  All right.

8          MR. MAHER:  Thank you.

9          THE COURT:  Do you have anything else you'd like to say?

10         MR. CUMMINGS:  You put your finger right on our point.  He

11  didn't know until December 12th, 2016, that the merger was in the

12  offing.

13         Everything else is smoke and unclear, and I don't think

14  they shook Mr. Anschutz's testimony at all.  And if we have to go

15  forward, we're probably going to be in a position to put

16  Mr. Wright on the witness stand, and I'll raise this motion again

17  at the end of the case.

18         THE COURT:  Well -- okay.  There's no question that the

19  government can pursue this case and the case of insider trading

20  on circumstantial evidence.  There obviously is no direct

21  evidence, and you admitted that in the opening statement.  What

22  I'm having trouble doing is coming up with any circumstantial

23  evidence that would justify a finding that Mr. Clark got insider

24  information and took some action on it.  We talk about highly

25  suspicious trading; that's not the evidence.  The evidence is

1    that Mr. Clark engaged in trading in puts and calls for a

2    considerable period of time, perhaps since 2008, but -- I don't

3    remember the exact date -- but over a long period of time he has

4    been involved in buying and selling this stock, according to the

5    evidence, and he's done it with puts and calls.  Well, you can

6    characterize puts and calls as highly suspicious behavior,

7    perhaps.  Most investors don't get involved in that risky kind of

8    trade.  But Mr. Clark was doing it long before you alleged he got

9    some insider information, and I can't see where that provides you

10   with any implication that he at some point in time got insider

11   information that he needed to take some action.

12        You put on your own witness, Mr. Anschutz, who said that

13   he didn't tell Mr. Wright anything about the merger until in

14   December when he came back from England.  Mr. Clark was already

15   involved in buying and continuing to buy the options for this

16   company.  I don't see where there's any evidence that anything

17   changed when you allege he got insider information.  He didn't

18   start doing anything new.  He continued just the same course on

19   through.  And where is any evidence that he got insider

20   information to do this?

21        MR. MAHER:  Your Honor, if I could address that.  First of

22   all, Mr. Clark was getting insider information ahead of his

23   preceding quarterly trading.

24        Now, the evidence on that is twofold.  One is, he had an

25   improbable success rate on that trading.  You heard our expert

1    talk about when you buy out-of-money calls, there's four things

2    that can go wrong, there's only one thing that can go right.

3    It's not a coin flip, yet Mr. Clark again and again and again got

4    it right just trading ahead of those quarterly trades.  In fact,

5    he predicted the stock price 14 out of 17 times in terms of the

6    direction it was going to go.  Those trades were preceded by

7    calls with Mr. Wright.  Mr. Wright is the head of the bookings

8    team.  He's a senior finance officer.  There's no dispute he had

9    that inside information.  So it's not just that Mr. Clark was

10   doing the trading -- his success rate is extraordinary.  It

11   defies any rational explanation, except that he had an

12   information advantage.

13       The other piece to recognize is that his trading itself,

14   it wasn't just that he was engaging in puts and calls, he was

15   doing things to finance it like opening up credit lines,

16   borrowing money, mortgaging his car.  His practices in connection

17   with that trading also suggest that it's someone who's trading

18   with an information advantage; the kind of evidence that a jury

19   should absolutely be allowed to decide.

20       And let's not forget, Your Honor, that Mr. Clark and

21   Mr. Nevins simultaneously, when asked about this, their trading,

22   by the FBI, both lied.  What are the chances, Your Honor, that

23   two gentlemen who traded honestly and fairly would simultaneously

24   at the same moment lie to the FBI about the basis for their

25   trading?  So I just want to reiterate, his history of trading

1    also reveals having an information advantage.  It is totally

2    consistent with having bet that CEB was going down for years.

3    Again and again and again he's making money by betting the stock

4    price is going down.  The first time he turns himself around and

5    pulls an investing 180, starts buying calls, wouldn't you know

6    it, just a couple of weeks later CEB announces a merger.

7         Again, the pattern of trading, the specifics, the

8    particulars, and the lies following the trading absolutely

9    support a strong circumstantial case that a jury, under Rule 50,

10   should be allowed to evaluate.  It is absolutely, under the

11   cases, a legally sufficient basis for a judgment.

12        THE COURT:  All right.

13        MR. CUMMINGS:  Just briefly, Judge.  The Nevins piece that

14   he talked about is a nothing burger.

15        The Nevins piece is -- he explained his trading to the FBI

16   agent.  He didn't lie about his trading.  And they talked about

17   Bill Wright being a part of CEB.  What Nevins lied about and what

18   Mr. Clark had maybe lied about, they were protecting each other

19   because he heard about $50,000 cash that he presumed to be in a

20   duffel bag, and that's what the FBI thought was the payoff to

21   Mr. Wright.  Well, it was a nothing burger.  It didn't happen.

22   Nevins went back and said, I lied, I didn't know what was going

23   on with my dad, I was trying to protect him.  Mr. Clark said, I

24   was trying to protect my son.  It had nothing to do with the

25   trades.  They dropped the case against Nevins.  They've taken no

1  enforcement action against Nevins.  He still has his earnings

2  from those trades.  He's out of the case.

3       The success rate that he points to justifies what you're

4  talking about.  He was successful 14 out of 17 times.  That means

5  he's a pretty good trader.  He still failed at least three times,

6  lost money on three times, was wrong three times.

7       And you've -- Judge, you've hit the thing.  He's been

8  doing this for years.  The circumstantial evidence -- we got the

9  direct evidence that he didn't do it from every witness who's

10  testified.  But the circumstantial evidence doesn't measure up,

11  Judge.  It would be a travesty for the jury to have to decide

12  this case on this weak evidence; that he borrowed money on his

13  car?  That he got an allowance on anyway he could use any way he

14  wants that would cover that?  He's a mortgage banker.  He

15  testified, I use debt.  I use debt when I get short on

16  commissions.  But he still made $340,000 that year.

17       THE COURT:  Well, I find, in regard to the trading, I

18  don't think there's anything suspicious about his trading.

19  There's nothing in evidence that would show that there's

20  something suspicious about his trading.  You know, you can say

21  he's a little more successful, maybe, than the ordinary person

22  would be, but the ordinary person doesn't mess with puts and

23  calls.  The fact that he's been a little more successful and

24  didn't lose money, I don't think that tells us anything.

25       As far as the lies to the FBI, I believe Counsel's right

1    about the fact that he only lies to the FBI when the issue was

2    raised about his son.  Otherwise, he seemed to be perfectly

3    honest with the FBI about what he had done and what he didn't do,

4    and what he told the FBI would comply with the evidence that

5    we've heard in this case.

6         As far as his finances are concerned, I don't see anything

7    that's a problem about his finances.  I mean, you could quibble

8    how somebody raised a few dollars, but this wasn't a man who was

9    desperate for money.  At all times during this entire situation

10   and before, his assets far exceeded his liabilities.  That's

11   just -- I don't see that there's anything here to go forward.

12   It's just a matter of speculation.  I mean, the government can

13   speculate that he made a little too much money, he was a little

14   too successful or more successful than he ought to be, so

15   therefore he's getting insider information, but there's no

16   evidence of it.  I mean, we've got phone calls and e-mails with

17   he and his brother-in-law, but obviously he's communicating with

18   his brother-in-law.  He said they weren't all that close, but

19   that doesn't mean they didn't talk and didn't do things together

20   and have obligations together and that sort of thing.  Of course

21   he would talk to his brother-in-law, and vice versa.

22        So, there's just simply no circumstantial evidence here

23   that gives rise to an inference that he received the insider

24   information, as has been alleged here.  And I think it's my duty

25   to grant the motion for a directed verdict -- not a directed

```
 1    verdict, but more of a judgment as a matter of law, and the
 2    judgment will be entered in favor of the defendant.
 3         MR. MAHER:  Your Honor, we just want to say a few things.
 4    One would be, we invite the Court to allow us to brief the issue
 5    before you make a decision.  But if not --
 6         THE COURT:  You've already argued it.  There's no reason
 7    to do anything further.
 8         MR. MAHER:  Okay.  And then, yes, you just --
 9         THE COURT:  I understand your argument.  I just disagree
10    with it.
11         MR. MAHER:  And that's fine, Your Honor.  And so the SEC,
12    just for the record, also wants to -- I'm not sure if we need to
13    object to preserve our rights for appeal, but just wanted to get
14    that on the record.  That's all.
15         THE COURT:  That's fine.
16         MR. MAHER:  Okay.
17         THE COURT:  All right.  Thank you, all.  Marshal, you can
18    excuse the jury.  Tell them what I've done and excuse the jury.
19         THE COURT SECURITY OFFICER:  Let them go?
20         THE COURT:  Let them go.  The case is over.
21         MR. CUMMINGS:  Judge, I --
22         THE COURT:  I've decided the case.  It's over.
23         MR. CUMMINGS:  Judge, I -- they sat through two days of
24    testimony.  Just as a matter of comity, I think you should invite
25    them in and just let them know what you did.  Just two sentences.
```

1  It's your court.  I don't mean to be --

2        THE COURT:  Well, I don't see any reason to do that.  I

3  mean, I -- the marshal can tell them what I did just as well as I

4  can tell them what I did.

5        MR. CUMMINGS:  Thank you, Judge.

6        THE COURT:  I don't understand the point.

7        MR. CUMMINGS:  Thank you, Judge.  Appreciate it.

8        THE COURT:  All right.  All right.  I'm going to enter an

9  order returning the exhibits to you all.

10        MR. CUMMINGS:  Do you want us to pick those up today, get

11  them out of here?

12        THE COURT:  The clerk does.

13        MR. CUMMINGS:  Thank you.

14        THE COURT:  All right.  Okay.  We'll adjourn now until

15  10:00 tomorrow morning.

16        (Proceedings adjourned at 10:35 a.m.)

17                    **C E R T I F I C A T E**

18

19              I, Scott L. Wallace, RDR-CRR, certify that
        the foregoing is a correct transcript from the record of
20        proceedings in the above-entitled matter.

21

        /s/ Scott L. Wallace                    12/13/21
22        ---------------------------      ---------------
        **Scott L. Wallace, RDR, CRR              Date**
23        **Official Court Reporter**

24

25