1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                  ALEXANDRIA DIVISION

 3
    UNITED STATES SECURITIES AND    )
 4  EXCHANGE COMMISSION             )
                                    )
 5                                  )
         VS.                        )   1:20-CV-1529  CMH
 6                                  )
                                    )   ALEXANDRIA, VIRGINIA
 7                                  )     DECEMBER 9, 2021
                                    )
 8  CHRISTOPHER CLARK               )
    _____)
 9

10

11

12

13  _____
14              TRANSCRIPT OF TRIAL
15      BEFORE THE HONORABLE CLAUDE M. HILTON
            UNITED STATES DISTRICT JUDGE
16                  AND A JURY

17              A.M. SESSION
18  _____

19

20

21

22

23

24  Proceedings reported by stenotype, transcript produced by

25  Julie A. Goodwin.
```

2

1                        A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:
           U.S. SECURITIES AND EXCHANGE COMMISSION
4          By:  MS. OLIVIA S. CHOE
           MR. DANIEL J. MAHER
5          MS. SARAH M. HALL
           MR. JOHN LUCAS
6          100 F Street, N.E.
           Washington, DC  20549
7          202.551.5000
           choeo@sec.gov
8          maherd@sec.gov
           halls@sec.gov
9          lucasj@sec.gov

10

11   FOR THE DEFENDANT CHRISTOPHER CLARK:
12         SHER, CUMMINGS & ELLIS
           By:  MR. MARK D. CUMMINGS
13         MR. DAVID E. SHER
           MR. ADAM M. COLLINS
14         3800 Fairfax Drive
           Suite 7
15         Arlington, Virginia  22203
           703.525.1200
16         mcummings@sherandcummings.com
           acollins@sherandcummings.com
17

18

19   OFFICIAL U.S. COURT REPORTER:
20         MS. JULIE A. GOODWIN, RPR
           United States District Court
21         401 Courthouse Square
           Eighth Floor
22         Alexandria, Virginia  22314
           512.689.7587

23

24

25

                                       Julie A. Goodwin, CSR, RPR

CLARK - Direct                                                        3

 1  (OCTOBER 29, 2021, 10:17 A.M., OPEN COURT.)

 2          THE COURTROOM DEPUTY:  Please rise for the jury.

 3      (JURY IN AT 10:17 A.M.)

 4          THE COURTROOM DEPUTY:  Mr. Clark, you can take the

 5  stand.

 6          THE COURT:  All right.  Good morning.

 7          MS. CHOE:  Good morning, Your Honor.

 8                    **CHRISTOPHER CLARK**,

 9      having been previously sworn, testified as follows:

10                  DIRECT EXAMINATION (Continued)

11  BY MS. CHOE:

12  Q.  Good morning, Mr. Clark.

13  A.  Good morning.

14  Q.  Yesterday at the end of the day we were talking about your

15  interview with the FBI.  Do you recall that?

16  A.  Yes.

17  Q.  After you were interviewed, you went to your son's office

18  to talk to him.  Is that right?

19  A.  Yes.

20  Q.  When you talked to Mr. Nevins, did he tell you that he had

21  lied to the FBI?

22  A.  No.

23  Q.  And did you tell him that you had also lied to the FBI?

24  A.  No.  It wasn't part of our conversation.

25  Q.  Now, did you and your son talk about the fact, during this

CLARK - Direct                                                        4

1    conversation, that Bill Wright was working at CEB at the time

2    of the merger?

3    A.   No, we did not discuss that, I don't believe.

4    Q.   You heard him testify that he learned, in that first FBI

5    interview, that Mr. Wright worked at CEB.  Correct?

6    A.   Correct.

7    Q.   But he didn't --

8    A.   I'm sorry.  Go ahead.

9    Q.   But he didn't ask you why you never told him that when you

10   recommended all of these CEB trades to him?

11   A.   What I remember from that conversation was discussing

12   withdrawal of $50,000 out of his account at Wells and it being

13   on video, with me being on the phone with him, because I had no

14   recollection of that.

15   Q.   So the answer is no, the topic of him learning about

16   Mr. Wright didn't come up?

17   A.   I don't recall.  What I said was I recalled from that

18   conversation talking about the $50,000 because I had not known

19   or heard of any of that.  And I was told that I was on the

20   phone with him while they were -- they had video of him taking

21   50,000 cash in, like -- I don't know -- they were insinuating a

22   duffel bag or something.  So that was what I recall from that

23   conversation.

24   Q.   Now, about a week after your FBI interview, do you recall

25   that the SEC sent a subpoena to you?

CLARK - Direct                                                    5

1  A.   I don't remember the timelines, but I know that I had

2  received one, yes.

3  Q.   If you could look at SEC Trial Exhibit 148 in your binder.

4           Do you see that's a letter attaching a subpoena to

5  you, care of your attorney, Mr. Cummings, dated November 3rd,

6  2017?

7  A.   Yes.

8  Q.   Do you recall that the subpoena asked you to produce all of

9  your communications with Mr. Wright from 2013 up until November

10 2017?

11 A.   Yes.

12 Q.   And in response to the subpoena, you produced some screen

13 shots of text messages between you and Mr. Wright.  Correct?

14 A.   Correct.

15 Q.   Could you turn to Exhibit 1 in your binder?

16 A.   Yes.

17 Q.   Those are the messages -- the screen shots that you

18 produced.  Correct?

19 A.   Yes, I had taken these, with my counsel, off my phone and

20 had them in a print form here.

21 Q.   Now, we talked about how the merger was announced on

22 January 5th, 2017.  Correct?

23 A.   Correct.

24 Q.   And we talked yesterday about how you sold your call

25 options on January 5th and 6th, 2017.  Correct?

CLARK - Direct                                                    6

1   A.   Correct.

2   Q.   But what you see in Exhibit 1 is that the oldest text

3   messages between you and Bill Wright that you produced is dated

4   January 7th, 2017.  Correct?

5   A.   Correct.

6          PARALEGAL:  Trial Exhibit number?

7          MS. CHOE:  Still on Trial Exhibit 1.

8          PARALEGAL:  Okay.  Thank you.

9   BY MS. CHOE:

10  Q.   That's the day after you sold all those options.  Correct?

11  A.   A day or two, yes.  It was on Saturday and I sold them on

12  Thursday and Friday.

13  Q.   And at this point in -- in December, when you produced

14  these, you knew that the FBI and the SEC were both

15  investigating your December 2016 trading.  Correct?

16  A.   Correct.

17  Q.   But you didn't produce any messages from before

18  January 7th, 2017.  Correct?

19  A.   Correct.

20  Q.   You didn't produce any from December 2016 when you were

21  buying those options.  Correct?

22  A.   Correct.

23  Q.   Now, the subpoena that we were just looking at, it also

24  required you to provide your cell phone.  Do you recall that?

25  A.   Correct.

CLARK - Direct                                                    7

1  Q.  But when you got the subpoena, you didn't, in fact, hand

2  over your iPhone to the SEC.  Is that right?

3  A.  My phone -- I don't own it.  It's my company's phone, the

4  company I work for.  And I believe that we explained that to

5  you at the time.

6           And in addition to that, that's why we supplied

7  these text messages that were on the phone.  And that phone

8  was -- the end of January 2015, when I was making the trades,

9  the phone that I had at that time was turned in to my company

10 right after Christmas, and I had gotten a brand new phone at

11 the end of December 2016.

12 Q.  So just to make sure we're clear, you're saying you didn't

13 hand over your phone initially because it was a company-issued

14 iPhone.  Is that right?

15 A.  Well, I work for a mortgage company, and there's financial

16 information on that phone for clients, company information.  It

17 was not my phone to hand over, nor was it my computer.  And I

18 believe we shared that information with you, and you eventually

19 subpoenaed my work to get that phone and computer.

20 Q.  If you could take a look at SEC Trial Exhibit 166.

21           Is that the letter that you're referring to where

22 you told the SEC that the phone belonged to your employer and

23 asked the SEC to let you know if the SEC was going to request

24 your phone from your employer?

25 A.  I do believe that this letter was sent to you, yes.

                                        Julie A. Goodwin, CSR, RPR

CLARK - Direct                                                    8

1          MS. CHOE:  Your Honor, we would move to admit SEC

2    Trial Exhibit 166.

3          THE COURT:  Any objection?

4          MR. CUMMINGS:  Judge, may I have -- could you indulge

5    me for a moment?  It seems there's a little confusion about

6    this exhibit.

7          THE COURT:  All right.

8      (BRIEF PAUSE.)

9          MR. CUMMINGS:  Judge, I know why we objected to this.

10   This is a letter signed by me.  It's counsel's representation

11   of what happened.  It's hearsay as to him.  And I don't think

12   they're permitted to get a letter from counsel -- I don't want

13   to take the witness stand about this.  But everything in here

14   is what I said that I knew about these issues in --

15   December 16th, 2017.  And I don't think it's admissible.

16          And I initially didn't object to it, and we've got

17   a mountain of exhibits.  And then when I looked closer at it

18   and realized it was under my signature and it enclosed a disk

19   with financial records, e-mails and texts, I just don't think

20   it's appropriate to go into evidence.

21          MS. CHOE:  Your Honor, we would submit that this is a

22   letter from Mr. Clark's counsel on his behalf, as his agent,

23   and is therefore not hearsay.  It's also something Mr. Clark --

24          THE COURT:  Objection overruled.  It's admitted.

25      (PLAINTIFF'S EXHIBIT 166 ADMITTED.)

CLARK - Direct                                                        9

1          MS. CHOE:   Thank you, Your Honor.

2    BY MS. CHOE:

3    Q.   So this was the letter that you were just talking about.

4    Is that right, Mr. Clark?

5    A.   I believe so.  If I could have a moment to read it.  It is

6    three pages -- a three-page-plus long letter.

7    Q.   You are free to read it, but if I could direct you to the

8    portion that I was asking about, that might help.

9    A.   If you can point to that direction, and I'll...

10   Q.   If you turn to page 3 of the letter, the large paragraph in

11   the middle, do you see at the end of that paragraph the letter

12   says, I would like to be informed if you are going to seek

13   information from his employer directly?

14          Do you see that?

15   A.   I do.

16   Q.   And then, as you testified a moment ago, the SEC did

17   ultimately go to your employer.  Correct?

18   A.   Correct.

19   Q.   And do you recall that after the SEC contacted your

20   employer, you were then scheduled to bring your phone in on

21   January 12th, 2018?

22   A.   Correct.

23   Q.   And by that time, January 12th, 2018, you knew that both

24   the FBI and the SEC were investigating your December trading in

25   CEB.  Correct?

1  A.  Correct.

2  Q.  And knowing all of this just days before January 12th, you

3  say that you lost your phone.  Correct?

4  A.  Correct.

5  Q.  Right after --

6  A.  Two weeks prior to that, approximately.

7  Q.  December --

8  A.  And before you contacted the employer.

9  Q.  December 31st?

10  A.  Yes.

11  Q.  Knowing that the SEC and the FBI were investigating --

12          MR. CUMMINGS:  Asked and answered.

13  BY MS. CHOE:

14  Q.  -- you say that's when you lost your phone?

15          THE COURT:  He's already answered yes.  It's asked and

16  answered.

17          MS. CHOE:  Thank you, Your Honor.

18  BY MS. CHOE:

19  Q.  Right after you say you lost your phone, you asked your

20  work for a replacement.  Correct?

21  A.  Correct.

22  Q.  And you didn't try to recover data from your old phone to

23  transfer to your new phone.  Is that right?

24  A.  It wasn't backed up, is my understanding.  The only thing

25  that was backed up was contacts.

CLARK - Direct                                                         11

1   Q.  Mr. Clark, I can't remember if you -- if I provided you

2   with a copy of your deposition testimony yesterday.

3               Do you have it up there?

4   A.  I do not have it.  Well, maybe this is it.  Hold on.

5   Q.  No, it's not.

6   A.  No, that's not it.

7               MS. CHOE:  With the Court's permission, may I hand --

8               THE COURT:  All right.

9               MS. CHOE:  -- a copy up here to the Court Security

10  Officer?

11              Thank you.

12  BY MS. CHOE:

13  Q.  Mr. Clark, do you recall that you were deposed during this

14  case in June of 2021?

15  A.  Correct.

16  Q.  And when you were deposed, you were under oath, as you are

17  today.  Right?

18  A.  Correct.

19  Q.  If you could turn to page 38 of your transcript.

20              And do you see that, at line 18, you were asked:

21  Did you ever try to recover data from the iPhone that you say

22  you lost on New Year's Eve?

23              Do you see that question?

24  A.  I do.

25  Q.  And do you see that your response is:  I did not?

CLARK - Direct                                                    12

1   A.   I do.

2   Q.   And so when your phone was turned in to the SEC a few days

3   later, it was a new phone with nothing on it.  Correct?

4   A.   Essentially, yes.  It had a couple of weeks' worth of data

5   on it.

6   Q.   Mr. Clark, when Mr. Wright got married -- you can set that

7   down.

8           When Mr. Wright got married -- I think you said it

9   was somewhere around 2000 or thereabouts -- were you in the

10  wedding?

11  A.   I was.

12  Q.   And what was your role?

13  A.   Well, my wife was one of the bridesmaids, because it was

14  her sister getting married, and they had both of us matched up

15  to be in the wedding.

16  Q.   So you were a groomsman?

17  A.   Effectively, yes.

18  Q.   Could you take a look at SEC Exhibit 94?

19  A.   Yes.

20  Q.   And is that a photo of the wedding party?

21  A.   Yes, it is.  What year?  2007 or '8, you said?

22  Q.   I think you said yesterday about 2007.

23  A.   Okay.

24  Q.   And is that Mr. Wright in the middle of the top row?

25  A.   It is.

1  Q.  And then who is immediately to his right, our left?

2  A.  That would be me.

3  Q.  And who's standing next to you on the other side?

4  A.  That would be Barron.

5  Q.  And who is Barron?

6  A.  Anschutz, a friend of Bill's.

7  Q.  Did you also go to Mr. Wright's bachelor party before he

8  got married?

9  A.  We had a trip to Las Vegas, yes.

10  Q.  And there were --

11  A.  Going back to the picture, in -- you know, so the bride is

12  kneeling down in front and --

13          MS. CHOE:  Your Honor, there's no question pending at

14  this time.

15          THE COURT:  Objection sustained.

16          THE DEFENDANT:  Well, you're asking about people in

17  the picture.  I was also trying to explain --

18          THE COURT:  Well, your attorney -- you've got an

19  attorney here --

20          THE DEFENDANT:  Okay.

21          THE COURT:  -- to do that kind of thing.  Just answer

22  her questions.

23          THE DEFENDANT:  Okay.

24  BY MS. CHOE:

25  Q.  The bachelor party was just three people, in addition to

```
CLARK - Direct                                                    14
```

 1  Mr. Wright.  Correct?

 2  A.   Essentially that were involved with this wedding here, but

 3  Tisha's cousins were also out there with another large group of

 4  people.

 5  Q.   Could you turn back to your deposition at page 311?

 6  A.   Page 311?

 7  Q.   Yes.

 8        And if I could direct your attention to line 4, do

 9  you see that you were asked:  When counsel was asking you

10  questions about your relationship with Bill, she mentioned that

11  I think you went to a bachelor party in Las Vegas with him?

12  A.   Correct.

13  Q.   And you answered:  Yes.

14        Do you see that?

15  A.   Yes.

16  Q.   And then you were asked:  And do you recall who else was

17  there?

18  A.   Yes.

19  Q.   And do you see that you answered:  Luis Pena, John

20  Vandenberg (phonetic), Barron Anschutz, Bill, and I believe

21  that may have been it?

22        Do you see that?

23  A.   Yes.

24  Q.   And you were under oath when you testified in June.

25  Correct?

CLARK - Direct                                                          15

 1  A.   Correct.

 2          THE COURT:  Well, that's the same thing he testified

 3  to here.

 4          MS. CHOE:  I believe there was a little additional

 5  testimony.  Just wanted to confirm, Your Honor.

 6          THE DEFENDANT:  Well, yes, that was --

 7          THE COURT:  All right.

 8          THE DEFENDANT:  -- who's stated on -- I'm sorry.

 9          THE COURT:  Let's move it along here.

10  BY MS. CHOE:

11  Q.   When -- did your car break down in January of 2017?

12  A.   Yes.  My engine had blown on it.

13  Q.   And whose car did you borrow at that time?

14  A.   There was a few days that had gone by.  And I believe at

15  some point Bill had shared with me that I could borrow his

16  third car that he normally has at his house for my in-laws to

17  use.

18  Q.   When the Wrights purchased their home in Arlington, did you

19  provide the mortgage?

20  A.   My company did, yes.

21  Q.   And that home, that's just a couple of miles from your

22  house.  Is that right?

23  A.   It is.

24  Q.   Did he sometimes refer mortgage clients to you?

25  A.   He would.

CLARK - Direct                                                      16

 1  Q.  And in addition to that house, Mr. Wright also owned a

 2  condo in Arlington.  Is that correct?

 3  A.  Correct.  He bought that before the house.

 4  Q.  Do you recall in January 2017, after the merger was

 5  announced, he was trying to sell his condo to his current

 6  tenant?

 7  A.  Yes.

 8  Q.  And do you recall that he introduced you to that tenant?

 9  A.  Yes.

10  Q.  And you tried to help the tenant get a mortgage so he could

11  buy that condo.  Right?

12  A.  Correct.  There was not a real estate agent involved in --

13  they were doing it as a "for sale by owner" kind of

14  transaction.

15  Q.  If you could turn back to SEC Trial Exhibit 1, the text

16  messages.  And if I could direct your attention to page 11.

17         Do you see that --

18         MR. CUMMINGS:  Could you hold on a second?

19         THE DEFENDANT:  Yeah, I'm not there yet.

20         MR. CUMMINGS:  Where is -- oh, I see.  I see -- I

21  found them.

22  BY MS. CHOE:

23  Q.  Do you have --

24  A.  Are you referring to, like, page 11 of 24?

25         MR. CUMMINGS:  Thank you.

CLARK - Direct                                                                    17

1           MS. CHOE:  Correct.  Yes.

2           THE DEFENDANT:  Okay.  Yes.

3    BY MS. CHOE:

4    Q.  Do you see that, on January 24th, 2017, Mr. Wright texted

5    you:  Was it Netflix or Nestle?  Tom just told me he heard

6    Nestle was moving here?

7           Do you see that text messages?

8    A.  Yes.

9    Q.  And you respond:  Nestle?

10   A.  Yes.

11   Q.  And that was a reference to a real estate deal where Nestle

12   was moving into a building near CEB.  Correct?

13   A.  It was a building that was near CEB in Rosslyn, a brand new

14   building that had been vacant for probably a year or two in

15   Arlington, and there was no tenant coming in, so it was always

16   a topic as to who was going to be moving in there.

17   Q.  And this first message from Mr. Wright, was that a

18   continuation of a conversation that you guys had previously

19   had?

20   A.  I assume.

21   Q.  And he tells you that he just heard from Tom that the

22   deal -- I'm sorry.  If you go down the page, his next text is:

23   They are not coming anymore.

24           Do you see that?

25   A.  Yes.

CLARK - Direct                                                    18

1   Q.  And you respond:  What?  Are you sure?

2   A.  Yes.

3   Q.  And he responds:  Their broker told Tom that already.  It's

4   our broker too.

5   A.  Yes.

6   Q.  CBRE is their broker.  That is what Lou Christopher told

7   Tom last week.

8            Do you see that?

9   A.  Yes.

10  Q.  Tom is Tom Monahan, the CEO of CEB.  Correct?

11  A.  I found that out through reading through the depositions,

12  yes.

13  Q.  Well, whose deposition are you referring to that you read

14  through?

15  A.  I believe I've read through them all, but I believe I saw

16  this in Bill's deposition.

17  Q.  If you turn to the next page, you don't ask anywhere who

18  Tom is.  Right?

19  A.  Nor Lou Christopher.

20  Q.  And Mr. Wright, he doesn't explain who Tom is.  Correct?

21  A.  He does not here.

22  Q.  And then couple of days later -- and just for the record,

23  we're at page 12 now -- do you see that on January 27th you

24  sent a message saying:  Following up on the above, I confirmed

25  done deal announcing 2/1?

CLARK - Direct                                                    19

1              Do you see that?

2    A.  I do.

3    Q.  And you're sending this message before February 1st.

4    Correct?

5    A.  Correct.

6    Q.  So before this information about the deal being a done deal

7    is going to be announced.  Is that right?

8    A.  It was known that it was going to be done.  They were just

9    having, I guess, an announcement on it on February 1st --

10   Q.  Well, Mr. Wright -- I'm sorry.

11   A.  It had been talked about through different real estate

12   brokers in the area.

13   Q.  Mr. Wright responds:  Wow.

14              Correct?

15   A.  He does.

16   Q.  So he seems surprised by the information.  Would you agree?

17   A.  Apparently.

18   Q.  And then if you could turn to page 17 of the text messages.

19   A.  Yes.

20   Q.  Do you see that on February 6th, 2017 you sent what looks

21   like a link to an article that says:  The Advisory Board

22   Company confirms that it's evaluating a potential sale?

23   A.  Yes.

24   Q.  And you write a message after that:  Interesting info.

25              Do you see that?

1   A.  Yes, it was an article that was published by

2   BizJournals.com and I forwarded it.

3   Q.  And Advisory Board is a company that's related to CEB.

4   Correct?

5   A.  Not any longer.  Probably 20 years prior to this I believe

6   CEB spun off of Advisory Board.

7   Q.  And you sent this to Mr. Wright because Advisory Board and

8   CEB were related companies -- had been related companies.

9   Correct?

10  A.  Correct.  Something of interest.

11  Q.  And then Mr. Wright called you back later that day.  Do you

12  see he says, Sorry -- you write:  I see that I missed your call

13  last night.

14          Do you see that in the next text message?

15  A.  Yes.

16  Q.  Did you and Mr. Wright ever talk about whether CEB was

17  going to be acquired in the same way that you send him an

18  article about Advisory Board potentially --

19  A.  We never discussed that.

20  Q.  -- being acquired?

21          I mean, you were investing thousands and thousands

22  of dollars in CEB.  Correct?

23  A.  This is -- was public information in an article that I had

24  forwarded to him based off of a company that was in the area,

25  and it had come across on BizJournal, and I knew that CEB had

CLARK - Direct                                                    21

1    spun off of them, and I had just sent it to him.

2            MS. CHOE:  Move to strike.  If the witness could

3    answer the question.

4            THE DEFENDANT:  Could you repeat the question, please?

5    BY MS. CHOE:

6    Q.  You invested thousands and thousands of dollars in CEB over

7    the years.  Correct?

8    A.  I have, yes.

9    Q.  And so you would have wanted to know if CEB were going to

10   be acquired.  Correct?

11   A.  Would I have wanted to know that CEB was being acquired?

12   Q.  Correct.

13   A.  No.  I've never received that information.  He's never

14   shared any of that information with me.  And -- no one has ever

15   shared that information with me.

16   Q.  In 2016 and 2017, you and Mr. Wright were both using

17   iPhones.  Correct?

18   A.  Yes.

19   Q.  And that's the blue and gray bubbles that we see in

20   Exhibit 1.  Correct?

21   A.  Yes.  And as you educated me on in my deposition, yes.

22   Q.  And as we heard the testimony yesterday, that's because

23   those are over the iMessage app.  Correct?

24   A.  Correct.

25   Q.  If I could ask you to take a look at Exhibit 2 in your

CLARK - Direct                                                    22

1   binder.

2           Do you see that on December 19th of 2014, you sent

3   an e-mail to Mr. Wright asking him to take a look at the stock

4   of the company where you worked, MVB Financial?

5   A.   Yes.

6   Q.   And you asked him to share his thoughts on the stock with

7   you because you were contemplating buying some shares.

8   Correct?

9   A.   Correct.

10  Q.   And you wanted to get his thoughts.  Is that right?

11  A.   Correct.

12  Q.   And Mr. Wright -- he responded later that day with his

13  assessment of the stock you were asking about.  Correct?

14  A.   Correct.

15  Q.   And then if you could take a look at SEC Exhibit 3.

16          Do you see that in March of 2017 you sent an e-mail

17  to Mr. Wright with the financial results for MVB for the year

18  of 2016?  Do you see that?

19  A.   Correct.

20  Q.   And you asked him:  See below.  What do you think?

21          Right?

22  A.   Correct.

23  Q.   And I think we already said this, but MVB was the company

24  where you were working at the time.  Right?

25  A.   Correct.

CLARK - Direct                                                    23

1  Q.  And you invested way less in MVB than you did in CEB.

2  Correct?

3  A.  Yes, out of my own funds, but I also had stock options with

4  that that I was granted as an employee there.

5  Q.  But in your E*TRADE accounts, where you did your active

6  trading, you invested way more in CEB than in MVB.  Correct?

7          MR. CUMMINGS:  Asked and answered.

8          THE DEFENDANT:  There was more in CEB.

9  BY MS. CHOE:

10  Q.  And you asked Mr. Wright for advice on investing in the

11  company where you worked.  Correct?

12          MR. CUMMINGS:  Asked and answered.

13          THE COURT:  Objection sustained.

14  BY MS. CHOE:

15  Q.  But is it your testimony you never talked to him about

16  investing in the company where he worked?

17  A.  Correct.

18  Q.  Now, in early December of 2016, you and Mr. Wright were

19  talking about the fact that he was thinking of leaving CEB and

20  moving to a new job in South Carolina.  Is that right?

21  A.  Correct.

22  Q.  And is it fair to say that in December of that year and

23  January 2017, you and Mr. Wright were actually in more frequent

24  contact than usual?

25  A.  I would say that that's fair to say.  There was -- seemed

CLARK - Direct                                                  24

1   like a lot going on between the first time our daughters were

2   playing basketball together and I was coaching the team, as

3   well as their discussion of relocating to Charleston, as well

4   as the holidays; always seems to be that we have multiple

5   occasions that we get together over the holidays.  And then, as

6   we've gone through and discussed already with the car.

7               Yeah, I would say that that was probably an

8   elevated amount of time that we were discussing more than

9   normal times of the year.

10  Q.  Was there any relationship between that elevated amount of

11  contact and your purchases of all those CEB options in that

12  same month?

13  A.  There was not.

14  Q.  Could you take a look at SEC Trial Exhibit 129A.

15              Do you have 129A?

16  A.  One second.

17  Q.  Do you understand --

18  A.  Hold on.  Hold on.

19  Q.  Do you have it now?

20  A.  I do.

21  Q.  And do you understand that this is a summary prepared by

22  the SEC of Verizon records showing contacts between you and

23  Mr. Wright between January 2016 and January 2017?

24  A.  Those are the dates that are on this.

25  Q.  And if I could direct your attention to pages 4 to 5.

CLARK - Direct                                                      25

1           Do you see that there are a number of call and text

2    contacts listed in November and December of 2016?

3           Starting at row 78 through about 98, 99.  Do you

4    see that?

5    A.   78 through what number?

6    Q.   About 99.  98.  Apologies.

7           Do you see that?

8    A.   So from November 15th to January 5th.

9    Q.   Correct.

10          Just looking at November and December, basically,

11   do you see there are a number of entries?

12   A.   Yes.

13   Q.   And you heard Mr. Wells from Verizon testify yesterday.

14   Correct?

15   A.   I did.

16   Q.   So these Verizon contacts wouldn't include any of the

17   iMessages between you and Bill Wright during this period.

18   Correct?

19   A.   I'm not an expert to comment on that, but from what he

20   said, iMessages would not be.

21   Q.   Fair enough.

22          Now, again, back to June and your deposition in

23   June.  Do you recall that during the deposition I showed you a

24   very similar chart to this one?  During your deposition do you

25   recall that?

CLARK - Direct                                                    26

1   A.   I guess.  I mean, there was a lot of stuff that we went

2   over, but okay.

3   Q.   Fair enough.

4              And do you recall that I asked you some questions

5   about calls between you and Mr. Wright that looked like they

6   took place between midnight and 1:00 a.m.?

7   A.   Yes.

8   Q.   And I asked you whether you and Mr. Wright usually talked

9   on that phone at that time?

10  A.   I do.

11  Q.   And do you recall that you responded that you were usually

12  in bed at that time and you didn't have any idea what those

13  calls were?

14  A.   Correct.

15  Q.   And you're aware that, as it turns out, those calls didn't

16  actually take place at 1:00 a.m.  Right?

17  A.   Yeah.  I believe the wrong time -- it was based off of

18  England time or something.

19  Q.   You're aware that there was --

20  A.   There's a five-hour difference.

21  Q.   There were some errors in that version because of some time

22  zone issues in the Verizon records.  Is that what you're

23  saying?

24  A.   That's what was brought to our attention, yes.

25  Q.   And do you understand that the SEC has since corrected

1  those time zone issues?

2  A.  I believe so, yes.

3  Q.  When you were interviewed by the FBI in October 2017, do

4  you recall they asked you whether you knew anyone who worked at

5  CEB?

6  A.  Yes.  I think we discussed that yesterday.

7  Q.  I think you're correct, we discussed the FBI interview.

8  But this is a new area in the FBI interview.  Do you recall

9  that they asked you that question?

10  A.  Yes.

11  Q.  And when they asked you that, you only referred to mortgage

12  clients over the years who had worked at CEB.  Is that right?

13  A.  That is correct.

14  Q.  You did not mention Bill Wright when you were asked that

15  question.

16  A.  As the interview went on, and we discussed further, he --

17  it had come up about Bill Wright and why I didn't mention him

18  initially.  And it was a tense issue because he asked, do I

19  know anyone who worked there currently?

20          And Bill didn't work there currently.

21          And then, after we discussed, it came out, and

22  discussed the tense, Bill was added to that, yes.

23  Q.  So just to be clear, your testimony is that when the FBI

24  asked you if you knew anyone who worked at CEB, you didn't

25  mention Mr. Wright who had worked there for over a decade

CLARK - Direct                                                      28

1  because there was confusion about present and past tense?

2  A.   Yes.

3  Q.   You knew at that time that the FBI was asking you questions

4  about your trading in December of 2016.  Correct?

5  A.   Yes.

6  Q.   But you thought they only wanted to know if you knew anyone

7  who was working at the company in October of 2017?

8  A.   He asked in the tense of who's -- do you know -- who do you

9  know that works at CEB?

10 Q.   So you didn't think that, even though they were

11 interested --

12        THE COURT:  Objection sustained.  He's answered your

13 question.  That's just argument.

14        MS. CHOE:  I can move on, Your Honor.

15 BY MS. CHOE:

16 Q.   Do you recall hearing Agent Desor testify about your

17 interview yesterday?

18 A.   Yes.  And he covered this as well.

19 Q.   And do you recall him saying that you told the FBI that you

20 bought options in December in advance of an earnings

21 announcement?

22 A.   Yes.

23 Q.   CEB usually announced its fourth quarter earnings in early

24 February.  Correct?

25 A.   Correct.

1  Q.   And you knew that because you traded around February

2  earnings announcements multiple times in the past.  Right?

3  A.   Correct.

4  Q.   In 2008, you made $70,000 in just two days around February

5  earnings.  Is that right?

6  A.   I'm sorry.  What was the date again?

7  Q.   February 2008, $70,000?

8  A.   We're going way back, but I know that I had successful

9  trading, yes.

10  Q.   And in February 2009, do you recall you made over $57,000

11  trading around that February announcement?

12  A.   What was that year?

13  Q.   2009.

14  A.   I know I had successful trading then.

15  Q.   And in fact, earlier that very year, in 2016, you made

16  almost $10,000 trading around the February earnings

17  announcement.  Correct?

18  A.   Yes.

19  Q.   The purchases that you started making on December 9th,

20  those were two months ahead of when a February earnings

21  announcement would have come out.  Correct?

22  A.   Correct.

23  Q.   And you didn't usually buy options two months in advance of

24  an earnings announcement.  Right?

25  A.   In this case, what was different was that we were seeing,

1  after December and the Dow going up 2,000 points, CEB stock had

2  gone from approximately 47 to $60 in one-month term, about a 28

3  percent increase.  I wanted to buy earlier because we had a

4  business-friendly administration coming in and it was apparent

5  in the market at that time across the board with many companies

6  in the way their stocks had been going up.  So I wanted to get

7  in now so I had the runway between December and the February

8  earnings call.  That was part of it.

9          The second part of it is CEB is a

10 business-to-business consulting company, and they -- their --

11 most of their customers are Fortune 500 companies, so if things

12 are doing well with these companies, they're going to be

13 spending more money with CEB, so therefore, there would be

14 hopefully an improved guidance for the announcement on earnings

15 in early February.

16         That was the strategy that I had on that.

17 Q.  Okay.  You just said a whole lot, so I'm going to try to

18 ask a few questions about different things.

19 A.  Please.

20 Q.  So these trades that you started making early, to get in

21 early, I think you said, before a February earnings

22 announcement --

23 A.  Correct.

24 Q.  -- they started on December 9th.  Correct?

25 A.  Yes.

CLARK - Direct                                                           31

1  Q.  Do you recall why you picked that day in particular to

2  start trading?

3  A.  Well, as I said, there had been a lot that had occurred

4  over that time with the increase in the stock and I started

5  thinking, well, if I wait until my normal time frame to do it,

6  that would -- you know, might be missing out on potential

7  gains.  So I started early in December.

8  Q.  When you're talking about the recent increases, you're

9  talking about the increase in CEB stock that occurred in

10 November of 2016.  Is that right?

11 A.  Correct.  I wish I had started buying then.

12 Q.  But you didn't start buying then, did you?

13 A.  No, I did not.

14 Q.  You didn't start buying until December.  Correct?

15 A.  The first week of December, yes.

16 Q.  And I think as you testified yesterday, you continued

17 buying throughout December into early January.  Correct?

18 A.  Correct.

19          THE COURT:  Haven't we been all over this more than

20 once?

21          MS. CHOE:  I was just asking some questions about the

22 witness' testimony.  If the Court would like, I can move on.

23          THE COURT:  Yes.

24 BY MS. CHOE:

25 Q.  Now, you told us just a moment ago about buying options to

CLARK - Direct                                                      32

 1  get in early before the February announcement would come out.

 2  Correct?

 3  A.   Yes.

 4  Q.   But on December 9th you bought January call options.

 5  Right?

 6  A.   Correct.

 7  Q.   And those options would have expired weeks before any

 8  February earnings announcement.  Correct?

 9  A.   Correct.

10  Q.   So those were not part of an earnings trade, were they?

11  A.   Those were, as I said in my deposition, a mistake that I

12  had done, purchase -- I meant to purchase February, and I had

13  accidentally purchased January's.

14  Q.   So your testimony is that you bought those by mistake?

15  A.   Those -- that one little allotment that I purchased at that

16  time was by mistake.  There was a drop-down window, and it's

17  very easy to buy the wrong month.  And every other one after

18  that was for January -- pardon me, February and March.

19  Q.   You were sitting on E*TRADE for quite a while that day, on

20  December 9th, buying options.  Correct?

21  A.   I'm on E*TRADE pretty much every day.

22  Q.   And you bought more options online on E*TRADE after that

23  January purchase.  Correct?

24  A.   I bought options through the month of December on separate

25  days.  I think -- you know, we talked about some of that

CLARK - Direct                                                          33

1   yesterday with the loans and stuff, yes.

2   Q.   But on December 9th specifically you had more transactions.

3   Correct?

4   A.   I don't remember how many I had that day.  If you could

5   remind me, please.

6   Q.   If you could take a look at SEC Trial Exhibit 202.

7            Do you see this -- are you there?

8   A.   I am.

9   Q.   Do you see that this is an excerpt of your order activity

10  on December 9th, 2016?

11  A.   I do.

12  Q.   And do you see that purchase of January calls took place at

13  12:21 p.m., according to the call on the right?

14  A.   I'm sorry.  Can you say the time again, please?

15  Q.   12:21 p.m.

16  A.   That was the first executed order of the day.

17  Q.   Do you see that you placed multiple orders, some of which

18  were canceled, and then one of which was executed at five

19  different occasions after that?

20  A.   Well, I think what I see is -- on the first entry, at

21  11:07, I had put in an order for March, and that order was not

22  being filled, so I canceled it, and probably adjusted the

23  price.

24           And then, when I went back in, that's when it

25  did -- because it didn't reset to March, and I accidentally

CLARK - Direct                                                      34

1   bought it with January.  But then if you look at all the

2   others, they're March.

3   Q.  And when you're logged in to E*TRADE and you execute a

4   trade, a confirmation pops up on your screen.  Correct?

5   A.  I don't believe you get anything that pops up on it, or at

6   least not in the version of E*TRADE that I have.

7            You would get a notification the next day, and

8   there's a transactions tab that you can go to and take a look

9   at.

10  Q.  Could you turn to page 264 of your deposition?

11           Can I direct -- I'm going to direct your attention

12  to line 14.  Do you see you were asked:  When you enter an

13  order in E*TRADE to purchase and it gets executed, do you get,

14  like, a confirmation?

15           And you answered:  Yes.

16           Do you see that?

17  A.  Yes.

18  Q.  And then you were asked:  An e-mail confirmation?

19           And you answered:  Not an e-mail confirmation.  You

20  get a confirmation on the screen.

21           Do you see that?

22  A.  Yes.  So there's -- when you go through --

23  Q.  I'm sorry, I just asked you if you saw that testimony.

24  A.  I do see that testimony.

25  Q.  And then --

CLARK - Direct                                                     35

1  A.  If I may add to it.

2  Q.  Well, I'm going to ask you a question.  Do you see that the

3  next thing you were asked is:  So you see it right away?

4            And you answered:  Yes.

5            Do you see that testimony?

6  A.  Yes.

7  Q.  And even after -- you realized that you had purchased these

8  January options that you say were a mistake either that day or

9  the day after the latest.  Correct?

10  A.  I don't recall when I realized that they were January.

11  Q.  Could you look at page 268 of your deposition?

12            MR. CUMMINGS:  Judge, he wasn't allowed to explain the

13  attempted, I guess, impeachment or refreshment of his

14  recollection.  He was trying to explain it to her and she cut

15  him off.  I mean, I can ask.  I can go back on cross, but --

16            THE COURT:  Well, do that.

17            MR. CUMMINGS:  Okay.

18  BY MS. CHOE:

19  Q.  And at 268 -- page 268, if I could direct your attention to

20  line 21.  Do you see that you were asked:  They were going to

21  expire in January, but you were aware that you held them before

22  January.  Correct?  Is it fair to say you became aware at some

23  point in December?

24  A.  Which line?  I'm sorry.

25  Q.  Apologies.  Starting at line 21 on page --

CLARK - Direct                                                    36

1          MR. CUMMINGS:  Is this on page 268?

2          MS. CHOE:  Correct, page 268.

3          MR. CUMMINGS:  Okay.

4    BY MS. CHOE:

5    Q.   Do you see that question?

6    A.   I'm sorry.  I'm on the wrong page.

7          I'm sorry.  I'm on the correct -- 268.  Now, what

8    line?

9    Q.   Line 21.  Do you see you were asked:  They were going to

10   expire in January, but you were aware that you held them before

11   January.  Correct?  Is it fair to say you became aware at some

12   point in December?

13          Do you see that?

14   A.   Yes.

15   Q.   And do you see that you responded:  Yeah, I probably -- it

16   was either that day or the next day I realized I had January

17   calls?

18          Do you see that testimony?

19   A.   Yes.

20   Q.   But after you realized that, either on January 9th or

21   January 10th, you didn't -- I'm sorry -- December 9th or

22   December 10th, you decided to hang on to them.  Correct?

23   A.   I had already purchased them and had them.

24   Q.   You didn't try to sell them and buy February or March

25   options, did you?

CLARK - Direct                                                          37

1   A.   I bought February and March with my next purchases.

2   Q.   And you ultimately made a return of 19,000 percent on those

3   January options.  Correct?

4   A.   That I don't know.

5   Q.   Your son also bought January calls on January 4th, 2017,

6   the day before the merger.  Correct?

7   A.   That's what I've seen in the paperwork --

8   Q.   And you --

9   A.   -- and in testimony.

10  Q.   Apologies.  You heard him testify about that yesterday.

11  Right?

12  A.   I did.

13  Q.   And he didn't -- he didn't say that those were a mistake,

14  did he?

15  A.   He did not.

16  Q.   And he said that you had recommended that he buy those

17  January options.  Correct?

18  A.   I don't believe that was what he had said, but I know that

19  we had discussions, and you had mentioned that we were talking

20  that afternoon.  And none of the orders that I had for that day

21  were for January, so I'm not sure if he accidentally had

22  purchased those versus January or -- pardon me, February or

23  March.

24          But all my orders for that day that I shared with

25  him were for February and March that I was doing, and that's

CLARK - Direct                                                    38

1  what the documentation shows that I was doing.

2  Q.  In the sworn written responses we discussed yesterday, the

3  interrogatory responses -- do you recall we talked about those?

4  A.  Yes.

5  Q.  And do you recall that in those responses you said one of

6  the reasons that you thought there might be a reason to invest

7  in CEB was because it was getting increasingly favorable

8  analyst coverage?  Do you recall that in your response?

9  A.  Not particularly, but I believe you.

10  Q.  It's Exhibit 149, if you want to take a look.  And it's at

11  page 2.

12  A.  The deposition.  Right?

13  Q.  No, the -- Exhibit 149.  It should be in your witness

14  binder -- the binder of exhibits.

15  A.  You say 149?

16  Q.  Exhibit 149 at page 2.  Are you there?

17  A.  I am.

18  Q.  And do you see that there's a sentence a couple of

19  sentences in that says:  In late 2016, CEB's chairman and chief

20  executive officer Tom Monahan announced he was resigning

21  without naming a successor, and CEB was getting increasingly

22  favorable analyst coverage?

23              Do you see that you referred to that as the reason

24  for your trading in December?

25              MR. CUMMINGS:  Not "the."  "A."

CLARK - Direct                                                      39

1   BY MS. CHOE:

2   Q.   Do you see that sentence, Mr. Clark?

3   A.   If you can give me a moment.  I want to read the whole

4   response to this, if I could.

5   Q.   Sure.

6        (BRIEF PAUSE.)

7             THE WITNESS:   Okay.

8   BY MS. CHOE:

9   Q.   Do you see that sentence where you referred to CEB getting

10  increasingly favorable analyst coverage?

11  A.   I do.

12  Q.   The analyst coverage, that was material you were finding by

13  using Google.  Right?

14  A.   Google, yes.

15  Q.   You weren't --

16  A.   Other, you know, websites searches.  It would lead you to

17  articles.

18  Q.   You weren't following any particular Wall Street analyst.

19  Right?

20  A.   No.

21  Q.   And are you aware that multiple analysts actually

22  downgraded CEB in late 2016?

23  A.   No, I'm not.

24  Q.   Do you recall hearing Dr. Cain testify yesterday about

25  Mr. Bisbee downgrading CEB in late November?

1  A.   Yeah, he adjusted his outlook on the stock, saying that the

2  movement on it that occurred in November kind of topped out,

3  and I think he had said that it was kind of a -- based off of

4  what he said yesterday, it was, like, a 60 or $65 target, or

5  something along those lines.

6  Q.   And if you could look at SEC Exhibit 278.

7        Do you see -- are you at Exhibit 278?

8  A.   I am, but it's showing two.

9  Q.   There's a trial exhibit and a deposition number.

10  A.   Okay.  Sorry.  I got it now.

11  Q.   So Trial Exhibit Number 278.  Do you --

12  A.   Yes.  I have it?

13  Q.   Do you see this is a headline from December 8th, 2016, the

14  day before you started trading?

15  A.   From TheFlyOnTheWall.com.

16  Q.   Correct.  Do you see that it's dated December 8th, 2016?

17  A.   Correct.

18  Q.   And do you see this is another Wall Street analyst, besides

19  Mr. Bisbee, also downgrading CEB?

20  A.   I don't see anything about Wall Street, but he's an analyst

21  from a company called Fly on the Wall, or The Fly on the Wall,

22  but -- yeah, so...

23  Q.   Do you see it says -- the title is:  CEB downgraded to Hold

24  from Buy at StifelStifel analyst Shlomo Rosenbaum?

25  A.   I see that this analyst has a downgrade on the stock at

CLARK - Direct                                                          41

1   $60, right where it was, yes.

2   Q.   But in Internet searches you didn't run across this analyst

3   downgrading CEB?

4   A.   I don't recall seeing this before.

5   Q.   In December 2016, you owned -- or you and your wife owned

6   four houses and a vacant lot.  Is that correct?

7   A.   Correct.

8   Q.   And that was --

9   A.   Five houses.

10  Q.   Well, there was the house where you lived.  Correct?

11  A.   Yep.

12  Q.   And then there were three rental properties in Georgia?

13  A.   Yep.

14  Q.   And then there was a lot in North Carolina?

15  A.   And a beach house in North Carolina.

16  Q.   And then a beach house that you owned through an entity.

17  Correct?

18  A.   Yes.

19  Q.   And those rental properties in Georgia, in 2016, those

20  houses weren't paying for themselves.  Right?

21  A.   No, they were paying for themselves.  We had a lot of --

22  they were ten years old at that point.  We had a lot of

23  maintenance on them.  But the rent typically would cover the

24  mortgage, minus the one-time expenses that we had to upgrade

25  the carpet and painting and stuff after ten years of owning

CLARK - Direct                                                    42

them.

Q.   If you could turn to page 63 of your deposition.

          And I'll direct your attention to line 7.  Do you
see that you were asked:  The houses were not paying for
themselves in 2016?

          Do you see that question?

A.   Yes.

Q.   And do you see that you responded:  Correct, because of the
expenses?

A.   Correct.  Along -- the same thing I just said now.  I mean,
the rents were fine -- when the rents were coming in, they'd
cover, but we had a lot of expenses that year for upgrades and
maintenance to the house.

Q.   And then the lot in North Carolina, that was not a source
of income either.  Correct?

A.   No, it was a vacant lot.

Q.   After the merger was announced and you sold your profits,
is it fair to say that -- did I just say -- after the merger
was announced and you sold your options, is it fair to say that
you used some of the money to pay off some debt?

A.   Correct.

Q.   You paid off the nearly $20,000 balance on your line of
credit.  Correct?

A.   Correct.

Q.   And you paid off that $9400 car loan that you had taken out

CLARK - Cross                                                        43

1  just a couple of weeks earlier.  Right?

2  A.   Correct.

3  Q.   And you paid off about $45,000 in credit card debt that you

4  had been carrying all year.  Right?

5  A.   Correct.  Combination, I think, between my wife's credit

6  card and mine, maybe.

7         MS. CHOE:  Your Honor, at this time, we have nothing

8  further.

9         THE COURT:  All right.

10            Exam.

11         MR. CUMMINGS:  Thank you, Your Honor.

12     (BRIEF PAUSE.)

13         THE COURT:  All right.  Do you have any questions?

14         MR. CUMMINGS:  Yes, Your Honor.  I just needed a

15  second to get my --

16         THE COURT:  Well, that isn't going to help you think

17  now, stack of papers.  Ask your question.

18         MR. CUMMINGS:  Thank you, Judge.

19                     CROSS-EXAMINATION

20  BY MR. CUMMINGS:

21  Q.   First of all, I want to ask you about this FBI interview.

22  Let's start with that.

23         You didn't hide the fact that you knew Bill Wright

24  when you were interviewing him, did you?

25  A.   I did not.

```
CLARK - Cross                                                    44
```

1   Q.   And it came up and you talked about it.  Correct?

2   A.   Yes.

3   Q.   All right.  But when he first said, who do you know that

4   works at CEB, right --

5   A.   Yes.

6   Q.   -- that was a trick question because he didn't work there

7   at that time that he had the interview.

8            MS. CHOE:  Objection.

9            THE DEFENDANT:  Correct.

10           THE COURT:  Objection overruled.

11           MR. CUMMINGS:  Thank you.

12           THE DEFENDANT:  Correct.

13  BY MR. CUMMINGS:

14  Q.   But you discussed it, and he -- I think, I don't know, I

15  think I recall you saying at one point that, well, you didn't

16  ask me who I knew who used to work there, and he kind of rolled

17  his eyes.  You said, yeah, Bill Wright is my brother-in-law.

18  He worked there.  There was no secret about that, in that

19  interview.  Right?

20  A.   Yes.

21  Q.   What spooked you was all the cash that he was representing

22  to you that your son had taken out that was on some kind of

23  video and you were on the phone with him?

24  A.   Correct.

25  Q.   That indicated some serious -- possibly serious criminal

1  behavior that your son was involved in?

2  A.   Correct.

3  Q.   And you -- you were concerned, you didn't want to say

4  anything that might incriminate your son because you had no

5  idea what that money was for that day?

6  A.   Correct.

7  Q.   And you subsequently found out what it was?

8  A.   Yes, we did.

9  Q.   Was it cash he took out?

10 A.   It was not cash.  He was at the bank getting a cashier's

11 check out for buying a house in -- in that spring during that

12 time, so it was his going to closing to purchase a house.

13 However, they were saying that it was cash that he was like

14 putting in in a duffle bag.

15 Q.   All right.  And so you went and asked your son about it,

16 and he straightened you out?

17 A.   Well, at the time he didn't -- he didn't know what it was.

18 He's like, no, I've never taken cash out of the bank.  And then

19 later we discovered that it was purchasing of his house that

20 they were referring to.  Because they had gone through all his

21 statements, and they just had seen that there was cash taken

22 out of his account.  But typically when you go to the bank for

23 a cashier's check, they take the money out of your account as a

24 cash withdraw and then give you a certified check for funds for

25 closing.

CLARK - Cross                                                          46

1   Q.   Okay.  I think you covered that.  Thank you.  Let's move on

2   to something else.

3               In stock market parlance, what is a correction?

4   A.   A correction can occur if the market has run up too much

5   over expectation and values on the different stocks.  And what

6   will happen is that there will be a pull-back in the market, so

7   it could sell off and can occur from people taking profits at

8   the time.  There is different economic news that can cause a

9   pull-back.  We've seen a lot of this over the course of the

10  last two years, especially with all the different COVID pieces

11  back in 2020.  There was a huge sell off at the end of March

12  and April, so it's kind of a knee-jerk reaction.

13  Q.   Okay.  In 2008, wasn't there a bubble --

14  A.   Yes.

15  Q.   -- that burst?

16  A.   Yes.

17  Q.   Okay.  And did you survive that bubble burst?

18  A.   Yes.

19  Q.   Okay.  And you were asked about your trades in 2008.  Were

20  you doing puts or calls?

21  A.   At that time, I can't remember if 2008 was puts or calls or

22  2009 was.

23  Q.   Okay.

24  A.   Sorry, I don't have the --

25  Q.   All right.

1  A.   -- statements here in front of me.

2  Q.   All right.  Let me just move on.  I just don't want to

3  belabor that.

4              So, see, you testified earlier that you watched

5  local companies, and there's a lot of reasons for that.

6  Correct?

7  A.   Correct.  You know, the big thing that all -- caught my eye

8  was back in early 2000s when I started having a handful of

9  clients coming from there.  As I said earlier, with some of the

10 incomes that they were making and they were constantly hiring

11 and growing, I can't remember the numbers at that point, but

12 they probably tripled in size over the course of the five, six,

13 seven years period there.

14 Q.   All right.  And their product -- they didn't make widgets,

15 and widget being a fictional product.  They didn't make

16 physical things.  What they did is they provided best

17 practices.  Right?  Can you tell us what their products were

18 and why it's an interesting company and innovative and

19 different?

20 A.   Yeah.  They would go in and work with their clients and do

21 studies on best practices for those companies and how to maybe

22 reorganize, or different structures in there that could

23 streamline for not only cost savings, additional employee

24 benefit, work life balance, as well as just streamlining the

25 processes within so that the company could be more efficient.

CLARK - Cross                                                          48

1    Q.  Okay.

2              Just -- just so -- I want to cover this now so I

3    don't forget about it later.

4              It's suggested that going back to at least 2013,

5    2000 -- for about an eight-year period, suggested that Bill

6    Wright was feeding you informa -- inside confidential

7    information about CEB.

8    A.  That's the impression I've been getting, yes.

9    Q.  Okay.

10             Has he ever given you any inside information or any

11   information at all about CEB stock?

12   A.  He has not.

13   Q.  Okay.  Do you know even if he even owns CEB stock?

14   A.  I have no idea.

15   Q.  Okay.

16             And after you made the puts where you made some

17   money, I think in 2005 and six then what you made in 2017, did

18   you ever give him any cash?

19   A.  I've never given him any cash for anything.

20   Q.  Have you ever given him a gift?

21   A.  I have not.  Well, I mean, outside Christmas.  There might

22   be something, like, from our family that, you know, a little

23   Christmas present or something, but typically --

24   Q.  Maybe a bottle of booze?

25   A.  Yeah, but typically, the parents, we don't exchange gifts.

1   We only get gifts for the kids.

2   Q.  It's because it's for the kids.  And the gifts, if there's

3   anything a lavish gift, it's a lavish toy or something like

4   that for one of the kids.  Right?

5   A.  Yeah.  Even then, we have very limited that we usually say

6   it's like no more than 30- or $40 for a gift for the kids.

7   Q.  Okay.

8           And you have a child who's the same age as his

9   child named Kaitlyn?

10  A.  My daughter, Cate, and Kaitlyn are the same age.

11  Q.  The same age.  Okay.

12  A.  And then my daughter, Molly, and Haley are the same age.

13  Q.  All right.  So I want to finish up here with CEB.

14          Did there come a time that CEB bought a

15  multimillion dollar lease on a huge brand new building in

16  Rosslyn, or almost new building in Rosslyn?

17  A.  Yes.

18  Q.  When did it that happen?

19          Roughly.

20  A.  Late 2000, like 2008 maybe.  Somewhere in there.

21  Q.  Okay.

22  A.  2009.

23  Q.  That got your interest.

24  A.  Yeah.  Well, I -- I follow a lot of Arlington -- I've lived

25  in Arlington my whole life, and with that I've seen, as I've

CLARK - Cross                                                          50

1  grown up, Arlington be completely flat, to go to high-rises and

2  major economic growth, and Arlington development, economic

3  development, has always been an interest of mine as I'm

4  involved in real estate.  So seeing skyrises -- skyrise going

5  up and in the companies that it's drawn to the area has always

6  been an interest of mine.

7  Q.  All right.  So, mortgage bank -- you're licensed.  Is that

8  correct?

9  A.  Yes.

10  Q.  Okay.  And you're -- in your licensing process with MVB,

11  you're prohibited from dealing in insider information?

12  A.  It would be an issue with my MLS license, which is a

13  national license.

14  Q.  Okay.

15        So, moving forward then, you -- you've heard Doctor

16  Cain's testimony kind of poo-pooing your thought about, well,

17  when Tom Monahan -- he'd been at the company 20 years, right,

18  CEB?

19  A.  Correct.  He -- he had been there since -- I believe it

20  spun off from Advisory Board.

21  Q.  Okay.  And he was one of the brain childs that got that

22  company up and running for ten years, and then for the last ten

23  years of his 20 years he was the chief executive officer.

24  Correct?

25  A.  That is correct.

CLARK - Cross                                                        51

1   Q.   Okay.  And this is in August 2016, I think the end of
2   August.  All right?  And you knew about that?
3   A.   That he was announcing his resignation.
4   Q.   All right.  And --
5   A.   And retiring.  Pardon me.
6   Q.   And why -- can you tell the jury why that was a clue for
7   you?
8   A.   Well, you know, may not of right at that moment been, but
9   as time had gone on into the fall and they hadn't named a
10  successor at that point --
11  Q.   They never named a successor.
12  A.   They did not.
13  Q.   And didn't that suggest to you maybe something was going on
14  behind the scenes?
15  A.   It was unusual at that point.
16  Q.   But you didn't know what was going on, but it was unusual,
17  based on your analysis, and your following companies, and this
18  company in particular?
19  A.   Correct.
20  Q.   All right.  And you were aware that at least somebody asked
21  a question during that earnings call.  Do you know if you
22  listened to that earnings call?
23  A.   I don't recall listening to that.
24  Q.   Okay.  You've seen it in discovery in this case?
25  A.   Yes.

CLARK - Cross                                                           52

1   Q.   Okay.

2            All right.  And that's a question that somebody

3   raised about, well, geez, this is a great opportunity to sell

4   the company?

5   A.   Bisbee.

6   Q.   All right.

7            But you didn't -- you didn't make any trades then.

8   And then what happened in November?  The stock -- the stock

9   market went up 2,000 points.  CEB went up I think you said 23

10  or 24 percent in November.

11           And you heard Cain say, Well, that was just an

12  anomaly.

13  A.   It went up 28 percent actually.

14  Q.   Thank you.  28 percent.

15           But you heard Cain say, Well, that was just an

16  anomaly, didn't you?

17  A.   Yeah, he didn't really reference the stock price increase

18  in November, anywhere that I --

19  Q.   And --

20  A.   -- recall.

21  Q.   -- if you're reading your tea leaves on this company, and I

22  think on November 7th or 8th, that's when the thing started

23  climbing and the -- the day after the election the stock market

24  kind of went down because it was kind of like sort of a shock

25  about, geez, this guy won the election.

CLARK - Cross                                                    53

1              And then the stock market took off.  CEB took off.
2  Right?
3  A.  It did.
4  Q.  Then it cooled down a little bit.  But you knew that he was
5  coming and he was going to be sworn in, in late January.  Okay?
6  A.  Correct.
7  Q.  And you expected companies to be making money, and CEB is
8  in a great spot because they service companies.  Companies are
9  going to have more money to buy CEB services.  It was a great
10  time for that company.
11  A.  Correct.  It was a great time for a business -- a lot of
12  businesses, yes, and that one as well.
13              THE COURT:  All right.  It's time for us to take a
14  brief recess.
15              MR. CUMMINGS:  Thank you, Judge.
16              THE LAW CLERK:  All rise.  This Court takes a brief
17  recess.
18      (JURY OUT AT 11:29 A.M.)
19      (11:29 A.M. TO 11:45 A.M. RECESS TAKEN ~ OFF THE RECORD.)
20      (JURY IN AT 11:46 A.M. ~ ON THE RECORD.)
21  BY MR. CUMMINGS:
22  Q.  Now, I think before we took our break we were talking about
23  CEB, but I just want to make something clear.  I wanted to show
24  you Defendant's Exhibit 19, which is a press release from CEB
25  announces leadership transition.

CLARK - Cross                                                              54

1              THE DEFENDANT:  Thank you, sir.

2              COURT SECURITY OFFICER:  No problem.

3    BY MR. CUMMINGS:

4    Q.  Just take a minute and look at that.

5              Did I say that was 19?

6    A.  I've read it.

7    Q.  Okay.

8              And the point I want to make, isn't it a fact that

9    when Mr. Monahan resigned as chief executive officer on August

10   of 2016, that was public knowledge.  Correct?

11   A.  Yes.

12   Q.  And that document you got there is a -- sort of a press

13   release by CEB announcing that Mr. Monahan was resigning?

14   A.  Correct.

15   Q.  And what's significant about his resignation?

16   A.  At this time and through the fall, that there was no

17   successor.

18   Q.  There was never, never a successor named?

19   A.  Correct.

20   Q.  They went right into a merger after the first of the year.

21             Now, take a look at the last paragraph.  Could you

22   read that out loud, at least the first two or three lines?

23   A.  CEB is a best practices inside technology company and

24   partnership with leading organizations around the globe.  We

25   develop innovative solutions to drive corporate performance.

1    CEB equips leaders at more than 10,000 companies with

2    intelligence to efficiently manage talent, customers and

3    operations.  CEB is a trusted partner to nearly 90 percent of

4    the Fortune 500, FTSE 100, and more than 70 percent of the Dow

5    Jones Asian Titans.  More at globalceb.com.

6    Q.  Okay.

7              Is that information that you were aware of?

8    A.  For the most part.  I don't know if I was like I knew about

9    70 percent of the Dow Jones or anything, but I knew it was a

10   good portion of companies that they worked with.

11   Q.  Okay.  And you liked it, as a company you liked their

12   product and you liked where it was going?

13   A.  Correct.

14   Q.  Okay.

15             Now, you remember Doctor Cain at one point Mr. Sher

16   asked him about a Barclays, I think, press release that's

17   indicated the stock might go as high as 90.  Remember that?

18   A.  Yes.

19   Q.  Okay.  And I think the upside, organic growth accelerates

20   and Bright Horizons continues to make select acquisitions under

21   this scenario of possible going as high as 90.

22             Remember, Mr. Cain says, well, this was just for

23   the public.  It's kind of puffery for the public.  Remember

24   that --

25   A.  I do.

CLARK - Cross                                                          56

1   Q.   -- testimony?

2   A.   I do.

3   Q.   Are you the public?

4   A.   I am.

5   Q.   Okay.  And when you -- when you're listening to -- was it

6   CNBC you listen to?

7   A.   Correct, CNBC.

8   Q.   And CNBC, are you talk -- you're not talking about CNBC the

9   news channel.  You're talking about CNBC --

10  A.   It's a business channel.

11  Q.   The business channel.

12  A.   Correct.

13  Q.   And you listen to that constantly.  Is that correct?

14  A.   Correct.

15  Q.   Well, when you're at the office it's always on.

16  A.   Correct.

17  Q.   Do you still listen to it today?

18  A.   Yes.

19  Q.   All right.  What else in 2015, 2016 in terms of keeping

20  track of the market were you paying any attention to?

21  A.   Well, at that time the big piece was the election in the

22  way the stock market had taken --

23  Q.   That's not my question.  I'm talking about --

24  A.   Sorry.

25  Q.   -- your sources of information about stocks and the stock

CLARK - Cross                                                        57

1    market and trends, analysts.

2              Were you getting -- isn't there some local business

3    journal that you -- you were --

4    A.  Oh, *Washington Business Journal*?

5    Q.  Yeah.  Describe what that is.

6    A.  It's a local media outlet that -- I think they actually

7    have a once-a-month publication that's hard copy, but for the

8    most part it's a daily reporting on soft copy and news events

9    on different businesses in the area.

10   Q.  And on that one, the *Washington Business Journal*, does CNB

11   [sic] pop up a lot on that?

12   A.  Would CNBC?

13   Q.  CE -- I'm sorry.  CEB.  Was that --

14   A.  Oh, occasionally with any press releases that they would

15   have announcements or goings-on, you know --

16   Q.  Yeah, like the ones we -- the one we just saw?

17   A.  Correct.

18   Q.  Okay.

19   A.  Or like the Advisory Board one.

20   Q.  So although the stock possibly going to 90 is pretty

21   optimistic and Mr. Cain says, well, that's -- you know, serious

22   people wouldn't take into consideration.  But you're a member

23   of the public and that's the kind of information that's out

24   there about CEB.  Correct?

25   A.  Correct.

1  Q.  During that time frame?

2         Let me -- let me move on.

3         Now, the SEC refers to your trades in December in

4  early January, and that January date, it was right after New

5  Year's.  Correct?  That was the first date that you could

6  actually buy stock, I think.

7  A.  I think the 5th was a Thursday, so the market was probably

8  open Wednesday and Tuesday, but I believe Monday was closed for

9  actually New Year's holiday.

10 Q.  Okay.

11        So they call them merger trades, and I think at one

12 point you corrected Ms. Choe?

13        MR. CUMMINGS:  I hope I pronounced that right.

14 BY MR. CUMMINGS:

15 Q.  That, I don't refer to them as merger trades.  Why not?

16 A.  Well, merger trades is implying that I was buying them

17 because of a merger, and I was buying them for the future

18 February, March after the announcement of their yearly

19 earnings.

20 Q.  Okay.

21 A.  So it was not -- they were not purchased because of a

22 merger.

23 Q.  All right.

24        And you talked about -- you mentioned the term

25 runway.  Do you remember that term?

 1  A.   Yes.

 2  Q.   In terms of buying stock or stock options, in your mind

 3  what does runway mean?

 4  A.   Well, I guess it's kind of -- if you're a plane landing,

 5  you want to know how much runway you have before you run off of

 6  it, so runway was the amount of times for expiration, and

 7  casting out to March was giving them anywhere from 75 to 80

 8  days runway, in some cases on the options that I was purchasing

 9  at that time.  So, it was quite a bit of extended time that I

10  had on them.

11  Q.   Okay.

12            So, if I understand you correctly, what you're

13  saying is you were trying to get past the first quarter

14  earnings call in 2017, so you wanted your runway to be as far

15  out as you could.  Correct?

16  A.   Correct.  The -- it was the year-end earnings call in

17  February, so it would have been for all of 2016.  They would

18  have had the year-end call in the first week of February.  And

19  when they have that call, that's when they do -- advise on

20  their guidance for either the upcoming year, whether they're

21  going to increase guidance.  And I thought if they would be in

22  a position, that they would probably have better guidance

23  because of the business friendly administration that we had

24  coming in would increase their amount of clients or the needs

25  of their clients.

CLARK - Cross                                                    60

1   Q.  So it made sense to you, you making these risky out of the
2   money call options to have as much runway distance out into the
3   next year, you wanted to try to capture that first quarter
4   earnings call?
5   A.  Correct.  And in doing that you have two different -- I
6   think we did a little bit of this yesterday, but the options,
7   they can only be bought in five dollar increments.  So it was
8   either 65, 70, 75, 80 would have been the purchase -- the
9   strike price purchases that they're -- they do not -- CEB did
10  not have at this time like an option for 61, 62, 63, so it was
11  only every five dollars, where larger companies may have them
12  as little as a quarter or 50 cents, a dollar in some cases.
13          So, with that, if I could have gotten to the 65,
14  that would have been a -- more than enough to have covered
15  everything that I'd put into it.  And when we were trading
16  around 60, 61, to think that, you know, a stock that just moved
17  28 percent, or 12 points in the month of November -- 12 to 13
18  points in the month of November, to have it cast out to end of
19  March, or mid-March on the expirations of those options would
20  have been for the stock to go up five -- five dollars, you
21  know, in an 80-day period, I didn't think that was too
22  unrealistic.
23  Q.  Okay.
24          And when Professor Cain says, well, Mr. Bisbee
25  downgraded it, I think in the third quarter or somewhere in

CLARK - Cross                                                              61

1  there, of course, he didn't know there was mergers being

2  discussed in the back rooms in CEB offices, so he downgraded.

3  But even he said his optimistic target was 70.  You're betting

4  65, so that's conservative.  Correct?  More conservative than

5  Bisbee's high of a possible 70, or Barclays' 90, which is way

6  out there.  Correct?

7          MS. CHOE:  Objection.

8          THE DEFENDANT:  Correct.

9          THE COURT:  Objection overruled.

10          MR. CUMMINGS:  Thank you.  I think he's answered.

11          THE DEFENDANT:  Correct.

12  BY MR. CUMMINGS:

13  Q.  Okay.

14          So -- and the stock was trading, what, around 60,

15  61 when you made those calls?

16  A.  Yeah.  I believe it was like between 59 and 61 is what we

17  heard from the analyst yesterday.

18  Q.  Okay.  So 65.

19          So let's -- and I don't expect you to know the

20  exact number, but let's assume that they came in after the

21  first of the year within your runway.  It went to 65, but not

22  70?

23  A.  Correct.  So in the beginning of the year, I recall

24  yesterday the analyst said that, if I remember correctly, the

25  price before January 5 was 52 -- pardon me -- 62 and some

1  change, maybe 62.50, 62.60.  So it was already almost halfway
2  to the 65 point.
3  Q.  All right.  So you thought that was pretty safe, given what
4  was going to be going on after this new president was sworn in?
5  A.  Correct.  I still had a lot of time on the expiration of
6  the February and March --
7  Q.  Okay.  Well, let's say the stock got to -- never got above
8  66, never got to the 70s.  How much, would you lose money or
9  would you still make money?
10  A.  Depending on the amount of time left in the options, I
11  would have on all my 65s recouped what I put into it, and plus
12  enough to have probably paid for what I have paid on the 70s --
13  Q.  Okay.
14  A.  -- so 66 would have been a very good number for a break
15  even point.
16  Q.  Okay.
17  A.  Depend -- with 45 days left in expiring on the Feb -- on
18  the March ones.
19  Q.  Okay.  I think I understand.
20        And so how many of your -- and I don't -- I'm sure
21  it's in here somewhere and I'll find it at some point.  But
22  going to 70 took a little bit -- you had to take a little bit
23  of a gulp there when you started purchasing those 70s.
24        Were you purchasing the 70s on December 9th or is
25  that later?

1   A.   The 70s I believe came in later in December.

2   Q.   Okay.

3          And you -- I think you had mentioned that you

4   missed out on a bunch of trades because you were trying to go

5   cheap.  Can you explain that to the jury?

6   A.   Yeah.  So when you go to purchase an option, you have the

7   choice between market and limit.  If you go in at market, it

8   will fill automatically whatever the market price is.  When you

9   go in at limit, you're saying I'll buy it for this amount of

10  money.

11         And that goes out there and it can sit there for

12  the whole day and not get filled, and we touched on that a

13  little bit earlier on the first trading day that I had because

14  I was putting in a limit on it because I didn't want to pay a

15  higher price on the actual securing of that, so I was trying to

16  get it maybe at 20 percent -- 20 cents lower than what it was

17  selling at.  So a limit, you're setting the price that you're

18  willing to pay --

19  Q.   Wait a minute.  You're trying to save 20 cents?

20  A.   Yeah, it was -- it was probably 20 cent -- it was 20 cents

21  per contract, so that would have been equivalent, on a hundred

22  would be -- or pardon me.  On ten would be -- on ten contracts

23  that would equal $200.

24  Q.   Okay.  And so did you buy some a little higher?

25  A.   Through the month I had different price points because I

CLARK - Cross                                                        64

1   was kind of averaging out, and I had multiple purchases for the

2   whole allocation.  It wasn't all done on one day of trading.

3   It was done over a series of trades in a three-week period.

4   Q.  Okay.  But you missed out on a bunch of trades you wanted

5   to make because you were being cheap.  Is that true?

6   A.  Well, kind of.  I mean, if I -- if I had gone in at market

7   I would have had it and --

8   Q.  Why didn't you go in at market?

9   A.  Well, I was in at limit and, you know, trying to make the

10  best of my, you know, money at that time and --

11  Q.  Is it --

12  A.  I mean, going in at market is hindsight because, you know,

13  the merger comes out.  I didn't know that there was a merger,

14  so otherwise I would have -- I had cash in my account that

15  could have bought many more contracts that would have increased

16  the amount of money that I would have made.

17  Q.  If you knew there was a -- if you had hard evidence there

18  was a merger, wouldn't you have gone gangbusters?

19  A.  I mean, once again, it's hindsight, but I mean, I probably

20  wouldn't have done a market.  I mean, I would have --

21  Q.  You know, you wouldn't have gone cheap, would you?

22  A.  No.  I was trying to maximize my -- my dollar.

23  Q.  Okay.  So I think you've explained why you don't call it

24  merger trades.

25  A.  Correct.

1  Q.  And I believe you discussed the fact that you've invested

2  in Apple.

3            Is Apple, that's not a local company, is it?

4  A.  It is not.

5  Q.  No, they're out in California.

6            In your Apple trades, is that in your E*TRADE

7  statements?

8  A.  Yes.

9  Q.  Okay.

10            And do you know, is all your E*TRADE trading, all

11  the documentation in the government's -- in the SEC's documents

12  in this case?

13            Have you gone through those?  Have you seen that?

14  A.  Yes.

15  Q.  Do you know if they've left anything out?

16  A.  I mean, there's nothing that I've seen on my 401(k)s, but I

17  don't believe that they've left anything out that I know of.

18  Q.  Okay.  So when the jury gets their exhibits, they're going

19  to see all the universe of your E*TRADE?

20  A.  Yes, every -- I think there's monthly statements in there.

21  I don't know if it's for the year, but it goes back for quite a

22  few years, yes.

23  Q.  Okay.

24            And earlier I meant to ask you, when you were

25  talking about CEB being an Arlington company or a lifelong

CLARK - Cross                                                                   66

1   Arlington resident -- you follow business trends in Arlington.

2   Of course, you're a mortgage banker. You're a finance officer

3   in Arlington. That makes sense.

4               But, did you go to a special class that Arlington

5   County puts out for adults about economic development in

6   Arlington?

7   A.  I did. It's called Leadership Arlington, or at the time it

8   was Leadership Arlington. They've since had a change, a name

9   to Center of Excellence, Leadership Center of Excellence,

10  something along those --

11  Q.  Would you describe for the jury what that is? We don't

12  need a whole lot of detail because I want to get through this

13  before lunch.

14  A.  Yeah, so it's kind of like a behind-the-scenes view of

15  Arlington, whether it's from the public school -- each day you

16  have a topic from public schools to health to arts to business

17  economic development, public safety, which included both the

18  police and fire department. And they take different community

19  leaders and you apply for it and -- but there's different

20  aspects from business owners to real estate agents to loan

21  officers to teachers.

22              Each Arlington County department sends somebody,

23  whether it's fire department, police department, public

24  schools, health and safety, the arts department, so it's an

25  eclectic group of a lot of different people, and I did that in

1   the fall of 2013 and spring of 2014.

2   Q.   How many hours does that involve?

3   A.   Oh, my.  During the course of the year, probably couple

4   hundred.

5   Q.   Okay.

6            And is there a fee you pay?

7   A.   Actually, you do pay for it, yes.

8   Q.   I think in response to Ms. Choe's questions, she asked you

9   if you've discussed your trades with Mr. Wright, and you

10  indicated no.  But you told Mr. Nevins what you were doing.

11  A.   Yes.

12  Q.   All right.  And you think you may have told -- you told

13  him, this is my strike price; this is what I'm doing.  He

14  didn't exactly follow what you told him you were doing.

15  A.   No, and not if you look -- especially when they bring up

16  the January 4th because I -- I had orders in on January 4th

17  that were not filled because I had limits on them, and those

18  were for March, if I remember correctly.  And so I don't know

19  if he was on the phone and didn't realize that he was under the

20  January ones, but I was on -- my orders on January 4th were all

21  for March.

22  Q.   Okay.  And a lot of those were limited so they didn't go

23  through?

24  A.   Correct.

25  Q.   Approximately how many, do you remember?

CLARK - Cross                                                    68

1    A.   I don't offhand.

2    Q.   Okay.   There's probably a document that we can produce at

3    some point that will --

4    A.   Yes, it's in here.

5    Q.   Okay.

6              And would you agree with me that your son, Nevin,

7    isn't quite as seasoned in market and -- in these complex,

8    risky calls and puts as you are?

9    A.   I would agree with that.

10   Q.   Okay.

11             And so you're relatively comfortable.   I mean, they

12   would scare me to death.   I just learned about them in this

13   case.   But would you agree with Ms. Choe that they're risky?

14   A.   There is an element of risk.   But, you know, with that the

15   way we've set up our finances, we have our conservative 401(k)s

16   and investments in there that we don't touch.   They're managed

17   through Fidelity and Great-West.

18             The E*TRADE account was there for riskier

19   investments that could take place, and so -- and when you look

20   at the total amount of what I invested on these trades that

21   have been of topic, I believe it's less than three percent of

22   our, you know, total wealth.   So it was very limited risk with

23   the overall wealth.

24   Q.   Okay.   So what you're saying is you're basically betting a

25   fraction of your net --

CLARK - Cross                                                                69

1   A.  Under three percent, I believe.

2   Q.  Okay.

3   A.  I want to stretch out and say even under four.

4   Q.  I'm not going to argue with you.

5           But you did share with your -- with your son why

6   this -- why you thought this was a good investment.  And he

7   indicated he did probably cursory, but he was probably relying

8   on your judgment as well.

9           Does he always take your advice?

10  A.  Not always, but usually.

11  Q.  All right.  Let's come back a little bit because there's a

12  lot -- she brought out that there was a lot more con -- contact

13  or communications between you and Mr. Wright in that December

14  time frame.

15          Part of that's Christmas.  Right?

16  A.  Uh-huh.

17  Q.  But -- and you indicated your daughter -- it was Kaitlyn

18  and Catie?

19  A.  Cate and Kaitlyn.

20  Q.  Your daughter -- they're the same age?

21  A.  Uh-huh.

22  Q.  And how old were they when they got on the basketball team

23  in that year?

24  A.  They -- they were third grade at that time, so I believe

25  that's probably like nine or ten.

CLARK - Cross                                                          70

1    Q.   Okay.  So you had them both on that team.  What was the

2    name of their team?

3    A.   So we had -- I had two teams -- well, I was coaching four

4    teams at that time.

5    Q.   Stop.  Wait a minute.  Four times simultaneously?

6    A.   Yes.

7    Q.   How often do they practice?

8    A.   Each -- well, the two teams that you're talking about, the

9    Wolves and --

10   Q.   Beasts.

11   A.   Thank you.  Beasts, were joint practices together.  It was

12   a county rec team.  Most of my coaching has been done with

13   Saint Agnes at -- on a CYO team.

14              And the CYO does not have a third grade team at

15   that time.  They don't start until fourth grade, so we do the

16   county league and myself and another father, we're coaching.

17   Q.   What was his name?

18   A.   Brent Hodges.

19   Q.   I think he's on one of the -- is mentioned in one of the

20   exhibits.

21   A.   Yes.  He sent out -- he was the communication coach that

22   would send out the e-mail with all the practice information.

23   Q.   Okay.

24   A.   So -- but Kaitlyn and Cate were -- I can't remember if they

25   were on the Beasts or on the Wolves.

1  Q.   Okay.

2  A.   But they were teammates on there.

3  Q.   They were teammates?

4  A.   And Brent and I coached both teams.

5  Q.   Okay.

6            Is it fair to say that Mr. Bill Wright was very

7  interested in his daughter's progress as a young athlete at

8  that time?

9  A.   Yes.  He was, you know, very proud of her.  She was --

10 she's a good athlete.  She's a very good athlete.

11 Q.   Okay.

12           Did he come to the -- did he come to the practices?

13 A.   You know, the practices that we had were -- usually it was

14 just the coaches and the -- and the players that were at them.

15 I mean, the parents would drop the kid off, but they didn't

16 hang around and --

17 Q.   Okay.  So it's a drop off --

18 A.   -- and watch.

19 Q.   -- thing.  You've got them -- how long is the practice?

20 A.   Usually like an hour, maybe an hour and 15 minutes.

21 Q.   Okay.  And then the parents come and pick them up.  And you

22 hang around to make sure all the kids got picked up.  Right?

23 A.   Yes.

24 Q.   Do you occasionally have to take a couple home?

25 A.   Not usually.  Usually we would call the parent and find out

1   that they're on the way.  I don't recall having to take

2   anyone --

3   Q.   Do you recall seeing Mr. Wright at any of those games?

4   A.   Yeah, I recall him at basketball games.  Yes.

5   Q.   Okay.  And when -- when he would come to a basketball, did

6   you go over in the corner and did he whisper, you know, you

7   better buy this stock?  You know, CEB is --

8   A.   No.

9   Q.   -- going to get bought out.

10  A.   No, nothing like that.

11  Q.   Okay.

12  A.   It was kind of like --

13  Q.   Describe how that -- just give me a typical CYO

14  basketball - well, this was a rec league - a typical rec league

15  game, during that time frame.  I want to make it relevant.

16  A.   Yeah, so -- I mean, we're talking third grade girls, and

17  usually you have two teams that are in the gym playing, then

18  you have two teams that are at the gym getting ready to come on

19  and play and then -- I mean, we're talking about a small

20  elementary school gym.  I mean, it's not big --

21  Q.   Probably not much bigger than this room.

22  A.   Not much and actually not as wide either.

23          And like, there's no seats on the sideline

24  normally.  You have to like stand.  And literally when you

25  stand on the sideline, your toes are on the court.  Like

1  you're -- they're over the line.  I mean, it's -- it's very

2  limited space.

3           And it's loud, and, you know, it's, you know, a

4  couple -- not a couple hundred.  It's probably about 75 people,

5  you know, 80 people in a really small gym with, you know, third

6  grade girls cheering for their teammates and --

7  Q.  Right.  So you get -- you get there, try to get there ahead

8  of time.  You're making -- marshalling all your kids, make sure

9  they're there.  There's another game going on, and you're

10  trying to get them somewhere in a corner, maybe usually in the

11  vestibule.  Maybe you're not even in the gym.  Right?

12  A.  Sometimes, you know.

13  Q.  Okay.

14           And so you're making sure, you know, who's here,

15  everybody here?  Who are we missing, you know.  And you make

16  sure everybody is there, and then you give them a little

17  speech.  Right?

18  A.  Yes.

19  Q.  Okay.  And you figure out who's going to start and who's

20  not?

21  A.  Uh-huh.

22  Q.  And you're trying to play every one of those kids, what, at

23  least a quarter?

24  A.  Yeah.  There's rules for play time for each kid.

25  Q.  Okay.

CLARK - Cross                                                    74

1   A.   And everyone's got to play half.

2   Q.   So you're occupied the whole time that game is going on.

3   Right?  And then at halftime you've got like ten minutes, and

4   you're like:  Jeanie, you've got to -- you've got to start

5   passing more.  And, hey, stop shooting from 20 feet out.  That

6   kind of thing?

7   A.   Yeah, but probably three minutes.  There's no ten-minute

8   half, but...

9   Q.   Okay.  Three-minute half then.  Okay.

10           And then when the game is over, you don't go talk

11  to the parents, do you?

12  A.   No.

13  Q.   You take the kids somewhere and you tell them it's a good

14  game and what they need to work on and we'll see you at

15  practice.  Right?

16  A.   Correct.

17  Q.   And the parents are generally waiting somewhere.

18  A.   Correct.

19  Q.   And Bill Wright would be waiting over there.  He wouldn't

20  be next to you while you're talking to your kids, hey, I got a

21  hot tip, would he?

22  A.   No.

23  Q.   Did you ever talk to him much at any of those games --

24  A.   No.

25  Q.   -- that you saw him at?

CLARK - Cross                                                    75

1  A.  Not -- not -- no.

2  Q.  Okay.

3  A.  At any parent.  No, I didn't -- you normally didn't speak

4  to any parents in there because it was just chaos.  And you're

5  with the team.  You release them; they go with their parents.

6  Usually talk with the coach a little bit afterwards, say, we've

7  got to work on this at practice this week.

8  Q.  All right.  I want to move on, but I just -- I just want to

9  ask you about, those other two teams, what kids were on that

10  and why were you coaching those other two teams, this -- the

11  other leagues?

12  A.  So, Cate, that's my second -- Molly is my youngest; Cate's

13  the second youngest, and I was coaching my son, Collin's team,

14  which would have been his sixth grade CYO team at Saint Agnes,

15  and then my daughter's eighth grade CYO team at Saint Agnes as

16  well.

17  Q.  All right.  So you've got four different practices -- four

18  different teams with practices at least once a week?

19  A.  Correct.

20  Q.  And a game on weekends?

21  A.  For each of them.

22  Q.  All right.  So you're -- you're -- do you make it to all

23  the games?

24  A.  Usually.

25  Q.  Just talk briefly about, in the complaint the SEC made a

CLARK - Cross                                                           76

1   big deal that you took all of your wife's retirement account,

2   invested in these speculative stocks.  What's the truth?

3   A.   It was one account that had a balance of 4- to $5,000 in

4   it.  And the way it's worded, it makes it sound like I took a

5   hundred percent of her retirement.  And in fact, it was less

6   than two percent because she had 275-, maybe $300,000 in a

7   separate 401(k).  So it was just one account that was

8   liquidated and put into CEB options.

9   Q.   And how much approximately?

10  A.   It was 4- to $5,000.

11  Q.   Okay.

12          And the total amount you invested over those two --

13  two months was about 30,000 roughly?

14  A.   I think it was 33,000, if I remember --

15  Q.   33,000, okay.  So that's 4,000 of it, or 4500 of it?

16  Somewhere in there.

17  A.   Correct.

18  Q.   Okay.

19          Did you have to get her permission to do that?

20  A.   No.

21  Q.   Okay.

22  A.   Let me back -- when you say her permission, I believe she

23  was involved when we had to sell the -- the asset.  It wasn't a

24  normal mutual fund.  It was like a second market mutual fund

25  that was with another financial investor that was rolled into

1    an IRA, and it was kind of an off-market piece.  So she was

2    involved when we sold that, but not when I --

3    Q.  Okay.

4    A.  -- purchased the options.

5    Q.  I'm going to try to speed this along and ask more leading

6    questions.

7    A.  Sure.

8    Q.  So she's not that interested in your stock market?

9    A.  No, not at all.

10   Q.  And she ever been by your office when CNBC is playing,

11   financial statement and that crazy guy Cramer is on and people

12   like that?

13   A.  Correct.  Yes.

14   Q.  She doesn't listen to it, and when you watch it at home?

15   A.  She could care less.

16   Q.  Okay.

17              Do you ever watch it at home and she says, Will you

18   turn that off?

19   A.  All the time, especially the last couple of years.  I've

20   been working from home for the last, almost --

21   Q.  Because of COVID at home --

22   A.  Well, even before COVID.  I had been working from home for

23   the last three years.

24   Q.  Okay.  And then --

25   A.  The coming March will be three years.

1  Q.  All right.  So when she's not in the room, not in the

2  house, you turn it on?

3  A.  Yeah, or I'll just have it on and she won't pay any --

4  she'll go get her own TV.

5  Q.  Okay.  But she won't sit there and watch that crazy Cramer

6  guy or those -- any of those other analysts --

7  A.  She can't stand them.

8          THE COURT REPORTER:  Y'all be careful.  Y'all are

9  talking on top of each other.

10          MR. CUMMINGS:  I'll try.  I'm sorry.  I'm just --

11 Unconsciously, I'm just trying to get through this, so I

12 apologize.  I'll take a deep breath and I'll try to slow it

13 down.

14          THE COURT REPORTER:  Thank you.

15 BY MR. CUMMINGS:

16 Q.  All right.  Can you repeat the last answer that I walked

17 over you on?

18 A.  She has no interest in Cramer or CNBC or any of that.

19 Q.  Okay.

20          Can you briefly describe how you and your wife

21 interact and handle your monthly debts and your finances and

22 what the division of labor is.

23          Do you understand my question?

24 A.  Yes.  So, my wife for probably 20 years now has been a

25 financial manager for a large IT -- a midsize IT company, we'll

1    call it, and handled all their accounts receivable, accounts

2    payable, account management.  She did that for 17 years.  So,

3    she primarily handles all the bills for the house.  My paycheck

4    goes directly into her account, and she divvies up all the

5    monthly bills and obligations, with the exception of probably

6    the properties that we have in Atlanta.

7              Her current position, she's along the same lines

8    with a company that we purchased a few years ago where she's

9    the financial manager there, CFO, and handles all the accounts

10   payable, accounts receivable, so that's her niche and where she

11   shines.

12             I've always -- had handled the investment side,

13   whether it's investment properties or looking to buy new

14   property, as well as stocks, retirements and -- and growing our

15   net egg.

16   Q.   Okay.  So what happens?  You got a -- you get a base salary

17   from, at the time it was MVB you were working for?

18   A.   Yeah, it's -- it's a draw.  It's called -- essentially

19   there's legalities on paying people, and they have to do a

20   minimum.  It's a $24,000-a-year draw, and it comes out of my

21   commission, so essentially I can't have a --

22   Q.   Wait a minute.

23   A.   -- a paycheck that's --

24   Q.   24,000 a year?

25   A.   Yes, $2,000 --

CLARK - Cross                                                      80

1   Q.   That's below poverty level.

2            THE COURT REPORTER:  Wait, what, below?

3            MR. CUMMINGS:  That's below poverty level.

4            THE DEFENDANT:  So it's $2,000 a month, so each

5   paycheck you get $1,000 on.  And then you have commission on

6   top of that of which they back out that $2,000, so essentially

7   a hundred percent commission.

8   BY MR. CUMMINGS:

9   Q.   Okay.  So, how often does your commission check cover your

10  monthly expenses?

11  A.   It normally covers every month.

12  Q.   Okay.  Is there times when it doesn't?

13  A.   There has been times where, you know, probably been a

14  little bit lower, but for the most part it covers the monthly

15  expenses that we have.

16  Q.   Okay.

17           So she brought out that you had a lot of debt, I

18  think 50-, 60,000 in credit card debt.

19  A.   Correct.

20  Q.   Does that sound about right?

21  A.   Uh-huh.

22  Q.   Okay.

23           And you pay, what, 5,000 a month to keep your

24  children in a parochial school?

25  A.   Correct.

CLARK - Cross                                                        81

```
 1  Q.  Have you ever thought about taking them out and saving that
 2  5,000 a month?
 3  A.  No.  We're happy with the education that they're getting.
 4  It's a choice.  It's a sacrifice that we make on our end, but
 5  that's how both my wife and I grew up and we want to make sure
 6  that they have the same education opportunity that we did.
 7            And in fact, they go to the same school that my
 8  wife went to, K through 8, and the same high school that I went
 9  to.  Actually, both of us went to.  Sorry.
10  Q.  Okay.  How old are your children now?
11  A.  18, 16, 13, and 11.
12  Q.  Okay.
13            Are you still coaching CYO teams?
14  A.  I am.
15  Q.  How many?
16  A.  I have two CYO teams and one rec team.
17  Q.  Okay.
18            Now, with respect to Mr. Wright's child, Katey --
19  A.  Kaitlyn.
20  Q.  Do you consider her a good athlete?
21  A.  Kaitlyn.
22  Q.  Kaitlyn, sorry.
23  A.  Yeah.  No, Kaitlyn is an extraordinarily good athlete.  I
24  mean, like way above average.
25  Q.  Okay.
```

CLARK - Cross                                                          82

1   A.   She's very talented.

2   Q.   So, after basketball season, is there another team you

3   coach, different type of team?

4   A.   I coach a lot of soccer.

5   Q.   Okay.  And how about flag football?

6   A.   Flag football as well, in the fall, yes.

7   Q.   All right.  And this, you're coaching kids?

8   A.   Yes.

9   Q.   And were you trying to recruit Kaitlyn for flag football?

10  A.   At one point, I was highly recommending that she play flag

11  football, but I don't believe she ever did.

12  Q.   Okay.

13            You were asked about some phone calls in July I

14  think of 2015.  Let me see if I can find those.  Bear with me.

15       (BRIEF PAUSE.)

16  BY MR. CUMMINGS:

17  Q.   Do you have exhibit -- Trial Exhibit 129A, SEC Trial

18  Exhibit 129A?

19  A.   Yes.

20  Q.   Go to -- and that's a summary document.  Correct?  It's a

21  summary of phone calls between you and Mr. Wright?

22  A.   Yes, it's the same one we reviewed earlier.

23  Q.   Okay.

24            I'm directing your attention to number -- item

25  number 30, Verizon call on 7-23 at 5:00 p.m.  Indicates Clark's

1   cell to Wright's cell, one minute.

2              And then after that, 31, same date, like a minute

3   later.  Looks like tried to call him again.  It's one minute.

4              And then the next one is on 7-24, the next day, at

5   6:18 p.m., assuming the time's right, Clark to Wright, one

6   minute.

7              And then on 7-25, number 33, okay.  Looks like you

8   got through to him at 2:52 p.m., a 12-minute phone call.

9              Do you see that?

10  A.   Yeah, the -- the only thing different -- you said I got

11  through to him.  He actually called me.

12  Q.   Oh, he called you.  Okay.

13  A.   Yeah, so the first three, the one minute ones --

14  Q.   Yeah?

15  A.   -- according to this, I called him.  And then the one that

16  you were mentioning on the 25th, that is 12 minutes, he called

17  me.

18  Q.   Okay.  What I'm trying to understand, Mr. Clark, the

19  three -- that apparently you -- you trying to call him, they're

20  all exactly one minute.  In fact, every call on here is an

21  exact number.

22             So, do you have any idea if they rounded up or

23  rounded down or whether you even talked to him on those

24  one-minute listed phones, because some of these others say 13

25  minutes and 33 seconds.

CLARK - Cross                                                        84

1              For example, number 90 is 23 seconds.  Number 91 is

2    two seconds.  They break it down.

3              Every one is one minute.  So, you don't know if you

4    actually got through or not on those particular calls.

5    A.   I do not know and do not recall --

6    Q.   Okay.

7    A.   -- making these calls.

8    Q.   So, you had a 12-minute call --

9    A.   Uh-huh.

10   Q.   -- right around the time you were making these trades.

11   It's on their document that they put up in opening statement.

12   And this would have been in the summer of 2015.

13             Do you know if Bill Wright had a beach house then?

14   A.   He did.

15   Q.   Did you have a beach house?

16   A.   Yes.

17   Q.   Did you have the beach house before your beach house --

18   before -- did you have your beach house before he got his beach

19   house?

20   A.   Yes.  I bought mine quite a few years earlier.

21   Q.   Okay.

22             And did he talk to you about what it was like

23   having a beach house, anything like that?  Any advice on the

24   mortgage on the beach house, anything like that?  Do you recall

25   any conversations about that?

CLARK - Cross                                                          85

1  A.   Yeah.  I mean, from early on before he bought it, as well

2  as when he was buying it.  You know, there's a lot of moving

3  parts when you have weekly renters going in, much different

4  than a single property when you have someone that leases for a

5  12-month period.  You have a new tenant every week, so a lot of

6  moving parts.

7  Q.   Okay.  You've got maintenance issues as well.

8  A.   Yes.

9  Q.   Okay.

10          Have you -- your family and Mr. Wright's family

11  ever vacationed together at the beach?

12  A.   We have not.

13  Q.   Have you ever vacationed at all with them?

14  A.   We've done like a Thanksgiving trip to our wives' aunt's

15  house.

16  Q.   Your wives' aunt's house?

17  A.   Yeah, in Norfolk.

18  Q.   Okay.

19  A.   But I mean outside of that, I don't recall any other family

20  vacation that we've done, other than Thanksgiving at maybe one

21  of the --

22  Q.   What year was that approximately, if you know?

23  A.   I would have to guess maybe 2012, somewhere in there.

24  Q.   Okay.  So since that, around 2012 going to the aunt's

25  house, at Thanks -- was that just a Thanksgiving --

CLARK - Cross                                                          86

1   A.   Correct.

2   Q.   -- holiday trip?  So it wasn't a whole -- was it a whole

3   week or just a few, couple of days?

4   A.   No, maybe two nights.

5   Q.   Okay.

6            Do you-all ever talk to each other about maybe

7   going on vacation together?  Let's get the family -- we both

8   have beach houses.  Let's get together?

9   A.   No.

10  Q.   Have there been occasions when both families have been at

11  their beach houses and you didn't see his family, or vice

12  versa?

13  A.   Yes, many times.

14  Q.   Okay.  Do you make it a point to try to get the families

15  together when you're both down there?

16  A.   No, we don't.  We've talked about it.

17           One in particular time -- I was refreshed through

18  some of the text messages that are in here that one beach

19  trip -- I can't remember if he reached out to me or I reached

20  out to him about getting together, but nothing materialized.

21  Q.   Okay.  And --

22  A.   We're about like, I don't know, seven miles from each

23  other.

24           MR. CUMMINGS:  Did you get that?

25           THE COURT REPORTER:  Yes.

1   BY MR. CUMMINGS:

2   Q.   You're about seven miles from each other.  And he has a

3   partner at his house.  Correct?

4   A.   Yes.

5   Q.   And who's that?

6   A.   Barron Anschutz.

7   Q.   Okay.  And they're very close?

8   A.   Yes.

9   Q.   They're buddy-buddy?

10  A.   Yes.

11  Q.   Okay.

12            I hate to bring this up.  I hate to embarrass you

13  and your wife and the Wrights, but beginning about 2010, 2011,

14  was there a rift between your wife and Mr. Wright's wife?

15  A.   In 20 -- in 2010, yeah.  Well, it might not have been

16  between them and I don't even know whether his wife knows about

17  it or not, but there was something that was -- that occurred

18  that was very hurtful that happened to my wife in August of

19  2010.

20  Q.   Can you just give us a sentence or two about what it was?

21  A.   So essentially, my wife had just returned from the

22  hospital, having our fourth child, Molly, our youngest, and

23  they were going to the beach, the Wrights were going to the

24  beach.  And my wife had just gotten home and had asked her

25  sister if there's any way that our daughter, Cate, who at the

1  time was probably like two or two and a half, could go with

2  them to their beach or to the -- on their vacation with them to

3  their beach with the grandmother.  And essentially Leslie said

4  no.

5          And she's like, I really need this.  Is there any

6  way you can take her, just for the weekend?

7          And Leslie shut her down.

8          So, that was kind of the turning point for my wife

9  at that time point where she's like, you know, I just can't

10 even, you know, go to you for anything.

11         And with this said, I have no idea if Leslie knows

12 about that or not, or whether that was that big of an issue for

13 my wife, but from that point on things have been very different

14 for my wife and her sister.

15 Q.  Thank you.

16         That Saturday July 25th call, that 12-minute call,

17 you don't recall exactly what you talked about, but you know

18 what you didn't talk about, don't you?

19 A.  Correct.

20 Q.  What didn't you talk about?

21 A.  I did not and have not at any point received any

22 information from Bill on CEB.

23 Q.  Let's talk a little bit, because it was brought up by

24 counsel -- we've talked about this, your retirement account.

25 And then she made a point of bringing up the fact you borrowed

1  money on your used car.  Do you remember that?

2  A.  Yes.

3  Q.  All right.  First of all, describe what the car was.  How

4  used was it?

5  A.  It was a 2010 Ford Edge.

6  Q.  Okay.  And why was borrowing money on your 2010 Ford Edge

7  not a very risky thing to do?

8  A.  So I -- through my company, I get a car allowance of, I

9  think it's 350 or $375, so over the years we've taken out

10 different car loans and always have had that allocation of that

11 money kind of -- you know, I get -- from my company goes

12 towards a car payment, and so that's essentially why it wasn't

13 a big deal.  I would have had it paid off with my car allowance

14 on a monthly basis.

15 Q.  Okay.  But the car was paid off at that point.  Correct?

16 A.  There was a couple of payments left on it.  I just redid

17 the loan.  I want to say there is a $1,000 balance --

18 Q.  Okay.

19 A.  -- or something on it at that time.

20 Q.  So you redid the loan.  You took out 9,000.  I think you

21 put about 8 in the out of cash -- out of money call options.

22 A.  I took the money out and transferred it to E*TRADE and

23 bought options.

24 Q.  Okay.

25         And if you hadn't of -- if you hadn't of -- you

CLARK - Cross                                                    90

1   know, if you hadn't realized a profit on your out of -- out of
2   cash calls - I want to try to be correct - if you hadn't
3   realized that money, you would have had a monthly car allowance
4   to pay that -- pay for that debt?
5   A.   Correct.
6   Q.   So it just made sense at the time, it was a good place to
7   grab some cash.
8   A.   Correct.
9   Q.   And you're a money manager, so you look for ways of -- you
10  know, if you have to use debt and if you're talking two or
11  three months before, you know, that runway you talked about,
12  you're not really talking about that much if you make it.  And
13  if you don't make it, you had a car payment -- you had a car
14  allowance from your company, kind of help defray that?
15  A.   Correct.
16  Q.   Okay.  So to you, it made economic sense at the time.
17  A.   Yeah, I mean -- look, I give debt out as what I do
18  is lend -- I'm a lender, so, I mean, I'm not afraid of debt.  I
19  believe everyone should carry debt.  You don't have to be debt
20  free and leverage your money however you can.
21  Q.   And when Ms. Choe in opening statement said, You have
22  millions and millions and millions of dollars in debt, what is
23  she talking about?
24  A.   I mean, the bulk of that was mortgages on a handful of
25  different properties, from a single family home to beach house

CLARK - Cross                                                    91

1    in investment properties that are in Atlanta and North

2    Carolina.

3    Q.  Okay.

4            And the SEC asked you in one of the interrogatories

5    to give your approximate net worth during the time frame.

6    Correct?

7    A.  Correct.

8    Q.  Okay.

9            And you prepared a chart for them.  Correct?

10   A.  Kind of like a little bit of a spreadsheet with estimates

11   on -- I mean, it was kind of hard to go back in time and get an

12   exact on what a balance is or a value of a home at a, you know,

13   time of three, four years ago --

14   Q.  Right?

15   A.  -- but estimates, yes.

16   Q.  Okay, estimates.

17           And the first estimate you did had an error in

18   it -- had errors in it?

19   A.  Correct.

20   Q.  And so you gave them a supplemental one?

21   A.  Correct.

22   Q.  Okay.

23           We'll return to that when we get to our case.  But

24   you did provide that information?

25   A.  Yes.

1  Q.  And since then, you figured out that you had a tax refund

2  that year and you didn't include that in it, so the $30,000 --

3  plus.  Correct?

4  A.  Correct.

5  Q.  Okay.

6          MR. CUMMINGS:  I apologize, Your Honor.  I am

7  searching for Mr. Clark's interrogatory response that we've

8  been talking to him about.

9          Thank you.

10 BY MR. CUMMINGS:

11 Q.  Do you have Exhibit 41?

12          No, this is -- well, this is the chart.  Let me

13 show you what's been marked as Exhibit 41.

14          MR. CUMMINGS:  Are you sure this is all 41?

15          THE DEFENDANT:  Thank you, sir.

16          THE COURT:  All right.  Ask your question now.

17 BY MR. CUMMINGS:

18 Q.  All right.  Can you take a look at the exhibit to your --

19 first of all, what's the title there?

20 A.  On page one?

21 Q.  Yeah.  What's the title?

22 A.  United States District Court, Eastern District of

23 Virginia --

24 Q.  I'm sorry.  The name of the doc -- the name of the

25 pleading.  It should be under that.

```
 1  A.   Defendant Christopher Clark, Supplemental Response To
 2  Plaintiff's Interrogatory Number 8.
 3  Q.   Okay.  And would you describe the -- is the chart attached
 4  that we were just referring to?
 5  A.   Yes.
 6  Q.   Okay.  Can you just sort of hold it up so the jury can see,
 7  you know, what it is from a distance?
 8  A.   (Complies.)
 9  Q.   Okay.
10           And then -- thank you.
11           And then just briefly tell the jury what is on
12  there.  How you came about making that chart of your
13  approximate value in 2016 and '17.
14  A.   I listed property addresses along with property values, as
15  well as the debt that was tied to each of those properties.
16  Q.   Okay.  Can you list the debt attached to each of those
17  properties?
18  A.   The total?
19  Q.   The total is fine.
20  A.   Approximately 1,268,000.
21  Q.   All right.  And that's on the investment properties.
22           Do you have how much you owe on your home?
23  A.   On my primary residence?
24  Q.   Yeah.
25  A.   On here is about -- there's a first mortgage and a second
```

```
     CLARK - Cross                                                94
 1   mortgage; combined is about 675,000.
 2   Q.   Okay.  So approximately how -- does that add up to over two
 3   million?
 4   A.   The -- on that line or --
 5   Q.   For the real estate.
 6   A.   Or the total on the --
 7   Q.   The total on the real estate debt.
 8   A.   The total -- well, so -- so there's a second category that
 9   have business holdings which, like our beach house is on that,
10   so if we can combine both of those, the total debt I believe
11   comes to 2,060,000.
12   Q.   Okay.  So Ms. Choe in her opening statement was correct.
13   Correct?
14   A.   Yes.
15   Q.   It's over two million in debt.
16   A.   Yes.
17   Q.   Does that scare you?
18   A.   No, it's all secured.
19   Q.   Okay.
20   A.   It's tied to property.
21   Q.   And is it -- does it show on there how much you owe?  I
22   mean, not how much you owe, but what your payments are and what
23   your -- what your equity is?
24   A.   The payments aren't on this, but it does go in and show the
25   equity.  The equity, according to this at that time, was about
```

```
CLARK - Cross                                                     95
```

1  $3,055,000.

2  Q.   That's the equity?

3  A.   Yes.

4  Q.   All right.  That kind of -- you're about a million dollars

5  ahead then on just those and the real estate investments.

6  A.   Correct.

7  Q.   Okay.  What else is on there?

8  A.   There's a breakdown on nonproperty and nonbusiness assets

9  which involve E*TRADE accounts, stocks, and IRA and 401(k)s --

10 Q.   Okay.

11 A.   -- and 529s.

12 Q.   And did you itemize that and total it?

13 A.   It was.  It was, with totals from September, October,

14 November, December, and January.

15 Q.   Okay.  You got a figure for us?

16 A.   In which month or -- I'm sorry.  And this is all for year

17 2016.  So the grand total at the end of December 2016 was on

18 stocks, mutual funds, 401(k)s is showing $677,995.

19 Q.   Is that retirement accounts or everything?

20 A.   That's -- that's all E*TRADE accounts, retirement accounts.

21 Q.   Okay.  What else is on there?

22 A.   There's a portion on the cars that we had, 2013 Toyota

23 Cor -- pardon me -- Sequoia, and a 2010 Ford Edge.  And there's

24 debt that's included on there.  This is showing approximately,

25 I don't know, $25,000 in equity in cars.

CLARK - Cross                                                          96

1   Q.   Okay.  But does the debt include the debt, that $8,000,
2   $9,000 loan?
3   A.   It does.
4   Q.   Okay.  That's in there?
5   A.   It does.
6   Q.   Okay.  Any other debt on there?
7   A.   There's a list of credit cards that amount to $64,000 in
8   credit card debt.
9   Q.   Okay.
10          And did you leave out your tax refund?
11  A.   Well, this didn't cover any income piece.  This is just
12  assets and liabilities.
13  Q.   Okay.
14          So, do you recall what your credit score was in
15  2016?
16  A.   You know, credit scores fluctuate on a daily and monthly
17  basis depending on reportings from different creditors, but
18  both my wife and I have excellent credit.
19  Q.   What's your credit score today?
20  A.   Probably about 750.
21  Q.   You got Exhibit 1 up there, SEC Trial Exhibit 1?
22  A.   Yes.
23  Q.   Okay.  Look at the very first page.
24  A.   Yes.
25  Q.   If -- the date is Saturday, January 7th at 8:54 a.m.

CLARK - Cross                                                    97

1  Right?

2  A.   Yes.

3  Q.   And Bill Wright's saying to you:  I hear she did okay last

4  night.

5            Now, I didn't ask you a question.  That's what it

6  says.  Correct?

7  A.   Yes.

8  Q.   All right.

9            So that implies he didn't make it to the game the

10 evening of January 6.

11 A.   Correct.

12 Q.   Okay.

13           And how did you reply to him?

14 A.   I had two replies.  The first was:  Real well.

15           The second was:  Both teams played well.

16 Q.   And then he says:  Higher scores for sure.

17           And how do you respond?

18 A.   They are starting to get it.  I think they're a little

19 further along than a lot of other teams.

20           I'm sorry.  There's three responses.  The first

21 was:  They are starting to get -- and I -- starting to get.  I

22 believe I was supposed to have an "it" at the end.

23           The second response was:  I think they're a little

24 further along than a lot of other teams.

25           Then the third response is:  We had to hold the

1  beast back from putting up 40 or 50 points.

2  Q.   Who's the Beast?

3  A.   One of the basketball teams that we coach.

4  Q.   And when you say hold them back, what are you talking

5  about?

6  A.   Typically, when you -- you have younger teams and you have

7  a team that's much better than another team, you do different

8  things to kind of curb the scoring so that it's not as

9  lopsided.

10 Q.   You don't want to demoralize the other team because they

11 can't shoot that well.

12 A.   Exactly, so you'll put in something like -- you take

13 your -- you know, maybe give more playing time to a lesser

14 player on a team or tell them they have to pass the ball 15

15 times before they can shoot or a handful of things so that the

16 score just doesn't get too crazy.

17 Q.   Okay.  And is that something you always do at all of these

18 games with these kids?

19 A.   Yeah.  I mean, it's kind of taught across the board and

20 standard practice for, you know, coaching at this age.

21 Q.   Okay.

22        The next entry is very telling.  What does that

23 say?  It's from Mr. Wright.  Correct?

24 A.   Make sure she's passing please.

25 Q.   And is that typically the kind of things he's interested in

1 when you're talking about his daughter?

2 A.   Yeah.   I would say that, you know, he wants to make sure

3 she's doing the right thing.

4 Q.   Okay.   So, I just want to -- I don't want to belabor this.

5              But then you said:   Yeah, she did pass very well.

6 Correct?   She did, and she passed well.

7              And did you try to take a video of her for

8 Mr. Wright?

9 A.   I -- I did not.   He says in a response to me -- I said:

10 She did and passed well.

11             And he said:   I only got one video.

12             But I don't know who took the video or --

13 Q.   Could be his wife?

14 A.   It could have been his wife or something.

15 Q.   Okay.

16 A.   I would have been coaching.   I wouldn't have been doing any

17 video.

18 Q.   All right.   And then -- then we jump to January 11, 2017.

19 These are in evidence.   The jurors get to see them.

20             So, can you tell the jury what's going on on these

21 January 12th texts back and forth?

22 A.   So on January 12th, I -- he had said that earlier that his

23 tenant wants to buy his condo from him, Bill did.   And then on

24 the 12th I responded to him with rates at -- showing 3.75

25 percent, 30-year fix, P&I equals 1,088 for $235,000 loan

CLARK - Cross                                                      100

1  amount.

2  Q.   Okay.

3  A.   I would be able to cover about two thousand of the closing

4  costs.

5  Q.   And that's him to you or you to him?

6  A.   That's me to him.

7  Q.   Oh, you as in -- and when you say, I would be able to cover

8  about two thousand of the closing costs, that means MVB?

9  A.   Correct.

10 Q.   So whenever you're talking mortgages, you're talking about

11 your company.  Your -- it's not your money?

12 A.   Correct.  So --

13 Q.   Just so we're clear.

14 A.   Correct.  With VA loans especially, there's what's

15 called -- there's overage on them.  And typically when there's

16 an overage you give what's called a lender credit back to the

17 buyer.

18 Q.   And then you say -- and he says:  Thanks.

19       And you say:  I'll get you an estimate drawn up of

20 all costs and everything so that you can -- you can --

21 A.   It's on the next page.

22 Q.   Can you -- all right.  That's page 4, page 5.  It kind

23 of -- it says:  215,000 at 235, is what I see.  Is that what

24 you see?

25 A.   No.  There's another entry on Thursday, January 12th.  It

1    says -- has the full message:  I'll get you an estimate drawn

2    up with costs and everything to -- everything so you can share

3    with him.

4    Q.   Okay.  And who's sharing -- who are you sharing it with?

5    A.   He was going to give it to his tenant, James Nugent, so

6    that he can see how much it would cost, his monthly payment

7    would be if he were to buy the condo.

8    Q.   Okay.  And he was on VA disability?

9    A.   He wasn't on VA disability.  He was a vet.  He was in the

10   Reserves, and he had spent I think ten years in the Reserves.

11   And in order to get VA eligibility through the Reserves, you

12   have to have six years, I guess, tenure.

13   Q.   Okay.

14   A.   Six years of doing the Reserves.

15   Q.   All right.

16             And it looks like you're going back and forth on

17   page 6, and we're moving into Tuesday, January 17th.

18             And then we get to what Ms. Choe referred to as, he

19   loaned you a car.  And I think that starts on page 7.  Well,

20   bottom of page 7.  You're still talking at the top of page 7

21   about Mr. Nugent who -- who was going to buy that condo?

22   A.   Yes.

23   Q.   Okay.

24             So then it says:  All good.  I can leave keys

25   outside anytime or you pick up 9:30 tonight or 8:15 in the

1   morning.

2              Can you tell the jury, because this was referred to

3   in your direct testimony, what this refers to and how this all

4   came about.

5   A.   So my car -- I had blown the engine in my Ford Edge and

6   needed a new engine.  And at some point --

7   Q.   Was that a warranty?

8   A.   It was out of warranty, unfortunately.

9   Q.   Okay.

10  A.   So it was probably six years old at the time, the car was,

11  so.

12             Anyway, so he had offered for me to use -- he had

13  an old Acura that he kept that my in-laws had used when they

14  were in town.  So they live in Florida, and when they would fly

15  up, if they didn't drive, they would fly so that they could

16  have access to a car.  Or if they drove, one of them would

17  still have another car to use.

18             And so my in-laws weren't in town.  They had gone

19  back to Florida at that point, so he offered me to use his car

20  while my car was getting a new engine put in on it.

21  Q.   Okay.  So you went without a car for several days?

22  A.   There was a few days.  I believe it happened on a Saturday

23  or Sunday.  I was on my way to a basketball game.  I can't

24  remember if it was a Saturday or a Sunday, so it looks like

25  this is Wednesday night, so my wife and I were splitting the

```
      CLARK - Cross                                          103
 1    car at the time.
 2    Q.   Okay.  And Mr. Wright kept a third car for the in-laws to
 3    use when they were up visiting for holidays and such?
 4    A.   Correct.
 5    Q.   He didn't need it.
 6    A.   Correct.  He had his own -- another primary car that he was
 7    using.
 8    Q.   Okay.  And was this an older car?
 9    A.   You know, it was an older Acura.
10    Q.   Okay.
11    A.   Probably 15 years old or --
12    Q.   But you were happy to be able to get it?
13    A.   Yes.
14    Q.   Okay.
15              And then it says here, he's going to leave the keys
16    out for you somewhere.  Right?
17    A.   Yes.  He, I believe, left them under the mat.  And I think
18    my wife drove me over there later that night, and I picked the
19    car up.
20    Q.   All right.  Then something bad happened while you had his
21    car.
22    A.   Yeah.  The -- the next morning, or maybe two mornings
23    later, I went to pull off my street and the axle broke in the
24    car, and that's what that picture is here is of a broken axle
25    that I sent to him.
```

CLARK - Cross                                                          104

1    Q.   And that's on page 9.

2             All right.  Who had a late night card; slept in,

3    prior to January 20th?  Is that you or Wright?

4    A.   That's Wright.

5    Q.   Okay.

6             Did you ever play cards with him?

7    A.   I have played cards with him.  It's been quite a while

8    since then.

9             My other brother-in-law and a couple of my wife's

10   cousins, we tried doing a card game together, but it just -- it

11   didn't work out well.

12   Q.   What do you mean it didn't work out?  Was there somebody

13   cheating?

14   A.   No, no, nothing like that.  It was one of these things

15   where some players are maybe a little bit more serious about a

16   game than others, and others don't -- you know, there's a flow

17   when you get to cards, and some people like to have many hands

18   going and people knowing what they're doing.  And betting out

19   of order can kind of mess things up and -- it just never really

20   did well.  We did it like three or four times and just kind of

21   discontinued it.

22   Q.   Okay.  Was Mr. Anschutz -- Barron, I guess, is a better

23   way -- Barron Anschutz in those games?

24   A.   No.

25   Q.   All right.  Did you learn that he's -- the game he's

CLARK - Cross                                                        105

1   referring to is a group he regularly plays with, it includes

2   Barron?

3   A.   Correct.  Yeah, this is a separate group.

4   Q.   Yeah, this is -- we're talking about January of 2017.

5            The merger has been announced.  Right?

6   A.   Yes.

7   Q.   Okay.

8            Then you're talking about some law, an FHA law.

9   What -- tell us what that is on page 11 and 12.

10           MR. CUMMINGS:  I'll try to speed through this.  I'm

11   sorry, Judge.

12   BY MR. CUMMINGS:

13   Q.   Tell us about that.

14   A.   There was just -- I can't remember the details of it, but

15   at the end of the administration the government, the Obama

16   administration, they made some change to some FHA law in

17   December, and then in 2017 it was over -- it was reversed.

18   Q.   Okay.

19   A.   It was --

20   Q.   All right.  I'm tell you what --

21   A.   It was nothing.

22   Q.   What are these keys, these pictures of keys about?

23   A.   When I had borrowed Bill's car, and I guess that morning

24   that I went out and the axle broke, I had my car keys with me,

25   or a set of my car keys with me, so I could have a house key.

 1   And I -- they were left in his car, and so these are my -- my

 2   keys that were missing for probably ten days.

 3   Q.   Okay.

 4   A.   And he found them in his car when he got the car back after

 5   he got his car fixed.

 6   Q.   All right.  Do you remember counsel asked you about this

 7   whole Nestle thing?

 8   A.   Yes.

 9   Q.   Okay.  Is that what's going on?  Can you tell the jury

10   what's going on, on page 15 and 16?

11   A.   This was the building that I had mentioned in Rosslyn.  It

12   actually was built probably two years prior to this.  We had

13   discussed it a lot in the Leadership Arlington class that I

14   mentioned earlier.  So it sat empty for a while and then

15   finally it had gained a tenant, and it was Nestle that was

16   moving in there.

17   Q.   Okay.  And you showed a picture -- oh, I see.  You sent him

18   the Journal article.

19   A.   Yeah, the *Washington Business Journal* article.

20   Q.   *Washington Business Journal* that you had the subscription

21   to.  And then again it's over on -- there's another one on the

22   next page, on page 16?

23            THE COURT:  All right.  It's time for us to recess for

24   lunch until 2:15.

25            THE LAW CLERK:  All rise.

1      (JURY OUT AT 1:00 P.M.)

2      (PROCEEDINGS ADJOURNED, LUNCH RECESS TAKEN AT 1:01 P.M. ~

3   OFF THE RECORD.)

4                              -oOo-

5

6

7

8   UNITED STATES DISTRICT COURT    )

9   EASTERN DISTRICT OF VIRGINIA    )

10

11          I, JULIE A. GOODWIN, Official Court Reporter for

12   the United States District Court, Eastern District of Virginia,

13   do hereby certify that the foregoing is a correct transcript

14   from the record of proceedings in the above matter, to the best

15   of my ability.

16          I further certify that I am neither counsel for,

17   related to, nor employed by any of the parties to the action in

18   which this proceeding was taken, and further that I am not

19   financially nor otherwise interested in the outcome of the

20   action.

21          Certified to by me this 13TH day of DECEMBER, 2021.

22

23                          /s/_____
                            JULIE A. GOODWIN, RPR
24                          Official U.S. Court Reporter
                            401 Courthouse Square
25                          Eighth Floor
                            Alexandria, Virginia  22314

108

1                                    <u>**INDEX**</u>

2

3    **DECEMBER 9, 20212 ~ DAY 2, AM SESSION**

4                                                        <u>**PAGE**</u>

5

    **WITNESSES ON BEHALF OF THE PLAINTIFF:**
6        **CHRISTOPHER CLARK**

    Direct Examination by Ms. Choe (Continued)..............   3
7    Cross-Examination by Mr. Cummings......................   43

8    Court Reporter's Certification......................... 107

9                              -oOo-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        ─Julie A. Goodwin, CSR, RPR

                        12/9/21  ~  AM Session

1                      <u>EXHIBIT INDEX</u>

2

3
     **DECEMBER 9, 2021 ~ DAY 2, AM SESSION**
4

5                                       <u>PAGE ADMITTED</u>

6
     Plaintiff Exhibit 166......................        8
7

8                            -o0o-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Julie A. Goodwin, CSR, RPR