**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 22-1157**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff – Appellant,

   v.

CHRISTOPHER CLARK,

        Defendant – Appellee,

and

WILLIAM WRIGHT,

        Defendant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:20–cv–01529–CMH–JFA)

Argued: December 7, 2022           Decided: February 23, 2023

Before AGEE, DIAZ, and QUATTLEBAUM, Circuit Judges.

Reversed and remanded by published opinion. Judge Quattlebaum wrote the opinion in which Judge Agee and Judge Diaz joined.

**ARGUED:** David Lisitza, UNITED STATES SECURITIES & EXCHANGE COMMISSION, Washington, D.C., for Appellant. Mark Davis Cummings, SHER, CUMMINGS & ELLIS, PLLC, Arlington, Virginia, for Appellee. **ON BRIEF:** Dan M.

Berkovitz, General Counsel, Michael A. Conley, Dominick V. Freda, Assistant General Counsel, UNITED STATES SECURITIES & EXCHANGE COMMISSION, Washington, D.C., for Appellant. David E. Sher, SHER, CUMMINGS & ELLIS, PLLC, Arlington, Virginia, for Appellee.

---

QUATTLEBAUM, Circuit Judge:

The Securities and Exchange Commission sued Christopher Clark for trading Corporate Executive Board, Inc. ("CEB") stock using inside information. The Commission alleged that Clark aggressively traded CEB stock after he received inside information about a potential merger from William Wright, Clark's brother-in-law and CEB's Corporate Controller. At trial, Clark moved for judgment as a matter of law under Rule 50(a)[1] at the conclusion of the Commission's case. He argued the Commission failed to present evidence that Wright possessed inside information about the merger at the time Clark began the relevant trading. And if Wright had no such information at that time, Clark contended, Wright could not have passed it on to Clark. The district court agreed and granted judgment for Clark.

In this appeal, the Commission insists that the evidence presented would permit a reasonable jury to conclude that Wright possessed the inside information and that Clark traded CEB stock after receiving it from Wright. Construing the evidence and all reasonable inferences from it in the light most favorable to the Commission, we agree. Thus, we reverse the district court's order granting judgment as a matter of law to Clark and remand for further proceedings consistent with this opinion.

---

[1] Prior to 1991, instead of the phrase "judgment as a matter of law," Rule 50(a) used the phrases "directed verdict" and "judgment notwithstanding the verdict." A 1993 Amendment note on Rule 50(a) emphasizes that the "judgment as a matter of law" language was amended in only a stylistic manner and does not change the standard under which Rule 50(a) motions should be granted.

I.

The Commission alleged Clark began trading CEB stock using inside information from Wright on December 9, 2016. This appeal's critical issue is whether the Commission presented evidence from which a reasonable jury could conclude that Wright possessed inside information about CEB's merger—which he then could have passed on to Clark—by that date.[2]

A.

In August 2016, CEB announced that its Chief Executive Officer and Chairman Tom Monahan would be stepping down. After that announcement, but while Monahan was still CEO and Chairman, several companies contacted him about the possibility of merging with or acquiring CEB. One was Gartner, Inc.

In October 2016, the chief executive officer of Gartner asked if CEB would be interested in merging. On November 1 and 2, Monahan discussed Gartner's interest with the CEB board of directors and a select few employees. The board decided that merging with Gartner was not in CEB's best interests at that time. So, Monahan relayed that information to Gartner.

On November 3, Wright communicated by email with Barron Anschutz, CEB's Chief Accounting Officer. Wright and Anschutz were not just co-workers; they were close

---

[2] There is no dispute that Wright had inside information by mid-December 2016. Likewise, there is no question that Clark continued trading CEB stock after mid-December. Thus, one might question why Clark's continued trading with potential inside information does not create liability, whether or not he had inside information from Wright on December 9. But at oral argument, the Commission expressly abandoned that theory of liability. So, we do not consider it.

friends. They talked daily, ate lunch together regularly, co-owned a vacation house and were in a weekly poker game. In the emails, Wright and Anschutz discussed the effect of a change in control of CEB—which a merger would be—on unvested employee stock options—which they both had. The Commission presented no direct evidence that, in early November, either Anschutz or Wright knew that CEB's board considered Gartner's merger inquiries. But the emails about the effect of a change of control on their stock options took place just one day after the board discussed that topic.

Gartner continued to pursue a merger with CEB. On November 7, it sent a confidential letter to Monahan outlining a non-binding proposal to acquire CEB for $68 per share. On November 18, the CEB board declined the offer. On November 21, Gartner increased its offer to $73 per share. But CEB's board rejected it as well.[3] CEB and Gartner continued discussions over the next few weeks with Gartner continuing to increase its offer price. On December 7, Gartner increased its offer to $77 per share. Finally, on December 9, the CEB board agreed with that proposed per share price and decided to move forward with due diligence and to negotiate a definitive merger agreement.

During the time Gartner's offers were increasing, CEB informed more of its senior management about the negotiations. CEB referred to these communications as being "brought under the tent." J.A. 812:21–22. Anschutz testified that CEB brought him under the tent around Thanksgiving.

---

[3] To compare how the prices Gartner offered related to the market price of CEB stock, on November 1 CEB's stock price was $48 per share. On November 30, it was $58.95 per share.

Throughout November and December, Wright was in almost constant contact with Anschutz. Wright was also in regular communication with Clark. And in December, Wright began reaching out to employment recruiters. He spoke to one employment recruiter on the phone on December 8, and Wright sent a thank you email to that recruiter the next day.

On December 9, the day CEB's board decided to proceed with the merger, Clark began the aggressive trading in CEB stock. Clark liquidated $4,000 from his wife's retirement account to purchase 40 CEB call options. Call options allow investors to profit on share prices going up by permitting the owner of the call option to buy shares at an agreed price—called a strike price. If the market value of the stock rises above the strike price, the investor can profit by buying shares at the strike price—even though the market value is higher. *See generally Put and Call Options Under Section 16 of the Securities Exchange Act*, 69 Yale L.J. 868, 869–70 (1960). But the risk in call options—absent inside information—is the uncertainty of whether the company's stock price will in fact increase above the strike price. *See generally id.* at 868–71. Before December 9, Clark had only purchased CEB call options once before, in April 2008.

Clark purchased the CEB call options with strike prices of $65 and $70 per share and expiration dates in January, February and March. He bought more call options on December 12, 13, 14, 15, 20, 22, 27, and 29 and on January 3 and 5. To finance these trades, Clark took out a line of credit at a 9% interest rate and borrowed against his car. Clark told his son to make similar purchases during the same period.

Anschutz and Wright left for a business trip to London on December 11. Anschutz said he brought Wright under the tent while they were on the trip.

CEB and Gartner continued with due diligence in December. On January 4, they approved the merger and then announced it the next morning. After this announcement, CEB's stock price increased. During December, CEB shares traded between $57.70 and $60.60. But on January 5, 2017, the price of CEB stock closed at $74.85.

On January 5, Clark and his son began to exercise their call options. Since their strike prices were now less than the market price of the CEB stock, they made a lot of money. All told, by spending $33,050, Clark cleared $245,230 in profit. And by spending $5,300, his son profited $53,050.

During this time, Wright continued email communications with employment recruiters. In emails from January, Wright told the recruiters that he was working on the merger on December 8—the day before Clark's trading began. In another email from January, he stated that he had been working on the merger "[f]or the last few months." J.A. 919.

On January 12, the Financial Industry Regulatory Authority ("FINRA") began an investigation related to the CEB/Gartner merger.[4] Clark and Wright had a 47-minute phone call three days later.

---

[4] In response to questions from FINRA, Wright acknowledged Clark was his brother-in-law and that he saw Clark at holiday events. But he said that between September 29, 2016, and January 4, 2017, they only spoke every month or two.

Pursuant to FINRA's investigation, CEB reported that Anschutz learned of the potential merger on November 1. After the FINRA investigation, the FBI questioned Clark and his son about their parallel trading patterns of CEB stock. Clark and his son told the FBI that they never discussed those CEB transactions with each other. Both admitted at trial that those statements were not true.

B.

The Commission sued Wright for providing insider information and Clark for trading on that information. Just before trial, Wright settled without making any admission of wrongdoing. The case proceeded to trial as to Clark. The Commission presented evidence consistent with the facts described above. After the Commission's case in chief, Clark moved for judgment as a matter of law under Rule 50(a). Clark maintained that the Commission presented only speculative evidence that Wright had the insider information before December 9, the day his recent flurry of CEB stock trading began. According to Clark, the Government's evidence was insufficient to show that Wright possessed inside information about CEB's merger. And if there was insufficient evidence that Wright had inside information on or before December 9, Clark argued, Wright could not have passed it on to him.

The district court granted Clark's motion from the bench. The Commission in turn timely appealed the district court's order granting judgment as a matter of law.[5]

---

[5] We have jurisdiction to hear this appeal under 28 U.S.C. § 1291.

II.

In considering the Commission's appeal, we begin with our standard of review.[6] Then we will review the applicable law to insider trading claims like the ones pressed by the Commission here before analyzing the evidence presented by the Commission.

A.

Under Rule 50(a), a motion for judgment as a matter of law is appropriate when "a party has been fully heard . . . and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party." Fed. R. Civ. P. 50(a)(1). We review orders granting judgment as a matter of law de novo, viewing the facts and drawing all reasonable inferences from them in favor of the nonmoving party. *Towler v. Sayles*, 76 F.3d 579, 581 (4th Cir. 1996). Courts must not weigh evidence, determine witness credibility "or substitute [] judgment of the facts for that of the jury." *Lust v. Clark Equip. Co., Inc.*, 792 F.2d 436, 438 (4th Cir. 1986). Even so, to defeat the motion for judgment as a matter of law, the nonmovant must present more than a scintilla of evidence to support its claim. *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660–61 (4th Cir. 1993).

B.

Before applying that standard, we briefly review the law pertaining to the Commission's civil claim against Clark. Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's corresponding Rule 10b-5 prohibit

---

[6] "Like offensive linemen on a football team, standards of review lack glamour but are often decisively important." *Portillo-Flores v. Barr*, 3 F.4th 615, 649 n.11 (4th Cir. 2021) (en banc) (Quattlebaum, J., dissenting).

persons under a duty of trust and confidence from secretly using inside corporate information that is not disclosed to the public for personal advantage. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. This duty of trust and confidence that requires abstention from trading extends to a tippee when he acquires the information from a tipper. *Salmon v. United States*, 137 S. Ct. 420, 423 (2016). To impose liability, the Commission must prove—by a preponderance of the evidence—that the tippee knew "the information was disclosed in breach of the tipper's duty, and the tippee . . . trad[ed] in disregard of that knowledge." *Id.*

The Supreme Court has ruled that a "tippee's liability for trading on inside information hinges on whether the tipper breached a fiduciary duty by disclosing the information." *Id.* (citing *Dirks v. SEC*, 463 U.S. 646, 664 (1983)). But because a defendant or interested party rarely makes a statement or reveals information that amounts to direct evidence of impermissible trading based on confidential insider information, the Commission may present circumstantial evidence to meet its burden of proof. *Dirks*, 463 U.S. at 663–64. Circumstantial evidence, if it meets all the other criteria of admissibility, "is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (quoting *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508, n.17 (1957)). That said, conjecture and speculation from the nonmovant are insufficient to overcome a motion for judgment as a matter of law. *See Moskos v. Hardee*, 24 F.4th 289, 299 (4th Cir. 2022).

C.

With our standard of review and the legal requirements for an insider trading claim in hand, we return to the question presented by this appeal: Could a reasonable jury infer, based on the evidence the Commission presented during its case in chief, that Clark engaged in insider trading based on insider information from Wright?

The district court determined the answer was no. It explained that Anschutz "testified that he didn't tell Wright until [] in December when he came back from England" and that the court was "having trouble . . . coming up with any circumstantial evidence that would justify a finding that Mr. Clark got insider information and took some action on it." J.A. 854:11–13; 855:22–24. The court also noted that Clark had traded CEB options "long before [the Commission] alleged he got some insider information." J.A. 856:8–9.[7] And it

---

[7] Clark actively traded CEB put options between 2008 and 2016. While a call option bets on a company's share price going up, a put option bets on it going down. *See Put and Call Options Under Section 16 of the Securities Exchange Act*, *supra*, at 869–70. If an investor purchases a put option for a company's stock, the put allows the investor to sell that stock at a certain price—called the strike price—within a specified time period. *See generally id.* at 893. If the market price of the stock falls below the strike price, the owner of the put can buy the stock at the lower market price and make a profit by selling it at the higher strike price. *See generally id.* At the time Clark bought put options for CEB stock, his brother-in-law Wright possessed inside information about the company's quarterly financial results. And he and Clark were in regular communication. While the Commission presented no direct evidence Wright passed the confidential information about CEB's financial data to Clark, it would not be unreasonable to conclude that did occur because Clark purchased put options that always expired the month following the release of the CEB quarterly financial reports and always bet on the stock price to go down. And it almost always did. Out of 18 put transactions, the CEB stock price declined 15 times. In all but a few instances, the market price fell below the strike price, allowing Clark to make a profit. In one example from July 2015, Wright learned that CEB would have disappointing quarterly earnings which would be made public in three days. He spoke to Clark on the phone within an hour of learning this information. Clark then opened a $15,000 line of

11

said that Clark, other than the lies to the FBI about his son's CEB trades, "seemed perfectly honest . . . about what he had done and what he didn't do." J.A. 860:2–3. As for Clark's financial situation, the court stated, "this wasn't a man who was desperate for money. At all times during this entire situation and before, his assets far exceeded his liabilities." J.A. 860:8–10. Thus, the court found nothing suspicious about Clark's CEB stock transactions beginning December 9 and there was "no circumstantial evidence here that gives rise to an inference that he received the insider information, as has been alleged here." J.A. 860:22–24. Because the Commission's evidence did not give "rise to an inference that he received the insider information," the district court held that it had the duty to grant Clark's motion for a judgment as a matter of law. J.A. 860–61.

But the district court failed to consider the evidence in the light most favorable to the Commission. In emails on November 3, Anschutz and Wright discussed the effect of a transaction like a merger on unvested CEB stock, which they both had. And Anschutz and Wright exchanged these emails just one day after CEB's board responded to Gartner's initial merger offer.

Then, in early December, when the stock price Gartner offered in its merger proposal reached a price acceptable to CEB, Wright began emailing employment recruiters.

---

credit the next day to fund a purchase of $27,000 CEB put options set to expire in August. After the two spoke on the phone the next morning, Clark purchased more of the same trades. CEB stock price fell 11% after it released its quarterly earnings and Clark made a profit of $82,880 when he exercised his put options. One way of viewing this evidence is the way the district court did—that Clark had a history before December 9 of speculating in call/put type transactions. Another way is that the evidence shows an opportunity and pattern of trading CEB with inside information from Wright. *Cf.* Fed. R. Evid. 404(b).

In later emails, he said that he had been working on the merger with Gartner when the recruiters first contacted him—which was before December 9. In another email in January, Wright told recruiters he had been working on the merger for months.

Finally, while there is a dispute about when Anschutz learned about the merger negotiations, Anschutz testified that he at least knew by Thanksgiving—before Clark began the trades at issue here. And Anschutz and Wright were close friends who saw each other frequently and communicated by text and phone daily throughout November and December.

From this evidence, a jury could have reasonably concluded that Wright had inside information about the merger before Clark began buying call options on December 9—the very day that the Board approved the merger. In fact, Wright corroborated that inference in the January emails with recruiters. True, Clark insists the emails to recruiters were just "puffery" designed to make Wright a more attractive candidate. J.A. 2007–08. True, the November 3 emails were before CEB accepted Gartner's offer and before the share price Gartner offered reached a level that was acceptable to CEB. And true, there was no direct evidence that Anschutz told Wright about the merger before December 9. But our job in reviewing an order granting a motion for judgment as a matter of law is not to decide whether Wright in fact possessed inside information before December 9; it is to decide whether there was evidence from which a reasonable jury could have concluded that he had such information. And there was.

There was also evidence from which a reasonable jury could have concluded that Wright passed inside information about the merger to Clark before December 9. First, the

13

trades began on December 9, the very day CEB accepted Gartner's offer. Second, until those transactions, Clark had only once before traded in CEB call options, nearly a decade earlier. Instead, he had always bought put options, which bet on the company's value to go down. Third, he did not just bet on CEB's share price to go up; Clark went to extraordinary measures to buy the call options. He emptied his wife's retirement account, borrowed money at a 9% interest rate, and took out a loan secured by his car to fund the purchases. In total, he bought call options ten times in less than a month. Fourth, he advised his son to make similar purchases and later lied to the FBI about whether he had done so.[8] And fifth, his trades proved remarkably lucrative. The $245,230 he made in profit from purchases of $33,050 represented a return on investment of over 700%. A jury considering all of this evidence could reasonably infer that Clark received inside information from Wright and used it to aggressively trade in a way that would be reckless if he did not have inside information.

In reversing the district court's order, we are not suggesting Clark is liable for insider trading. A jury could reasonably decide that Wright did not have any inside information about the merger by December 9. As the district court noted, Clark had speculated on CEB stock for many years. And he professed to have an investment strategy that explained his December 9 transactions. But to repeat, in considering a motion for a

---

[8] The district court stated that Clark seemed to be honest. But credibility determinations are not appropriate in considering a motion for a judgment as a matter of law and should be left to a jury. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). That is particularly true here when we know Clark had lied to federal authorities.

judgment as a matter of law, our task is only to decide whether there is evidence from which a reasonable jury could have decided that Clark was liable.

III.

The right to a trial by jury is enshrined by the Seventh Amendment. And the Federal Rules of Civil Procedure require that juries, not judges, decide cases so long as there is evidence from which a reasonable decision can be made. Here, evidence existed from which a reasonable jury could infer that Clark engaged in prohibited insider trading beginning on December 9, 2016. We, therefore, reverse the district court's order granting Clark's motion for judgment as a matter of law and remand for proceedings consistent with this opinion.

*REVERSED AND REMANDED*